HENNIGAN, BENNETT & DORMAN LLP
BRUCE BENNETT (Cal. Bar No. 105430)
JOSHUA M. MESTER (Cal. Bar No. 194783)
MICHAEL C. SCHNEIDEREIT (Cal. Bar No. 234956)
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234

*Proposed Reorganization Counsel for
Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re*<br><br>CALIFORNIA COASTAL COMMUNITIES, INC., et al.[1]<br><br>Debtor. | Case No. 09-21712-TA<br><br>CHAPTER 11<br><br>(Request for Joint Administration Pending)<br><br>**DECLARATION OF RAYMOND J. PACINI IN SUPPORT OF FIRST DAY MOTIONS FILED BY CALIFORNIA COASTAL COMMUNITIES, INC. ET AL., AND AFFILIATED DEBTORS**<br><br><u>Hearing</u><br>Date: TBD<br>Time: TBD<br>Place: Courtroom "5B"<br>     411 West Fourth Street<br>     Santa Ana, CA 92701-4593 |

I, Raymond J. Pacini, do hereby declare that:

1. I am and have been the director, President, and Chief Executive Officer of Debtor California Coastal Communities, Inc. ("<u>CALC</u>") (together with its debtor subsidiaries identified

---

[1] The Debtors include the following entities: California Coastal Communities, Inc., Signal Landmark Holdings Inc.; Signal Landmark; Hearthside Holdings, Inc.; Hearthside Homes, Inc.; HHI Chandler, L.L.C.; HHI Chino II, L.L.C.; HHI Crosby, L.L.C.; HHI Hellman, L.L.C.; HHI Lancaster I, L.L.C.; and HHI Seneca, L.L.C.

1

761073.5

1       below, collectively, the "Debtors"), since May 1998.  Prior to that time, I was CALC's Executive

2       Vice President, Chief Financial Officer, Secretary, and Treasurer.  I am also an officer and member

3       of the board of each of the other Debtors.

4              2.      In my various capacities with the Debtors, I have generally supervised the Debtors'

5       operations, conducted extensive analyses of the Debtors' financial structure, analyzed ways in which

6       their operations could be improved, analyzed the Debtors' current cash flow, assumed a primary role

7       in discussing the financial condition of the Debtors with their lenders and other creditors and

8       generally supervised and advised on all aspects of the Debtors' business operations.  As a result of

9       the foregoing, I am thoroughly familiar with the Debtors' business operations, their financial

10      condition, their cash flow and debt structure.

11             3.      Also in my various capacities with the Debtors, I perform management functions

12      including, without limitation, overseeing the daily financial and business operations of CALC and

13      its debtor and non-debtor subsidiaries, participating in negotiations, and implementing financial and

14      operational activities.  I am consequently thoroughly familiar with the assets and liabilities of the

15      Debtors, their policies and practices with respect to employee wages, salaries, and other benefits,

16      their cash management system, and other aspects of the Debtors' financial reporting.

17             4.      Except where otherwise noted, I have personal knowledge of the facts set forth in this

18      Declaration, and I have familiarized myself with the books and records of the Debtors (or

19      compilations and summaries of those books and records) sufficient to form the opinions stated

20      herein.  If called and sworn as a witness, I could and would testify competently to such facts.

21             5.      I submit this Declaration in support of the "first day" motions and applications

22      (collectively, the "First Day Motions") filed by the Debtors in connection with their voluntary

23      petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code") on October

24      27, 2009 (the "Petition Date").  The purpose of this Declaration is to acquaint the Court and other

25      parties in interest with the nature of the Debtors' businesses, the reasons for the commencement of

26      these chapter 11 cases, and the basis for the First Day Motions.  The first part of this Declaration

27      describes the Debtors' business and the developments that led to the filing of these cases.  The

28      second part of this Declaration sets forth other relevant facts in support of the First Day Motions.

761073.5

## BACKGROUND

6. Debtor California Coastal Communities, Inc. ("CALC"), a publicly traded company on the NASDAQ (ticker: CALC), and its subsidiaries are in the business of residential land development and homebuilding with properties owned or controlled in various counties in Southern California. The Debtors' principal activities are: (1) obtaining zoning and other entitlements for land that they own or for other landowners under consulting contracts; (2) improving the land for residential development; and (3) designing, constructing, and selling single-family homes on that land. Debtor Hearthside Homes, Inc. ("Hearthside Homes") performs construction and marketing functions for the Debtors' projects. Since 1994, the Debtors have delivered over 2,200 homes to families in Southern California.

7. Currently, the Debtors' largest project is "Brightwater," a 356 unit master planned community located on 105 acres of the Bolsa Chica mesa in the City of Huntington Beach in Orange County, California. Brightwater offers a broad mix of four different neighborhoods (The Trails, The Sands, The Cliffs, and The Breakers) with home choices ranging from 1,710 to 4,339 square feet and overlooks the Pacific Ocean and the recently restored 1,300-acre Bolsa Chica Wetlands. The Brightwater project is one of the last remaining ocean-front developments in Southern California. To date, the Debtors have delivered 53 homes in Brightwater to individual home buyers and 17 model homes to an investor, and have 17 homes in escrow to be delivered to individual home buyers starting November 2, 2009.

8. The Debtors also have two other projects. Debtor Signal Landmark owns The Ridge, which is being planned for 22 homes on five acres located near Brightwater, and Debtor HHI Lancaster I, LLC owns 73 unimproved lots in Lancaster, California and 54 improved lots at Quartz Hill in Lancaster, California. The first two of these projects are in early stages of development. Quartz Hill is partially constructed having delivered 23 completed homes to individual home buyers.

## THE DEBTORS' CAPITAL STRUCTURE AND OUTSTANDING INDEBTEDNESS

*The Brightwater Project Indebtedness*

9. On September 15, 2006, the Debtors entered into that certain Senior Secured Revolving Credit Agreement (the "Prepetition Revolving Credit Agreement") with KeyBank

National Association, as agent (the "Revolver Agent") and lender and the lenders a party thereto (the "Revolving Lenders") in the maximum amount of $100,000,000. The obligations under the Prepetition Revolving Credit Agreement are secured by liens against the Brightwater Project. As of the Petition Date, approximately $81,679,317.58 in principal, plus accrued and unpaid interest, fees and expenses, remained outstanding under the Prepetition Revolving Credit Agreement.

10. On September 15, 2006, the Debtors entered into that certain Senior Secured Term Credit Agreement (the "Prepetition Term Loan Agreement" and together with the Prepetition Revolving Credit Agreement, the "Prepetition Credit Agreements") with KeyBank National Association, as agent (the "Term Loan Agent" and together with the Revolver Agent, the "Prepetition Agent") and lender and the lenders a party thereto (the "Term Loan Lenders" and together with the Revolving Lenders, the "Prepetition Secured Lenders") in the maximum amount of $125,000,000. The obligations under the Prepetition Term Loan Agreement are secured by, among other security, liens against the Brightwater Project and equity interests in certain direct and indirect subsidiaries of CALC. As of the Petition Date, approximately $99,800,000 in principal, plus accrued and unpaid interest, fees and expenses, remained outstanding under the Prepetition Term Loan Agreement.

11. Since September 2006, the Debtors have used the proceeds of the Prepetition Credit Agreements to develop, improve, and construct the Brightwater project, including the construction of homes to be delivered to individual homebuyers.

*The Quartz Hill Project Indebtedness*

12. On or about November 23, 2005, HHI Lancaster I, LLC entered into a Building Loan Agreement with IndyMac Bank, FSB in the principal amount of $17,674,330 (the "Quartz Hill Loan Agreement") the proceeds of which were to be used for the development and construction of a 77 lot subdivision in Lancaster, California commonly referred to as "Quartz Hill." The obligations under the Quartz Hill Loan Agreement are secured by liens against the Quartz Hill project and guaranteed by Hearthside Homes. Prior to the Petition Date, the Quartz Hill Loan Agreement was assigned to One West Bank. As of the Petition Date, approximately $2.9 million was outstanding under the Quartz Hill Loan Agreement.

4

761073.5

# EVENTS LEADING UP TO THE
# COMMENCEMENT OF THE CHAPTER 11 CASES

13. After commencing construction in 2006, the Debtors opened The Trails and The Sands neighborhoods (the smaller homes in the Brightwater project ranging from 1,710 to 2,160 square feet) in Brightwater in August 2007, which was also the start of the worldwide financial crisis. During that year, the Debtors sold nine homes in The Trails and The Sands neighborhoods. In March 2008 (the same weekend as the collapse of Bear Stearns), the Debtors opened The Cliffs and The Breakers neighborhoods (the larger homes in Brightwater ranging from 2,724 to 4,339 square feet, 61 of which have unobstructed ocean views). During 2008 Debtors sold 23 homes across all four neighborhoods. Unfortunately, shortly after the commencement of construction and release of homes, the financial and housing markets took a precipitous decline, new home sales slowed dramatically, and credit markets for residential home buying tightened to historical levels.

14. As a result, in the summer of 2008, the Debtors were forced to negotiate amendments to the Prepetition Credit Agreements in an effort to extend the repayment of that indebtedness in hopes of weathering the economic storm. However, such negotiations preceded the September 2008 collapse of Lehman Brothers that in turn sparked one of the worst financial crises in history. In fact, while these amendments were executed on September 30, 2008, the terms of the amendments were based on operational forecasts developed much earlier in 2008 and therefore could not have anticipated the devastating economic collapse that occurred in the fourth quarter of 2008.

15. Thereafter, the Debtors commenced an intense effort to raise additional capital through the sale and leaseback of 17 model homes at Brightwater, negotiated the sale or transfer of their two largest inland projects in Corona and Beaumont, California to their lender and a third party, respectively, and reduced general administrative, overhead and operational costs in order to minimize the effect of the financial crisis on its ability to repay its debt obligations. These cost saving efforts have enabled the Debtors to continue to perform their obligations to their trade creditors keeping substantially current on these obligations.

16. In addition to reducing costs, the Debtors explored options with strategic alternatives in order to satisfy mandatory prepayments under the amended Prepetition Credit Agreements.

5
761073.5

Signal Landmark was able to sell 17 model homes at Brightwater to an investor, IHP Capital Partners, through a sale leaseback transaction. This transaction generated approximately $22.5 million in cash, which was used to make required repayments under the Prepetition Credit Agreements. The transaction with IHP also preserved the Debtors ability to continue to use the model homes to generate future sales at Brightwater and provided for profit sharing between the Debtors and IHP when the model homes are sold in the future.

17. While the Debtors' cost-cutting measures have improved operations and reduced overhead costs, the credit market for home buyers remains tight and, until recently, home sales have remained sluggish. As a result, the Debtors commenced discussions with the Prepetition Agent in July 2009 to restructure the obligations under the Prepetition Credit Agreements over a longer period of time to allow market conditions to recover. During those discussions, on September 30 2009, CALC missed a $1.7 million mandatory principal payment under the Prepetition Revolving Credit Agreement and failed to satisfy a loan to value covenant. These defaults also triggered defaults under the Prepetition Term Loan Agreement. The Debtors were able to enter into forbearance agreements with the Prepetition Agent and the Prepetition Lenders to enable the parties to have further discussions regarding a consensual restructuring of the Prepetition Credit Agreements. Under the forbearance agreements, the Prepetition Agent and the Prepetition Lenders agreed to forbear from exercising any remedies until November 1, 2009.

18. The Debtors and the Prepetition Agent used the forbearance period to continue their dialogue on a consensual restructuring of the Prepetition Credit Agreements. On October 14, 2009, CALC failed to make required interest payments under the Prepetition Credit Agreements, which in turn terminated the forbearance agreements. Despite the occurrence of additional defaults, the Debtors and the Prepetition Lenders continued to discuss the proposed restructuring.

19. In light of the defaults under the Prepetition Credit Agreements and previously scheduled reductions in commitments under the Prepetition Revolving Credit Agreement, the Debtors have lost the ability to borrow additional amounts under the Revolving Credit Agreement. While the Debtors have continued to pay their suppliers, their liquidity has dropped significantly. In order to preserve liquidity to continue to construct homes, maximize the value of the Brightwater

761073.5

project and the Debtors' business, the Debtors commenced these cases in order to capture the expected proceeds from the sales of approximately 17 Brightwater homes that are expected to close over the coming months, seven of which are scheduled to close in November 2009 with another two scheduled to close in December 2009.

20. The Debtors nevertheless remain optimistic about Brightwater's potential, due to its unique coastal location, the extremely limited supply of new homes on the Southern California coast, and the absence of significant competition due to the lack of available land for the development of new single family detached homes. Indeed, even though the project has not been immune to the effects of the unstable mortgage and housing markets, it continues to enjoy significant weekly traffic and the number of prospects considered to be motivated buyers appears to have increased since the end of the first quarter of 2009. Indeed, during the quarter ended September 30, 2009 the Brightwater project generated 15 net new sales orders compared with six net new orders in the comparable quarter of 2008, and 11 net new orders in the second quarter of 2009. As of October 26, 2009, the Company has 17 Brightwater homes in backlog with an aggregate sales value of $20.8 million.

21. Thus, while market conditions may continue to be challenging in the near future, the Debtors believe that they can emerge from bankruptcy in a strong position to take advantage of a housing and economic recovery.

## **THE FIRST DAY MOTIONS**

22. The Debtors filed the various First Day Motions in order to enable them to continue to operate effectively as debtors in possession and to maximize the value of their bankruptcy estates. For the reasons described below, I believe that the relief sought by the Debtors in the First Day Motions is critical to preserve the value of the bankruptcy estates, and that failure to grant such relief would have a tremendously deleterious effect upon the Debtors' business, the Debtors' ability to successfully restructure its financial and operational affairs, and the ultimate success of this reorganization.

761073.5

## I. THE MOTION FOR JOINT ADMINISTRATION

23. By the "Motion for an Order Directing Joint Administration of Debtors' Cases and Estates Pursuant to Bankruptcy Rule 1015(B)," the Debtors request an Order directing the joint administration of their chapter 11 cases and estates pursuant to Bankruptcy Rule 1015(b).

24. I believe that the burdens on the Court, the Clerk of the Court, the Debtors, and parties in interest would be increased materially if these cases were not jointly administered and separate dockets were maintained for each Debtor. Given the connected nature of the Debtors' various operations and indebtedness, in the absence of joint administration I believe that virtually every paper filed in the case of one Debtor likely would have to be duplicated and filed in the case of the other Debtors. Accordingly, I submit that joint administration of these cases will limit such duplication and, as a consequence, will promote the interests and convenience of all parties and will reduce the costs and expedite the administration of these cases.

## II. THE PREPETITION WAGES MOTION

25. The Debtors collectively employ approximately 35 employees,[2] whose duties range from handling clerical and administrative tasks to performing critical operations functions. Many of the Debtors' employees are highly experienced in home sales, marketing, construction, or other facets of the real estate industry.

26. I believe that our workforce is second to none and has tremendous familiarity with the Brightwater project. Dedication, attention to quality, and exceptional customer-oriented service have always been key elements of the Debtors' business strategy. To that end, the Debtors have invested in recruiting and training employees who can provide the highest level of professionalism and service to customers.

27. I believe that it is essential to the survival of the Debtors' business that the Debtors be permitted to retain their current employees. It would be expensive and redundant for the Debtors to hire new employees at this time, requiring a substantial investment in recruiting and employee training at precisely the time at which the Debtors can least afford it. Retaining the current

---

[2] CALC employs six full-time employees and one part-time employee. Debtor HHI employs 23 full-time employees, four part-time employees, and one part-time temporary employee.

8

761073.5

employees, by contrast, would permit the Debtors to retain the knowledge and experience that is one of the Debtors' major intangible assets.

28. For example, employees handling the marketing and sale of homes have already gained a comprehensive knowledge of the intricacies of Brightwater, and are familiar with key selling points and customer concerns. It would take an extended period to train new employees to achieve the same level of efficiency and would essentially squander the sunk costs that the Debtors have already invested in training and developing their employees.

29. Due to the recent financial turmoil in the real estate markets, the Debtors have already undertaken to trim their workforce to the maximum extent. Since September of 2007, the Debtors reduced their workforce by a full 50%, from 66 to 33 full time equivalent employees. As a result, the Debtors now operate as leanly and efficiently as possible. However, the reductions also make the Debtors' remaining employees invaluable to the Debtors' reorganization efforts and continued operations. Any further reductions to the workforce would significantly impair operations and impact the Debtors' financial bottom line.

30. I believe that employee support for the Debtors' reorganization efforts is critical to the success of those efforts, given the need to continue the construction, marketing, and sale of homes. Without the continued construction and sale of homes, there is no way for the Debtors to generate cash to operate their business. At this critical stage, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in workforce morale attributable to a failure to pay accrued, but unpaid, prepetition wages, employee expenses, and earned commissions, or the failure to continue to provide the Employee Programs.

31. The Debtors routinely require employees to pay for certain expenses such as travel and meal costs incurred during sales functions out of their own funds and later submit reimbursement requests to the Debtors. The Debtors process these reimbursement requests as they are submitted, by issuing checks drawn against their own bank account. The Debtors believe that the amount of outstanding expense reimbursement checks that remain uncashed for the period ended on or prior to the Petition Date is approximately $500.

9

761073.5

32. The expense of the Employee Programs is not substantial under the circumstances of these cases. Specifically, I estimate that the aggregate cost of maintaining the Employee Programs on a monthly basis will be no more than $30,000, a sum that pales in comparison to the value generated by the Debtors' workforce, or the cost of replacing that workforce. In fact, all prepetition amounts due for the Employee Programs were paid prepetition. However, the Debtors do accrue paid time off for all employees and paid sick leave for certain employees that employees use in the ordinary course of business. The maximum accruable amount of paid time off per employee is 280 hours. The twenty-five employee equivalents at debtor Hearthside Homes have accrued 4,304 hours, for a total value of $203,118. The seven employee equivalents at CALC have accrued 938 hours, for a total value of $93,186. The Debtors discontinued their sick leave accrual program on December 31, 2006, at which time they transitioned to a paid time off program for all leave. There are however accrued sick leave hours that were grandfathered in to the new program. There are 3,186 grandfathered hours for sixteen employee equivalents of Hearthside Homes, for a total value of $171,697. There are 720 grandfathered hours for three employee equivalents at CALC, for a total value of $77,651. Based on the foregoing, the Debtors estimate that the aggregate amount of accrued paid time off and sick leave is approximately $565,652.

33. The Debtors also match a small part of their employees' contributions to their 401(k) plan. This match is only provided to non-highly compensated employees. The current monthly matched amount is approximately $1,200 in the aggregate. However, it is not possible to estimate the amount of the monthly match with precision on a going forward basis because it is calculated annually with reference to the number of non-highly compensated employees.

## III. THE CASH MANAGEMENT MOTION

34. The Debtors have established a sophisticated centralized cash management system to account for and maintain funds from their homebuilding and selling operations. The system is based upon a central CALC account that from time to time pays into or draws out of an investment account. From the central account, funds are disbursed to subsidiary accounts on a regular basis or as needed. A graphical representation summarizing the major components of the cash management system is attached to the Cash Management Motion as <u>Exhibit B</u> and incorporated by reference. In

10

addition, a schedule identifying substantially all of the Debtors' prepetition bank accounts (collectively, the "Prepetition Bank Accounts"), is attached to the Cash Management Motion as Exhibit C and incorporated herein by reference.

35. The principal components of the Debtors' centralized cash management system are as follows:

    a. Operating Account: The Debtors' centralized cash management system is designed around a main operating account (Account No. XXXX-XX2817), which is maintained at Union Bank by CALC (the "CALC Operating Account"). All funds received from CALC's operations are deposited into the CALC Operating Account. Excess funds from the CALC Operating Account are invested in the CALC Investment Account discussed below. The CALC Operating Account is also the source of all disbursements (except with respect to separate disbursement accounts maintained by Debtors Signal Landmark ("Signal"), Signal Landmark Holdings, Inc. ("Signal Holdings"), Hearthside Holdings, Inc. ("Hearthside Holdings"), and Hearthside Homes). Signal, Signal Holdings, Hearthside Holdings, and Hearthside Homes also maintain concentration/master operating accounts with Union Bank that are linked to the CALC Operating Account. The account numbers for those accounts are as follows: Signal (Account No. XXXX-XX2871) ("Signal Operating Account"), Signal Holdings (Account No. XXXX-XX0229), Hearthside Holdings (Account No. XXXX-XX2901), and Hearthside Homes (Account No. XXX-XX2569) ("Hearthside Homes Operating Account").

    b. Payroll Account: Hearthside Homes maintains a payroll account at Union Bank (Account No. XXXX-XX6360). This account is funded on the day prior to payment of Hearthside's and CALC's payroll. On the date that payroll is processed, a third-party payroll servicer debits the Payroll Account via ACH for all employee and employer payroll taxes. The remaining amount, for all but two employees, is automatically wired to the Debtors' employees. The remaining two employees receive checks issued from this account.

761073.5

  c. <u>Health/Dependent Care Account</u>: CALC maintains a health benefits and dependent care account under section 125 of Title 26 of the United States Code at Union Bank (Account No. XXXX-XX4298). This account is funded directly from the CALC and Hearthside Homes Operating Account and is swept automatically by the Debtors' section 125 plan administrator.

  d. <u>Investment Accounts</u>. The CALC Operating Account is also funded from an investment account (Account No. XXX5305), which is maintained at UBS by CALC (the "<u>CALC Investment Account</u>"), on an as needed basis to the extent funds are available. In addition to the CALC Investment Account mentioned above, Signal maintains an investment account at UBS (Account No. XXX7524) that currently does not have any funds. CALC also maintains two investment accounts or money market mutual funds at KeyBank Capital Markets ("<u>KBCM</u>") containing funds to satisfy interest payments due under the revolver and term loan agreements. As of the Petition Date, the KBCM Investment Accounts held an aggregate of $3,002,000 and were invested in commercial paper.

  e. <u>Interest Reserve Accounts</u>. CALC maintains two deposit accounts with KeyBank (the "<u>Interest Reserve Accounts</u>"). Funds designated to pay interest on the revolving loan facility are held in Account No. XX-XXXXXXXX2070, and funds earmarked to pay interest on the term loan facility are held in Account No. XX-XXXXXXXX2088.

  f. <u>Hearthside Homes, Inc. Brightwater Project Account</u>: Signal maintains an account at Union Bank (Account No. XXXX-XX1937) that is funded from the Signal Operating Account and is used to fund costs related to the Brightwater Project development for expenses such as construction, marketing and payroll.

36.  It is important that, to avoid substantial disruption to the normal operation of their business and to preserve a "business as usual" atmosphere, the Debtors be permitted to continue to use the Prepetition Bank Accounts. Allowing these accounts to be maintained with the same account numbers will assist the Debtors in accomplishing a smooth transition to operating under

12
761073.5

chapter 11. Many of the Debtors' transactions are accomplished through online transfers of funds from one account to another, the disruption of which would have a significant adverse impact on the Debtors' operations.

37. To protect against the possible inadvertent payment of prepetition claims, all banks with which the Debtors hold accounts have been or will be advised immediately not to honor checks issued prior to the Petition Date, except as otherwise ordered by the Court. The Debtors, moreover, have the capacity to distinguish clearly between prepetition and postpetition obligations and payments without closing existing accounts and opening new ones.

38. The Debtors would be subject to tremendous administrative burdens if they were required to close and reopen accounts and create an entirely new manual system for issuing checks and paying postpetition obligations. I believe that the Debtors would incur significant administrative expenses if required to recreate this system for the postpetition period.

39. In the ordinary course of their business, the Debtors use a multitude of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change.

## IV. THE MOTION TO LIMIT NOTICE

40. Given the number of creditors and parties in interest in these cases, and the significant number of notices that likely will be served, the requested limitations on notice are reasonable and appropriate, and in the best interests of the estates, because they will lessen the enormous administrative and economic burden that the Debtors, the Bankruptcy Clerk and the bankruptcy estates otherwise would incur in the service of notices to all creditors. Indeed, a requirement to provide notice to all creditors would substantially delay the provision of notice in each particular instance, place an enormous administrative burden on the Debtors' estates, and impede the consummation of transactions, negotiation of settlements, and the granting of other relief advantageous to the Debtors' estates, their creditors, and other parties in interest.

## V. THE SCHEDULES EXTENSION MOTION

41. Due to the size and complexity of the Debtors' businesses, the critical need to continue the operations of those businesses, and the limited staffing available to gather, process and complete the Schedules, the Debtors do not believe that fifteen days will be sufficient to permit a thorough and accurate completion of the Schedules. Specifically, in order to prepare the required Schedules, the Debtors must gather information from books, records and documents relating to a multitude of transactions and databases. This information must be gathered from the parent company and each of its 10 subsidiaries that together comprise the Debtors. Such assembly and analysis of necessary information will require an expenditure of significant time and effort on the part of the Debtors' professionals and employees. Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the Debtors require additional time to prepare and file the Schedules.

42. At this juncture, I estimate that an extension of thirty (30) additional days (for a total of forty-five (45) days to December 11, 2009) will provide sufficient time to prepare and file the Schedules. It is also important for the Court to authorize the Debtors to exclude current and former homebuyers from the list of creditors, schedules, and statement of financial affairs. It would be highly undesirable to burden homebuyers with the volume of notices that this case may generate. It is possible that the volume of notices will have a negative impact among homebuyers in the Brightwater project that the Debtors are currently trying to sell, and any loss of goodwill could likely adversely affect the interest of potential homebuyers.

## VI. WARRANTY OBLIGATIONS MOTION

43. The Debtors have offered and continue to offer warranties on all of the homes that they sell. The warranties add significant value to the homes sold by the Debtors in that they provide the Homebuyers with peace of mind and security. I believe that failure to honor the warranties after the Petition Date could have disastrous consequences to the Homebuyers. If such consequences were permitted to occur, the Debtors' would likely lose customers that are parties to existing sales contracts and also prospective customers, leading to potentially irreparable damage to the

14

761073.5

Brightwater project, the Debtors' brand and reputation. This could be fatal to a successful reorganization.

44. I am not aware of any significant existing claims under any warranty, but believe that it is critical that they be authorized to honor any warranty claim, including by utilizing the coverage for the claim under the Policies.

45. The Debtors have mitigated their exposure under the warranty obligations by obtaining various insurance policies ("Policies"). The Policies are issued on a per-project basis, such that all warranties offered on a particular project are subject to a single Policy. Each Policy requires the payment of a specified deductible for coverage of claims under the covered warranties, ranging from $15,000 - $100,000 per claim or occurrence.

## VII. MOTION TO SELL HOMES FREE AND CLEAR

46. The Debtors contract in the ordinary course of their business with individuals for the sale of completed homes, which includes, among other things, the residential structure, fixtures, non fixture appliances, the real property on which the structure is built, and any undivided interests in common areas (collectively, the "Homes") and sometimes to-order construction of Homes. The Debtors' ability to satisfy their existing contractual obligations to customers and to continue to contract for the sale of completed and ordered Homes, including by transferring title to homebuyers "free and clear" of liens, is the essence of the Debtors' business and must continue uninterrupted if the Debtors' reorganization is to succeed.

47. As of the Petition Date, the Debtors are parties to 17 contracts for the construction and/or sale of Homes in the Brightwater Project (the "Prepetition Sales Contracts"). The Debtors believe that they are authorized to continue to sell Homes in the ordinary course of business under Bankruptcy Code section 363(b) without the need for a court order. To provide clarity to the Debtors' customers and title insurers, however, the Debtors seek an order of this Court specifically authorizing the Debtors to close sales of Homes, pursuant to the Prepetition Sales' Contracts, as well as other contracts entered into during the pendency of these chapter 11 cases, when construction is finished and other conditions to closing are satisfied.

761073.5

48. In addition, the Debtors strive to make the home buying experience more convenient for their customers. To that end, the Debtors from time to time adopt certain customer-related programs designed to incentivize new purchases, enhance customer satisfaction, sustain goodwill and ensure that the Debtors remain competitive (the "Customer Programs"). Certain Customer Program obligations are reflected in the Prepetition Sales Contracts. Among other things, the Customer Programs may include the Debtors' agreement to pay brokers' or other closing fees on their customers' behalf. Because the Debtors anticipate that these chapter 11 cases may create some apprehension for homebuyers presently under contract with respect to the Debtors' ability to honor their contractual obligations, the Debtors seek specific authority to honor their prepetition obligations and commitments under Prepetition Sales Contracts, to modify such contracts to address market conditions or other negotiating changes as is necessary, and to provide additional appropriate incentives consistent with ordinary business practices in the homebuilding industry.

49. As part of their homebuilding operations, the Debtors rely on, and routinely contract with, a number of third parties (the "Operational Lien Claimants") who may be able to assert liens against the Debtors' property to secure payment for certain prepetition goods and services delivered to the Debtors or for other prepetition claims ("Operational Lien Claims"). The Debtors estimate that the Operational Lien Claims do not exceed $2 million.

50. The Debtors' escrow agents and title insurance agents (collectively, the "Title Insurers") are not likely to proceed with Home sale closings unless the Debtors provide assurance that the Operational Liens will not cloud title to the Homes. The Debtors' customers and their lenders could have similar concerns.

51. Most of the Operational Lien Claimants provide goods or services that are fundamental to the Debtors' operations. Failure to pay their claims may lead the Operational Lien Claimants to refuse to provide building materials and services going forward, which would substantially impede the Debtors' ability to construct Homes or cause significant expense and delay while the Debtors scramble to find alternate goods and service providers. This will likely prove difficult where the goods have been custom ordered to meet requirements of the home buyers under the Prepetition Sales Contracts.

16
761073.5

## VIII. MOTION TO PAY PREPETITION LIEN CLAIMS

52. The Debtors rely in the ordinary course of business on certain third parties to supply goods, materials and services without which the Debtors' business either could not operate or would operate at significantly reduced profitability. These vendors provide the diverse services and products that are necessary at all stages of home construction and development. Such services and products include building materials, home designs, cabinetry, plumbing and electrical work. Several of the supplies and services the Debtors use in construction are not fungible or available from a variety of different sources, such that one supplier's failure to do business with the Debtors could have a significant adverse impact on business operations.

53. Many of these critical vendors and suppliers are likely entitled under applicable non-bankruptcy law to assert liens against the Debtors and their property if the Debtors fail to pay for the goods or services rendered to them (the "Lien Claimants"). The Debtors depend on these Lien Claimants to provide services, supplies and building materials necessary to ensure that home construction continues in a timely manner. Prior to the Petition Date, the Debtors have generally made timely payments to their Lien Claimants. As of the Petition Date, some Lien Claimants may not have been paid for certain prepetition goods and services as to which payment is not yet due or may have been paid, but such payment may not have cleared the Debtors' bank accounts.

54. As of the Petition Date, the Debtors believe the aggregate amount of outstanding claims, including payments that have not yet cleared the Debtors' accounts, that may be secured by Mechanics' Liens is less than $2 million. The majority of this work was performed on homes in Brightwater that are scheduled to close in November and December. The Debtors believe that certain of the Lien Claimants may refuse to perform their ongoing obligations under existing agreements with the Debtors until their Mechanics' Liens are satisfied. In certain instances, the Debtors have contracted with the Lien Claimants for multiple homes, some of which are still in various stages of production, and the Lien Claimants' refusal to continue providing materials and services to the Debtors (and on reasonable terms) may severely hamper the Debtors' business activities during this critical period. Moreover, the cash flow from the Debtors' home sales is critical to its continued operations and their ability to successfully emerge from chapter 11.

17

761073.5

Executed this 27th day of October, 2009, at Irvine, California.

*/s/ Raymond J. Pacini*

Raymond J. Pacini

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california