1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (Cal. Bar No. 105430)
2  JOSHUA M. MESTER (Cal. Bar No. 194783)
   MICHAEL C. SCHNEIDEREIT (Cal. Bar No. 234956)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone: (213) 694-1200
   Fax: (213) 694-1234
5
   *Reorganization Counsel for Debtors*
6  *and Debtors in Possession*

7

8              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
9                    **SANTA ANA DIVISION**

10
   *In re*                                    ) Case No. 8:09-21712-TA
11 ☐ CALIFORNIA COASTAL                       )
        COMMUNITIES, INC.                     ) Jointly Administered with Case Nos.
12 ☐ SIGNAL LANDMARK HOLDINGS, INC.           ) 8:09-21713-TA; 8:09-21714-TA;
   ☐ SIGNAL LANDMARK                          ) 8:09-21715-TA; 8:09-21717-TA;
13 ☐ HEARTHSIDE HOLDINGS, INC.                ) 8:09-21718-TA; 8:09-21719-TA;
   ☐ HEARTSIDE HOMES, INC.                    ) 8:09-21720-TA; 8:09-21721-TA;
14 ☐ HHI CHANDLER, L.L.C.                     ) 8:09-21722-TA; 8:09-21723-TA
   ☐ HHI CHINO II, L.L.C.                     )
15 ☐ HHI CROSBY, L.L.C.                       )           Chapter 11
   ☐ HHI HELLMAN, L.L.C.                      )
16 ☐ HHI LANCASTER I, L.L.C.                  ) **SECOND AMENDED DISCLOSURE**
   ☐ HHI SENECA, L.L.C.                       ) **STATEMENT FOR SECOND AMENDED**
17                                            ) **JOINT PLAN OF REORGANIZATION**
   ☒ All Debtors                             ) **DATED MAY 19, 2010**
18                                            )
                    Debtors.                   )
19 _____)

20

21 **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT**

22 **PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A**

23 **DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

24 **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS**

25 **NOT BEEN APPROVED BY THE BANKRUPTCY COURT**

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

    A.    HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ...................................... 2

    B.    VOTING PROCEDURES ........................................................................................ 4

    C.    CONFIRMATION HEARING .................................................................................. 5

II.   OVERVIEW OF THE JOINT PLAN ..................................................................... 7

III.  SUMMARY OF THE JOINT PLAN ...................................................................... 24

    A.    UNCLASSIFIED CLAIMS .................................................................................... 24

        1.    Administrative Expense Claims ................................................. 24

        2.    Compensation and Reimbursement Claims .............................. 24

        3.    Priority Tax Claims ................................................................... 26

    B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................... 26

        1.    Classification Of Claims Against And Interests In CALC
            (Class A) .................................................................................... 27

        2.    Classification Of Claims Against And Interests In SL
            Holdings (Class B) .................................................................... 29

        3.    Classification Of Claims Against And Interests In Signal
            Landmark (Class C) .................................................................. 31

        4.    Classification Of Claims Against And Interests In  Hearthside
            Holdings (Class D) .................................................................... 33

        5.    Classification Of Claims Against And Interests In Hearthside
            Homes (Class E) ........................................................................ 36

        6.    Classification Of Claims Against And Interests In HHI
            Lancaster (Class F) .................................................................... 38

        7.    Classification Of Claims Against And Interests In Inactive
            Debtors (Class G) ..................................................................... 40

    C.    MEANS FOR IMPLEMENTATION OF THE JOINT PLAN .............................................. 42

        1.    Revesting of Assets ................................................................... 42

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES CALIFORNIA

778943.4

# TABLE OF CONTENTS CONT'D

**Page**

2.   Amended and Restated Articles of Incorporation & Amended and Restated By-Laws.................................................................43

3.   Board of Directors/Management ..................................................43

4.   Dissolution of Inactive Debtors...................................................44

5.   Issuance of New Securities..........................................................44

6.   Corporate Actions.........................................................................44

7.   Sources of Cash for Plan Distributions .....................................45

8.   Cancellation of Liens....................................................................45

9.   Cancellation and Surrender of Existing Debt Instruments ......45

10.  Surety Bonds .................................................................................45

D.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................46

1.   Assumption and Rejection of Executory Contracts and Unexpired Leases ..........................................................................46

2.   Cure of Defaults in Connection with Assumption ...................47

3.   Bar Date for Rejection Damages.................................................47

4.   Bar Date for Bankruptcy Code § 365(n) Election ....................47

E.   DISTRIBUTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS........................................................................................48

1.   Reorganized Debtors to Serve As Disbursing Agent ...............48

2.   Dates of Distributions..................................................................48

3.   Cash Distributions .......................................................................49

4.   De Minimis Distributions ............................................................49

5.   Disputed Claims ...........................................................................49

6.   Undeliverable and Unclaimed Distributions .............................50

7.   Surrender of Existing Debt Instruments ....................................50

8.   No Postpetition Interest on Prepetition Claims .........................51

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

# TABLE OF CONTENTS CONT'D

**Page**

9.  Compliance with Tax Requirements ...................................................... 51

10. Objections to Claims ........................................................................ 52

11. Authority to Prosecute Objections ..................................................... 52

12. Estimation of Tax Claims .................................................................. 52

13. Temporary or Permanent Resolution of Disputed Claims ..................... 53

14. Setoff ............................................................................................. 53

15. Rights of Action ............................................................................... 54

F.  CONFIRMATION AND EFFECTIVENESS OF THE JOINT PLAN. .................... 55

1.  Conditions to Confirmation ............................................................... 55

2.  Conditions to the Effective Date ........................................................ 55

3.  Waiver of Conditions to the Confirmation or Effective Date ................. 56

4.  Effect of Nonoccurrence of Conditions to the Effective Date ............... 56

IV. DESCRIPTION OF THE DEBTORS' BUSINESS ....................................... 57

A.  THE DEBTORS' CURRENT AND FUTURE HOMESITES. ............................ 57

B.  HOMEBUILDING. ............................................................................. 59

C.  MANAGEMENT/BOARD OF DIRECTORS. ............................................. 60

D.  SUMMARY OF PREPETITION INDEBTEDNESS AND PREPETITION
    FINANCING. .................................................................................... 61

1.  Prepetition Revolving Loan ............................................................... 61

2.  Prepetition Term Loan ...................................................................... 62

3.  Model Home Financing ..................................................................... 63

4.  Other Project Debt ........................................................................... 63

V.  EVENTS PRECEDING THE  COMMENCEMENT OF THE CASES .................. 64

VI. EVENTS OCCURRING  DURING THE REORGANIZATION CASES ............... 66

A.  FIRST DAY MOTIONS. ...................................................................... 66

778943.4

**TABLE OF CONTENTS CONT'D**

**Page**

B.    INTERIM ORDERS AUTHORIZING USE OF CASH COLLATERAL. .............................. 66

C.    AUTHORIZATION TO CONTINUE TO SELL HOMES FREE AND CLEAR .................... 67

D.    FILING OF SCHEDULES OF ASSETS AND STATEMENT OF FINANCIAL
       AFFAIRS. ............................................................................................................ 68

E.    APPROVAL OF PAYMENT OF SALES COMMISSIONS. ................................................ 68

F.    RETENTION OF PROFESSIONALS. ................................................................................. 68

G.    SALE OF QUARTZ HILL PROJECT. ............................................................................... 68

H.    PENSION PLANS. ........................................................................................................... 69

I.    CHANGE IN COMPOSITION OF THE PREPETITION SECURED LENDERS
       AND PREPETITION AGENT. .......................................................................................... 70

J.    NASDAQ DELISTING. ................................................................................................... 70

K.    SIGNIFICANT CLAIMS AGAINST THE ESTATES AND PENDING
       LITIGATION. .................................................................................................................. 70

       1.    Insurance Company of the West. .................................................. 71

       2.    Brightwater Models, LLC. ........................................................... 71

       3.    State Lands Commission. .............................................................. 71

       4.    IndyMac Ventures, LLC ................................................................ 71

       5.    Pending Litigation. ........................................................................ 72

VII.    CERTAIN FACTORS TO CONSIDER  IN VOTING TO ACCEPT OR
          REJECT THE JOINT PLAN ........................................................................................ 74

A.    THE HOMEBUILDING INDUSTRY HAS UNDERGONE A SIGNIFICANT
       AND SUSTAINED DOWNTURN. .................................................................................... 74

B.    THE DEBTORS' STRATEGIES IN RESPONDING TO THE ADVERSE
       CONDITIONS IN THE HOMEBUILDING INDUSTRY MAY NOT BE
       SUCCESSFUL. ................................................................................................................. 75

C.    THE REORGANIZED DEBTORS WILL HAVE SUBSTANTIAL
       INDEBTEDNESS. ............................................................................................................ 75

D.    AVAILABILITY OF ADDITIONAL LIQUIDITY ........................................................... 76

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**TABLE OF CONTENTS CONT'D**

**Page**

E.    CHANGES IN LAWS OR OTHER EVENTS THAT ADVERSELY AFFECT
      LIQUIDITY IN THE SECONDARY MORTGAGE MARKET COULD HURT
      THE DEBTORS' BUSINESS. ............................................................76

F.    THE HOMEBUILDING INDUSTRY IS HIGHLY COMPETITIVE AND, WITH
      MORE LIMITED RESOURCES THAN MANY OF THE DEBTORS'
      COMPETITORS, THE DEBTORS MAY NOT BE ABLE TO COMPETE
      EFFECTIVELY ........................................................................77

G.    THE DEBTORS' BUSINESS IS CYCLICAL AND DOWNWARD CHANGES IN
      ECONOMIC CONDITIONS GENERALLY OR IN THE MARKET REGIONS
      WHERE THE DEBTORS OPERATE COULD FURTHER DECREASE
      DEMAND AND PRICING FOR NEW HOMES IN THESE AREAS .......................77

VIII.  VOTING PROCEDURES AND  CONFIRMATION OF THE JOINT PLAN ...............79

A.    GENERAL. ..............................................................................79

B.    VOTING PROCEDURES AND REQUIREMENTS. .......................................80

C.    CONFIRMATION HEARING ..............................................................81

D.    ACCEPTANCE OR CRAMDOWN. .......................................................82

E.    BEST INTERESTS TEST; LIQUIDATION ANALYSIS. ...............................82

F.    FEASIBILITY ............................................................................85

G.    VALUE OF THE BRIGHTWATER PROJECT AND OTHER ASSETS. ..............88

H.    COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY
      CODE ....................................................................................89

I.    RETENTION OF JURISDICTION ........................................................89

IX.   CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF
      CONSUMMATION OF THE JOINT PLAN ................................................92

A.    CONSEQUENCES TO THE DEBTORS. ................................................93

      1.    Cancellation of Debt ..........................................................93

      2.    Alternative Minimum Tax ......................................................94

B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS. ..........................94

      1.    Holders of Allowed Claims in Classes .......................................94

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

778943.4

**TABLE OF CONTENTS CONT'D**

**Page**

  2. Distributions in Discharge of Accrued Interest ....................................... 95

  3. Information Reporting and Withholding ................................................. 96

X. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS.................................................................................................................. 97

 A. GENERAL.................................................................................................... 97

 B. BANKRUPTCY CODE EXEMPTIONS FROM REGISTRATION REQUIREMENTS ....................................................................................... 97

 C. SUBSEQUENT TRANSFERS OF SECURITIES UNDER FEDERAL SECURITIES LAWS............................................................................................................ 98

XI. RECOMMENDATION AND CONCLUSION .......................................... 101

EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A – Joint Plan

Exhibit B – Disclosure Statement Order

Exhibit C – California Coastal Communities, Inc.'s Form 10-K Annual Report for 2009

Exhibit D – Projections

Exhibit E – Liquidation Analysis

778943.4

## I.    INTRODUCTION

CALC; Signal Landmark Holdings Inc.; Signal Landmark; Hearthside Holdings, Inc.; Hearthside Homes, Inc.; HHI Lancaster I, L.L.C.; HHI Chandler, L.L.C.; HHI Chino II, L.L.C.; HHI Crosby, L.L.C.; HHI Hellman, L.L.C.; and HHI Seneca, L.L.C. (collectively, the "Debtors" or the "Joint Plan Proponents") have filed a Second Amended Joint Plan of Reorganization dated May 19, 2010 (the "Joint Plan") to provide for the Debtors to emerge from bankruptcy.  A copy of the Joint Plan is attached as Exhibit A.  This Disclosure Statement is being distributed to you by the Joint Plan Proponents to help enable you to make an informed judgment about the Joint Plan, and to solicit your acceptance of the Joint Plan.  The Joint Plan Proponents believe that the acceptance, confirmation and implementation of the Joint Plan are in the best interests of the Debtors, their creditors and their shareholders.

The United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") has scheduled a hearing on _____ __, 2010 to consider whether to confirm the Joint Plan..

On _____ __, 2010, after notice and a hearing held on _____, 2010, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors and equity interest holders to make an informed judgment whether to accept or reject the Joint Plan.  **APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE JOINT PLAN.  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  THE SECURITIES AND EXCHANGE COMMISSION HAS NOT APPROVED OR DISAPPROVED THE DISCLOSURE STATEMENT, OR DETERMINED IF IT IS TRUTHFUL OR CORRECT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE JOINT PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.**

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth deadlines for voting to accept or reject the Joint Plan and concerning procedures to be followed to object to confirmation of the Joint Plan, and the record date for voting purposes.  A Ballot for the acceptance or rejection of the Joint Plan is enclosed with each Disclosure Statement submitted to a holder of Claims or interests who are entitled to vote to accept or reject the Joint Plan.  In addition, voting instructions accompany each Ballot.

Each holder of a Claim entitled to vote on the Joint Plan should read the Disclosure Statement, the Joint Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting to accept or reject the Joint Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests and the tabulation of votes.  No solicitation of votes to accept the Joint Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- • The Joint Plan (Exhibit A);

- • Order of the Bankruptcy Court dated _____ __, 2010 (the "Disclosure Statement Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Joint Plan (Exhibit B);

- • CALC's Form 10-K Annual Report for 2009, which includes CALC's audited financial results for 2009 (Exhibit C);

- • The Debtors' Financial Projections for the Years 2010 through 2014 (the "Projections") (Exhibit D); and

- • Analysis of the potential results of a liquidation of the Debtors' assets conducted in cases under chapter 7 of the Bankruptcy Code (Exhibit E).

## A.    Holders of Claims and Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests in classes of Claims or Interests that are impaired under a chapter 11 plan are entitled to vote to accept or reject the Joint Plan.  Classes of Claims or Interests in which the holders of claims

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

or interests will not receive or retain any property under a chapter 11 plan are conclusively deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of Claims or Interests in which the holders of Claims or Interests are unimpaired under a chapter 11 plan are conclusively deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Classes A-3, A-4, A-6, A-7, B-3, B-4, B-6, B-7, C-3, C-4, C-6, C-7, D-3, D-4, D-6, D-7, E-3, E-4, E-6, E-7, F-4, F-5, F-7, F-8, and G-3 are unimpaired under the Joint Plan and the holders of Claims or Interests in those Classes are conclusively presumed to have accepted the Joint Plan. Classes A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, D-1, D-2, D-5, E-1, E-2, E-5, F-1, F-2, F-3, and F-6 of the Joint Plan are classified as impaired under the Joint Plan and holders of Allowed Claims in those Classes are entitled to vote to accept or reject the Joint Plan. Therefore, acceptances of the Joint Plan are being solicited only from holders of Claims or Interests in Classes A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, D-1, D-2, D-5, E-1, E-2, E-5, F-1, F-2, F-3, and F-6.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. Acceptance of a plan by a class of interests requires acceptance by at least two-thirds of the amount of shares in such class for which ballots are cast for acceptance or rejection of the plan. For a complete description of the requirements for confirmation of the Joint Plan, see Section VIII, "Voting Procedures and Confirmation of Joint Plan."

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or Interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VIII.E, "Best Interests Test, Liquidation Analysis."

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    With respect to any Class of Claims that vote to reject the Joint Plan, the Joint Plan

2    Proponents intend to request confirmation of the Joint Plan pursuant to section 1129(b) of the

3    Bankruptcy Code, notwithstanding the rejection of the Joint Plan by such Class or Classes.

4    **B.      Voting Procedures**

5    If you are entitled to vote to accept or reject the Joint Plan, a Ballot is enclosed for the

6    purpose of voting on the Joint Plan.  If you hold Claims in more than one Class and you are entitled

7    to vote Claims in more than one Class, you will receive separate Ballots that must be used for each

8    separate Class of Claims.  Please vote and return your Ballot(s) to:

9                         Hennigan, Bennett & Dorman LLP
                          Attention:  Mr. Kevin Floyd
10                        865 S. Figueroa St., Suite 2900
                          Los Angeles, CA  90017
11                        Facsimile:  213-694-1234
                          E-mail:  CALCbkcase@hbdlawyers.com

12

13    **DO NOT RETURN ANY SECURITIES OR OTHER EVIDENCE OF YOUR CLAIM**

14    **AGAINST THE DEBTORS WITH YOUR BALLOT.**

15    **TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR**

16    **REJECTION OF THE JOINT PLAN MUST BE ACTUALLY RECEIVED NO LATER**

17    **THAN 5:00 P.M. P.D.T., ON _____ __, 2010.  ANY BALLOT THAT DOES NOT**

18    **INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE JOINT PLAN WILL**

19    **NOT BE COUNTED.**

20    **ANY CLAIM IN AN IMPAIRED CLASS AS TO WHICH AN OBJECTION OR**

21    **REQUEST FOR ESTIMATION IS PENDING BEFORE THE BANKRUPTCY COURT OR**

22    **WHICH IS SCHEDULED BY THE DEBTORS AS UNLIQUIDATED, DISPUTED OR**

23    **CONTINGENT, INCLUDING ANY TORT CLAIM, IS NOT ENTITLED TO VOTE ON**

24    **THE JOINT PLAN UNLESS THE HOLDER OF SUCH CLAIM HAS OBTAINED AN**

25    **ORDER OF THE BANKRUPTCY COURT TEMPORARILY ALLOWING SUCH CLAIM**

26    **FOR THE PURPOSE OF VOTING ON THE JOINT PLAN.**

27    Pursuant to the Disclosure Statement Order, the Bankruptcy Court has set _____ __, 2010

28    as the record date for voting on the Joint Plan.  Accordingly, only holders of Allowed Claims as of

778943.4

such date that are otherwise entitled to vote on the Joint Plan will receive a Ballot and may vote on the Joint Plan.

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Joint Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Hennigan, Bennett & Dorman LLP:

Hennigan, Bennett & Dorman LLP<br>
Attention:  Mr. Kevin Floyd<br>
865 S. Figueroa St., Suite 2900<br>
Los Angeles, CA  90017<br>
Telephone: 213-694-1200<br>
Email:  CALCbkcase@hbdlawyers.com

**C.    Confirmation Hearing**

The hearing to consider confirmation of the Joint Plan will be held on _____, 2010, at __:__ _.m. P.D.T., before the Honorable Theodor C. Albert, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom "5B," 411 West Fourth Street, Santa Ana, California 92701.

The Bankruptcy Court has directed that objections, if any, to Confirmation of the Joint Plan be served and filed so that they are received on or before _____ __, 2010 at 5:00 p.m., P.D.T, in the manner described below in Section I.C, "Confirmation Hearing."  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the confirmation hearing or at any subsequent adjourned confirmation hearing.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not create an implication that there has not been any change in the information stated since the date hereof.

For the convenience of Holders of Claims and Interests, this Disclosure Statement summarizes the terms of the Joint Plan, but the Joint Plan itself qualifies all summaries.  If any inconsistency exists between the Joint Plan and the Disclosure Statement, the terms of the Joint Plan are controlling.  Also, summaries of certain provisions of agreements referred to in this disclosure

778943.4

statement do not purport to be complete and are subject to, and are qualified in their entirety by, reference to the full text of the applicable agreement, including the definitions of terms contained in such agreement.

The Disclosure Statement may not be relied on for any purpose other than for the purpose of determining whether to vote to accept or reject the Joint Plan, and nothing stated herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors, or be deemed conclusive evidence of the tax, securities law, or other legal effects of the Joint Plan on the Debtors or holders of Claims or Interests.

Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions based upon current facts and circumstances. There can be no assurance that such statements will be reflective of actual outcomes, which may be materially different from any future results expressed or implied in such forward-looking statements. All holders of Claims should carefully read and consider fully Section VII of this Disclosure Statement, "Certain Factors To Consider In Voting To Accept Or Reject The Joint Plan," before voting to accept or reject the Joint Plan.

Although no assurance can be given, the Debtors believe that the Joint Plan will enable the Debtors to successfully reorganize and accomplish the objectives of chapter 11 and that acceptance of the Joint Plan is in the best interests of the Debtors, their creditors, and their shareholders.

**THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE JOINT PLAN.**

778943.4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## II.    OVERVIEW OF THE JOINT PLAN

The following table briefly summarizes the classification and treatment of Claims and Interests under the Joint Plan.  The "recoveries" set forth below are projected recoveries only and may change based on factors related to the Debtors' business operations and general economic conditions.  For a description of certain risks associated with the recoveries provided under the Joint Plan, see Section VII, "Certain Factors To Consider in Voting to Accept or Reject the Joint Plan."

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class A-1<br><br>Prepetition Revolver Loan Claims against CALC<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against CALC shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |
| Class A-2<br><br>Prepetition Term Loan Claims against CALC<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against CALC shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class A-3<br><br>Other Secured Claims against CALC<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized CALC: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized CALC. | 100% |
| Class A-4<br><br>Other Priority Claims against CALC<br><br>Unimpaired | $22,000 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized CALC and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against CALC shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized CALC's election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against CALC that are not due and payable on or before the Effective Date shall be paid by Reorganized CALC when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-8-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class A-5<br><br>General Unsecured Claims against CALC<br><br>Impaired | $138,000 - $1,000,000 | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |
| Class A-6<br><br>Intercompany Claims against CALC<br><br>Unimpaired | $47.8 million | There shall be no monetary distributions on account of Intercompany Claims against CALC.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against CALC shall have its Intercompany Claim reinstated. | 100% |
| Class A-7<br><br>Interests in CALC<br><br>Unimpaired | N/A | On the Effective Date, Holders of existing Interests in CALC shall, at the election of Reorganized CALC, either retain their Interests in CALC or receive one share of New CALC Common Stock for every four (4) shares of existing common stock in CALC. | 100% |
| Class B-1<br><br>Prepetition Revolver Loan Claims against SL Holdings<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against SL Holdings shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class B-2<br><br>Prepetition Term Loan Claims against SL Holdings<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against SL Holdings shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |
| Class B-3<br><br>Other Secured Claims against SL Holdings<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized SL Holdings: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized SL Holdings. | 100% |

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class B-4<br><br>Other Priority Claims against SL Holdings<br><br>Unimpaired | $0 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized SL Holdings and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against SL Holdings shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized SL Holdings' election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against SL Holdings that are not due and payable on or before the Effective Date shall be paid by Reorganized SL Holdings when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |
| Class B-5<br><br>General Unsecured Claims against SL Holdings<br><br>Impaired | $0 | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class B-6<br><br>Intercompany Claims against SL Holdings<br><br>Unimpaired | $458,651 | There shall be no monetary distributions on account of Intercompany Claims against SL Holdings.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against SL Holdings shall have its Intercompany Claim reinstated. | 100% |
| Class B-7<br><br>Interests in SL Holdings<br><br>Unimpaired | N/A | Holders of Interests in against SL Holdings shall retain such Interests. | 100% |
| Class C-1<br><br>Prepetition Revolver Loan Claims against Signal Landmark<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Signal Landmark shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |
| Class C-2<br><br>Prepetition Term Loan Claims against Signal Landmark<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Signal Landmark shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-12-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class C-3<br><br>Other Secured Claims against Signal Landmark<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized Signal Landmark: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized Signal Landmark. | 100% |
| Class C-4<br><br>Other Priority Claims against Signal Landmark<br><br>Unimpaired | $0 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized Signal Landmark and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against Signal Landmark shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized Signal Landmark's election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against Signal Landmark that are not due and payable on or before the Effective Date shall be paid by Reorganized Signal Landmark when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class C-5<br><br>General Unsecured Claims against Signal Landmark<br><br>Impaired | $155,529 - $1,000,000 | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |
| Class C-6<br><br>Intercompany Claims against Signal Landmark<br><br>Unimpaired | $0 | There shall be no monetary distributions on account of Intercompany Claims against Signal Landmark.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against Signal Landmark shall have its Intercompany Claim reinstated. | 100% |
| Class C-7<br><br>Interests in Signal Landmark<br><br>Unimpaired | N/A | Holders of Interests in Signal Landmark shall retain such Interests. | 100% |
| Class D-1<br><br>Prepetition Revolver Loan Claims against Hearthside Holdings<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Hearthside Holdings shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-14-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class D-2<br><br>Prepetition Term Loan Claims against Hearthside Holdings<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Hearthside Holdings shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |
| Class D-3<br><br>Other Secured Claims against Hearthside Holdings<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized Hearthside Holdings: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized Hearthside Holdings. | 100% |

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| **Class D-4**<br><br>Other Priority Claims against Hearthside Holdings<br><br>Unimpaired | $0 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized Hearthside Holdings and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against Hearthside Holdings shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized Hearthside Holdings' election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Other Priority Claims against Hearthside Holdings that are not due and payable on or before the Effective Date shall be paid by Reorganized Hearthside Holdings when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |
| **Class D-5**<br><br>General Unsecured Claims against Hearthside Holdings<br><br>Impaired | $0 | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will: (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class D-6<br><br>Intercompany Claims against Hearthside Holdings<br><br>Unimpaired | $10.5 million | There shall be no monetary distributions on account of Intercompany Claims against Hearthside Holdings. Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against Hearthside Holdings shall have its Intercompany Claim reinstated. | 100% |
| Class D-7<br><br>Interests in Hearthside Holdings<br><br>Unimpaired | N/A | Holders of Interests in Hearthside Holdings shall retain such Interests. | 100% |
| Class E-1<br><br>Prepetition Revolver Loan Claims against Hearthside Homes<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Hearthside Homes shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |
| Class E-2<br><br>Prepetition Term Loan Claims against Hearthside Homes<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Hearthside Homes shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-17-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class E-3<br><br>Other Secured Claims against Hearthside Homes<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized Hearthside Homes: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized Hearthside Homes. | 100% |
| Class E-4<br><br>Other Priority Claims against Hearthside Homes<br><br>Unimpaired | $24,000-$244,800 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized Hearthside Homes and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against Hearthside Homes shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized Hearthside Homes' election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against Hearthside Homes that are not due and payable on or before the Effective Date shall be paid by Reorganized Hearthside Homes when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class E-5<br><br>General Unsecured Claims against Hearthside Homes<br><br>Impaired | $650,000 - $1.3 million | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |
| Class E-6<br><br>Intercompany Claims against Hearthside Homes<br><br>Unimpaired | $56.4 million | There shall be no monetary distributions on account of Intercompany Claims against Hearthside Homes.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against Hearthside Homes shall have its Intercompany Claim reinstated. | 100% |
| Class E-7<br><br>Interests in Hearthside Homes<br><br>Unimpaired | N/A | Holders of Interests in Hearthside Homes shall retain such Interests. | 100% |
| Class F-1<br><br>IndyMac Secured Claim against HHI Lancaster<br><br>Impaired | $100,000 - $400,000 | On the Effective Date, IndyMac shall, on account of the IndyMac Secured Claim, receive Cash as may be required to be paid under section 506(b) of the Bankruptcy Code. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class F-2<br><br>Prepetition Revolver Loan Claims against HHI Lancaster<br><br>Impaired | $81.5 million | On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against HHI Lancaster shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.<br><br>A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan. | 100% |
| Class F-3<br><br>Prepetition Term Loan Claims against HHI Lancaster<br><br>Impaired | $99.8 million | On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against HHI Lancaster shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.<br><br>A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan. | 100% |
| Class F-4<br><br>Other Secured Claims against HHI Lancaster<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized HHI Lancaster: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized HHI Lancaster. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class F-5<br><br>Other Priority Claims against HHI Lancaster<br><br>Unimpaired | $144,914 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized HHI Lancaster and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against HHI Lancaster shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized HHI Lancaster's election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Other Priority Claims against HHI Lancaster that are not due and payable on or before the Effective Date shall be paid by Reorganized HHI Lancaster when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. | 100% |
| Class F-6<br><br>General Unsecured Claims against HHI Lancaster<br><br>Impaired | $9,500 - $300,000 | In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will: (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-21-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class F-7<br><br>Intercompany Claims against HHI Lancaster<br><br>Unimpaired | $14.68 million | There shall be no monetary distributions on account of Intercompany Claims against HHI Lancaster.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against HHI Lancaster shall have its Intercompany Claim reinstated. | 100% |
| Class F-8<br><br>Interests in HHI Lancaster<br><br>Unimpaired | N/A | Holders of Interests in HHI Lancaster shall retain such Interests. | 100% |
| Class G-1<br><br>Prepetition Revolver Loan Claims against Inactive Debtors<br><br>Impaired | $81.5 million | Holders of Prepetition Revolver Loan Claims against the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |
| Class G-2<br><br>Prepetition Term Loan Claims against Inactive Debtors<br><br>Impaired | $99.8 million | Holders of Prepetition Term Loan Claims against the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |
| Class G-3<br><br>Other Secured Claims against Inactive Debtors<br><br>Unimpaired | $0 | On the Effective Date, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction of its Allowed Other Secured Claim, at the option of the Inactive Debtors: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; or (ii) the property securing such Allowed Other Secured Claim. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-22-

778943.4

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class G-4<br><br>Other Priority Claims against Inactive Debtors<br><br>Impaired | $12,000 | Holders of Other Priority Claims against the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |
| Class G-5<br><br>General Unsecured Claims against Inactive Debtors<br><br>Impaired | $36,200 | Holders of General Unsecured Claims against the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |
| Class G-6<br><br>Intercompany Claims against Inactive Debtors<br><br>Impaired | $43.6 million | Holders of Intercompany Claims against the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |
| Class G-7<br><br>Interests in Inactive Debtors<br><br>Impaired | N/A | Holders of Interests in the Inactive Debtors shall receive no distribution under the Joint Plan | 0% |

778943.4

### III.    SUMMARY OF THE JOINT PLAN

The Joint Plan Proponents believe that (i) the Joint Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees and (ii) through the Joint Plan, creditors and equity interest holders will obtain a greater recovery from the Debtors' estates than would be available if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code.

The Joint Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Joint Plan set forth below is qualified in its entirety by reference to the more detailed provisions of the Joint Plan.

### A.    Unclassified Claims

#### 1.    Administrative Expense Claims

Except as provided in Section 2.2 in the Joint Plan or to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtors shall pay to each holder of an Allowed Administrative Expense Claim, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made on either (a) the latest to occur of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Administrative Expense Claim, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order; provided, however, that all Ordinary Course Administrative Expenses shall be paid in full by the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of agreements relating thereto.  The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Ordinary Course Administrative Expenses.

#### 2.    Compensation and Reimbursement Claims

Except as provided in Section 2.3 of the Joint Plan, all Entities that are awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 330 or 331 of the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2),

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes a Final Order, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Reorganized Debtors.

Except as otherwise provided in the Joint Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the pertinent Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date (the "Administrative Claims Bar Date").  Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors or the Reorganized Debtors or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (A) 120 days after the Effective Date or (B) 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

Professionals or other Entities asserting a Professional Fee Claim for services rendered to the Estate before the Effective Date must File and serve on the pertinent Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Professional Fee Order, or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim, as it relates to services provided to the Estate, no later than 60 days after the Effective Date.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 90 days after the Effective Date or (2) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Professional Fee Order, regarding the payment of Professional Fee Claims.

778943.4

### 3.    Priority Tax Claims

Unless otherwise agreed to by the Debtors and the holder of an Allowed Priority Tax Claim (in which event such other agreement will govern), each holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order. All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

Notwithstanding the provisions of Section 2.2 of the Joint Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment as a General Unsecured Claim if not subordinated to General Unsecured Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the pertinent Debtor, Reorganized Debtor or their respective property.

### B.    Classification and Treatment of Claims and Interests

The Joint Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Joint Plan provides separately for each Class that holders of certain Claims and Interests will receive various amounts and types of consideration (e.g., Cash, notes, and/or New CALC Common Stock), thereby giving effect to the different rights of the holders of Claims and Interests in each Class.

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**1.    Classification Of Claims Against And Interests In CALC (Class A)**

**a)    Class A-1 – Prepetition Revolver Loan Claims Against CALC**

Class A-1 consists of Prepetition Revolver Loan Claims against CALC.  On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against CALC shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan.  Class A-1 is impaired. Because Class A-1 is Impaired and Holders of Class A-1 Claims receive consideration under the Joint Plan, the Holders of Claims in Class A-1 are permitted to vote to accept or reject the Joint Plan.

**b)    Class A-2 – Prepetition Term Loan Claims Against CALC**

Class A-2 consists of the Prepetition Term Loan Claims against CALC.  On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against CALC shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.  A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan.  Class A-2 is impaired. Because Class A-2 is Impaired and Holders of Class A-2 Claims receive consideration under the Joint Plan, the Holders of Claims in Class A-2 are permitted to vote to accept or reject the Joint Plan.

**c)    Class A-3 – Other Secured Claims Against CALC**

Class A-3 consists of all Other Secured Claims against CALC.  On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized CALC: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized CALC.  Class A-3 is unimpaired.  The Holders of Claims in Class A-3 will not vote to accept or reject the Joint Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

### d)     Class A-4 – Other Priority Claims Against CALC

Class A-4 consists of all Other Priority Claims against CALC.  On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized CALC and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against CALC shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized CALC's election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against CALC that are not due and payable on or before the Effective Date shall be paid by Reorganized CALC when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.  Class A-4 is unimpaired.  The Holders of Claims in Class A-4 will not vote to accept or reject the Joint Plan.

### e)     Class A-5 – General Unsecured Claims Against CALC

Class A-5 consists of all General Unsecured Claims against CALC.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business.  Class A-5 is impaired.  Because Class A-5 is Impaired and Holders of Class A-5 Claims receive consideration under the Joint Plan, the Holders of Claims in Class A-5 are permitted to vote to accept or reject the Joint Plan.

### f)     Class A-6 – Intercompany Claims Against CALC

Class A-6 consists of Intercompany Claims against CALC.  There shall be no monetary distributions on account of Intercompany Claims against CALC.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Intercompany Claim against CALC shall have its Intercompany

1   Claim reinstated.  Class A-6 is unimpaired.  The Holders of Claims in Class A-6 will not vote to

2   accept or reject the Joint Plan.

3               g)      **Class A-7 – Interests In CALC**

4          Class A-7 consists of all Interests in CALC.  On the Effective Date, Holders of existing

5   Interests in CALC shall, at the election of Reorganized CALC, either retain their Interests in CALC

6   or receive one share of New CALC Common Stock for every four (4) shares of existing common

7   stock in CALC.  Class A-7 is unimpaired.  The Holders of Interests in Class A-7 will not vote to

8   accept or reject the Joint Plan.

9          **2.      Classification Of Claims Against And Interests In SL Holdings (Class B)**

10              a)      **Class B-1 – Prepetition Revolver Loan Claims Against SL Holdings**

11         Class B-1 consists of Prepetition Revolver Loan Claims against SL Holdings.  On the

12  Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against SL Holdings shall

13  be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description of the

14  Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan.  Class B-1 is

15  impaired.  Because Class B-1 is Impaired and Holders of Class B-1 Claims receive consideration

16  under the Joint Plan, the Holders of Claims in Class B-1 are permitted to vote to accept or reject the

17  Joint Plan.

18              b)      **Class B-2 – Prepetition Term Loan Claims Against SL Holdings**

19         Class B-2 consists of the Prepetition Term Loan Claims against SL Holdings.  On the

20  Effective Date, the holders of Allowed Prepetition Term Loan Claims against SL Holdings shall be

21  entitled to receive an equal amount of Restated Junior Secured Term Loans.  A description of the

22  Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan.  Class B-2 is

23  impaired.  Because Class B-2 is Impaired and Holders of Class B-2 Claims receive consideration

24  under the Joint Plan, the Holders of Claims in Class B-2 are permitted to vote to accept or reject the

25  Joint Plan.

26              c)      **Class B-3 – Other Secured Claims Against SL Holdings**

27         Class B-3 consists of all Other Secured Claims against SL Holdings.  On the Effective Date,

28  each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-29-

778943.4

Other Secured Claim, at the option of Reorganized SL Holdings: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against Reorganized SL Holdings.  Class B-3 is unimpaired.  The Holders of Claims in Class B-3 will not vote to accept or reject the Joint Plan.

### d)    Class B-4 – Other Priority Claims Against SL Holdings

Class B-4 consists of all Other Priority Claims against SL Holdings.  On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized SL Holdings and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against SL Holdings shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized SL Holdings' election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against SL Holdings that are not due and payable on or before the Effective Date shall be paid by Reorganized SL Holdings when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.  Class B-4 is unimpaired.  The Holders of Claims in Class B-4 will not vote to accept or reject the Joint Plan.

### e)    Class B-5 – General Unsecured Claims Against SL Holdings

Class B-5 consists of all General Unsecured Claims against SL Holdings.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-30-

applicable nonbankruptcy law or in the ordinary course of business.  Class B-5 is impaired.  Because Class B-5 is Impaired and Holders of Class B-5 Claims receive consideration under the Joint Plan, the Holders of Claims in Class B-5 are permitted to vote to accept or reject the Joint Plan.

**f)      Class B-6 – Intercompany Claims Against SL Holdings**

Class B-6 consists of Intercompany Claims against SL Holdings.  There shall be no monetary distributions on account of Intercompany Claims against SL Holdings.  Pursuant to section 1124 of the Bankruptcy Code each holder of an Intercompany Claim against SL Holdings shall have its Intercompany Claim reinstated.  Class B-6 is unimpaired.  The Holders of Claims in Class B-6 will not vote to accept or reject the Joint Plan.

**g)      Class B-7 – Interests In SL Holdings**

Class B-7 consists of all in Interests in SL Holdings.  Holders of Interests in SL Holdings shall retain such Interests.  Class B-7 is unimpaired.  The Holders of Interests in Class B-7 will not vote to accept or reject the Joint Plan.

**3.      Classification Of Claims Against And Interests In Signal Landmark (Class C)**

**a)      Class C-1 – Prepetition Revolver Loan Claims Against Signal Landmark**

Class C-1 consists of Prepetition Revolver Loan Claims against Signal Landmark.  On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Signal Landmark shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan.  Class C-1 is impaired.  Because Class C-1 is Impaired and Holders of Class C-1 Claims receive consideration under the Joint Plan, the Holders of Claims in Class C-1 are permitted to vote to accept or reject the Joint Plan.

**b)      Class C-2 – Prepetition Term Loan Claims Against Signal Landmark**

Class C-2 consists of the Prepetition Term Loan Claims against Signal Landmark.  On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Signal Landmark shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.  A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan.  Class C-2 is impaired.  Because Class C-2 is Impaired and Holders of Class C-2 Claims receive consideration

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-31-

1  under the Joint Plan, the Holders of Claims in Class C-2 are permitted to vote to accept or reject the

2  Joint Plan.

3              c)        **Class C-3 – Other Secured Claims Against Signal Landmark**

4          Class C-3 consists of all Other Secured Claims against Signal Landmark.  On the Effective

5  Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its

6  Allowed Other Secured Claim, at the option of Reorganized Signal Landmark: (i) the net proceeds

7  of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of

8  such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim;

9  or (iii) payments in accordance with the provisions of any agreement relating to the property, on

10  substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim

11  Reinstated against Reorganized Signal Landmark.  Class C-3 is unimpaired.  The Holders of Claims

12  in Class C-3 will not vote to accept or reject the Joint Plan.

13              d)        **Class C-4 – Other Priority Claims Against Signal Landmark**

14          Class C-4 consists of all Other Priority Claims against Signal Landmark.  On (a) the later of

15  (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an

16  Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized

17  Signal Landmark and the holder of such Claim, or (b) such other date as the Bankruptcy Court may

18  order, each holder of an Allowed Other Priority Claim against signal Landmark shall receive on

19  account of and in full and complete settlement, release and discharge of such Claim, at Reorganized

20  Hearthside Homes' election, (i) cash in the amount of such Allowed Other Priority Claim in

21  accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required

22  to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed

23  Other Priority Claims against Signal Landmark that are not due and payable on or before the

24  Effective Date shall be paid by Reorganized Signal Landmark when such claims become due and

25  payable in the ordinary course of business in accordance with the terms thereof.  Class C-4 is

26  unimpaired.  The Holders of Claims in Class C-4 will not vote to accept or reject the Joint Plan.

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

e)     **Class C-5 – General Unsecured Claims Against Signal Landmark**

Class C-5 consists of all General Unsecured Claims against Signal Landmark.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable nonbankruptcy law or in the ordinary course of business.  Class C-5 is impaired.  Because Class C-5 is Impaired and Holders of Class C-5 Claims receive consideration under the Joint Plan, the Holders of Claims in Class C-5 are permitted to vote to accept or reject the Joint Plan.

f)     **Class C-6 – Intercompany Claims Against Signal Landmark**

Class C-6 consists of Intercompany Claims against Signal Landmark.  There shall be no monetary distributions on account of Intercompany Claims against Signal Landmark.  Pursuant to section 1124 of the Bankruptcy Code each holder of an Intercompany Claim each holder of an Intercompany Claim against Signal Landmark shall have its Claim reinstated.  Class C-6 is unimpaired.  The Holders of Claims in Class C-6 will not vote to accept or reject the Joint Plan.

g)     **Class C-7 – Interests In Signal Landmark**

Class C-7 consists of all Interests in Signal Landmark.  Holders of Interests in Signal Landmark shall retain such Interests.  Class C-7 is unimpaired.  The Holders of Interests in Class C-7 will not vote to accept or reject the Joint Plan.

**4.     Classification Of Claims Against And Interests In Hearthside Holdings (Class D)**

a)     **Class D-1 – Prepetition Revolver Loan Claims Against Hearthside Holdings**

Class D-1 consists of Prepetition Revolver Loan Claims against Hearthside Holdings.  On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Hearthside Holdings shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint

-33-

1  Plan.  Class D-1 is impaired.  Because Class D-1 is Impaired and Holders of Class D-1 Claims

2  receive consideration under the Joint Plan, the Holders of Claims in Class D-1 are permitted to vote

3  to accept or reject the Joint Plan.

4      **b)  Class D-2 – Prepetition Term Loan Claims Against Hearthside Holdings**

5      Class D-2 consists of the Prepetition Term Loan Claims against Hearthside Holdings.  On

6  the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Hearthside

7  Holdings shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.  A

8  description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint

9  Plan.  Class D-2 is impaired.  Because Class D-2 is Impaired and Holders of Class D-2 Claims

10  receive consideration under the Joint Plan, the Holders of Claims in Class D-2 are permitted to vote

11  to accept or reject the Joint Plan.

12      **c)  Class D-3 – Other Secured Claims Against Hearthside Holdings**

13      Class D-3 consists of all Other Secured Claims against Hearthside Holdings.  On the

14  Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction

15  of its Allowed Other Secured Claim, at the option of Reorganized Hearthside Holdings: (i) the net

16  proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed

17  amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other

18  Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the

19  property, on substantially the same terms as such agreement, or (b) have its Allowed Other Secured

20  Claim Reinstated against Reorganized Hearthside Holdings.  Class D-3 is unimpaired.  The Holders

21  of Claims in Class D-3 will not vote to accept or reject the Joint Plan.

22      **d)  Class D-4 – Other Priority Claims Against Hearthside Holdings**

23      Class D-4 consists of all Other Priority Claims against Hearthside Holdings.  On (a) the later

24  of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an

25  Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized

26  Hearthside Holdings and the holder of such Claim, or (b) such other date as the Bankruptcy Court

27  may order, each holder of an Allowed Other Priority Claim against Hearthside Holdings shall

28  receive on account of and in full and complete settlement, release and discharge of such Claim, at

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-34-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   Reorganized Hearthside Holdings' election, (i) cash in the amount of such Allowed Other Priority

2   Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment

3   required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All

4   Allowed Other Priority Claims against Hearthside Holdings that are not due and payable on or

5   before the Effective Date shall be paid by Reorganized Hearthside Holdings when such claims

6   become due and payable in the ordinary course of business in accordance with the terms thereof.

7   Class D-4 is unimpaired.  The Holders of Claims in Class D-4 will not vote to accept or reject the

8   Joint Plan.

9   **e)    Class D-5 – General Unsecured Claims Against Hearthside Holdings**

10          Class D-5 consists of all General Unsecured Claims against Hearthside Holdings.  In full

11   satisfaction of and in exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to

12   the extent such Claim is due and owing on the Effective Date, be paid the full amount of such Claim

13   in eight equal quarterly payments, in cash, commencing 90 days after the Effective Date without

14   interest; or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full,

15   in cash, in accordance with the terms of any agreement between the parties, or as may be due and

16   owing under applicable nonbankruptcy law or in the ordinary course of business.  Class D-5 is

17   impaired.  Because Class D-5 is Impaired and Holders of Class D-5 Claims receive consideration

18   under the Joint Plan, the Holders of Claims in Class D-5 are permitted to vote to accept or reject the

19   Joint Plan.

20   **f)    Class D-6 – Intercompany Claims Against Hearthside Holdings**

21          Class D-5 consists of Intercompany Claims against Hearthside Holdings.  There shall be no

22   monetary distributions on account of Intercompany Claims against Hearthside Holdings.  Pursuant

23   to section 1124 of the Bankruptcy Code each holder of an Intercompany Claim each holder of an

24   Intercompany Claim against Hearthside Holdings shall have its Intercompany Claim reinstated.

25   Class D-6 is unimpaired.  The Holders of Claims in Class D-6 will not vote to accept or reject the

26   Joint Plan.

27

28

778943.4

g)    **Class D-7 – Interests In Hearthside Holdings**

Class D-7 consists of all Interests in Hearthside Holdings.  Holders of Interests in Hearthside Holdings shall retain such Interests.  Class D-7 is unimpaired.  The Holders of Interests in Class D-7 will not vote to accept or reject the Joint Plan.

5.    **Classification Of Claims Against And Interests In Hearthside Homes (Class E)**

a)    **Class E-1 – Prepetition Revolver Loan Claims Against Hearthside Homes**

Class E-1 consists of Prepetition Revolver Loan Claims against Hearthside Homes.  On the Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against Hearthside Homes shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan.  Class E-1 is impaired.  Because Class E-1 is Impaired and Holders of Class E-1 Claims receive consideration under the Joint Plan, the Holders of Claims in Class E-1 are permitted to vote to accept or reject the Joint Plan.

b)    **Class E-2 – Prepetition Term Loan Claims Against Hearthside Homes**

Class E-2 consists of the Prepetition Term Loan Claims against Hearthside Homes.  On the Effective Date, the holders of Allowed Prepetition Term Loan Claims against Hearthside Homes shall be entitled to receive an equal amount of Restated Junior Secured Term Loans.  A description of the Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan.  Class E-2 is impaired.  Because Class E-2 is Impaired and Holders of Class E-2 Claims receive consideration under the Joint Plan, the Holders of Claims in Class E-2 are permitted to vote to accept or reject the Joint Plan.

c)    **Class E-3 – Other Secured Claims Against Hearthside Homes**

Class E-3 consists of all Other Secured Claims against Hearthside Homes.  On the Effective Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other Secured Claim, at the option of Reorganized Hearthside Homes: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in accordance with the provisions of any agreement relating to the property, on

778943.4

1  substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim

2  Reinstated against Reorganized Hearthside Homes.  Class E-3 is unimpaired.  The Holders of

3  Claims Class E-3 will not vote to accept or reject the Joint Plan.

4        **d)**      **Class E-4 – Other Priority Claims Against Hearthside Homes**

5        Class E-4 consists of all Other Priority Claims against Hearthside Homes.  On (a) the later of

6  (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an

7  Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by the Reorganized

8  Debtors and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order,

9  each holder of an Allowed Other Priority Claim against Hearthside Homes shall receive on account

10 of and in full and complete settlement, release and discharge of such Claim, at Reorganized

11 Hearthside Homes' election, (i) cash in the amount of such Allowed Other Priority Claim in

12 accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required

13 to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed

14 Other Priority Claims against Hearthside Homes that are not due and payable on or before the

15 Effective Date shall be paid by Reorganized Hearthside Homes when such claims become due and

16 payable in the ordinary course of business in accordance with the terms thereof.  Class E-4 is

17 unimpaired.  The Holders of Claims in Class E-4 will not vote to accept or reject the Joint Plan.

18       **e)**      **Class E-5 – General Unsecured Claims Against Hearthside Homes**

19       Class E-5 consists of all General Unsecured Claims.  In full satisfaction of and in exchange

20 for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim is due and

21 owing on the Effective Date, be paid the full amount of such Claim in eight equal quarterly

22 payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to the extent

23 such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with

24 the terms of any agreement between the parties, or as may be due and owing under applicable

25 nonbankruptcy law or in the ordinary course of business.  Class E-5 is impaired.  Because Class E-5

26 is Impaired and Holders of Class E-5 Claims receive consideration under the Joint Plan, the Holders

27 of Claims in Class E-5 are permitted to vote to accept or reject the Joint Plan.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1

**f)**      **Class E-6 – Intercompany Claims Against Hearthside Homes**

2     Class E-6 consists of Intercompany Claims against Hearthside Homes.  There shall be no

3 monetary distributions on account of Intercompany Claims against Hearthside Homes.  Pursuant to

4 section 1124 of the Bankruptcy Code each holder of an Intercompany Claim each holder of an

5 Intercompany Claim shall have its Claim reinstated.  Class E-6 is unimpaired.  The Holders of

6 Claims in Class E-6 will not vote to accept or reject the Joint Plan.

7

**g)**      **Class E-7 – Interests In Hearthside Homes**

8     Class E-7 consists of all Intercompany Equity Interests in Hearthside Homes.  Holders of

9 Interests in Hearthside Homes shall retain such Interests.  Class E-7 is unimpaired.  The Holders of

10 Interests in Class E-7 will not vote to accept or reject the Joint Plan.

11

**6.**      **Classification Of Claims Against And Interests In HHI Lancaster (Class F)**

12

**a)**      **Class F-1 – IndyMac Secured Claim Against HHI Lancaster**

13     Class F-1 consists of the IndyMac Secured Claim.  On the Effective Date, IndyMac shall, on

14 account of the IndyMac Secured Claim, receive Cash as may be required to be paid under section

15 506(b) of the Bankruptcy Code.  Class F-1 is impaired.  Because Class F-1 is Impaired and Holders

16 of Class F-1 Claims receive consideration under the Joint Plan, the Holders of Claims in Class F-1

17 are permitted to vote to accept or reject the Joint Plan.

18

**b)**      **Class F-2 – Prepetition Revolver Loan Claims Against HHI Lancaster**

19     Class F-2 consists of Prepetition Revolver Loan Claims against HHI Lancaster.  On the

20 Effective Date, the holders of Allowed Prepetition Revolver Loan Claims against HHI Lancaster

21 shall be entitled to receive an equal amount of Restated Senior Secured Term Loans.  A description

22 of the Restated Senior Secured Term Loans is attached as Schedule 1.96 to the Joint Plan.  Class F-2

23 is impaired.  Because Class F-2 is Impaired and Holders of Class F-2 Claims receive consideration

24 under the Joint Plan, the Holders of Claims in Class F-2 are permitted to vote to accept or reject the

25 Joint Plan.

26

**c)**      **Class F-3 – Prepetition Term Loan Claims Against HHI Lancaster**

27     Class F-3 consists of the Prepetition Term Loan Claims against HHI Lancaster.  On the

28 Effective Date, the holders of Allowed Prepetition Term Loan Claims against HHI Lancaster shall

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1    be entitled to receive an equal amount of Restated Junior Secured Term Loans.  A description of the

2    Restated Junior Secured Term Loans is attached as Schedule 1.95 to the Joint Plan.  Class F-3 is

3    impaired.  Because Class F-3 is Impaired and Holders of Class F-3 Claims receive consideration

4    under the Joint Plan, the Holders of Claims in Class F-3 are permitted to vote to accept or reject the

5    Joint Plan.

6              **d)    Class F-4 – Other Secured Claims Against HHI Lancaster**

7              Class F-4 consists of all Other Secured Claims against HHI Lancaster.  On the Effective

8    Date, each Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its

9    Allowed Other Secured Claim, at the option of Reorganized HHI Lancaster: (i) the net proceeds of

10   the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of

11   such Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim;

12   or (iii) payments in accordance with the provisions of any agreement relating to the property, on

13   substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim

14   Reinstated against Reorganized HHI Lancaster.  Class F-4 is unimpaired.  The Holders of Claims in

15   Class F-4 will not vote to accept or reject the Joint Plan.

16             **e)    Class F-5 – Other Priority Claims Against HHI Lancaster**

17             Class F-5 consists of all Other Priority Claims against HHI Lancaster.  Treatment:  On (a)

18   the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim

19   becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by the

20   Reorganized Debtors and the holder of such Claim, or (b) such other date as the Bankruptcy Court

21   may order, each holder of an Allowed Other Priority Claim against HHI Lancaster shall receive on

22   account of and in full and complete settlement, release and discharge of such Claim, at Reorganized

23   HHI Lancaster's election, (i) cash in the amount of such Allowed Other Priority Claim in

24   accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required

25   to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed

26   Other Priority Claims against HHI Lancaster that are not due and payable on or before the Effective

27   Date shall be paid by Reorganized HHI Lancaster when such claims become due and payable in the

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-39-

1  ordinary course of business in accordance with the terms thereof.  Class F-5 is unimpaired.  The

2  Holders of Claims in Class F-5 will not vote to accept or reject the Joint Plan.

3  **f)      Class F-6 – General Unsecured Claims Against HHI Lancaster**

4  Class F-6 consists of all General Unsecured Claims against HHI Lancaster, including any

5  Unsecured deficiency claim asserted by IndyMac.  Treatment:  In full satisfaction of and in

6  exchange for each Allowed General Unsecured Claim, the Holder will:  (a) to the extent such Claim

7  is due and owing on the Effective Date, be paid the full amount of such Claim in eight equal

8  quarterly payments, in cash, commencing 90 days after the Effective Date without interest; or (b) to

9  the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in

10  accordance with the terms of any agreement between the parties, or as may be due and owing under

11  applicable nonbankruptcy law or in the ordinary course of business.  Class F-6 is impaired.  Because

12  Class F-6 is Impaired and Holders of Class F-6 Claims receive consideration under the Joint Plan,

13  the Holders of Claims in Class F-6 are permitted to vote to accept or reject the Joint Plan.

14  **g)      Class F-7 – Intercompany Claims Against HHI Lancaster**

15  Class F-7 consists of Intercompany Claims against HHI Lancaster.  There shall be no

16  monetary distributions on account of Intercompany Claims.  Pursuant to section 1124 of the

17  Bankruptcy Code each holder of an Intercompany Claim each holder of an Intercompany Claim

18  shall have its Claim reinstated.  Class F-7 is unimpaired.  The Holders of Claims in Class F-7 will

19  not vote to accept or reject the Joint Plan.

20  **h)      Class F-8 – Interests In HHI Lancaster**

21  Class F-8 consists of all Interests in HHI Lancaster.  Holders of Interests in HHI Lancaster

22  shall retain such Interests.  Class F-8 is unimpaired.  The Holders of Interests in Class F-8 will not

23  vote to accept or reject the Joint Plan.

24  **7.      Classification Of Claims Against And Interests In Inactive Debtors (Class G)**

25  **a)      Class G-1 – Prepetition Revolver Loan Claims Against Inactive Debtors**

26  Class G-1 consists of Prepetition Revolver Loan Claims against the Inactive Debtors.

27  Holders of Prepetition Revolver Loan Claims against the Inactive Debtors shall receive no

28  distribution under the Joint Plan.  Because Class G-1 is Impaired and Holders of Class G-1 Claims

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-40-

1   do not receive consideration under the Joint Plan from the Inactive Debtors, the Holders of Claims

2   in Class G-1 are deemed to reject the Joint Plan.

3   **b)    Class G-2 – Prepetition Term Loan Claims Against Inactive Debtors**

4   Class G-2 consists of the Prepetition Term Loan Claims against the Inactive Debtors.

5   Holders of Prepetition Term Loan Claims against the Inactive Debtors shall receive no distribution

6   under the Joint Plan.  Class G-2 is impaired.  Because Class G-2 is Impaired and Holders of Class

7   G-2 Claims do not receive consideration under the Joint Plan from the Inactive Debtors, the Holders

8   of Claims in Class G-2 are deemed to reject the Joint Plan.

9   **c)    Class G-3 – Other Secured Claims Against Inactive Debtors**

10   Class G-3 consists of all Other Secured Claims against the Inactive Debtors.  On the

11   Effective Date, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction of

12   its Allowed Other Secured Claim, at the option of the Inactive Debtors: (i) the net proceeds of the

13   sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such

14   Allowed Other Secured Claim; or (ii) the property securing such Allowed Other Secured Claim.

15   Class G-3 is unimpaired.  The Holders of Claims in Class G-3 will not vote to accept or reject the

16   Joint Plan.

17   **d)    Class G-4 – Other Priority Claims Against Inactive Debtors**

18   Class G-4 consists of all Other Priority Claims against the Inactive Debtors.  Holders of

19   Other Priority Claims against the Inactive Debtors shall receive no distribution under the Joint Plan.

20   Class G-4 is impaired.  Because Class G-4 is Impaired and Holders of Class G-4 Claims do not

21   receive consideration under the Joint Plan, the Holders of Claims in Class G-4 are deemed to reject

22   the Joint Plan.

23   **e)    Class G-5 – General Unsecured Claims Against Inactive Debtors**

24   Class G-5 consists of all General Unsecured Claims against the Inactive Debtors.  Holders

25   of General Unsecured Claims against the Inactive Debtors shall receive no distribution under the Joint

26   Plan.  Class G-5 is impaired.  Because Class G-5 is Impaired and Holders of Class G-5 Claims do

27   not receive consideration under the Joint Plan, the Holders of Claims in Class G-5 are deemed to

28   reject the Joint Plan.

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

f)        **Class G-6 – Intercompany Claims Against Inactive Debtors**

Class G-6 consists of Intercompany Claims against the Inactive Debtors.  Holders of

Intercompany Claims against the Inactive Debtors shall receive no distribution under the Joint Plan.

Class G-6 is impaired.  Because Class G-6 is Impaired and Holders of Class G-6 Claims do not

receive consideration under the Joint Plan, the Holders of Claims in Class G-6 are deemed to reject

the Joint Plan.

g)        **Class G-7 – Interests In Inactive Debtors**

Class G-7 consists of all Interests in the Inactive Debtors.  Treatment: On the Effective Date,

all Interests in the Inactive Debtors shall be canceled and holders of Interests in the Inactive Debtors

shall receive no distribution under the Joint Plan.  Class G-7 is impaired.  Because Class G-7 is

Impaired and Holders of Class G-7 Claims do not receive consideration under the Joint Plan, the

Holders of Claims in Class G-7 are deemed to reject the Joint Plan.

**C.        Means for Implementation of the Joint Plan.**

**1.        Revesting of Assets**

Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property

of the Estates of the Debtors (other than the Inactive Debtors), including all Rights of Action, and

any property acquired by the Debtors (other than the Inactive Debtors) under or in connection with

the Joint Plan shall be assigned to and will vest in the respective Reorganized Debtor free and clear

of all Claims, Liens, charges, other encumbrances and Interests, except as otherwise provided under

the Joint Plan.  On and after the Effective Date, the Reorganized Debtors may operate their business

and may use, acquire and dispose of property and compromise or settle any Claims or Interests

without supervision or approval by the Bankruptcy Court and free of any restrictions of the

Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Joint Plan

or the Confirmation Order.  Sources of Cash for future operations will include, inter alia, Cash of the

Debtors and anticipated revenue from further business operations.  In accordance with section

1109(b) of the Bankruptcy Code, nothing in this paragraph shall preclude any party in interest from

appearing and being heard on any issue in the Reorganization Cases

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

**2.    Amended and Restated Articles of Incorporation & Amended and Restated By-Laws**

On the Effective Date, the Amended and Restated Articles of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their Amended and Restated Articles of Incorporation, Amended and Restated By-Laws and other constituent documents as permitted by applicable non-bankruptcy law.

**3.    Board of Directors/Management**

On the Effective Date, the following persons shall serve as the board of directors for Reorganized CALC subject to the terms and conditions of the Articles of Incorporation, the By-Laws and applicable law:

> Phillip R. Burnaman, II
>
> Raymond J. Pacini
>
> Geoffrey W. Arens
>
> Marti P. Murray

On the Effective Date, the following persons shall serve as directors of the Reorganized Debtors, other than Reorganized CALC, subject to the terms and conditions of the Articles of Incorporation, the By-Laws and applicable law:

> Raymond J. Pacini
>
> Sandra G. Sciutto

On the Effective Date, the following persons shall serves as officers of the Reorganized Debtors:

> Raymond J. Pacini, President and Chief Executive Officer
>
> Sandra G. Sciutto, Senior Vice President and Chief Financial Officer
>
> Jon Johnston, Vice President

On the Effective Date, the following persons shall also serve as officers of Reorganized Hearthside Homes:

> Michael J. Rafferty, President and Chief Operating Officer

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-43-

778943.4

John W. Marshall, Senior Vice President

Ed Mountford, Senior Vice President

Doug Woodyard, Vice President

The compensation for the Officers and Directors of the Reorganized Debtors shall be consistent with their current compensation, which is set forth on pages 43 through 50 in Exhibit C.

**4.    Dissolution of Inactive Debtors**

The Joint Plan provides that on the Effective Date, the Inactive Debtors shall be dissolved.

**5.    Issuance of New Securities**

The Joint Plan provides that on the Effective Date, the Reorganized Debtors shall issue the Restated Senior Secured Term Loans, the Restated Junior Secured Term Loans, and the New CALC Common Stock for distribution in accordance with the Joint Plan.

**6.    Corporate Actions**

The Joint Plan provides that on the Effective Date, all actions contemplated by the Joint Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Joint Plan), including, without limitation, the following:  (a) the adoption and the filing with the Secretary of State of the State of Delaware of the Amended and Restated Articles of Incorporation; (b) the adoption of the By-Laws; (c) the execution of and entry into the Restated Senior Term Loan Agreement; (d) the execution of and entry into the Restated Junior Term Loan Agreement; (e) the dissolution of the Inactive Debtors and (f) the execution and the delivery of, and the performance under, all documents and agreements contemplated by or relating to any of the foregoing.  All matters provided for under the Joint Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Reorganized Debtors in connection with the Joint Plan shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of further action by the shareholders or the directors of the Reorganized Debtors.  On the Effective Date, the appropriate officers of each of the Reorganized Debtors are authorized and directed to execute and to deliver all agreements, documents and instruments contemplated by the Joint Plan in the name and on behalf of the pertinent Reorganized Debtors.

778943.4

7.     **Sources of Cash for Plan Distributions**

The sources of Cash for distribution under the Joint Plan shall be the Debtors' Cash, the Net Proceeds, and future revenues of the Reorganized Debtors that may be retained by the Reorganized Debtors or transferred to the Disbursing Agent as necessary for distribution pursuant to the terms and conditions of the Joint Plan.

8.     **Cancellation of Liens**

Except as otherwise provided in this Joint Plan, on the Effective Date any Lien securing any Secured Claim shall be deemed released, and the Entity holding such Secured Claim shall be authorized and directed to release any collateral or other property of the debtors or the Estates (including without limitation any cash collateral) held by such entity and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including without limitation the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors (at the expense of the Reorganized Debtors).

9.     **Cancellation and Surrender of Existing Debt Instruments**

On the Effective Date, all promissory notes, indentures, share certificates, options, warrants, and other instruments evidencing any Prepetition Revolver Loan Obligation, Prepetition Term Loan Obligation or IndyMac Secured Obligation shall be deemed cancelled and null and void without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors and Reorganized Debtors governing the Senior Secured Revolving Loan Obligations, Senior Secured Term Loan Obligations and IndyMac Secured Obligation shall be discharged.  All such instruments shall be surrendered in accordance with Section 7.7 of the Joint Plan.

10.     **Surety Bonds**

The Debtors require and the Reorganized Debtors will require for their operations to maintain certain surety bonds issued on their behalf by Insurance Company of the West ("ICW"). These bonds are financial accommodations that cannot be assumed without the consent of ICW.  In consideration of the terms of the Joint Plan and in consideration of the debtors assumption or affirming of their obligations to ICW under the terms of the agreement of indemnity with ICW and

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-45-

778943.4

the Debtors, which obligations will become obligations of the Reorganized Debtors under the Joint

Plan, ICW will keep its surety bonds in effect after the Effective Date and on behalf of the

Reorganized Debtors subject to the terms of the indemnity agreement and underwriting practices.

**D.      Treatment Of Executory Contracts And Unexpired Leases.**

**1.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all executory contracts or unexpired leases of the Debtors that have

not been expressly rejected by the Debtors on or before the Effective Date shall be deemed assumed

in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the

Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or

rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms,  (iii) is an

executory contract or unexpired lease that is included under a separate assumption/rejection motion

or is required under the Joint Plan to be included in such motion, or (iv) has otherwise been listed on

Joint Plan Schedule 6.1, which shall be the schedule of executory contracts or unexpired leases

rejected pursuant to this Joint Plan, or (v) are otherwise rejected pursuant to the terms of this Joint

Plan.  Joint Plan Schedule 6.1 shall be Filed no later than five Business Days prior to the

Confirmation Date.  The Joint Plan Proponents reserve the right to amend Joint Plan Schedule 6.1 at

any time prior to the Confirmation Date.  Entry of the Confirmation Order by the Bankruptcy Court

shall constitute approval of such assumption pursuant to sections 365(a) and 1123 of the Bankruptcy

Code.  Each executory contract and unexpired lease assumed by the Debtors pursuant to the Joint

Plan or any assumption/rejection motion shall be assigned by operation of law, revest in and be fully

enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the

provisions of the Joint Plan, or any order of the Bankruptcy Court authorizing and providing for its

assumption or applicable federal law.  Neither the exclusion nor the inclusion by the Joint Plan

Proponents of a contract or lease on Joint Plan Schedule 6.1 nor anything contained in this Joint

Plan shall constitute an admission by the Joint Plan Proponents that such lease or contract is an

unexpired lease or executory contract that any Debtor or Non-Debtor Affiliate has any liability

thereunder.  The Joint Plan Proponents reserve the right, subject to notice, to amend, modify,

supplement, or otherwise change Joint Plan Schedule 6.1 on or before the Effective Date.

-46-

1

2.    **Cure of Defaults in Connection with Assumption**

2        Any monetary amounts by which each executory contract and unexpired lease to be assumed

3    or assumed and assigned pursuant to the Joint Plan is in default will be satisfied, pursuant to section

4    365(b)(1) of the Bankruptcy Code, at the option of the pertinent Reorganized Debtor: (a) by

5    payment of the default amount in Cash on the Effective Date or (b) on such other terms as are

6    agreed to by the parties to such executory contract or unexpired lease.  If there is a dispute

7    regarding: (a) the amount of any cure payments; (b) the ability of the pertinent Reorganized Debtor

8    to provide "adequate assurance of future performance" (within the meaning of section 365 of the

9    Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to

10    assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made

11    promptly following the entry of a Final Order resolving the dispute and approving the assumption.

12    3.    **Bar Date for Rejection Damages**

13        If the rejection of an executory contract or unexpired lease pursuant to the Joint Plan gives

14    rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever

15    barred and shall not be enforceable against the Reorganized Debtors, their successors or properties

16    unless a proof of Claim is filed and served on the pertinent Reorganized Debtor and its counsel

17    within 30 days after the Effective Date.  Notice of the Bar Date for rejection damages shall be sent

18    to all parties to such Contracts or Leases that were rejected.  All such Claims for which proofs of

19    Claim are required to be filed, if Allowed, will be, and will be treated as, General Unsecured Claims

20    subject to the provisions of the Joint Plan.

21    4.    **Bar Date for Bankruptcy Code § 365(n) Election**

22        If the rejection of an executory contract pursuant to the Joint Plan gives rise to the right by

23    the other party or parties to such contract to make an election under § 365(n) of the Bankruptcy

24    Code to either treat such contract as terminated or to retain its rights under such contract, such other

25    party to such contract will be deemed to elect to treat such contract as terminated unless such other

26    party files and serves a notice of its alternative election on the pertinent Reorganized Debtor and its

27    counsel within 30 days after the Effective Date.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-47-

**E.      Distributions And Procedures For Resolving Disputed Claims.**

**1.      Reorganized Debtors to Serve As Disbursing Agent**

The Reorganized Debtors shall serve as the Disbursing Agents to hold and distribute Cash and such other property as may be distributed pursuant to the Joint Plan, provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Joint Plan.  Even if the Disbursing Agent is a Person other than the Reorganized Debtors, the Disbursing Agent shall be an agent of the Reorganized Debtors and not a separate taxable entity with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors.  The Reorganized Debtors shall not be required to post or otherwise provide a bond in connection with the making of any distributions pursuant to the Joint Plan.

**2.      Dates of Distributions**

The Sections of the Joint Plan on treatment of Administrative Expense Claims, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Joint Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Joint Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.  If, under the terms of the Joint Plan, the resolution of a particular Disputed Claim, (e.g., it is Disallowed), entitles other Holders of Claims or Interests to a further distribution, either (a) the Reorganized Debtors or the Disbursing Agent may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors or the Disbursing Agent who is to make such distribution, to be less than $500 for any Creditor, then, in order to afford the Reorganized Debtor an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtor or the

778943.4

Disbursing Agent may make such further distribution any time prior to sixty (60) days after the Final Resolution Date.

### 3.  Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 4.  De Minimis Distributions

The Reorganized Debtors or Disbursing Agent shall not distribute Cash to the holder of an Allowed Claim in an impaired Class if the total aggregate amount of Cash to be distributed on account of such Claim is less than $25, unless the Reorganized Debtors or the Disbursing Agent determines within its sole discretion to make such distribution.  Any holder of an Allowed Claim on account of which the total aggregate amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors or Disbursing Agent, or their respective property.

### 5.  Disputed Claims

Distributions of consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.  After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense Claim shall be made by the Reorganized Debtors or the Disbursing Agent.  Such distribution shall be made at the time provided in the Joint Plan for the next scheduled distribution to the class or type of Claim, Interest or Administrative Expense of such Holder and, if there is no such further scheduled time, within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim, Allowed Interest or Allowed Administrative Expense.  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-49-

778943.4

1    If the Claim or Interest of a Holder of a Claim or Interest is Disallowed (by example only,

2    under 11 U.S.C. § 502(d)), the Claim or Interest of such Holder shall be cancelled, retired and of no

3    further force and effect and such Holder shall be obligated to surrender any document, certificate or

4    other matter evidencing such Claim or Interest.  The Holders of any such cancelled instruments,

5    securities and other documentation will have no rights arising from or relating to such instruments,

6    securities or other documentation, or the cancellation thereof, except the rights provided pursuant to

7    the Joint Plan.

8    **6.    Undeliverable and Unclaimed Distributions**

9    If any distribution under the Joint Plan is returned to the Reorganized Debtor or its agents as

10    undeliverable or the check or other similar instrument or distribution by the Reorganized Debtor

11    remains uncashed or unclaimed for one hundred eighty (180) days, such distribution shall be

12    deemed to be unclaimed property ("Unclaimed Property").  Upon a distribution becoming

13    Unclaimed Property, it immediately shall be revested in the Reorganized Debtor.  Pending becoming

14    Unclaimed Property, such distribution will remain in the possession of the Disbursing Agent and, if

15    the Disbursing Agent is notified in writing of a new address for the Holder, it shall cause

16    distribution of the Unclaimed Property, as appropriate, within 45 days thereafter.  Once there

17    becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may

18    otherwise be due under the Joint Plan will accrue or be held for such Holder, provided that, if the

19    Reorganized Debtor is notified in writing of such Holder's then-current address and status as a

20    Holder under the Joint Plan, thereafter, the Holder will become entitled to its share of distributions,

21    if any, which first become due after such notification.

22    **7.    Surrender of Existing Debt Instruments**

23    Each Holder of a promissory note or other instrument evidencing a Senior Secured Revolver

24    Loan Obligation, Senior Secured Term Loan Obligation, or IndyMac Secured Obligation shall

25    surrender such promissory note or instrument to the Reorganized Debtors upon request.  No

26    distribution under this Joint Plan shall be made to or on behalf of any such Holders unless and until

27    such promissory note or instrument is received by the Reorganized Debtors or the unavailability of

28    such promissory note or instrument is established to the reasonable satisfaction of the Reorganized

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-50-

778943.4

1    Debtor.  In accordance with section 1143 of the Bankruptcy Code, any Holder of a promissory note

2    or other instrument evidencing a Senior Secured Revolver Loan Obligation, Senior Secured Term

3    Loan Obligation, or IndyMac Secured Obligation that fails to (a) surrender or cause to be

4    surrendered such promissory note or instrument or to execute and deliver an affidavit of loss and

5    indemnity reasonably satisfactory to the Reorganized Debtors and (b) if requested by the

6    Reorganized Debtors, furnish a bond in form and substance (including amount) reasonably

7    satisfactory to the Reorganized Debtors within two years of the Effective Date shall be deemed to

8    have forfeited all rights and Claims under such Senior Secured Revolver Loan Obligation, Senior

9    Secured Term Loan Obligation, or IndyMac Secured Obligation, and shall not participate in any

10    distribution under this Joint Plan on account of such Claims or obligations.

**8.    No Postpetition Interest on Prepetition Claims**

12        Except as otherwise set forth in this Joint Plan, no interest shall be deemed to have accrued

13    after the Petition Date on Claims arising prior to the Petition Date, and no such interest shall be

14    allowed or paid.

**9.    Compliance with Tax Requirements**

16        The Reorganized Debtors and the Disbursing Agent shall comply with all withholding and

17    reporting requirements imposed by federal, state or local taxing authorities in connection with

18    making distributions pursuant to the Joint Plan.  In connection with each distribution with respect to

19    which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042)

20    or withholding is required, the Reorganized Debtor and the Disbursing Agent shall file such

21    information return with the Internal Revenue Service and provide any required statements in

22    connection therewith to the recipients of such distribution, or effect any such withholding and

23    deposit all moneys so withheld to the extent required by law.  With respect to any Person from

24    whom a tax identification number, certified tax identification number or other tax information

25    required by law to avoid withholding has not been received by the Reorganized Debtors or the

26    Disbursing Agent, the Reorganized Debtors or the Disbursing Agent may, at their sole option,

27    withhold the amount required and distribute the balance to such Person or decline to make such

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1  distribution until the information is received; provided, however, that the Reorganized Debtors or

2  the Disbursing Agent shall not be obligated to liquidate any securities to perform such withholding.

3  **10.    Objections to Claims**

4  All objections to Claims must be Filed and served on the Holders of such Claims by the

5  Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served

6  on the parties on the then-applicable service list in the Reorganization Cases.  If an objection is

7  required to be Filed and has not been Filed to a proof of Claim or a scheduled Claim by the Claims

8  Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be

9  treated as an Allowed Claim if such Claim has not been allowed earlier.  An objection is deemed to

10  have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of

11  the Claims Objection Bar Date.  Each such Tort Claim will remain a Disputed Claim until it

12  becomes an Allowed Claim.

13  **11.    Authority to Prosecute Objections**

14  After the entry of the Confirmation Order, only the Reorganized Debtors will have the

15  authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims,

16  including pursuant to any alternative dispute resolution or similar procedures approved by the

17  Bankruptcy Court.

18  **12.    Estimation of Tax Claims**

19  In addition to any other available remedies or procedures with respect to Tax Claims or Tax

20  issues or liabilities, the Reorganized Debtors or any of them, at any time, may utilize (and receive

21  the benefits of) section 505 of the Bankruptcy Code with respect to: any Tax issue or liability

22  relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to

23  the Effective Date.  If a Reorganized Debtor utilizes section 505(b) of the Bankruptcy Code: (1) the

24  Court shall determine the amount of the subject Tax liability or Claim in the event that the

25  appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated

26  on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability or

27  Claim in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors and any

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1  successors to the Debtors shall be entitled to such discharge which shall apply to any and all Taxes

2  relating to the period covered by such return.

3         **13.    Temporary or Permanent Resolution of Disputed Claims**

4         The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any

5  Disputed Claim, including without limitation any Tax Claim, pursuant to section 502(c) of the

6  Bankruptcy Code, irrespective of whether the Reorganized Debtor has previously objected to such

7  Disputed Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy

8  Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time

9  during litigation concerning any objection to the Disputed Claim, including during the pendency of

10  any appeal relating to any such objection.  If the Bankruptcy Court estimates any Disputed Claim,

11  that estimated amount would constitute either the Allowed amount of such Disputed Claim or a

12  maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the

13  estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized

14  Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on

15  account of such Disputed Claim.  In addition, the Reorganized Debtor may resolve or adjudicate any

16  Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative

17  Expense Claim and the rights of the Holder of such Claim, Interest or Administrative Expense

18  Claim would have been resolved or adjudicated if the Reorganization Cases had not been

19  commenced.  All of the aforementioned objection, estimation and resolution procedures are

20  cumulative and not necessarily exclusive of one another.

21         **14.    Setoff**

22         The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable

23  non-bankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense Claim

24  and the distributions to be made pursuant to the Joint Plan on account of such Claim, Interest or

25  Administrative Expense Claim (before any distribution is made on account of such Claim, Interest

26  or Administrative Expense Claim), the Rights of Action of any nature that the Debtors may hold

27  against the Holder of such Allowed Claim, Interest or Administrative Expense Claim.  Neither the

28  failure to set off nor the allowance of any Claim, Interest or Administrative Expense Claim

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-53-

1  hereunder will constitute a waiver or release by the Reorganized Debtor of any such Rights of

2  Action that it may have against such Holder.

3      **15.    Rights of Action**

4      In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the

5  extent set forth below, and their successors, any assigns hereunder and future assigns will retain and

6  may exclusively enforce any Rights of Action subject only to any express waiver or release thereof

7  in the Joint Plan or in any other contract, instrument, release, indenture or other agreement entered

8  into in connection with the Joint Plan, and the Confirmation Order's approval of the Joint Plan shall

9  be deemed a res judicata determination of such rights to retain and exclusively enforce such Rights

10  of Action.  Absent such express waiver or release, the Reorganized Debtors, or its successors or

11  assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the

12  Reorganized Debtor (or its successors or future assigns).  The Rights of Actions may be asserted or

13  prosecuted before or after solicitation of votes on the Joint Plan or before or after the Effective Date.

14      Absent an express waiver or release as referenced above, nothing in the Joint Plan shall (or is

15  intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing,

16  pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no

17  preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel,

18  issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to

19  such Rights of Action upon or after Confirmation or Consummation.  By example only and without

20  limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any

21  proceeding with respect thereto against a Person, by the Reorganized Debtor or any successor to or

22  assign of it, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise)

23  as a result of: (a) the solicitation of a vote on the Joint Plan from such Person or such Person's

24  predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or

25  such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Holders

26  of Interests, or in the Joint Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or

27  allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's

28  predecessor in interest; or (d) Confirmation of the Joint Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-54-

Notwithstanding any allowance of a Claim or Administrative Expense Claim, the

Reorganized Debtors reserve the right to seek, among other things, to have such Claim or

Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time,

determine that one or more of them has a defense under 11 U.S.C. § 502(d), e.g., a Reorganized

Debtor holds a Right of Action for Recovery Action against the Holder of such Claim or

Administrative Expense Claim and such Holder after demand refuses to pay the amount due in

respect thereto.  Such reservation shall remain subject to any limitation on application of 11 U.S.C.

§ 502(d) to Administrative Expense Claim under applicable law.

**F.    Confirmation And Effectiveness Of The Joint Plan.**

   **1.    Conditions to Confirmation**

   The Bankruptcy Court will not enter the Confirmation Order unless and until the following

conditions have been satisfied or duly waived pursuant to Section 10.3 of the Joint Plan:

- The Disclosure Statement Order has been entered by the Bankruptcy Court in a form reasonably acceptable to the Joint Plan Proponents.

- The Confirmation Order is reasonably acceptable in form and substance to the Joint Plan Proponents, the Agent, and the Lenders.

- All Joint Plan Documents are in form and substance reasonably satisfactory to the Joint Plan Proponents.

   **2.    Conditions to the Effective Date**

   The Effective Date will not occur, and the Joint Plan will not be consummated, unless and

until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3 of

the Joint Plan:

- The Confirmation Order has been entered, has not been reversed, stayed, modified or amended and has become a Final Order.

- The Confirmation Order shall authorize the Reorganized Debtors to take all actions necessary or appropriate to implement the Joint Plan, including consummation of the transactions contemplated by the Joint Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreement or documents generated in connection with the Joint Plan.

- The Joint Plan shall not have been amended, altered or modified from the Joint Plan as confirmed, in any material respect, unless such amendment, alteration or modification has been consented to in accordance with Section 14.1, and all definitive documentation relating to the Joint Plan, Restated Senior Secured Term Loans, Restated Junior Secured Term Loans and the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

transactions contemplated thereby, and all other documents material to the consummation of the transactions contemplated under the Joint Plan shall be in a form reasonably acceptable to the Joint Plan Proponents.

- All conditions to Confirmation shall have been satisfied or waived in accordance with Section 10.3.

- The Effective Date has occurred by August 31, 2010.

**3.      Waiver of Conditions to the Confirmation or Effective Date**

The conditions to Confirmation set forth in Sections 10.1 of the Joint Plan and the conditions to the Effective Date set forth in Sections 10.2 of the Joint Plan may be waived, in writing, in whole or in part by the Joint Plan Proponents, with the consent of the Agent and the Lenders, which consent shall not be unreasonably withheld or delayed, at any time without an order of the Bankruptcy Court.

**4.      Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.3 of the Joint Plan, then upon motion by the Joint Plan Proponents made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section 10.4, (1) the Joint Plan will be null and void in all respects, including with respect to:  (a) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code; (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Article VI; and (c) the releases described in Section 13.6 of the Joint Plan; and (2) nothing contained in the Joint Plan will:  (a) constitute a waiver or release of any claims by or against, or any Interest in, the Debtors; or (b) prejudice in any manner the rights of the Debtors, or any other party in interest.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-56-

778943.4

# IV.    DESCRIPTION OF THE DEBTORS' BUSINESS

The Debtors are a residential land development and homebuilding companies with properties owned or controlled primarily in Orange County, California and Los Angeles County, California. Debtor California Coastal Communities, Inc. ("CALC") is a public company, whose common stock was previously traded over the Nasdaq exchange under the symbol CALC and is now traded on the over-the-counter market (OTCQB) under the CALCQ ticker symbol.  The Debtors' primary asset is a 356-home luxury coastal community known as Brightwater.  The Debtors' principal activities include:

- obtaining zoning and other entitlements for land that the Debtors own or for third parties under consulting agreements;

- improving the land for residential development; and

- designing, constructing and selling single-family homes in Southern California.

Once the Debtors' residential land is entitled, the Debtors either build homes, sell unimproved land to other developers or homebuilders, sell improved land to homebuilders, or participate in joint ventures with other developers, investors or homebuilders to finance and construct infrastructure and homes.  Most of the Debtors' homes are designed to appeal to move-up homebuyers and are generally offered for sale in advance of their construction.

The Debtors' total revenues for the years ended December 31, 2009, 2008, and 2007 were $47.2 million, $46.0 million, and $47.0 million, respectively.  For the years ended December 31, 2009, 2008, and 2007 the Debtors delivered 49, 55, and 77 homes, respectively.  The Debtors' total assets as of December 31, 2009 and 2008 were $249.9 million and $312.5 million, respectively. Hearthside Homes, Inc. has delivered over 2,300 homes to families throughout Southern California since its formation in 1994.

## A.    The Debtors' Current and Future Homesites.

The Debtors currently have on-going Southern California homebuilding projects in Orange County in the Huntington Beach area.  Brightwater is the coastal Orange County residential community, located on 105 acres of the Bolsa Chica mesa in the City of Huntington Beach, approximately 35 miles south of downtown Los Angeles. Brightwater was annexed into the City of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

Huntington Beach in 2008. Brightwater offers a broad mix of home choices averaging 2,860 square feet and ranging in size from 1,710 square feet to 4,339 square feet. Located near Pacific Coast Highway and overlooking the Pacific Ocean, Huntington Harbor and the recently restored 1,300-acre Bolsa Chica Wetlands, 63 of the 356 homes at Brightwater will have unobstructed ocean and/or wetlands views.

Brightwater is the largest property in the Debtors' portfolio. This project is located on one of the last large undeveloped coastal properties in Southern California. Brightwater is bordered on the north and east by residential development in the City of Huntington Beach and Huntington Harbor, to the south by open space and the 1,300-acre Bolsa Chica wetlands, and to the west by 120 acres of publicly-owned conservation land and open space on the lower bench of the Bolsa Chica mesa, Pacific Coast Highway, Bolsa Chica State Beach, and the Pacific Ocean. Brightwater also has 37 acres of open space and conservation area.

Key facts and assumptions regarding the Brightwater development project include the following:

- Brightwater is expected to consist of 356 homes, including 106 homes at The Breakers, 109 homes at The Cliffs, 79 homes at The Sands and 62 homes at The Trails.

- There are 63 homes at Brightwater that will have unobstructed views of the Pacific Ocean and/or the Bolsa Chica wetlands, including 36 homes at The Breakers (five delivered to date), 25 homes at The Cliffs and two homes at The Sands.

- Build-out of production homes, which is subject to market conditions, is currently expected to take approximately five years and be completed in 2014.

- Costs to improve the lots from their raw condition to finished lots, including County permits, City annexation fees and school fees, approximate $200,000 per lot. As of December 31, 2009, approximately 76% of these lot improvement costs have already been incurred.

- The direct costs (excluding indirect costs such as supervision, overhead, sales and marketing, warranty, insurance, etc.) of building homes at Brightwater are currently expected to range from approximately $125 to $140 per square foot.

- Indirect costs are expected to approximate 3% of sales revenues.

The Debtors completed construction of eight model homes at The Trails and The Sands neighborhoods in July 2007 and held a grand opening in August 2007 and delivered the first nine

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-58-

homes in December 2007.  For the years ended December 31, 2009, 2008 and 2007, the Debtors

delivered 24, 12 and nine homes at The Trails and The Sands, respectively, and generated $21.1

million, $12.3 million and $11.0 million in revenue, respectively.  The Debtors generated gross

operating margins of 10.7%, 28.6% and 33.6% for The Trails and The Sands during 2009, 2008 and

2007, respectively.  Homes at The Trails and The Sands are presently being offered at prices ranging

from $810,000 to $1.0 million.  As of March 31, 2010, there were six homes in escrow at The Trails

and The Sands.

    During January 2008, the Debtors completed construction of nine additional model homes

for The Cliffs and The Breakers and in February 2008 began selling homes to buyers who

previously registered on their priority list.  The Debtors held a grand opening for these

neighborhoods on March 15, 2008.  These homes are larger than The Trails and The Sands, ranging

from 2,724 to 4,339 square feet.  The Debtors began delivering homes at The Cliffs and The

Breakers during the third quarter of 2008 and delivered 11 of these homes during the year ended

December 31, 2008 and seven homes during the year ended December 31, 2009.  The Debtors

generated $15.9 million in revenue and generated gross operating margins of 30% for The Cliffs and

The Breakers in 2009 and $21.0 million in revenue and generated gross operating margins of 35.1%

for The Cliffs and The Breakers in 2008.  Homes at The Cliffs and The Breakers are presently being

offered at prices ranging from $1.3 million to $3.2 million for 2,724 to 4,339 square foot homes.  As

of March 31, 2009, six homes were in escrow at The Cliffs and The Breakers.

**B.    Homebuilding.**

    The Debtors' current homebuilding operations include the four projects described above in

the City of Huntington Beach  in Southern California.  The Debtors delivered 49 homes during

2009, compared to 55 homes during 2008, and 77 deliveries in 2007.  The Debtors acquired no

single-family residential lots during 2009, 2008, 2007 or 2006 and have no contracts to acquire land

or lots.

    During 2009 and 2008, the Debtors saw continued price depreciation and an excess supply of

homes available for sale in the Inland Empire and Lancaster markets.  As a result of declining

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS

778943.4

markets and overleveraged projects, the Debtors decided to exit these markets during 2009 and successfully implemented this strategy as described below.

On March 31, 2009, a subsidiary of Hearthside Homes completed a deed-in-lieu transaction for the Hearthside Lane project in the City of Corona with the investor that had acquired the project loan secured by the property from IndyMac Federal Bank.  The subsidiary conveyed the remaining 134 finished lots to the investor in exchange for a $28.7 million reduction in the note balance and retained seven homes which secured the then remaining note balance of $2.5 million. These seven homes were delivered during the second and third quarters of 2009 and the remaining note balance was fully repaid.

On September 30, 2009, a subsidiary of Hearthside Homes completed a sale of the 62 remaining finished lots at the Woodhaven project for $1.8 million and sold the four remaining model homes for approximately $500,000, thereby disposing of all remaining assets of the project. The lender for the loan secured by the Woodhaven project accepted the proceeds of the sale in full settlement of the loan without further recourse or obligation and the Company recognized a $4.1 million gain on debt cancellation.

**C.    Management/Board of Directors.**

As of the Petition Date, the following individuals served as members of the board of directors for CALC:

> Phillip R. Burnaman, II
>
> Raymond J. Pacini
>
> Geoffrey W. Arens
>
> Marti P. Murray

As of the Petition Date, the following individuals served as members of the board of directors for Debtors other than CALC:

> Raymond J. Pacini
>
> Sandra G. Sciutto

As of the Petition Date, the following individuals served as officers of each of the Debtors, other than Hearthside Homes:

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS

1        Raymond J. Pacini, President and Chief Executive Officer

2        Sandra G. Sciutto, Senior Vice President and Chief Financial Officer

3        Jon Johnston, Vice President

4    As of the Petition Date, the following individuals served as officers of Hearthside Homes:

5        Raymond J. Pacini, Chief Executive Officer

6        Michael J. Rafferty, President and Chief Operating Officer

7        Sandra G. Sciutto, Senior Vice President and Chief Financial Officer

8        Jon Johnston, Vice President

9        John W. Marshall, Senior Vice President

10       Ed Mountford, Senior Vice President

11       Doug Woodyard, Vice President

12   **D.    Summary of Prepetition Indebtedness and Prepetition Financing.**

13       **1.    Prepetition Revolving Loan.**

14       On September 15, 2006, the Debtors entered into that certain Senior Secured Revolving

15   Credit Agreement (the "Prepetition Revolving Credit Agreement") with KeyBank National

16   Association, as agent ("KeyBank" and the "Revolver Agent") and lender and the lenders a party

17   thereto (the "Revolving Lenders") in the maximum amount of $100,000,000.  The obligations under

18   the Prepetition Revolving Credit Agreement are secured by, among other security, (i) the Deed of

19   Trust with Assignment of Rents, Security Agreement and Fixture Filing, by Signal Landmark, a

20   California corporation ("Signal Landmark") for the benefit of Revolver Agent, recorded in the

21   Official Records of Orange County, California as Instrument No. 2006000617267 (as modified,

22   amended, restated, supplemented, renewed or replaced from time to time, the "First Deed of Trust"),

23   granting the Agent a first priority security interest in the Brightwater project as described therein

24   (the "Property"), (ii) the Collateral Assignment of Contracts, Development Rights, Licenses,

25   Permits, Warranties and Guaranties and Subordination Agreement, dated as of September 15, 2006,

26   by and among CALC, Signal Landmark and Agent (as modified, amended, restated, supplemented,

27   renewed or replaced from time to time, the "Collateral Assignment"), and (iii) certain other

28   collateral assignments or security agreements for the benefit of the Agent.  As of the Petition Date,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1  approximately $81,679,317.58 in principal, plus accrued and unpaid interest, fees and expenses,

2  remained outstanding under the Prepetition Revolving Credit Agreement.

3      **2.**    **Prepetition Term Loan.**

4      On September 15, 2006, the Debtors entered into that certain Senior Secured Term Credit

5  Agreement (the "Prepetition Term Loan Agreement" and together with the Prepetition Revolving

6  Credit Agreement, the "Prepetition Credit Agreements") with KeyBank National Association, as

7  agent (the "Term Loan Agent" and together with the Revolver Agent, the "Agent") and lender and

8  the lenders a party thereto (the "Term Loan Lenders" and together with the Revolving Lenders, the

9  "Prepetition Secured Lenders") in the maximum amount of $125,000,000.  The obligations under

10  the Prepetition Term Loan Agreement are secured by, among other security, (i) the Deed of Trust

11  with Assignment of Rents, Security Agreement and Fixture Filing, by Signal Landmark for the

12  benefit of the Term Loan Agent, recorded in the Official Records of Orange County, California as

13  Instrument No. 2006000617268 (as modified, amended, restated, supplemented, renewed or

14  replaced from time to time, the "Second Deed of Trust"), granting the Agent a perfected second

15  priority security interest in the Property, (ii) Pledge and Security Agreement, dated as of September

16  15, 2006, by CALC, in favor of Term Loan Agent (as modified, amended, restated, supplemented,

17  renewed or replaced from time to time), pursuant to which CALC pledged to the Term Loan Agent

18  the ownership interests in Hearthside Holdings, Inc. and Signal Landmark Holdings, Inc., (iii)

19  Pledge and Security Agreement, dated as of September 15, 2006, by Hearthside Holdings, Inc., in

20  favor of Agent (as modified, amended, restated, supplemented, renewed or replaced from time to

21  time), pursuant to which such pledgor pledged to Agent as additional security for the Loan its

22  ownership interests in Hearthside Homes, Inc.), (iv) Pledge and Security Agreement, dated as of

23  September 15, 2006, by Signal Landmark Holdings, Inc., in favor of the Term Loan Agent, pursuant

24  to which such pledgor pledged to the Term Loan Agent its ownership interests in Signal Landmark

25  (as modified, amended, restated, supplemented, renewed or replaced from time to time), (v) Pledge

26  and Security Agreement, dated as of September 15, 2006, by Hearthside Homes, Inc., in favor of

27  Agent (as modified, amended, restated, supplemented, renewed or replaced from time to time),

28  pursuant to which such pledgor pledged to term Loan Agent its ownership interests in it subsidiaries

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1   identified therein, and (vi) certain other collateral assignments or security agreements for the benefit

2   of the Term Loan Agent.  As of the Petition Date, approximately $99,800,000 in principal, plus

3   accrued and unpaid interest, fees and expenses, remained outstanding under the Prepetition Term

4   Loan Agreement.

5        **3.    Model Home Financing.**

6        On December 31, 2008, the Debtors entered into a sale-leaseback transaction for 17 model

7   homes at its Brightwater project with an unrelated third party investor for $25.0 million, consisting

8   of $22.5 million cash, $2.0 million deferred and payable in two years provided there has not been a

9   significant decrease in the value of the model homes, and $500,000 payable for conversion of the

10  model homes for sale to homebuyers upon termination of the lease agreement.  The Debtors have an

11  option to repurchase the model homes after at least 90% of the homes of the respective model type

12  have sold, but no earlier than January 1, 2011.  If the Debtors do not repurchase the models, after the

13  lessor receives a 16% internal rate of return, the Debtors are entitled to receive 75% of any profit

14  resulting from the sale of the models at the end of the lease.

15       **4.    Other Project Debt.**

16       In conjunction with the acquisition of single-family residential lots, Hearthside Homes and

17  its subsidiaries, entered into construction loan agreements with commercial banks.  These loan

18  facilities finance a portion of land acquisitions and the majority of the construction of infrastructure

19  and homes.  Each loan facility requires a guaranty of project completion and an environmental

20  indemnity by Hearthside Homes.  As of the Petition Date the last remaining project loan was held by

21  IndyMac Ventures LLC with respect to the Quartz Hill project owned by HHI Lancaster.  IndyMac

22  Ventures asserted that HHI Lancaster owed in excess of $2.9 million under the loan agreement.

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

## V.    EVENTS PRECEDING THE COMMENCEMENT OF THE CASES

After commencing construction in 2006, the Debtors opened The Trails and The Sands neighborhoods (the smaller homes in the Brightwater project ranging from 1,710 to 2,160 square feet) in Brightwater in August 2007, which was also the start of the worldwide financial crisis. During that year, the Debtors sold nine homes in The Trails and The Sands neighborhoods.  In March 2008 (the same weekend as the collapse of Bear Stearns), the Debtors opened The Cliffs and The Breakers neighborhoods (the larger homes in Brightwater ranging from 2,724 to 4,339 square feet, 61 of which have unobstructed ocean views).  Unfortunately, shortly after the commencement of construction and release of homes for sale, the financial and housing markets took a precipitous decline, new home sales slowed dramatically, and credit markets for residential home buying tightened to historical levels.  During 2008 and 2009, Debtors sold 23 homes and 31 homes, respectively, across all four neighborhoods at Brightwater.

As a result of the decline in the financial and housing markets, in the summer of 2008 the Debtors were forced to negotiate amendments to the Prepetition Credit Agreements in an effort to extend the repayment of that indebtedness in hopes of weathering the economic storm.  However, such negotiations preceded the September 2008 collapse of Lehman Brothers that in turn sparked one of the worst financial crises in history.  In fact, while these amendments were executed on September 30, 2008, the terms of the amendments were based on operational forecasts developed much earlier in 2008 and therefore could not have anticipated the devastating economic collapse that occurred in the fourth quarter of 2008.

Thereafter, the Debtors commenced an intense effort to raise additional capital through the sale and leaseback of 17 model homes at Brightwater, negotiated the sale or transfer of their two largest inland projects in Corona and Beaumont, California to their lender and a third party, respectively, and reduced general administrative, overhead and operational costs in order to minimize the effect of the financial crisis on its ability to repay its debt obligations.  These cost saving efforts have enabled the Debtors to continue to perform their obligations to their trade creditors, keeping substantially current on these obligations.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    While the Debtors' cost-cutting measures have improved operations and reduced overhead

2    costs, the credit market for home buyers remains tight and, except for the period from March 1, 2009

3    through September 30, 2009 when the Debtors generated net sales orders for 30 homes (or 4.29 net

4    orders per month) at Brightwater, home sales have remained sluggish.  As a result, the Debtors

5    commenced discussions with the Agent in July 2009 to restructure the obligations under the

6    Prepetition Credit Agreements over a longer period of time to allow market conditions to recover.

7    During those discussions, on September 30 2009, CALC missed a $1.7 million mandatory principal

8    payment under the Prepetition Revolving Credit Agreement and failed to satisfy a loan to value

9    covenant.  These defaults also triggered defaults under the Prepetition Term Loan Agreement.  The

10    Debtors were able to enter into forbearance agreements with the Agent and the Prepetition Secured

11    Lenders to enable the parties to have further discussions regarding a consensual restructuring of the

12    Prepetition Credit Agreements.  Under the forbearance agreements, the Agent and the Prepetition

13    Secured Lenders agreed to forbear from exercising any remedies until November 1, 2009.

14    The Debtors and the Agent used the forbearance period to continue their dialogue on a

15    consensual restructuring of the Prepetition Credit Agreements.  On October 14, 2009, CALC failed

16    to make required interest payments under the Prepetition Credit Agreements, which in turn

17    terminated the forbearance agreements.  Despite the occurrence of additional defaults, the Debtors

18    and the Prepetition Secured Lenders continued to discuss the proposed restructuring.

19    In light of the defaults under the Prepetition Credit Agreements and previously scheduled

20    reductions in commitments under the Prepetition Revolving Credit Agreement, the Debtors have lost

21    the ability to borrow additional amounts under the Revolving Credit Agreement.  While the Debtors

22    have continued to pay their suppliers, their liquidity has dropped significantly.  In order to preserve

23    liquidity to continue to construct homes and maximize the value of the Brightwater project and the

24    Debtors' business, the Debtors commenced these cases.  This enabled them to capture the expected

25    proceeds from the backlog of 17 Brightwater homes that were expected to close over the coming

26    months, eight of which closed in November and December 2009, five which cancelled primarily due

27    to concerns over the bankruptcy process and another four scheduled to close in 2010.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## VI.    EVENTS OCCURRING
## DURING THE REORGANIZATION CASES

**A.    First Day Motions.**

The Debtors filed numerous motions on the Petition Date seeking the relief provided by certain first-day orders.  First-day orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code, or as to which the Bankruptcy Code requires prior approval by the bankruptcy court.  The Bankruptcy Court entered first-day orders that, among other things:

- Authorized the joint administration of the Debtors' cases.

- Extended the deadline to file schedules of assets and liabilities and statements of financial affairs for each of the Debtors to December 12, 2009.

- Authorized use of existing cash management systems.  A final order was entered on March 3, 2010.

- Authorized the payment of certain prepetition lien claims related to the construction of homes at Brightwater.

- Authorized the Debtors to continue to sell homes and close on the sale of homes at Brightwater free and clear of liens claims and interests on an interim basis.  This authority has been extended through April 9, 2010.

- Authorized the Debtors to continue to perform their obligations under homeowner warranty programs.

- Authorized the Debtors to honor certain prepetition obligations to employees, such as expense reimbursements and employee benefit programs.

**B.    Interim Orders Authorizing Use Of Cash Collateral.**

On November 6, 2009, the Debtors filed their Emergency Motion For Entry Of Interim Order (I) Authorizing Use Of Cash Collateral; (II) Providing Adequate Protection To Prepetition Lenders; (III) Modifying The Automatic Stay; And (IV) Scheduling A Final Hearing (the "First Cash Collateral Motion").  On November 10, 2009 the Court held an interim hearing and entered the First Interim Order authorizing the Debtors to use cash collateral through December 10, 2009.  The Court has issued five more interim cash collateral orders authorizing the Debtors to use cash collateral through May 12, 2010 (collectively, the "Interim Cash Collateral Orders").  Under the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1  Interim Cash Collateral Orders, the Agent and the Prepetition Secured Lenders consented to the use

2  of their cash collateral in accordance with budgets that were approved by the Agent.  In addition, the

3  Interim Cash Collateral Orders also provided, among other things, for the Debtors to pay the

4  Prepetition Secured Lenders current interest at the contract non-default rate, and the reasonable fees

5  and expenses of professionals for the Agent.  The Interim Cash Collateral Orders also granted the

6  Agent liens in assets that were not subject to the Agent's prepetition liens only to the extent of the

7  diminution in value of the Agent's prepetition collateral and superpriority claims.

8  On March 26, 2010, the Debtors filed their Second Emergency Motion For Entry Of Interim

9  Order (I) Authorizing Use Of Cash Collateral; (II) Providing Adequate Protection To Prepetition

10 Lenders; (III) Modifying The Automatic Stay; And (IV) Scheduling A Final Hearing (the "Second

11 Cash Collateral Motion") pursuant to which they requested authority to use cash collateral on a non-

12 consensual basis in anticipation of the expiration of the use of cash collateral on a consensual basis.

13 In support of the Second Cash Collateral Motion, the Debtors submitted the declaration of Mr. Carl

14 DiStefano and an appraisal of the Brightwater project that placed an "as is" value on Brightwater of

15 $219.7 million as of February 1, 2010.  The Debtors and Wilmington Trust reached an agreement on

16 continued use of cash collateral on a consensual basis and on April 13, 2010 the Court entered the

17 Interim Order Granting Second Emergency Motion For Order (I) Authorizing Use Of Cash

18 Collateral (II) Providing Adequate Protection To Prepetition Lenders, (III) Modifying The

19 Automatic Stay And (IV) Scheduling Final Hearing, which authorized the Debtors to use cash

20 collateral through June 30, 2010.

21 **C.    Authorization To Continue To Sell Homes Free And Clear.**

22 Another of the Debtors' first day motions was a request for authorization to continue to sell

23 homes in the ordinary course free and clear of liens, claims, and encumbrances.  At the first day

24 hearing, the Court entered an interim order authorizing the Debtors to continue to sell homes free

25 and clear through December 9, 2009.  The Court has issued a total of ten orders extending the

26 Debtors' authority to sell homes free and clear, with the most recent order set to expire on June 30,

27 2010.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

**D.    Filing of Schedules of Assets and Statement of Financial Affairs.**

On December 12, 2009, each of the Debtors filed their statements of financial affairs and schedules of assets and liabilities.

**E.    Approval of Payment of Sales Commissions.**

The Debtors employ "new home counselors" who serve as the interface between the Debtors and prospective homebuyers. The counselors are involved at every stage of the sale process, soliciting customers, guiding them through the financing process, managing customer requests for options and changes to the homes, assisting them with closing escrow, and assisting them with any other issues that may arise. On December 16, 2009, the Debtors filed a motion for authority to pay the counselors the commissions arising as a result of the closing of the sale of homes that were the subject of prepetition sales contracts. On December 23, 2009, the Court authorized the payment of commissions arising from closings occurring in November 2009. On January 28, 2010, the Court entered a final order authorizing the payment of any remaining commissions arising from the closing of prepetition sales contracts.

**F.    Retention of Professionals.**

The Debtors have retained several professionals in these cases, including Hennigan, Bennett & Dorman LLP as reorganization counsel, Corporate Law Solutions P.C. as special corporate counsel, Deloitte & Touche LLP as auditors, and several ordinary course professionals. The Debtors have also filed applications to employ Imperial Capital as financial advisor and DiStefano & Company as appraiser. On February 16, 2010, the Bankruptcy Court entered an order authorizing the retention of certain professionals in the ordinary course of the Debtors' business. On March 24, 2010, the Bankruptcy Court entered an order approving interim compensation procedures for professionals.

**G.    Sale of Quartz Hill Project.**

On November 25, 2009, Hearthside Homes and HHI Lancaster filed a motion for authority to sell their interest in the Quartz Hill project that consisted of 54 unfinished lots in Lancaster, California to Richmond American Homes, Inc. for $3.1 million. On December 17, 2009, the Court approved the sale of the Quartz Hill project to Richmond American, provided that approximately

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    $2.5 million of the proceeds from the sale were distributed to IndyMac Ventures, LLC through

2    escrow in partial satisfaction of IndyMac Ventures' secured claim against the property.  On

3    December 29, 2009, the Debtors closed the sale and are currently holding approximately

4    $548,022.18 in remaining sale proceeds in a segregated account.

5    **H.    Pension Plans.**

6          CALC has a noncontributory defined benefit retirement plan which covered substantially all

7    employees of CALC prior to September 30, 1993 who had completed one year of continuous

8    employment (the "ERISA Pension Plan").  The Pension Plan is covered by Title IV of the Employee

9    Retirement Income Security Act of 1974, as amended ("ERISA") (29 U.S.C. § 1304 et seq.).  The

10   Debtors estimate that as of the Petition Date, the ERISA Pension Plan was underfunded by $3.4

11   million.  The Debtors estimate that benefit payments will average approximately $520,000 for each

12   of the next five years and an aggregate of $2.3 million for the five fiscal years thereafter.  The

13   Debtors are required to contribute approximately $700,000 to the ERISA Pension Plan in 2010.

14         The Pension Benefit Guaranty Corporation (the "PBGC"), a United States Government

15   corporation that guarantees the payment of certain pension benefits upon termination of a pension

16   plan, asserts that the Debtors are obligated to contribute to the ERISA Pension Plan at least the

17   amounts necessary to satisfy ERISA's minimum funding standards, found in ERISA section 302 and

18   Internal Revenue Code section 412.  The PBGC also takes the position that in the event of a

19   termination of the ERISA Pension Plan, the Debtors and all members of their controlled group may

20   be jointly and severally liable for the unfunded benefit liabilities of the ERISA Pension Plan, See

21   ERISA section 4062, 29 U.S.C. § 1362, and that the ERISA Pension Plan may be terminated only if

22   the statutory requirements of either ERISA section 4041 or 4042 are met.

23         Under the Joint Plan, CALC is not terminating the ERISA Pension Plan.  Instead, the ERISA

24   Pension Plan will be continued by the Reorganized Debtors.  Neither the Debtors nor the

25   Reorganized Debtor intend to request any minimum funding waivers.  Unless the ERISA Pension

26   Plan has been terminated prior to the Effective Date of the Joint Plan, the liability of the Debtors, the

27   Reorganized Debtors, and their controlled groups (if any) to the ERISA Pension Plan, or the PBGC

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1   with respect to the ERISA Pension Plan, under ERISA, shall not be affected in any way by this

2   reorganization proceeding, including by discharge or release.

3       CALC also has a non-qualified pension plan entitled the "Retirement Plan for the Non-

4   Employee Directors of The Henley Group, Inc. (and Henley Properties, Inc.)" (the "Retiree Director

5   Pension Plan"). There are seven participants in the Retiree Director Pension Plan. The Debtors'

6   estimate that approximately $128,000 has accrued and remains unpaid under the Retiree Director

7   Pension Plan through March 31, 2010 and approximately $2.1 million could be payable in the future

8   based upon certain actuarial assumptions. Claims under the Retiree Director Pension Plan are

9   treated in Class A-5 of the Joint Plan.

10  **I.      Change in Composition of the Prepetition Secured Lenders And Prepetition Agent.**

11      On or before April 6, 2010, certain Prepetition Secured Lenders, including KeyBank, sold

12  their holdings of Prepetition Secured Claims to other lenders. As a result of KeyBank's sale of its

13  holdings of Prepetition Secured Claims, KeyBank also resigned as the Prepetition Agent. On April

14  6, 2010, Wilmington Trust FSB ("Wilmington Trust") succeeded to KeyBank and became the

15  Prepetition Agent.

16  **J.      NASDAQ Delisting.**

17      The day after the Petition Date, CALC received a delisting notice from the Nasdaq Staff.   In

18  December 2009, CALC successfully appealed to the panel and was granted continued Nasdaq listing

19  until April 26, 2010, upon which date CALC was required by the Panel's decision to have emerged

20  from the Chapter 11. CALC requested that the panel extend its deadline so that the common stock

21  would remain listed while the Debtors completed the Chapter 11 process. When the panel refused to

22  grant any further extension, CALC submitted the matter to the Nasdaq Review Council which, by

23  having declined to accept the matter for review, resulted in CALC's common stock being delisting

24  effective April 27, 2010. CALC's common stock is now traded on the over-the-counter market

25  (OTCQB) under the CALCQ ticker symbol.

26  **K.      Significant Claims Against The Estates And Pending Litigation.**

27      Listed below are descriptions of several significant claims asserted against the Debtors'

28  estates and certain pending litigation:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1

**1.      Insurance Company of the West.**

Insurance Company of the West ("ICW") has issued numerous construction performance

bonds in support of several of the Debtors' residential development projects, including public

improvements to the Brightwater project, the Quartz Hill project, and a former project developed by

HHI Hellman, LLC.  The Debtors estimate that the face amount of the construction bonds issued by

ICW is approximately $22.5 million.  The Debtors' liability under the construction bonds is

contingent upon failure to complete the respective construction projects supported by the ICW

bonds.  CALC and Signal Landmark have agreed to indemnify ICW for any claims against ICW

under the construction bonds.  ICW has asserted current claims under the indemnity agreement of

approximately $100,000.

**2.      Brightwater Models, LLC.**

As discussed above, in December 2008, Signal Landmark entered into a sale-leaseback

transaction with Brightwater Models, LLC pursuant to which Singal Landmark sold the 17 model

homes at the Brightwater project.  In connection with that transaction, Brightwater Models, LLC

leased the model homes back to Signal Landmark.  The lease contains provisions for sharing profits

from the ultimate sale of the models.  The Projections for the Joint Plan assume that the lease is

assumed and that the Debtors exercise their right to extend the term of the lease.

**3.      State Lands Commission.**

In 1997, the predecessor to Signal Landmark sold 880 acres of wetlands located near the

Brightwater project to the State of California.  Pursuant to agreements related to that sale, CALC

and Signal Landmark agreed to indemnify the State Lands Commission for certain environmental

liabilities related to the property.  Environmental remediation is ongoing. The Debtors estimate that

their share of remediation expenses may range from $100,000 to over $1,000,000.  The claims of the

State Lands Commission may be asserted against both CALC and Signal Landmark and are

included in classes A-5 and C-5 of the Joint Plan.

**4.      IndyMac Ventures, LLC.**

IndyMac Ventures, LLC asserted a secured claim against HHI Lancaster I, LLC in the

amount of $2,926,391.63 based upon a loan agreement between HHI Lancaster I, LLC and IndyMac

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-71-

1    Bank FSB dated as of November 23, 2005.  IndyMac Ventures, LLC, as successor to IndyMack

2    Bank FSB with respect to the Lancaster Loan, asserted a security interest in real property owned by

3    HHI Lancaster I, LLC located in Lancaster, California commonly referred to as Quartz Hill.  As

4    discussed above, on December 17, 2009, the Court approved the sale of the Quartz Hill property,

5    and other assets, to Richmond American Homes, Inc. for $3.1 million.  Pursuant to the sale order,

6    $2,552,163.10 was paid to IndyMac Ventures, LLC at the closing of the sale to Richmond American

7    Homes.  IndyMac Ventures asserts a lien against the remaining proceeds of the sale.  The Debtors

8    dispute that IndyMac Ventures had a perfected security interest in all of the property that was sold to

9    Richmond American Homes and estimate IndyMac Ventures' remaining secured claim to be

10   between $100,000 and $400,000.  IndyMac Ventures' secured claim is included in Class F-1 and

11   any deficiency claim is included in Class F-6.

12           **5.        Pending Litigation.**

13           In *Continental Insurance Co., et al. v. Honeywell International, Inc. et al.*, Superior Court of

14   Morris County New Jersey, Case No. MRS-133-04, CALC is named as a cross-defendant for claims

15   relating to insurance coverage for various alleged asbestos liabilities and claims against various

16   former subsidiaries of Honeywell (f/k/a Allied-Signal, Inc.), a predecessor of CALC.  Resco

17   Holdings LLC and others have filed a cross-complaint in the 23rd Judicial District Court of Wharton

18   County, Texas against CALC for numerous indemnity claims related to M.W. Kellogg Company, a

19   former affiliate of CALC and Pullman Passenger Car Company ("PPCC"), a non-Debtor subsidiary

20   of CALC.  In connection with the December 1988 spin-off of CALC from its former parent, CALC

21   indemnified its former parent for certain liabilities of M.W. Kellogg.  In the PPCC matters, CALC

22   and PPCC are indemnified by MAFCO Consolidated Group Inc. ("MAFCO"), which has been

23   defending all of these cases in accordance with a March 1997 Settlement Agreement between CALC

24   and MAFCO.  Travelers seeks declaratory relief and equitable subrogation against CALC, PPCC,

25   and MAFCO.

26           In *Smith et al v. Amcord Inc. et al*, Los Angeles Superior Court Case No.BC387962 Signal

27   Landmark is named as a successor-defendant in an asbestos case related to a home sold in the late

28   1960s in Westlake Village, California, which was built by an entity that Signal Landmark purchased

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  in 1969.  Three of Signal Landmark's insurance carriers (CNA, Chubb and Travelers) have now

2  accepted indemnification for this case and Signal Landmark has received reimbursements of

3  litigation costs to date.

4          The litigation pending against CALC and Signal Landmark has been stayed and relief from

5  stay has not been granted.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-73-

1

2

## VII.    CERTAIN FACTORS TO CONSIDER
## IN VOTING TO ACCEPT OR REJECT THE JOINT PLAN

3

### A.    The Homebuilding Industry Has Undergone A Significant And Sustained Downturn.

The homebuilding and mortgage lending industries have experienced a significant and sustained downturn. Unprecedented levels of national concern over instability in the credit markets, along with concerns over the recession and elevated levels of unemployment, have exacerbated the decline in demand for new homes. These conditions include, among other things: reduced consumer confidence; significant concerns over the impact of higher-risk mortgage loan products on the banking system and financial markets; reduced availability and higher costs of mortgage loan financing; fluctuating energy costs; the absence of home price stability; and continued declines in the value of new homes. All of these factors, in an economy that has been in recession since December 2007 and appears to be gradually recovering, have contributed to the significant decline in the demand for new homes. The government's legislative and administrative measures aimed at restoring liquidity to the credit markets and providing relief to homeowners facing foreclosure have recently begun to show positive results.

If the downturn in the homebuilding and mortgage lending industries continues or the recovery occurs slower than expected, or if the national economy experiences a "double dip" recession, the Debtors could experience further declines in the market value and demand for their homes, which could have a significant negative impact on their gross margins from home sales and financial and operational results. Also, the prices of land and new homes, and the stock prices of companies like the Debtors' that build new homes, may decline further if the demand for new homes continues to weaken. A decline in the prices for new homes has had and would continue to have an adverse effect on the Debtors' homebuilding business, in particular on their revenues and margins. The Debtors can provide no assurances that the homebuilding market will improve in the near future.

778943.4

**B.    The Debtors' Strategies In Responding To The Adverse Conditions In The Homebuilding Industry May Not Be Successful.**

While the Debtors continue to monitor and modify their strategies in responding to the current economic environment, the effectiveness of these strategies in future reporting periods is unknown.  To the extent they are not successful; the Reorganized Debtors' financial and operating results may be adversely impacted.  The Debtors believe that the cancellation rates largely reflected a decrease in homebuyer confidence based on sustained home price declines, increased offerings of sales incentives in the marketplace for both new and existing homes, generally poor economic conditions, and the filing of the Debtors' chapter 11 cases, all of which prompted homebuyers to forgo or delay home purchases.  While there appears to be improvement in the mortgage lending environment, the inability of some buyers to sell their existing homes has also led to lower demand for new homes and higher cancellations.  Many of these factors affecting new orders and cancellation rates are beyond the Debtors' control.  It is uncertain how long these factors, and the reduced sales levels and volatility in cancellations the Debtors have experienced will continue.

**C.    The Reorganized Debtors will have Substantial Indebtedness.**

Following the Effective Date, the Reorganized Debtors will have a substantial amount of indebtedness and other fixed obligations, including, without limitation, the Restated Senior Secured Term Loan and the Restated Junior Secured Term Loan.  The degree to which the Reorganized Debtors are leveraged could have important consequences, including, but not limited to: (i) making it more difficult to pay interest and satisfy debt obligations, (ii) increasing the Reorganized Debtors' vulnerability to general adverse economic and industry conditions, (iii) requiring the dedication of a substantial portion of the Reorganized Debtors' cash flow from operations to the payment of indebtedness and interest thereon, thereby reducing the availability of the cash flow to fund working capital or other general corporate requirements of the Reorganized Debtors, (iv) limiting the ability of the Reorganized Debtors to obtain additional financing, and (v) placing the Reorganized Debtors at a competitive disadvantage compared to less leveraged competitors.

778943.4

1

**D.      Availability of Additional Liquidity.**

2

The availability of additional capital, whether from private capital sources (including banks)

3

or the public capital markets, fluctuates as market conditions change.  There may be times when the

4

private capital markets and the public debt or equity markets lack sufficient liquidity or when the

5

Reorganized Debtors' securities cannot be sold at attractive prices, in which case the Reorganized

6

Debtors would not be able to access capital from these sources.  Based on current market conditions

7

for small businesses such as the Debtors, the Reorganized Debtors' ability to effectively access these

8

liquidity sources could be limited.  In addition, a further weakening of the Debtors' financial

9

condition, including in particular a material decrease in their profitability or cash flows, could

10

adversely affect their ability to obtain necessary funds or otherwise increase their cost of borrowing.

11

Moreover, due to the condition of the credit markets and the uncertainties that exist in the

12

general economy and for homebuilders in particular, the Debtors cannot be certain that they would

13

be able to replace existing financing or secure additional sources of financing.  In addition, the

14

significant decline in CALC's stock price and the reduction in CALC's stockholders' equity relative

15

to the Debtors' debt could also impede the Debtors' access to the equity markets or increase the

16

amount of dilution CALC's stockholders would experience should the Debtors seek or need to raise

17

capital through issuance of equity.

18

**E.      Changes In Laws Or Other Events That Adversely Affect Liquidity In The Secondary
         Mortgage Market Could Hurt The Debtors' Business.**

19

20

The government-sponsored enterprises, principally FNMA and FHLMC, play a significant

21

role in buying home mortgages and creating investment securities that they either sell to investors or

22

hold in their portfolios.  These organizations provide liquidity to the secondary mortgage market.

23

FNMA and FHLMC have experienced financial difficulties.  Any new federal laws or regulations

24

that restrict or curtail their activities, or any other events or conditions that prevent or restrict these

25

enterprises from continuing their historic businesses, could affect the ability of the Debtors'

26

customers to obtain the mortgage loans or could increase mortgage interest rates or credit standards,

27

which could reduce demand for the Debtors' homes and/or the loans that they originate and

28

adversely affect their results of operations.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1    In addition, the Housing and Economic Recovery Act of 2008 prohibits, as of October 15,

2    2008, seller funded down payment assistance programs.  As a result of these trends, the ability and

3    willingness of prospective buyers to finance home purchases or to sell their existing homes has been

4    adversely affected, which has adversely affected the Debtors' operating results.  These conditions

5    may continue.

6    **F.    The Homebuilding Industry Is Highly Competitive And, With More Limited Resources**
     **Than Many Of The Debtors' Competitors, The Debtors May Not Be Able To Compete**
7    **Effectively.**

8    The homebuilding industry is highly competitive.  The Debtors compete with numerous

9    other residential construction firms, including large national and regional firms, for customers, land,

10   financing, raw materials, skilled labor and employees.  The Debtors compete for customers

11   primarily on the basis of the location, design, quality and price of their homes and the availability of

12   mortgage financing.  Some of the competitors have substantially larger operations and greater

13   financial resources than the Debtors do and as a result may have lower costs of capital, labor and

14   materials, and may be able to compete more effectively.  However, there is a very limited supply of

15   land entitled for residential development along the coast of Southern California, and the Brightwater

16   project offers a unique location that is expected to thrive as the housing market recovers.

17   **G.    The Debtors' Business Is Cyclical And Downward Changes In Economic Conditions**
     **Generally Or In The Market Regions Where The Debtors Operate Could Further**
18   **Decrease Demand And Pricing For New Homes In These Areas.**

19   The residential homebuilding industry is sensitive to changes in economic conditions such as

20   those which are listed below. Adverse changes in any of these conditions generally, or in the market

21   regions where the Debtors operate, could decrease demand and pricing for new homes in these areas

22   or result in customer cancellations of pending contracts, which could adversely affect the number of

23   home deliveries the Debtors make or reduce the prices the Debtors can charge for homes, either of

24   which could result in a decrease in the Debtors' revenues and earnings.

25   The Debtors' business is substantially affected by changes in national and general economic

26   factors outside of the Debtors' control, such as:

27
28        •    short and long term interest rates;

          •    the availability of financing for homebuyers;

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

- consumer confidence (which can be substantially affected by external conditions, including international hostilities involving the United States);

- consumer income;

- federal mortgage financing programs; and

- federal and state income tax provisions, including provisions for the deduction of mortgage interest payments.

The cyclicality of the Debtors' business is also highly sensitive to changes in economic conditions that can occur on a local or regional basis, such as changes in:

- housing demand;

- population growth;

- employment levels and job growth; and

- property taxes.

The factors described above can cause demand and prices for the Debtors' homes to diminish or cause the Debtors to take longer and incur more costs to build their homes. The Debtors may not be able to recover these increased costs by raising prices because prices have been declining over the last three years and the price of each home is usually set several months before the home is delivered, as the Debtors' customers typically sign their home purchase contracts before construction has even begun on their homes. In addition, some of the factors described above could cause some homebuyers to renegotiate for lower prices or cancel their home purchase contracts altogether.

-78-

778943.4

# VIII.  VOTING PROCEDURES AND CONFIRMATION OF THE JOINT PLAN

**A.    General.**

To confirm the Joint Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Joint Plan and the Debtor, including that:

- the Joint Plan has classified Claims and Interests in a permissible manner;

- the Joint Plan complies with the applicable provisions of the Bankruptcy Code;

- the Joint Plan Proponents have complied and will comply with the applicable provisions of the Bankruptcy Code;

- the Joint Plan Proponents have proposed the Joint Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Joint Plan has been accepted by the requisite votes of creditors and equity interest holders (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code (see Section VIII.D. "Acceptance or Cramdown"));

- the Joint Plan is feasible, including that confirmation of the Joint Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors;

- the Joint Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class who does not accept the Joint Plan by providing to such creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Joint Plan provides for the payment of such fees on the Effective Date;

- the Joint Plan provides for the continuation after the Effective Date of all retiree benefits provided by the Debtor, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Reorganized Debtors have been made.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-79-

778943.4

1    **B.      Voting Procedures and Requirements.**

2          Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in the Debtors

3    that are "impaired" under the terms of the Joint Plan are entitled to vote to accept or reject the Joint

4    Plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or

5    interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of

6    Claims or Interests that are not impaired are not entitled to vote on the Joint Plan and are

7    conclusively presumed to have accepted the Joint Plan.  In addition, classes of Claims or Interests

8    that receive no distributions under the Joint Plan are not entitled to vote on the Joint Plan and are

9    deemed to have rejected the Joint Plan unless such Class otherwise indicates acceptance.  The

10   classification of Claims and Interests is summarized, together with an indication of whether each

11   class of Claims or Interests is impaired or unimpaired, in Section III.B. "Summary of Classification

12   and Treatment of Claims and Interests under the Joint Plan."

13         Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy

14   Court may estimate and temporarily allow a Claim for voting or other purposes.  By order of the

15   Bankruptcy Court, certain vote tabulation rules have been approved that temporarily allow or

16   disallow certain Claims for voting purposes only.  These tabulation rules are described in the

17   solicitation materials provided with your Ballot.

18         **VOTING ON THE JOINT PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM**

19   **OR INTEREST ENTITLED TO VOTE ON THE JOINT PLAN IS IMPORTANT.  YOU**

20   **SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

21         **PLEASE CAREFULLY FOLLOW ALL OF THE INSTRUCTIONS CONTAINED**

22   **ON THE BALLOT PROVIDED TO YOU.  ALL BALLOTS MUST BE COMPLETED AND**

23   **RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED.**

24         **TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY 5:00**

25   **P.M., P.D.T., ON [_____,] 2010 (OR SUCH OTHER TIME AND DATE IDENTIFIED**

26   **ON YOUR BALLOT) AT THE ADDRESS SET FORTH ON THE PREADDRESSED**

27   **ENVELOPE PROVIDED TO YOU.  IT IS OF THE UTMOST IMPORTANCE TO THE**

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1   **JOINT PLAN PROPONENTS THAT YOU VOTE PROMPTLY TO ACCEPT THE JOINT**

2   **PLAN.**

3        Votes cannot be transmitted orally.  Accordingly, you are urged to return your signed and

4   completed Ballot promptly.

5        **IF ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO**

6   **REJECT THE JOINT PLAN, (I) THE JOINT PLAN PROPONENTS MAY SEEK TO**

7   **SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN UNDER**

8   **THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE**

9   **AND, IF REQUIRED, MAY AMEND THE JOINT PLAN TO CONFORM TO THE**

10  **STANDARDS OF SUCH SECTION; OR (II) THE JOINT PLAN MAY BE MODIFIED OR**

11  **WITHDRAWN.**

12       IF YOU ARE ENTITLED TO VOTE AND YOU DID NOT RECEIVE A BALLOT,

13  RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, PLEASE CALL THE JOINT

14  PLAN PROPONENTS' VOTING AGENT.

15  **C.    Confirmation Hearing.**

16       The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on

17  whether the Joint Plan Proponents have fulfilled the Confirmation requirements of section 1129 of

18  the Bankruptcy Code.  The Confirmation Hearing has been scheduled for [_____,] 2010 at

19  [__:00 a.m.] before The Honorable Theodor C. Albert, United States Bankruptcy Court for the

20  Central District of California, Santa Ana Division, Courtroom 5B, 411 West Fourth Street, Santa

21  Ana, California  92701.  The Confirmation Hearing may be adjourned from time to time by the

22  Bankruptcy Court without further notice, except for an announcement of the adjourned date made at

23  the Confirmation Hearing.  Any objection to Confirmation must be made in writing and must

24  specify in detail the name and address of the objector, all grounds for the objection and the amount

25  of the Claim or Interest held by the objector.  Any such objections must be Filed and served upon

26  the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline

27  described therein.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

**D.    Acceptance or Cramdown.**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Joint Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors.  Classes A-3, A-4, A-6, A-7, B-3, B-4, B-6, B-7, C-3, C-4, C-6, C-7, D-3, D-4, D-6, D-7, E-3, E-4, E-6, E-7, F-4, F-5, F-7, F-8 and G-3 are unimpaired and deemed to accept the Joint Plan. Classes A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, D-1, D-2, D-5, E-1, E-2, E-5, F-1, F-2, F-4, and F-6 are permitted to vote to accept or reject the Joint Plan.

Wilmington Trust has advised the Debtors and the Bankruptcy Court that a majority in number and amount of the holders of the Prepetition Revolver Claims and the Prepetition Term Loan Claims oppose confirmation of the Joint Plan and intend to vote to reject the Joint Plan.  To the extent that a Class of Impaired Claims votes to reject the Joint Plan, the Joint Plan Proponents intend to request that the Bankruptcy Court confirm the Joint Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such rejecting Class.  The Debtors believe that the Joint Plan satisfies those requirements.  Wilmington Trust, however, maintains that the Joint Plan does not satisfy those requirements.

Section 1129(a)(10) requires that if a plan impairs a class of creditors, one impaired class must vote to accept the plan without counting the votes of an insider.  The Plan Proponents submit that if any of A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, D-1, D-2, D-5, E-1, E-2, E-5, F-1, F-2, F-3, and F-6 votes to accept the Joint Plan, the requirements of Section 1129(a)(10) will be meet.

**E.    Best Interests Test; Liquidation Analysis.**

Notwithstanding acceptance of the Joint Plan by each impaired Class, to confirm the Joint Plan, the Bankruptcy Court must determine that the Joint Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Joint Plan. Accordingly, if an impaired Class does not unanimously accept the Joint Plan, the "best interests" test requires that the Bankruptcy Court find that the Joint Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1    Effective Date, at least equal to the value of the distribution that each such member would receive if

2    the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

3    To estimate what members of each impaired Class of Claims or Interests would receive if the

4    Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first

5    determine the aggregate dollar amount that would be available if the Reorganization Cases were

6    converted to chapter 7 cases under the Bankruptcy Code and the Debtors' assets were liquidated by

7    a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtors would consist

8    of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by

9    the Debtors.

10    The Liquidation Value available to holders of Unsecured Claims and Interests in Classes A-

11    5, B-5, C-5, D-5, E-5, or F-6 would be reduced by, among other things, (i) the Claims of secured

12    creditors to the extent of the value of their collateral; (ii) the costs, fees and expenses of the

13    liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (iii) unpaid

14    Administrative Expense Claims of the Reorganization Cases; and (iv) Priority Claims and Priority

15    Tax Claims.  The costs of liquidation in chapter 7 cases would include the compensation of a trustee,

16    as well as of counsel and of other professionals retained by such trustee, asset disposition expenses,

17    applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the

18    pendency of the chapter 7 cases and all unpaid Administrative Expense Claims incurred by the

19    Debtors during the Reorganization Cases that are allowed in the chapter 7 case.  The liquidation

20    itself may trigger certain Priority Claims, such as Claims for severance pay, and would likely

21    accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be

22    payable in the ordinary course of business.  These Priority Claims and Priority Tax Claims would be

23    paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance

24    would be made available to pay Unsecured Claims or to make any distribution in respect of

25    Interests.  The Joint Plan Proponents believe that the liquidation also would generate a significant

26    increase in Unsecured Claims, such as rejection damage Claims.

27    The information contained in Exhibit E hereto provides a summary of the Liquidation Value

28    of the Debtors' interests in property, assuming a chapter 7 liquidation in which a trustee appointed

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-83-

1   by the Bankruptcy Court would liquidate the Debtors' properties and interests in property.  As more

2   fully described in Exhibit E, the liquidation analysis is based on a number of other estimates and

3   assumptions that are subject to significant uncertainties, including estimates and assumptions

4   relating to the proceeds of sales of assets, the timing of such sales, the impact of pending

5   liquidations on continuing operations and values and certain tax matters.  **YOU SHOULD**

6   **CAREFULLY REVIEW IN DETAIL ALL OF THE ESTIMATES AND ASSUMPTIONS**

7   **SET FORTH IN EXHIBIT E.  WHILE THE JOINT PLAN PROPONENTS BELIEVE THAT**

8   **THESE ESTIMATES AND ASSUMPTIONS ARE REASONABLE FOR THE PURPOSE OF**

9   **PREPARING HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSES, NO**

10  **ASSURANCE EXISTS THAT SUCH ESTIMATES AND ASSUMPTIONS WOULD BE**

11  **VALID IF THE DEBTORS WERE, IN FACT, TO BE LIQUIDATED.  THE FUTURE**

12  **VALUE AVAILABLE FOR DISTRIBUTION TO HOLDERS OF CLAIMS AND**

13  **INTERESTS UNDER A CHAPTER 7 LIQUIDATION COULD BE MATERIALLY**

14  **GREATER OR LESSER THAN AS SET FORTH IN EXHIBIT E.**

15      As noted above, the Joint Plan Proponents believe that chapter 7 liquidation could result in

16  substantial litigation that could delay the liquidation beyond the periods assumed in Exhibit E.  This

17  delay could materially reduce the amount determined on a present value basis available for

18  distribution to creditors, including holders of Unsecured Claims in Classes A-5, B-5, C-5, D-5, E-5,

19  or F-6.  Moreover, the Joint Plan Proponents believe that such litigation and attendant delay could

20  adversely affect the values realizable in the sale of the Debtors' assets to an extent that cannot be

21  reliably estimated at this time.

22      Based on the liquidation analysis set forth in Exhibit E, although no assurance can be given,

23  the Joint Plan Proponents believe that holders of Claims and Interests will receive value, as of the

24  Effective Date, at equal to or greater value under the Joint Plan than such holders would receive

25  under a chapter 7 liquidation.

26      In actual liquidations of the Debtor, distributions to holders of Claims would be made

27  substantially later than the Effective Date assumed in connection with the Joint Plan.  This delay

28  would materially reduce the amount determined on a present value basis available for distribution to

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-84-

creditors. The hypothetical chapter 7 liquidation of the Debtor is assumed to commence on August 1, 2010 and to be completed within 180 days thereafter. The Liquidation Analysis assumes the distributions are made by the chapter 7 trustee beginning immediately following commencement of the liquidation and completed within 180 days of commencement. As a result, the Joint Plan Proponents believe the value of the liquidation distributions on a present value basis determined as of the projected Effective Date would be less than the value distributable under the Joint Plan.

The Joint Plan Proponents further believe that chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by holders of Claims and Interests, as compared to the proposed distributions under the Joint Plan, because of, among other factors:

a.    the failure to realize the maximum going concern value of the Debtors' assets;

b.    additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation and from the rejection of Executory Contracts and Unexpired Leases in connection with a cessation of the Debtor's operations; and

c.    the substantial time that would elapse before entities would receive any distribution in respect of their Claims.

Consequently, the Joint Plan Proponents believe, although no assurance can be given, that the Joint Plan will provide a greater return to holders of Claims against the Debtor than would a chapter 7 liquidation.

**F.    Feasibility**

To confirm the Joint Plan, the Bankruptcy Court must find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. Although no assurances can be given, the Joint Plan Proponents believe that the Reorganized Debtors will be able to timely perform all obligations described in the Joint Plan, and, therefore, that the Joint Plan is feasible.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1    In an effort to demonstrate the feasibility of the Joint Plan, the Debtors have prepared two

2    sets of financial projections for years 2010 – 2014, as set forth in Exhibit D attached to this

3    Disclosure Statement.  The first set of projections (the "Base Case Projections") indicate that the

4    Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and

5    to fund their operations.  The terms of the Restated Senior Secured Term Loan and the Restated

6    Junior Secured Term Loan coupled with the deferral of Cash distributions to unsecured creditors

7    provide the Cash resources needed to fund the Joint Plan.  Accordingly, the Joint Plan Proponents

8    believe that the Joint Plan satisfies the feasibility requirement of section 1129(a)(11) of the

9    Bankruptcy Code.  The second set of projections (the "Covenant Case Projections" and together

10   with the Base Case Projections, the "Projections") reflect the Debtors' forecast used in setting the

11   proposed quarterly amortization schedules for the Restated Senior Term Loan and the Restated

12   Junior Term Loan.

13   As noted in the Projections, however, the Debtors caution that no representations can be

14   made as to the accuracy of the Projections or as to the Reorganized Debtor's ability to achieve the

15   projected results.  Many of the assumptions upon which the Projections are based are subject to

16   uncertainties outside the control of the Joint Plan Proponents.  Some assumptions inevitably will not

17   materialize, and events and circumstances occurring after the date on which the Projections were

18   prepared may be different from those assumed or may be unanticipated, and may adversely affect

19   the Reorganized Debtors' financial results.  Therefore, the actual results may vary from the

20   projected results and the variations may be material and adverse.  *See* Section VII "Certain Factors

21   to Consider in Voting to Accept or Reject the Joint Plan" for a discussion of certain risk factors that

22   may affect feasibility of the Joint Plan.

23   **THE PROJECTIONS WERE NOT PREPARED BY THE JOINT PLAN**

24   **PROPONENTS WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES**

25   **ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC**

26   **ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH**

27   **GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND**

28   **REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

1   PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT

2   ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE

3   PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, WHICH ARE

4   FURTHER DESCRIBED IN EXHIBIT D.  THERE IS NO ASSURANCE THAT ANY OR

5   ALL OF THE ASSUMPTIONS WILL BE ACCURATE OR THAT THE PROJECTIONS

6   WILL PROVE TO BE ACCURATE.  SOME OF THESE ASSUMPTIONS HAVE NOT

7   BEEN ACHIEVED IN THE PAST, MAY NOT BE REALIZED IN THE FUTURE, AND ARE

8   SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE

9   UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE

10  CONTROL OF THE JOINT PLAN PROPONENTS.  CONSEQUENTLY, THE

11  PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR

12  WARRANTY BY THE JOINT PLAN PROPONENTS, OR ANY OTHER PERSON, THAT

13  THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY BE

14  MATERIALLY BETTER OR WORSE THAN THOSE PRESENTED IN THE

15  PROJECTIONS.

16              GENERAL DISCLAIMER REGARDING
               FORWARD-LOOKING STATEMENTS
17

18          CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE

19  STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS

20  ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY

21  DIFFERENT FROM ACTUAL, FUTURE RESULTS.  EXCEPT WITH RESPECT TO THE

22  PROJECTIONS SET FORTH IN EXHIBIT "D" ATTACHED HERETO, AND EXCEPT AS

23  OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS

24  DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR

25  SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL

26  IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

27  NEITHER THE JOINT PLAN PROPONENTS NOR THE REORGANIZED DEBTORS

28  INTEND TO UPDATE THE PROJECTIONS OR ANY FORWARD-LOOKING

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-87-

1 **STATEMENTS.  THUS, THE PROJECTIONS (AND ANY FORWARD-LOOKING**

2 **STATEMENT SET FORTH HEREIN) WILL NOT REFLECT THE IMPACT OF ANY**

3 **SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS**

4 **UNDERLYING THE PROJECTIONS OR SUCH FORWARD-LOOKING STATEMENTS.**

5 **FURTHER, THE JOINT PLAN PROPONENTS DO NOT ANTICIPATE THAT ANY**

6 **AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE**

7 **DISTRIBUTED TO REFLECT SUCH OCCURRENCES.  ACCORDINGLY, THE**

8 **DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT UNDER ANY**

9 **CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR**

10 **COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.**

11 **G.     Value of the Brightwater Project and Other Assets.**

12      The treatment of Claims and Interests under the Joint Plan is based upon the Debtors'

13 valuation of the collateral securing the Prepetition Revolver Claims and Prepetition Term Loan

14 Claims, as well as other assets that the Debtors propose to include as additional collateral.  This

15 valuation is based upon an independent appraisal, as of February 1, 2010, provided by Mr. Carl

16 DiStefano of DiStefano & Company.  The Debtors filed the appraisal with the Bankruptcy Court in

17 support of the Second Cash Collateral Motion.

18      Wilmington Trust, the agent for the holders of Prepetition Revolver Claims and the

19 Prepetition Term Loan Claims, disagrees with the Debtors' appraisal of Brightwater.  Based upon a

20 prior appraisal commissioned by Wilmington Trust's predecessor, Wilmington Trust maintains that

21 the value of the collateral securing the Prepetition Revolver Claims and Prepetition Term Loan

22 Claims is not greater than the amounts of those claims in the aggregate.  Wilmington Trust's

23 existing appraisal values the Brightwater collateral at substantially less than the amounts owed to

24 holders of Prepetition Revolver Claims and Prepetition Term Loan Claims in the aggregate.

25 Wilmington Trust has advised the Bankruptcy Court and the Debtors that it has commissioned a new

26 appraisal of the Brightwater collateral that it intends to submit to the Bankruptcy Court and to the

27 Debtors.

28

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Pursuant to the hearing on the Debtors' Disclosure Statement, the Bankruptcy Court has ordered that a hearing on the valuation of the Debtors' assets take place before the hearing on confirmation of the Joint Plan.  Such hearing is scheduled to take place on July 15, 2010, at 2:00 p.m. prevailing Pacific Time.  At that hearing the Bankruptcy Court will determine the value of the Brightwater collateral and other assets of the Debtors.  If Wilmington Trust's position regarding valuation is correct and the holders of Prepetition Revolver Claims and Prepetition Term Loan Claims are not significantly oversecured, the Joint Plan might not be confirmable.  Even if the value of the Brightwater collateral is determined to be equal to or greater than the aggregate amount of Prepetition Revolver Claims and Prepetition Term Loan Claims, the Bankruptcy Court will need to determine at the Confirmation Hearing whether the treatment proposed for holders of Prepetition Revolver Claims and Prepetition Term Loan Claims satisfies the applicable standards for confirmation of a plan under the Bankruptcy Code.

**H.    Compliance with Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Joint Plan comply with the applicable provisions of the Bankruptcy Code.  The Joint Plan Proponents have considered each of these issues in the development of the Joint Plan and believe that the Joint Plan complies with all provisions of the Bankruptcy Code.

**I.    Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Reorganization Cases and any of the proceedings related to the Reorganization Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Joint Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

- to establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense Claim or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with Bankruptcy Code §505), resolve any objections to the allowance or priority of Claims,

778943.4

Administrative Expense Claim or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense Claim or Interest pursuant to the Joint Plan;

•   to grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Joint Plan, for periods ending on or before the Effective Date;

•   to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

•   to ensure that distributions to Holders of Allowed Claims or Administrative Expense Claims are made pursuant to the provisions of the Joint Plan, and to effectuate performance of the provisions of the Joint Plan;

•   to decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending before the Effective Date or that may be commenced thereafter as provided in the Joint Plan;

•   to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Joint Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Joint Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

•   to resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Joint Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Joint Plan and the Confirmation Order or any Person's rights arising under or obligations incurred in connection with the Joint Plan or the Confirmation Order; provided, however, that, absent a Reorganized Debtors' request or consent, such retention of jurisdiction shall not apply to any cases, controversies, suits or disputes that may arise in connection with a Reorganized Debtors' or any other entity's rights or obligations as: (a) the issuer or Holder, respectively, of any securities issued or delivered pursuant to the Joint Plan; or (b) a party to any agreements governing, instruments evidencing or documents relating to the securities issued or delivered pursuant to the Joint Plan;

•   subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, to modify the Joint Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or

778943.4

document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Joint Plan, to the extent authorized by the Bankruptcy Code;

- to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Joint Plan or the Confirmation Order,

- to consider and act on the compromise and settlement of any Claim against, or Right of Action of the Debtors or the Estates;

- to decide or resolve any Rights of Action under the Bankruptcy Code, including without limitation, avoidance actions and claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

- to enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtor or the Reorganized Debtor wherever located;

- to hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Reorganization Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Reorganized Debtor, and (iv) estimation or allowance of any tax claims asserted against the Debtor or Reorganized Debtor;

- to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

- to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Reorganization Cases or the Joint Plan;

- to remand to state court any claim, cause of action, or proceeding involving the Debtor that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

- to determine any other matters that may arise in connection with or relate to the Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Joint Plan;

- to determine any other matter not inconsistent with the Bankruptcy Code; and

- to enter an order concluding the Reorganization Cases.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-91-

## IX.    CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF CONSUMMATION OF THE JOINT PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Joint Plan to the Debtor and certain holders of Claims.  The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in Cash, or are otherwise unimpaired under the Joint Plan (e.g., holders of Administrative Expense Claims, holders of Priority Tax Claims, Other Priority Claims, and certain Secured Claims), or (ii) holders whose Claims or Interests are or may be extinguished without a distribution in exchange therefor.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Joint Plan are complex and are subject to significant uncertainties.  The Joint Plan Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Joint Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Joint Plan, nor does it purport to address the federal income tax consequences of the Joint Plan to Claims held solely by the United States or any state or local government, or to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.**

778943.4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE JOINT PLAN.**

**A.      Consequences to the Debtors.**

As of December 31, 2009 the Debtors had federal net operating losses ("NOLs") of approximately $163 million.  The amount of federal NOLs that expire if not utilized is $49 million in 2010, $42 million in 2011, zero in 2012, 2013 and 2014, and $72 million thereafter.  The Debtor anticipates that a portion of such NOL carryforwards may be utilized to offset income from operations in its current taxable year.  In addition, the amount of such NOL carryforwards and other losses remains subject to adjustment by the IRS.  On May 13, 2010 the Debtors reinstated limitations on certain acquisitions of CALCQ stock in order to reduce the risk of a 50% change in ownership which would subject the Debtors to significant limitations on the availability of their $163 million of NOL carryforwards under Section 382 of the Code.  As discussed below, any remaining NOL carryforwards (and possibly certain other tax attributes) may be eliminated or subject to limitations in future years upon the implementation of the Joint Plan.

**1.      Cancellation of Debt**

In general, the Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets – by the amount of any cancellations of debt ("COD").  COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor.  As a result of the discharge of the Allowed Claims pursuant to the Joint Plan, the Debtors would suffer COD and tax attribute reduction, except to the extent that holders of Allowed Claims are paid in full or one or more statutory or judicial exceptions to COD and tax attribute reduction apply (such as where the payment of the cancelled debt would have given rise to a tax reduction).  The extent of such COD and resulting tax attribute reduction will depend on the fair market value of the Restated Senior Secured Term Loan, the Restated Junior Secured Term Loan, and the amount of Cash distributed in discharge of such Allowed Claims.  Confirmation of the Joint Plan may result in the reduction of the Debtors' NOL carryforwards after taking into account current year operating income.

778943.4

1

### 2. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an "ownership change" within the meaning of Section 382 of the Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### B. Consequences to Holders of Certain Claims.

Pursuant to the Joint Plan, holders of Prepetition Revolver Loan Claims will be entitled to receive, in satisfaction of their Claims, Restated Senior Secured Term Loans. Holders of Prepetition Term Loan Claims will be entitled to receive, in satisfaction of their Claims, Restated Junior Secured Term Loans. Holders of Allowed Unsecured Claims and Allowed Other Priority Claims will be entitled to receive, in satisfaction of their Claims, Cash. Distributions by the Reorganized Debtors that will be made on the Effective Date.

### 1. Holders of Allowed Claims in Classes

In general, each holder of an Allowed Claim in Classes A-1, A-2, A-3, A-4, A-5, B-1, B-2, B-3, B4, B-5, C-1, C-2, C-3, C-4, C-5, D-1, D-2, D-3, D-4, -D-5, E-1, E-2, E-3, E-4, E-5, F-1, F-2, F-3, F-4, F-5, F-6 and G-3 will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued

778943.4

but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the tax consequences of Claims for accrued interest, see Section IX.B.2 "Distributions in Discharge of Accrued Interest," below.

The "amount realized" by a holder generally will equal the (a) the amount of any cash received, or (b) the fair market value of any Restated Senior Secured Term Loan or Restated Junior Secured Term Loan received.

The character of gain or loss recognized by a holder, as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.  A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 2.        Distributions in Discharge of Accrued Interest

Pursuant to the Joint Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent that any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

778943.4

3.    **Information Reporting and Withholding**

All distributions to holders of Allowed Claims under the Joint Plan are subject to any applicable withholding (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 31%.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE JOINT PLAN.**

778943.4

# X.    APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS.

## A.    General.

The Joint Plan Proponents believe that, subject to certain exceptions described below, various provisions of the Bankruptcy Code and related no-action interpretations of the staff of the SEC exempt from federal securities registration requirements (i) the offer and distribution of such securities under the Joint Plan and (ii) subsequent transfers of such securities.  In addition, various provisions of the Bankruptcy Code exempt from state securities registration requirements the offer and distribution of such securities pursuant to the Joint Plan.  However, the ability to effect subsequent transfers of such securities under state securities laws without registration or qualification under such laws may be limited in circumstances where the securities are not registered under the Securities and Exchange Act of 1934, as amended (the "Exchange Act") or do not constitute "covered securities" for purposes of the Exchange Act (i.e., not listed on the New York Stock Exchange or Amex, or quoted on the Nasdaq Stock Market).

## B.    Bankruptcy Code Exemptions from Registration Requirements

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa (the "Securities Act") and applicable state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such an affiliate, or principally in such exchange and partly for cash or property.  The Joint Plan Proponents believe that the offer and sale of the New CALC Common Stock under the Joint Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and applicable state securities laws.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

**C.    Subsequent Transfers of Securities Under Federal Securities Laws.**

In general, all resales and subsequent transactions in the New CALC Common Stock distributed under the Joint Plan will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, which exempts from registration transactions by any person other than the "issuer," an "underwriter" or a "dealer."

Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

> (i)    persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

> (ii)    persons who offer to sell securities offered under a plan for the holders of such securities ("distributors");

> (iii)    persons who offer to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; and

> (iv)    a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "underwriter" includes any person who purchases from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of a security, or participates directly or indirectly in such an undertaking.  For these purposes, the term "issuer" includes a person directly or indirectly controlling or controlled by or under direct or indirect or common control with the issuer (commonly known as an "affiliate" of the issuer).  Under section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of such person's time, directly or indirectly, as agent, broker or principal in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

Section 1145(b) of the Bankruptcy Code also specifies that an entity that is not the issuer is not an underwriter, even if it falls within one of the four categories specified above, with respect to "ordinary trading transactions."  The staff of the SEC has indicated that a transaction in securities may be considered an "ordinary trading transaction" if the class of securities is registered under the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Exchange Act and if the transaction is made on an exchange or in the over the counter market and

2    does not involve any of the following factors:

(i)    either (a) concerted action by the recipients of securities issued under

a plan in connection with the sale of such securities or (b) concerted action by

distributors on behalf of one or more such recipients in connection with such sales;

(ii)    the use of informational documents concerning the offering of the

securities prepared or used to assist in the resale of such securities, other than a

bankruptcy court approved disclosure statement and supplements thereto and

documents filed with the SEC pursuant to the Exchange Act; or

(iii)    the payment of special compensation to brokers and dealers in

connection with the sale of such securities designed as a special incentive to the

resale of such securities (other than the compensation that would be paid pursuant to

arms' length negotiations between a seller and a broker or dealer, each acting

unilaterally, not greater than the compensation that would be paid for a routine

similar sized sale of similar securities of a similar issuer).

Although not binding with respect to any future events or circumstances, including those

directly or indirectly relevant to the Joint Plan, the staff of the SEC has indicated in a series of no-

action interpretations that, in certain situations, (i) non-affiliates of an issuer may make unregistered

offers and sales of securities received in a reorganization in "ordinary trading transactions" and (ii)

"affiliates" of an issuer may effect resales of such securities in reliance on Rule 144 under the

Securities Act without compliance with any holding period.  Rule 144 provides an exemption from

registration under the Securities Act for certain limited public resales of unrestricted securities by

"affiliates" of the issuer of such securities.  Rule 144 allows a holder of unrestricted securities that is

an affiliate of the issuer of such securities to sell, without registration, within any three-month period

a number of shares of such unrestricted securities that does not exceed the greater of 1% of the

number of outstanding securities of the class in question or the average weekly trading volume in

such securities during the four calendar weeks preceding the date on which notice of such sale was

filed on Form 144, subject to the satisfaction of certain other requirements of Rule 144 regarding,

-99-

778943.4

among other things, the manner of sale and the availability of current public information regarding

the issuer.  The Joint Plan Proponents believe that, pursuant to section 1145(c) of the Bankruptcy

Code, the New CALC Common Stock to be issued pursuant to the Joint Plan will be issued in a

public offering pursuant to such section and will be deemed unrestricted securities for purposes of

Rule 144.

For a company such as CALC, the securities of which are registered under the Exchange

Act, sufficient information generally is deemed available to the public only if it has filed all reports

required to be filed under the Exchange Act for the twelve months preceding the date of resale.

CALC has remained current on its Exchange Act filings.

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, DEALER, OR AN AFFILIATE OF THE REORGANIZED DEBTOR, OR THE APPLICABILITY OF THE "ORDINARY TRADING TRANSACTION" EXEMPTION OR RULE 144, THE JOINT PLAN PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW CALC COMMON STOCK TO BE DISTRIBUTED PURSUANT TO THE JOINT PLAN.  THE JOINT PLAN PROPONENTS HAVE NOT SOUGHT THE SEC'S VIEWS ON ANY OF THESE MATTERS.  THE JOINT PLAN PROPONENTS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN SECURITIES COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

778943.4

## XI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Joint Plan Proponents believe that the Confirmation and consummation of the Joint Plan is preferable to all other alternatives. Consequently, the Joint Plan Proponents urge all holders of Claims in voting Classes to vote to accept the Joint Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

DATED:  May 19. 2010

By: _____
    Raymond J. Pacini
    Chief Executive Officer
    California Coastal Communities, Inc.

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

778943.4

-101-