HENNIGAN, BENNETT & DORMAN LLP
BRUCE BENNETT (Cal. Bar No. 105430)
JOSHUA M. MESTER (Cal. Bar No. 194783)
MICHAEL C. SCHNEIDEREIT (Cal. Bar No. 234956)
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234

*Reorganization Counsel for Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| *In re* <br> ☐ CALIFORNIA COASTAL COMMUNITIES, INC. <br> ☐ SIGNAL LANDMARK HOLDINGS, INC. <br> ☐ SIGNAL LANDMARK <br> ☐ HEARTHSIDE HOLDINGS, INC. <br> ☐ HEARTHSIDE HOMES, INC. <br> ☐ HHI CHANDLER, L.L.C. <br> ☐ HHI CHINO II, L.L.C. <br> ☐ HHI CROSBY, L.L.C. <br> ☐ HHI HELLMAN, L.L.C. <br> ☐ HHI LANCASTER I, L.L.C. <br> ☐ HHI SENECA, L.L.C. <br><br> ☒ All Debtors <br><br> Debtors. | Case No. 8:09-21712-TA <br><br> Jointly Administered with Case Nos. <br> 8:09-21713-TA; 8:09-21714-TA; <br> 8:09-21715-TA; 8:09-21717-TA; <br> 8:09-21718-TA; 8:09-21719-TA; <br> 8:09-21720-TA; 8:09-21721-TA; <br> 8:09-21722-TA; 8:09-21723-TA <br><br> Chapter 11 <br><br> **EMERGENCY MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO EXIT FINANCING COMMITMENT LETTER AND PAY RELATED FEES; (B) APPROVING A BREAK UP FEE; (C) AUTHORIZING THE DEBTORS TO AMEND JOINT PLAN OF REORGANIZATION; AND (D) RESCHEDULING AND CONSOLIDATING HEARINGS ON VALUATION AND PLAN CONFIRMATION** <br><br> Hearing <br><br> **Date: TBD** <br> **Time: TBD** <br> **Place: Courtroom "5B"** <br> **411 West Fourth Street** <br> **Santa Ana, CA 92701-4593** |

778914.1

**TO THE HONORABLE THEODOR C. ALBERT AND ALL INTERESTED PARTIES:**

California Coastal Communities, Inc., et al., the debtors and debtors in possession herein (collectively, the "Debtors") hereby move this Court for entry of an order, in substantially the form of the proposed order (the "Order") attached hereto as Exhibit A, (a) authorizing the Debtors to enter into the proposed exit financing commitment letter (collectively, with the terms sheets and other attachments annexed thereto, the "Commitment Letter") with Luxor Capital Group, L.P. ("Luxor") attached hereto as Exhibit B, pursuant to sections 105 and 363 of the Bankruptcy Code; (b) approving the expense reimbursement and indemnification provisions of the Commitment Letter, including providing a deposit of up to $175,000 toward Luxor's reimbursable expenses; (c) authorizing and approving payment of a break-up fee under section 503 of the Bankruptcy Code, on the terms and conditions stated in the Commitment Letter, if Luxor is overbid as provider of exit financing; (d) authorizing the Debtors to file a third amended joint plan of reorganization to be funded by the exit facility; (e) rescheduling and consolidating the hearings on valuation and confirmation; and (f) granting related relief.

In support of this Motion, the Debtors submit the accompanying Declaration of Raymond J. Pacini" (the "Pacini Declaration") and respectfully represent as follows:

## I. INTRODUCTION

1. On May 12, 2010, the Court approved the Debtors' disclosure statement for their second amended joint plan of reorganization and scheduled a hearing for July 15, 2010 to determine the value of the Debtors' assets for plan confirmation purposes. Under the Second Amended Plan, the Debtors propose to restructure their prepetition secured debt. The agent for the prepetition secured lenders has stated that the secured lenders intend to vote to reject the Second Amended Plan and contest the Debtors' valuation of its assets. Since April 2010, the agent has engaged in extensive discovery aimed at opposing confirmation of the Debtors' Second Amended Joint Plan.

2. The Debtors' are pleased that they have recently obtained the Commitment Letter, which provides for an alternative to the contested Second Amended Plan. Luxor has committed to provide $182 million in exit financing (the "Exit Facility") that will be used to pay the Lenders the

full allowed amount of their secured claims on the effective date and that will recapitalize the Debtors such that unsecured creditors will be repaid in full over time.

3. Because the Debtors will use the Exit Facility to repay the Lenders in full in cash, there is no need for the estate to incur the costs of a contested valuation hearing. In short, the Exit Facility provides a complete solution to the Debtors' cases, facilitates the prompt emergence from chapter 11, and preserves value for the Debtors' unsecured creditors and shareholders.

4. Luxor has committed to provide the entire $182 million contemplated by the Exit Facility, has not conditioned its commitment on performing further due diligence, and is not charging the Debtors any fees for the Exit Facility, except for the expense reimbursement and indemnification obligations described below. The Commitment Letter is the result of arm's-length negotiations and is in the best interests of the estate. Moreover, the Exit Facility will provide certainty about the Debtors' emergence from chapter 11 and allow them to emerge from bankruptcy more promptly.

5. The Commitment Letter requires that the Debtors obtain approval of a break-up fee equal to 3.5% of the total commitment (the "Break-Up Fee"), the reimbursement of expenses incurred by Luxor in the negotiating and documenting of the Exit Facility, including the provision of an initial expense deposit of $75,000 with an additional deposit of $100,000 due on July 1, 2010 (collectively, the "Expense Deposits"), and approval of the indemnification of Luxor from losses arising from the Commitment Letter (other than from Luxor's gross negligence or willful misconduct). The Break-Up Fee, expense reimbursement, and indemnification provisions are necessary expenses as they are an express condition to Luxor's commitment to provide the Exit Facility. Moreover, these fees and expenses are reasonable and within the range approved by other courts, particularly since Luxor is not charging the Debtors a commitment fee or any other facility fee for issuing the Commitment Letter.

6. In light of the availability of the Exit Facility, the Debtors further require authority to modify the Second Amended Plan to incorporate the Exit Facility and modify the treatment to the Lenders. Similarly, because the Exit Facility eliminates the immediate need for the valuation hearing, the Debtors require the Court to reschedule the valuation hearing to be combined with the

-3-

778914.1

confirmation hearing as a holding date in case the Court does not confirm the Debtors' plan as modified to include the Exit Facility.

7. Accordingly, the relief requested in the Motion is reasonable and in the best interests of the estates and their creditors and should be granted.

## II. BACKGROUND

8. On October 27, 2009 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code.

9. The Debtors are continuing in possession of their assets and are operating and managing their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10. Debtor California Coastal Communities, Inc. ("CALC"), a publicly traded company on the over-the-counter market (ticker: CALCQ), and its subsidiaries are in the business of residential land development and homebuilding with properties owned or controlled in various counties in Southern California. The Debtors' principal activities are: (1) obtaining zoning and other entitlements for land that they own or under consulting contracts for other landowners; (2) improving the land for residential development; and (3) designing, constructing, and selling single-family homes on that land. Debtor Hearthside Homes, Inc. is the homebuilder for the Debtors' projects, and performs construction and marketing functions for the Debtors' projects. Since 1994, the Debtors have delivered over 2,200 homes to families in Southern California.

### A. Brightwater And The Debtors' Other Assets.

11. Currently, the Debtors' largest project is "Brightwater," a 356 unit master planned community located on 105 acres of the Bolsa Chica mesa in the City of Huntington Beach in Orange County, California. Brightwater offers a broad mix of four different neighborhoods (the Trails, the Sands, the Cliffs, and the Breakers) with home choices ranging from 1,710 to 4,339 square feet. Located near Pacific Coast Highway and overlooking the Pacific Ocean, Huntington Harbor and the recently restored 1,300-acre Bolsa Chica Wetlands, 63 of the 356 homes at Brightwater will have unobstructed ocean and/or wetlands views. This project is located on one of the last large undeveloped coastal properties in Southern California. Brightwater is bordered on the north and

-4-

778914.1

east by residential development in the City of Huntington Beach and Huntington Harbor, to the south by open space and the 1,300-acre Bolsa Chica wetlands, and to the west by 120 acres of publicly-owned conservation land and open space on the lower bench of the Bolsa Chica mesa, Pacific Coast Highway, Bolsa Chica State Beach, and the Pacific Ocean. Brightwater also has 37 acres of open space and conservation area.

12. As of the Petition Date, the Debtors had delivered 53 homes in Brightwater to individual home buyers and 17 model homes to an investor.

13. The Debtors also have one other project – Debtor Signal Landmark owns The Ridge, located near Brightwater, which is in the beginning stages of development, with no construction having been commenced. Debtor HHI Lancaster I, LLC ("HHI Lancaster") also owns 73 unimproved lots in Lancaster, California.

**B.    The Prepetition Secured Lenders and the Joint Plan of Reorganization.**

14. The Debtors are a party to two prepetition credit facilities that are secured by, among other things, the Brightwater project. As of the Petition Date, the revolving credit facility had approximately $81.7 million in principal amount outstanding (the "Prepetition Revolving Loans") and the term loan credit facility had approximately $99.8 million in principal amount outstanding (the "Prepetition Term Loans"). On or about April 6, 2010, Wilmington Trust FSB became the successor administrative agent for the lenders (the "Lenders") holding Prepetition Revolving Loans and Prepetition Term Loans.

15. In spite of the Debtors' extensive efforts to negotiate a consensual plan of reorganization, in March 2010 after a change in the composition of the Lenders, it became apparent that the Debtors could not reach an agreement on a consensual restructuring. On March 26, 2010, the Debtors filed their joint plan of reorganization and subsequently scheduled May 12, 2010 as the hearing to consider approval of their disclosure statement. Under the plan, the Debtors propose to give the Lenders new secured loans in exchange for their existing loans. On May 12, 2010, the Court approved the Debtors' disclosure statement, subject to additional modifications, and set a hearing on valuation under section 506 for July 15, 2010, and a hearing on confirmation of the Joint

Plan for July 28, 2010. On May 19, 2010, the Debtors filed their second amended disclosure statement and second amended plan (the "Second Amended Plan").

16. On May 24, 2010, the parties entered into a stipulation scheduling certain deadlines for completing discovery, preparing expert reports, and briefing for the July 15, 2010 hearing on valuation issues. Under that schedule, the parties are to complete fact discovery by June 22, 2010, exchange expert reports on June 23, 2010, and file opening briefs on July 6, 2010. Currently, the parties have identified in approximately 11 fact witnesses and four experts that may be deposed over the course of the next two to three weeks.

### C. The Proposed Exit Facility From Luxor

17. During the preparations for the valuation hearing, the Debtors also engaged in discussions with Luxor regarding the possibility of Luxor providing exit financing to replace the Lenders.[1] On June 15, 2010, Luxor provided the Debtors with the Commitment Letter, pursuant to which Luxor has agreed to provide the Debtors with exit financing on the terms contained therein, summarized as follows:[2]

- Commitment Amount: $182 million in principal amount provided pursuant to three separate loans (a first, second, and third priority loan).
- Fees: No fees, other than a potential administration fee for the agent under the various loans;
- Conditions to the Commitment: The Commitment Letter has few conditions and does not include a condition for further due diligence.
- Closing: Luxor is prepared to close the Exit Facility no later than August 31, 2010.
- Break-Up Fee: Given Luxor's agreement to provide a commitment through the confirmation of the Debtors' plan, as amended, Luxor has required that

---

[1] In June 2010, Luxor or its affiliates became a Lender and purchased Prepetition Revolving Loans and/or Prepetition Term Loans, along with a portion of CALC's common stock.

[2] This summary is qualified in its entirety by the provisions of the Commitment Letter. The Commitment Letter shall control in the event of any inconsistency between this Motion and the Commitment Letter.

-6-

778914.1

    the Debtors' obtain approval of a Break-Up Fee equal to 3.5% of the principal amount of the loans committed by Luxor.  The Break-Up Fee would only be paid in the event that the Debtors subsequently choose an alternative financing or seek to confirm a chapter 11 plan other than a plan financed by the Exit Facility.

- <u>Expense Reimbursement/Indemnification</u>:  The Commitment Letter requires the Debtors to reimburse Luxor for its reasonable out of pocket expenses incurred in negotiating and documenting the Exit Facility and indemnify Luxor for any loss arising out of the Commitment Letter, other than losses resulting from Luxor's gross negligence or willful misconduct.  Toward that end, the Commitment Letter requires the Debtors to provide Luxor with the Expense Deposits in the amount of $75,000 upon approval of the Commitment Letter by this Court and a supplemental deposit of $100,000 on July 1, 2010.

18. The Commitment Letter requires that the Debtors obtain the entry of an order granting the relief requested in this Motion no later than June 22, 2010 or the Commitment Letter will terminate.  Accordingly, time is of the essence.

## III.    RELIEF REQUESTED

19. By this motion, the Debtors request an order that (a) authorizes them to enter into the Commitment Letter, (b) approves the expense reimbursement and indemnification provisions in the Commitment Letter (including, without limitation, the funding of the Expense Deposits), (c) approves the allowance and payment of the Break-Up Fee, (d) authorizes the Debtors to amend their plan to modify the treatment for the Lenders and to implement the Exit Facility, and (e) reschedule and combine the valuation hearing with the confirmation hearing as a holding date so that the Debtors can focus on emerging from chapter 11 expeditiously while eliminating litigation expenses that are no longer necessary.

-7-

778914.1

### A. Authority to Enter Into the Commitment Letter

20. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. A debtor may generally use estate property outside of the ordinary course of business after notice and a hearing if the debtor can demonstrate that the disposition has a valid business justification and is in good faith. *See*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *240 North Brand Partners v. Colony GFP Partners, L.P. (In re 240 North Brand Partners)*, 200 B.R. 653, 659 (B.A.P. 9th Cir. Cal. 1996). Once a debtor has articulated a valid business justification for the disposition, a presumption arises that the decision was made on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *In re Integrated Resources*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Courts will generally not interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. *Id.* (citing *FSLIC v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal 1988)).

21. A sound business justification exists to grant the relief requested herein. The Debtors believe that the Exit Facility offered by Luxor is in the best interests of the estates and is the result of arms'-length negotiations. The Exit Facility provides the Debtors sufficient liquidity to repay the Lenders in cash rather than by forcing them to accept new loans over their objection. The Exit Facility also eliminates the need to incur further administrative expenses litigating with the Lenders over the value of the Debtors' assets and the treatment offered to the Lenders under the Second Amended Plan.

22. Negotiations with Luxor have been conducted at arm's length and in good faith and the Debtors have determined in their business judgment that the terms contained in the proposed Commitment Letter are fair and reasonable. Under these circumstances, the Debtors believe that entering into the Commitment Letter is in the best interests of the estates, creditors, shareholders, and the Debtors' business.

778914.1

**B.    Approval Of The Break-Up Fee Is Reasonable And Necessary to Preserve the Value of the Estate**

23.    The Debtors seek approval of the Break-Up Fee, which is equal to 3.5% of the principal amount of the Luxor commitment. Courts have recognized that break-up fees are often a key component to realizing value for stakeholders. As the District Court in *Integrated Resources* stated:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Integrated Resources*, 147 B.R. at 659-60. Specifically, "break-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 955 5th Ave. Assocs*., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). The district court in *Integrated Resources* held that courts should consider the following three factors in evaluating the allowance of a proposed breakup fee: (a) the relationship between the initial bidder and the seller; (b) whether the fee is designed to encourage bidding; and (c) the size of the fee in relation to the purchase price. *Integrated Resources*, 147 B.R. at 650.

24.    Here all of the factors support approval of the Break-Up Fee. First, the Break-Up Fee was the product of arms'-length negotiations between the Debtors and Luxor. Second, Luxor is not willing to enter into the Commitment Letter without approval of the Break-Up Fee and has made approval of the Break-Up Fee an express condition of the Commitment Letter.

25.    Third, the Break-Up Fee is reasonable and a cost-effective alternative to a non-refundable commitment fee. It is customary for lenders issuing commitments for financing, both exit financing and postpetition financing, to charge borrowers a fee for holding the commitment to lend open until the closing date of the loan. These commitment fees are sunk costs that generally are not recoverable if the financing ultimately does not close and are generally measured as a percentage of the total commitment. In this case, Luxor is not charging the Debtors a nonrefundable commitment fee. Instead, the Break-Up Fee will only be paid in the event that the Debtors elect to pursue an alternative to the Exit Facility, in which case, such financing will likely result in economic

savings greater than the Break-Up Fee.  Thus, the Break-Up Fee provides the only compensation to Luxor in the event that the Debtors terminate the commitment in favor of an alternative transaction.

26.     Fourth, the Break-Up Fee is within the range of those approved by courts in other cases.  For instance, in *In re Muzak Holdings LLC*, Case No. 09-10422 (JC) (Bankr. D. Del. December 21, 2009) (Dkt. 732), the Bankruptcy Court in approved a break-up fee comprising 3.5% of the total exit financing commitment.  In *Integrated Resources*, the court approved a break-up fee of approximately 3.3%.  *Integrated Resources*, 147 B.R. at 660-62.  In *In re Ronco Corp.*, Judge Mund approved a break-up fee of 3% along with an expense reimbursement of up to 1.5% to a stalking horse bidder.  *In re Ronco Corp., et al.*, Case No. 07-12000 (GM) (Bankr. C.D. Cal. July 13, 2007) (Dkt. 101); *see also In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 7, 2010) (Dkt. 5145) (order approving issuance of warrants to parties to commitment agreements to purchase equity of reorganized debtors); *In re Solutia, Inc.*, Case No. 03-17949 (Bankr. S.D.N.Y. Nov. 23, 2007 (Dkt. 4352) (order approving an undisclosed break-up fee in connection with an exit financing commitment letter).

27.     Accordingly, the Break-Up Fee is necessary to secure the commitment from Luxor for the Exit Facility, is reasonable under the circumstances, and is in the best interests of the estates and their stakeholders.

**C.    The Indemnification And Expense Reimbursement Obligations Are Reasonable And Necessary to Preserve the Value of the Estate**

28.     As with the Break-Up Fee, the expense reimbursement, the Expense Deposits, and indemnification provisions in the Commitment Letter are reasonable and necessary to preserve the value of the estate for stakeholders.  The Commitment Letter requires the Debtors to reimburse Luxor for expenses incurred in connection with negotiating and documenting the Exit Facility, and towards that end, to provide Luxor with the Expense Deposits.  Specifically, the Commitment Letter calls for the Debtors to provide an initial deposit of $75,000 upon approval of the Commitment Letter and an additional deposit of $100,000 on July 1, 2010.  The Debtors currently believe that they have unused amounts in the budget through June 2010 for the current cash collateral order that can be used to fund the initial expense reimbursement deposit.  The Debtors intend to include the

-10-

778914.1

1 additional expense reimbursement deposit amount in the budget for July 2010, which would be the
2 subject of the next cash collateral order.

3       29.     Expense reimbursement and indemnification provisions for exit financing lenders are
4 customary terms for financing in the marketplace. Such provisions have been approved in numerous
5 cases in other jurisdictions. *See, e.g., In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr.
6 D. Del. Dec. 21, 2009) (Dkt. 732) (order authorizing the debtors to enter into exit financing
7 commitment letters and pay certain fees and expenses associated therewith); *In re Flying J Inc.*,
8 Case No. 08-13384 (MFW) (Bankr. D. Del. October 15, 2009) (Dkt. 2100); *In re Buffets Holdings,*
9 *Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Mar. 4, 2008) (Dkt. 2181). Moreover, Luxor will
10 not agree to provide the Exit Facility without approval of the expense reimbursement and
11 indemnification provisions.

12       30.     Accordingly, approval of the expense reimbursement and indemnification provisions
13 in the Commitment Letter will provide a benefit to the estates and are actual and necessary
14 expenses.

15       **D.**     **Authority to Amend the Joint Plan**

16       31.     As noted above, the Debtors filed their second amended Joint Plan on May 19, 2010.
17 The Second Amended Plan contemplates providing the Lenders with new secured loans. Under the
18 Exit Facility, the Debtors would have the means to pay the Lenders' allowed claims in full and in
19 cash. In order to implement the Exit Facility in their plan, the Debtors' require authority to modify
20 the Second Amended Plan to change the treatment offered to the Lenders. The Debtors do not
21 propose changing the treatment offered to other creditors.

22       **E.**     **Rescheduling and Consolidation of the Valuation and Confirmation Hearings**

23       32.     The Exit Facility offered by Luxor removes the immediate need for the continued
24 litigation over the value of the Debtors' assets and the cramdown standards under the Bankruptcy
25 Code. Because the Lenders will be paid in full and in cash on the effective date, there is no longer
26 any reason to determine the value of their collateral, as cash would constitute the indubitable
27 equivalent of their collateral. Accordingly, it is in the best interests of the estates to reschedule the
28 valuation hearing to be combined with the confirmation hearing as a holding date. In the unlikely

-11-

778914.1

1  event that the Court does not confirm the Debtors' plan as modified or if the Debtors cannot close on

2  the Exit Facility, then at the confirmation hearing, the Court can reschedule the valuation litigation.

3  But, it would serve no purpose to waste estate resources preparing for a contested valuation hearing

4  if the Prepetition Lenders will be paid in full in cash on the effective date.  Accordingly, the Court

5  should defer the current valuation hearing and discovery schedule.

778914.1

## IV. CONCLUSION

WHEREFORE, for the reasons set forth above, and based on the Pacini Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form of the proposed Order attached hereto as Exhibit A, granting the following relief: (a) authorizing the Debtors to enter into the Commitment Letter; (b) approving the Break-Up Fee; (c) approving the expense reimbursement and indemnification provisions in the Commitment Letter; (d) authorizing the Debtors to file a third amended joint plan of reorganization implementing the Exit Facility; (d) rescheduling and consolidating the hearing on valuation and related deadlines; and (e) granting related relief.

DATED:  June 15, 2010

HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
LOS ANGELES, CA 90017


By: */s/ Joshua M. Mester*
    Bruce Bennett
    Joshua M. Mester
    Michael C. Schneidereit

Reorganization Counsel for Debtors
and Debtors in Possession

-13-

778914.1