Robert Jay Moore (SBN 77495)
Linda Dakin-Grimm (SBN 119630)
David B. Zolkin (SBN 155410)
Delilah Vinzon (SBN 222681)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

Attorneys for Wilmington Trust FSB,
Successor Agent for Prepetition Secured Lenders

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CALIFORNIA COASTAL COMMUNITIES, INC., et al.,[1] | ) Case No.   8:09-21712-TA |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **MOTION OF WILMINGTON TRUST FSB TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE, IN LIGHT OF NEW CONDITION TO CLOSE ON EXIT FINANCING COMMITMENT** |
| | ) Hearing |
| | ) Date:  [Requested on Shortened Notice] |
| | ) Time:  [Requested on Shortened Notice] |
| | ) Place:  Courtroom "5B" |
| | )           411 West Fourth Street |
| | )           Santa Ana, CA 92701 |

---

[1] The Debtors, along with the last four digits of each Debtors' federal tax identification number are: California Coastal Communities, Inc. ("CALC") (6634) Signal Landmark Holdings Inc. (4663), Signal Landmark (5092),  Hearthside Holdings, Inc. (5323), Hearthside Homes, Inc. (8051), HHI Chandler, L.L.C. (0897), HHI Chino II, L.L.C. (8596), HHI Crosby, L.L.C. (8650), and HHI Hellman, L.L.C. (5072), HHI Lancaster I, L.L.C. (8520), and HHI Seneca, L.L.C. (6572).

-1-
MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT .................................................................................................... 1

BACKGROUND .............................................................................................................................. 5

    A.    The Exit Financing Motion and Order Thereon. ................................................... 5

    B.    The Agent/Lender-Debtor Settlement and the Debtors' Subsequent Announcement of the Modification of the Exit Facility Closing Conditions. ............................................................................................................. 7

ARGUMENT .................................................................................................................................... 9

    A.    Materially Changed Circumstances Warrant that the Exit Financing Order be Reconsidered Pursuant to FRCP 60(b) ............................................................... 9

        1.    The Exit Financing Order May be Vacated Under FRCP 60(b)(2). ......... 10

        2.    The Exit Financing Order May be Vacated Under FRCP 60(b)(6). ......... 15

    B.    In the Alternative, the Court Should Modify the Exit Financing Order to Clarify that the Estates Have No Liability for the Break Up Fee if the Junior Capital Financing Closing Condition Is Not Satisfied. .............................. 15

CONCLUSION ............................................................................................................................... 16

-i-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

# TABLE OF AUTHORITIES

**CASES**

Chinichian v. Campolongo (In re Chinichian),
  784 F.2d 1440 (9th Cir. 1986) ........................................................................................ 16

In re Int'l Fibercom, Inc.,
  503 F.3d 933 (9th Cir. 2007) ..................................................................................... 15, 16

In re Roxford Foods, Inc.,
  12 F.3d 875 (9th Cir. 1993) ............................................................................................ 10

In re Walker,
  332 B.R. 820 (Bankr.D.Nev.2005) ................................................................................. 10

Klapprott v. United States,
  335 U.S. 601 (1949) ........................................................................................................ 15

Meyer v. Lenox (In re Lenox),
  902 F.2d 737 (9th Cir. 1990) .......................................................................................... 16

Pincay v. Andrews,
  389 F.3d 853 (9th Cir. 2004) .......................................................................................... 10

Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship,
  507 U.S. 380 (1993) ........................................................................................................ 10

State of Washington v. United States,
  214 F.2d 33 (9th Cir.) ..................................................................................................... 11

**STATUTES**

11 U.S.C. § 105(a) ................................................................................................................ 1

Federal Rule of Bankruptcy Procedure § 9024 .................................................................... 1

-ii-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

Wilmington Trust FSB, ("Wilmington" or the "Agent"), in its capacity as Successor Agent for prepetition secured lenders (the "Lenders")[2], hereby requests that the Court reconsider its June 18, 2010 Order Granting Motion For Entry Of An Order (A) Authorizing The Debtors To Enter Into An Exit Financing Commitment Letter And Pay Related Fees; (B) Approving A Break Up Fee; (C) Authorizing The Debtors To Amend Joint Plan Of Reorganization; And (D) Rescheduling And Consolidating Hearings On Valuation And Plan Confirmation (the "Exit Financing Order") [Docket No. 325]. This request is made pursuant to section 105(a) of the United States Code, 11 U.S.C. § 101-1532 (as amended, the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure ("FRBP") 9024. Alternatively, in light of material changes to the closing conditions of the proposed Luxor Exit Financing (defined below) that were made just days ago by Luxor Capital Group, L.P. ("Luxor") and unexpectedly announced by the Debtors at the July 28, 2010 hearing on the motion to approve the settlement agreement among the Debtors, the Agent and certain of the Lenders, the Agent requests that the Court clarify that because of the new material condition imposed by Luxor, the Debtors' estates will not be liable for the $6.4 million break up fee that otherwise might arguably be payable to Luxor in the event that such changed closing conditions cannot be satisfied.

**PRELIMINARY STATEMENT**

The single, most essential premise underlying the Debtors' June 15, 2010 emergency Exit Financing Motion (defined below) was that the $184 million exit financing facility ("Exit Facility") described in Luxor's commitment letter ("Commitment Letter") would provide the Debtors with all of the liquidity necessary for an exit from bankruptcy. Both in the Exit Financing Motion and during the June 18, 2010 hearing on the Exit Financing Motion (the "June 18, 2010 Hearing"), the Debtors repeatedly represented to the Court and to the Agent that

---

[2] The Lenders hold, in the aggregate, in excess of $181.7 million in secured claims under (i) that certain Senior Secured Revolving Credit Agreement, dated as of September 15, 2006 (the "Revolving Credit Agreement"), and (ii) that certain Senior Secured Term Loan Agreement, dated as of September 15, 2006 (the "Term Loan Agreement" and, together with the Revolving Credit Agreement, the "Loan Agreements").

-1-

MOTION OF WILMINGTON TRUST FSB TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

the Exit Facility would provide the Debtors with sufficient liquidity to pay the Agent and Lenders the allowed amount of their claims in full, in cash, on the effective date of the Debtors' plan of reorganization, <u>and</u>, based on the increase in the Exit Facility from $182 million to $184 million announced at the hearing in response to the Agent's concern regarding liquidity, retain sufficient working capital to enable the Debtors' plan to be confirmed and go effective by no later than August 31, 2010. Furthermore, the Debtors represented, and the terms of the Commitment Letter made very clear, that the Commitment Letter contained few conditions precedent—and certainly none related to the Debtors' liquidity.

In a complete turnabout from the Debtors' unequivocal representations in the Exit Financing Motion and at the June 18 Hearing, the Debtors suddenly disclosed, in an 8-K filed with the Securities Exchange Commission on July 28, 2010 and in a new disclosure statement (the "<u>Fifth Amended Disclosure Statement</u>") filed on July 28, 2010 in support of their Fifth Amended Joint Plan Of Reorganization Dated July 28, 2010 (the "<u>Fifth Amended Plan</u>"), that they must now raise an additional $15 million of subordinated debt and/or equity capital as a condition to Luxor's obligation to close on the Exit Facility, and that the Debtors had agreed with Luxor to further amend their Fourth Amended Joint Plan Of Reorganization Dated July 2, 2010 (the "<u>Fourth Amended Plan</u>") to so provide. The Fifth Amended Disclosure Statement states, in pertinent part, as follows:

> The Debtors have agreed with the Exit Lender that the Exit Facility Credit Documents will contain a condition to closing that the Debtors receive not less than $15 million in net proceeds from the Junior Capital financing (as described below) on the Effective Date, will have at least $15 million of unrestricted cash on the Effective Date, and will not have sold any homes below certain minimum sales prices prior to the Effective Date.

Fifth Amended Disclosure Statement, Art. III, Sec. D.1.

The Court will undoubtedly recall that the Agent's response to the June Exit Financing Motion raised two principal concerns: (i) that the then-proposed break up fee "triggers" in the Commitment Letter were far too broad in that they were not limited strictly to

-2-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

an overbid, but rather, would be triggered by awarding Luxor an approximate $6.4 million break-up fee ("Break Up Fee") if the Luxor-backed plan could not be confirmed, and (ii) that the $182 million in financing offered in the original June 15, 2010 commitment letter might not be sufficient to make the Luxor-backed plan feasible.  At the June 18th Hearing, the Court acknowledged the risks associated with approving a commitment letter (in the circumstances of this case) that contained such a substantial break-up fee, but, in deference to the Debtors' business judgment and counsel's representations in the record as to feasibility and liquidity and weighing the evidence as to risks, made the difficult decision of approving the requested relief.  In particular, the Court considered repeated representations that the Luxor commitment had no "due diligence conditions" or other material conditions, and that the Exit Facility would be sufficient to get the Debtors to the timely confirmation of a plan by August 31, 2010, that would pay the Agent and Lenders in full.  That has proven not to be the case.

The potential harm to the estates and, in particular, to the Agent and Lenders, by Luxor's and the Debtors' sudden and unilateral modifications to the Commitment Letter is substantial.  It will be extraordinarily challenging, and perhaps impossible, for the Debtors to raise $15 million of subordinated debt and/or equity capital ("Junior Capital Financing") in the circumstances and time constraints of these cases.  Luxor's Commitment Letter terminates on August 31, 2010, leaving the Debtors less than thirty days to obtain $15 million in Junior Capital Financing.  (See Zolkin Decl. ¶ 3, Ex. A).  Even if (i) Luxor were to agree to extend its commitment for some additional period at no further charge to the Debtors' estates (it has not so agreed) and (ii) the Agent and Lenders were willing to accept the further delay in these bankruptcy cases that any such extension of the commitment would entail (they are not), the likelihood that these Debtors will be able to raise $15 million in equity or subordinated debt in addition to the $184 million exit facility is remote.

If the Debtors are unable to close on their contemplated Junior Capital Financing, then their Fifth Amended Plan will not go effective and Luxor theoretically would be able to

-3-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

assert a right to the Break Up Fee, leading, at a minimum, to further litigation and, at worst, to the imposition upon the estates of an additional $6.4 million in administrative expenses that would need to be satisfied in any subsequent plan construct. This is entirely inconsistent with this Court's ruling at the June 18 Hearing and the Agent's agreement to live with the Court's ruling based upon the disclosures and representations made at that time. The Agent would not live with this new condition nor, would we suspect, would this Court.

What the new condition/modification to the Commitment Letter really demonstrates is that, in order to move forward with their plan, Luxor and the Debtors require the Agent and Lenders to accept a further $15 million discount on their indebtedness that the Agent and Lenders are not prepared to accept.

Luxor's and the Debtors' modifications to the Exit Facility's closing conditions are plainly material. Consequently, the modifications require Court approval to the same extent that the original Commitment Letter required Court approval. The Debtors' refusal to seek that approval is unacceptable, absolutely inconsistent with the requirements of the Bankruptcy Code, and suggests a material lapse in the exercise of their fiduciary duties. At a minimum, it is disingenuous for the Debtors not to have sought such approval *when they obviously believed the additional closing condition was material enough to compel the filing of an 8-K to disclose it to the public*.

To protect the interests of the estates and the Agent and Lenders, the Agent respectfully requests that the Court immediately reconsider its entry of the Exit Financing Order. Given the substantially diminished likelihood that the Debtors' plan can go effective as modified by the Fifth Amended Plan, the weight of the risk and harm to the estates imposed by a $6.4 million break up fee has materially shifted, warranting the vacation of the Exit Financing Order. In the alternative, the Agent asks that the Court clarify the Exit Financing Order by ruling that the Debtors' estates will have no liability for the Break Up Fee in the event that the Plan cannot go effective on account of the Debtors' inability to raise the Junior Capital Financing.

# BACKGROUND

**A.    The Exit Financing Motion and Order Thereon.**

On June 15, 2010, the Debtors filed their Emergency Motion For Entry Of An Order (A) Authorizing the Debtors to Enter into an Exit Financing Commitment Letter and Pay Related Fees; (B) Approving a Break Up Fee; (C) Authorizing the Debtors to Amend Joint Plan of Reorganization; and (D) Rescheduling And Consolidating Hearings On Valuation And Plan Confirmation" (the "Exit Financing Motion") [Docket No. 310]. Prior to filing the Exit Financing Motion, the Debtors had filed and sought confirmation of a highly disputed plan of reorganization that sought to cram down the Agent and the Lenders. Among the most material issues in dispute at that time were valuation and the indubitable equivalence of the secured notes that the Debtors proposed to provide the Agent and the Lenders upon the plan's effective date.

The Debtors represented that the Exit Financing Motion signified a course change in these cases. In the Exit Financing Motion, the Debtors asked the Court, *inter alia*, to (a) authorize the Debtors to enter into the Commitment Letter pursuant to which Luxor committed to provide the Debtors with a $182 million Exit Facility, subject to terms and conditions set forth in the Commitment Letter;[3] (b) approve the Debtors' payment to Luxor of the Break Up Fee if the Debtors terminate the Commitment Letter or seek approval of an alternative plan; (c) approve the expense reimbursement and indemnification provisions in the Commitment Letter; (d) authorize the Debtors to file a further amended plan of reorganization implementing the Exit Facility and (e) to stay ongoing litigation over valuation and other plan confirmation related issues. The Commitment Letter terminates on August 31, 2010, unless the Debtors' plan can go effective by that date.

The express premise of the Exit Financing Motion was that the Exit Facility would provide the Debtors with sufficient liquidity to exit bankruptcy and pay the allowed

---

[3] Luxor originally had committed to fund a $182 million exit facility. At the June 18 Hearing, Debtors advised the Court that Luxor had increased its commitment to $184 million.

claims of the Agent and the Lenders *in full*, *in cash*, *on the plan effective date*. With the Exit Facility, there would be no further need for the Debtors and the Agent and the Lenders to litigate over issues of valuation and plan confirmation. The Debtors represented that the Exit Facility provided

> a complete solution to the Debtors' cases, facilitates the prompt emergence from chapter 11, and preserves value for the Debtors' unsecured creditors and shareholders.

Exit Financing Motion, ¶ 3.

Indeed, the Debtors repeatedly represented that their new Luxor-backed plan would provide the Debtors with sufficient liquidity for payment of the Agent's and Lenders' claims in full, in cash, on the effective date of their plan. See Exit Financing Motion, ¶¶ 3, 21, 31, and 32. During the course of the June 18, 2010 emergency hearing on the Exit Financing Motion, counsel for the Debtors stated on no fewer than <u>seven occasions</u> that, under the Luxor-backed plan, the Agent and the Lenders would be paid in full, in cash, on or about the effective date.[4]

In response to the Exit Financing Motion, the Agent made clear that it would support any financing that would result in the payment in full of its claims. The Agent, however, objected to the Exit Financing as presented based upon the concern that (i) the triggers for a Break Up Fee in the Commitment Letter were far too broad and could adversely impact the case by awarding Luxor the Break Up Fee if the Luxor-backed plan could not be confirmed, and (ii) the $184 million committed in the proposed Exit Facility might not be sufficient to make the Luxor-backed plan feasible.

The Court acknowledged the risks associated with approving the Exit Financing Motion containing the substantial break-up fee. Indeed, the Court noted that it was "disturbed" by those risks. (See Zolkin Decl. ¶3, Ex. B at 57:2-3.) But, in deference to the Debtors'

---

[4] See Declaration of David B. Zolkin ("Zolkin Decl.") ¶3, Ex. B (Transcript of June 18, 2010 Exit Financing Motion Hearing) at (i) 27:10-13; (ii) 45:5-8; (iii) 60:25-61:3; (iv) 61:12-15; (v) 61:21-24; (vi) 65: 21-24; and (vii) 66:19-23.

-6-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

business judgment, and weighing the evidence as to risks under the circumstances as presented (e.g., a pay in full plan that only required that the Exit Facility move forward) the Court approved the Exit Financing Motion.  (See Zolkin Decl. ¶3, Ex. B at 56:18-57:6.)  The Court entered the Exit Financing Order on June 18, 2010.  (See Zolkin Decl. ¶3, Ex. B at 56:18-57:6.)

**B.     The Agent/Lender-Debtors Settlement and the Debtors' Subsequent Announcement of the Modification of the Exit Facility Closing Conditions.**

Subsequently, the Debtors filed their Fourth Amended Joint Plan Of Reorganization Dated July 2, 2010 (the "Fourth Amended Plan"), which, incorporated the Exit Facility and, except for the Debtors' reservation of certain rights to with respect to the Agent's and Lenders' claims, proposed to pay the Agent and Lenders their allowed claims, in full, in cash, on the Fourth Amended Plan's effective date.  On July 15, 2010, less than a month after the entry of the Exit Financing Order, and less than two weeks after the Debtors filed the Fourth Amended Plan, the Agent and a majority (in number and dollar amount) of the Lenders (the "Lender Parties"), entered into a settlement agreement with the Debtors premised on the Debtors' moving forward with the Fourth Amended Plan (the "Settlement Agreement").  In order to provide the Debtors with further comfort that they would have sufficient time to solicit and sufficient liquidity to confirm the Fourth Amended Plan, the Agent and Lender Parties agreed as part of the Settlement Agreement to (i) withdraw their then pending objection to the Fourth Amended Disclosure Statement[5] and (ii) walk away from in excess of $650,000 in past professional fees and in excess of $6 million in unpaid default interest to which they would otherwise have been entitled under the Loan Documents.  Subject to there being no Termination Event[6] under the Settlement Agreement, the Agent and the Lender Parties also agreed to stand

---

[5] On July 15, 2010, at a hearing on a further motion of the Debtors to extend plan exclusivity, counsel to the Debtors and the Agent informed the Court of the Settlement Agreement and counsel for the Debtors asked that the Court set a confirmation hearing for August 12, 2010, *representing that it intended to solicit the Fourth Amended Plan immediately*.  Although the Court accommodated the Debtors' request, the Debtors never commenced solicitation of the Fourth Amended Plan.

[6] Termination Event, under the Settlement Agreement, is defined as any of the following events: (i) the termination of the Commitment Letter , (ii) the termination, reduction or materially modification by

-7-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

down in further litigating issues in these bankruptcy cases and to cap their fees for the months of July and August, 2010.

On July 27, 2010, on the eve of the hearing on the Debtors' and Agent's joint motion to approve the Settlement Agreement, the Debtors advised the Agent for the first time that Luxor required the Junior Capital Financing in order for Luxor to be obligated to close on the Exit Facility and that the Debtors had agreed to modify the Fourth Amended Plan to so provide.[7] On July 28, 2010, the Debtors reiterated the disclosures regarding the Junior Capital Financing in (i) an 8-K filed with the Securities Exchange Commission and (ii) in a Fifth Amended Disclosure Statement.

During the July 28, 2010 hearing on the motion to approve the Settlement Agreement, counsel for the Debtors represented that the Debtors' need for additional liquidity was driven by two components: first, a demand by Luxor that certain reserves be set aside in connection with the Exit Facility, and second, that home sales had not been as robust as had been anticipated during the prior six week period. In response, counsel for the Agent advised the Court, among other things, that

- the modification of the closing conditions to the Exit Facility was a material change to the substance of the Commitment Letter and Exit Facility as presented to the Court at the June 18, 2010 Hearing;
- the modification could severely prejudice the estates by materially increasing the probability that Luxor would refuse to close or assert its entitlement to the Break Up Fee upon a failure of the condition;

---

Luxor of the terms of its commitment to provide the Exit Facility such that the effective date of the Fourth Amended Plan will not occur by August 31, 2010, or (iii) the Fourth Amended Plan is not confirmed.

[7] The Agent is informed and believes that Luxor had approached certain of the Lender Parties just days prior to this date to raise concerns regarding Luxor's desire to have the Debtors fully fund a 1-year interest reserve on the Exit Facility and provide additional liquidity for unstated reasons, conditions that were not present in the negotiated in the Commitment Letter and presented material additional closing risks. It is represented that Luxor also asked them to support a plan that would not pay them in full, in cash on the effective date, which request was rejected. The Agent is informed and believes that no discussions took place regarding the addition of a new covenant to close the Exit Facility.

-8-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

- the modification could impair the potential rights of the estates against Luxor for breach of the Commitment Letter contract if Luxor refused to close or fund; and
- the modification had triggered a "Termination Event" under the Settlement Agreement, entitling the Agent, among other things, to challenge any further amended plan of reorganization of the Debtors.
- The rights and remedies of the Agent's and the Lenders were fully reserved.[8]

Notwithstanding the occurrence of a Termination Event under the Settlement Agreement, the Agent agreed to move forward with the Settlement Agreement, but subject to the preservation of its rights with respect to the occurrence of such Termination Event and to take appropriate action to protect its interests and those of the Lenders.

Because the modification to the Exit Facility closing conditions was not formally before the Court at the July 28 hearing, the Court refrained from rendering any decisions in connection therewith. As of the date hereof, the Debtors have not filed a motion to approve the amendment to the Exit Facility and have given no indication that they intend to do so.

On August 2, 2010, the Agent served the Debtors with a Notice of Termination Event, advising the Debtors that a Termination Event under the Settlement Agreement occurred no later than July 28, 2010 on account of the modification of Luxor's conditions to close the Exit Facility.

## ARGUMENT

**A.  Materially Changed Circumstances Warrant that the Exit Financing Order be Reconsidered Pursuant to FRCP 60(b)**

FRBP 9024 makes Federal Rule of Civil Procedure ("FRCP") 60 applicable in cases under the Code, with certain limited exceptions. FRCP 60 provides, in pertinent part, as follows:

---
[8]

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: … (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); ... or (6) any other reason justifying relief from the operation of the judgment.

FRCP 60(b).

Whether relief should be granted under any of the provisions of Rule 60(b) is subject to the discretion of the Court. See In re Roxford Foods, Inc., 12 F.3d 875 (9th Cir. 1993). But, a court's treatment of Rule 60(b) should not be rigid. The court must equitably consider all relevant circumstances. Pincay v. Andrews, 389 F.3d 853, 856, 860 (9th Cir. 2004) (en banc) cert. denied, 544 U.S. 961 (2005) (noting that the standard was an equitable one requiring a flexible approach, declining to adopt a strict per se rule) (citing Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 395 (1993)).

**1.  The Exit Financing Order May be Vacated Under FRCP 60(b)(2).**

Rule 60(b)(2) provides that a court may relieve a party from a final judgment if there is "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)...." If the newly discovered evidence relates to a change of law or fact that has arisen after a court has issued its decision, such change of law or fact is of significant importance to the decision and substantial justice so requires, the court may consider such change of law or fact for purposes of reconsidering its prior ruling. See, In re Walker, 332 B.R. 820, 828-829 (Bankr. D. Nev. 2005)(evidence pertaining to after-occurring events is only newly discovered if "such events would lead to a change in original result"); see also State of Washington v. United States, 214 F.2d 33, 47 (9th Cir.), cert. denied, 348 U.S. 862 (where an event is of major importance to a case and substantial justice requires, appellate court "will consider changes of law or fact which have occurred since the decision below").

Here, the changes in fact and circumstance warrant reconsideration and modification of the Exit Financing Order. It is hard to believe that the Court actually would have

-10-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

approved the Exit Financing Motion had it been aware at the June 18 Hearing that, only a few weeks later, the Debtors and Luxor would agree (without seeking further Court approval) to materially modify Luxor's financing commitment such that Luxor would only be required to close on the Exit Facility if the Debtors successfully raise an additional $15 million in junior capital by August 31, 2010.

At the emergency June 18 Hearing, the Debtors convinced the Court that entry into the Commitment Letter and approval of the Break Up Fee represented a sound exercise of their business judgment because (i) Luxor's willingness to provide the Exit Facility validated the Debtors' position that the Agent and Lenders are substantially oversecured, (ii) the Exit Facility would provide the Debtors with all of the liquidity that they would need in order to implement a plan of reorganization that would pay the Agent and the Lenders, and all unsecured creditors, in full and (iii) the Commitment Letter contained few conditions precedent and did not include a due diligence out. The Exit Facility was to be the linchpin of a plan that was intended to keep equity "in the money."[9]

The Debtors repeatedly proclaimed to the Court (without any evidence) that the Agent and Lenders are oversecured. They successfully pressed the Court to stay pending valuation litigation because their next amended plan would be a very straight forward, full pay plan, rendering further valuation litigation irrelevant. Mr. Bennett represented that there would be no "trickiness" in the plan. (See Zolkin Decl. ¶3, Ex. B at 61:21-24.)

The Fourth Amended Plan, filed on July 2, 2010, generally did what the Debtors had represented it would do: the funds necessary to pay allowed claims fully, and to satisfy the Debtors' post-plan effective date working capital needs would be derived from the proceeds of the Exit Facility, the Debtors' cash on hand and the Debtors' future cash flow.[10]

---

[9] The Debtors presented no evidence of their business judgment in this regard – only the conclusory declaration of CEO Ray Pacini. The Court will recall that the Agent objected to that declaration because Mr. Pacini had refused to attend his deposition before the hearing, so that he could be cross-examined on his statements.

[10] The Fourth Amended Plan was not entirely without "trickiness". Although the Debtors had throughout

-11-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

One might conclude, however, that the Fifth Amended Plan and the Debtors' July 28, 2010 announcement that they and Luxor have agreed (without prior Court approval) to modify the conditions precedent to Luxor's obligation to close the Exit Facility, is inconsistent with Mr. Bennett's "no trickiness" representation. First, the new Junior Capital Financing condition is contrary to the premise underlying the Exit Financing Motion and the Court's entry of the Exit Financing Order. The condition constitutes an admission that the Exit Facility alone will not provide the Debtors with sufficient liquidity post-plan effective date. Moreover, the Debtors apparently are attempting to impose this material modification on the estates and their creditors, without seeking Court approval. This fairly can be seen as an effort by the Debtors to (i) deprive the Agent and the Lenders of an opportunity to be heard on the modification and (ii) avoid the risk that the Court will refuse to authorize the modification.

The Debtors' 8-K announcement regarding the Junior Capital Financing condition appears to have been very carefully worded in an effort to preserve an argument that a Termination Event under the Settlement Agreement has not occurred.[11] (See Zolkin Decl. ¶ 7, Ex. D) As set forth above, a Termination Event under the Settlement Agreement occurs if (i) the Commitment Letter is terminated, (ii) Luxor otherwise terminates, reduces or materially

---

these bankruptcy cases stipulated to the principal and non-default interest claims of the Agent , the Fourth Amended Plan included a new provision that suggested that the Debtors might seek to challenge such claims. That provision and the lack of disclosure around it, caused the Agent to file an objection to the disclosure statement in support of the Fourth Amended Plan. As indicated above, that objection subsequently was withdrawn as part of the Agent and Lender Parties' July 28th entry into the Settlement Agreement with the Debtors.

[11] The 8-K states, in pertinent part, as follows:
> To enhance its liquidity after emerging from its current Chapter 11 bankruptcy proceedings and to satisfy a closing condition mutually agreed to by the Registrant and Luxor Capital Group, LP during the course of negotiating definitive documentation of the previously announced $184 million of exit financing, the Registrant will file an amendment to its Chapter 11 joint plan of reorganization which provides for, among other things, the Registrant to raise $15 million of additional capital in the form of (i) indebtedness that would be subordinated to the $184 million of exit financing; (ii) equity; or (iii) a combination of subordinated debt and equity. There can be no assurance that the additional capital will be successfully raised or that the amended plan will be consummated.

(See Zolkin Decl. ¶ 7, Ex. D)

-12-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

modifies the terms of its commitment to provide the Exit Facility such that the Fourth Amended Plan's effective date will not occur by August 31, 2010, or (iii) the Fourth Amended Plan is not confirmed by the Court.

The announcement in the Debtors' 8-K appears to have been carefully worded to avoid any express statement that *Luxor* has materially modified the terms of its commitment. Yet, that is exactly what occurred here. The Debtors acknowledge as much in the Fifth Amended Disclosure Statement, where they state that the "Debtors have agreed with the Exit Lender that the Exit Facility Credit Documents" will be conditioned upon the raising of the Junior Capital Financing by the plan effective date. Fifth Amended Disclosure Statement, Art. III, Sec. D.1. It is beyond dispute that Luxor, with the Debtors' acquiescence and cooperation, has materially modified the terms of its commitment enhancing its own position at the expense of the Lenders.[12]

Finally, as the Court is well aware, the June 18th Hearing on the Luxor Commitment Letter was held on an ex parte basis, with virtually no notice to the Agent and Lenders. Debtors made the disclosure of the material modification to the Commitment Letter last week, the night before the hearing on the motion to approve the Settlement Agreement. Whether or not these last minute actions were done intentionally to deprive the Agent of a meaningful opportunity to fully consider the implications and present arguments in opposition, they plainly have done so.

If the Debtors cannot timely raise the Junior Capital Financing by August 31, and the necessary solicitations completed in a timely fashion, then the Fifth Amended Plan will not go effective and Luxor likely will assert a right to the Break Up Fee. This would lead, at a minimum, to further litigation and, at worst, to the imposition upon the estates of an additional $6.4 million in administrative expenses that would need to be satisfied in any subsequent plan

---

[12] A Termination Event also has occurred because, by replacing the Fourth Amended Plan with the Fifth Amended Plan, the Debtors have now made it impossible for the Court to confirm the Fourth Amended Plan.

-13-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

construct after the Debtors' Fifth Amended Plan fails due to the Debtors' inability to raise $15 million of subordinated debt or equity in the next thirty days. Although the Court previously determined that the risks associated with the estates' exposure to the Break Up Fee were outweighed by the benefits offered by the Commitment Letter, that determination was made in a context in which the Debtors had in hand a signed $184 million exit financing commitment that contained limited outs and that the Debtors represented would be sufficient for the Debtors' liquidity needs.

The current context is very different. The Luxor financing commitment now has been made even more contingent – upon the Debtors' raising an additional $15 million in subordinated debt or equity by August 31, 2010. The Debtors have no commitment for the Junior Capital Financing in hand, and the likelihood that the Debtors will be able to raise Junior Capital Financing appears remote.

Although the Debtors have repeatedly claimed that the Agent is oversecured, no evidence has established this as fact. To the contrary, the modification suggests that in order for the Debtors to move forward with their plan, Luxor now will utilize the threat of the imposition of a break up fee on the estates and the Agent and the Lenders to require the Agent and Lenders to accept a $15 million discount on the payment of their indebtedness or agree to accept a $15 million subordinated note from the Debtors that would entitle them to deferred cash payments over time and that would be secured by liens junior (fourth in priority) to those that Luxor would receive under the Exit Facility. Neither of those alternatives was presented to the Court in connection with the Exit Financing Motion and neither is acceptable to the Agent and Lenders.

Absent the Debtors' and Court's receipt of confirmation from Luxor that it will not assert the Break Up Fee should the Debtors fail to raise the Junior Capital Financing, the Court should reconsider and vacate the Exit Financing Order.

-14-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

**2.    The Exit Financing Order May be Vacated Under FRCP 60(b)(6).**

Rule 60(b)(6) "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Klapprott v. United States, 335 U.S. 601, 614 (1949). A party who moves for such relief "must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with ... the action in a proper fashion." In re Int'l Fibercom, Inc., 503 F.3d 933, 941 (9th Cir. 2007).

The Ninth Circuit upheld a bankruptcy court's decision to modify/clarify its order under Rule 60(b)(6) because it was misled about the circumstances when it first decided the motion. Int'l Fibercom, Inc., 503 F.3d at 943-44. "In fact, the bankruptcy court went so far as to state that '[c]learly, ... if it had been brought to the Court's attention that the contract was not executory and that the effect of granting the Debtors' motion would be to secure the Debtors' prepetition obligation to reimburse Zurich for the deductibles incurred on claims arising prepetition, ... this Court would not have granted the motion.'" Id., quoting In re Int'l Fibercom, Inc., 311 B.R. 862, 866 (D. Az. 2004).

All of the reasons set forth above with respect to FRCP 60(b)(2) have equal application with respect to FRCP 60(b)(6). It cannot be disputed that the injury that could be suffered if the Debtors fail to satisfy the Junior Capital Financing condition would be the assertion by Luxor of the Break Up Fee. Similarly, it cannot be disputed that the circumstances giving rise to that injury, the Debtors' entry into a further modification of the closing conditions to the Exit Facility, arise from circumstances that were beyond the Agent's ability to control.

**B.    In the Alternative, the Court Should Modify the Exit Financing Order to Clarify that the Estates Have No Liability for the Break Up Fee if the Junior Capital Financing Closing Condition Is Not Satisfied.**

FRCP 60(b) not only authorizes a court to vacate a prior order, but, as demonstrated by the Ninth Circuit Court of Appeal's decision in Int'l Fibercom, also empowers the court to modify, clarify and reinterpret its prior orders. FRCP 60(b) compliments the discretionary power that bankruptcy courts have as courts of equity under section 105 of the

-15-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

Bankruptcy Code "to reconsider, modify or vacate their previous orders so long as no intervening rights have become vested in reliance on the orders." Int'l Fibercom, 503 F.3d at 940 (quoting Meyer v. Lenox (In re Lenox), 902 F.2d 737, 740 (9th Cir. 1990) (citing Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986))). Bankruptcy courts have broad discretion to revisit past orders.

As an alternative to vacating the Exit Financing Order in its entirety, the Agent believes it entirely appropriate for the Court simply to clarify the Exit Financing Order, by further ruling that the Debtors will have no liability for the Break Up Fee in the event that the Junior Capital Financing condition to the closing of the Exit Facility cannot be satisfied. Clarifying the Exit Financing Order in this fashion will avoid the imposition of a manifest injustice upon the estates and the Agent and the Lenders. Furthermore, as the Debtors never sought authority from the Court to enter into a material modification of the Luxor financing commitment, neither the Debtors nor Luxor can reasonably argue that either detrimentally relied upon the Exit Financing Order when they agreed to modify Luxor's financing commitment.

## CONCLUSION

The Agent respectfully requests that the Court enter a further Order that either vacates the Exit Financing Order, or, in the alternative, clarifies that the Debtors will have no liability for the Break Up Fee under the Exit Financing Order in the event that the Junior Capital Financing condition to the closing of the Exit Facility cannot be satisfied.

Dated: August 3, 2010    **MILBANK TWEED HADLEY & M<sup>c</sup>CLOY LLP**

By: _____/s/ Delilah Vinzon_____
    Robert Jay Moore
    Linda Dakin-Grimm
    David B. Zolkin
    Delilah Vinzon

Attorneys for Wilmington Trust FSB,
Successor Agent for Prepetition Secured Lenders

-16-

MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT,
OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017

A true and correct copy of the foregoing document described MOTION TO (I) RECONSIDER ORDER APPROVING LUXOR EXIT FINANCING COMMITMENT, OR (II) IN THE ALTERNATIVE, TO CLARIFY UNAVAILABILITY OF BREAK UP FEE will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 3, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

mbradshaw@shbllp.com; rbrunette@sheppardmullin.com; rgarretson@ptwww.com; nancy.goldenberg@usdoj.gov; aimoisili@milbank.com; hisrael@kayescholer.com; jben@kayescholer.com; ssolow@kayescholer.com; efile@pbgc.gov; mesterj@hbdlawyers.com; kroe@wthf.com; dfunsch@wthf.com; krussak@frandzel.com; efiling@frandzel.com; banderson@frandzel.com; jsamuels@sidley.com; ustpregion16.sa.ecf@usdoj.gov; mwallin@sheppardmullin.com

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____ served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 3, 2010 | Delilah Vinzon | /s/ Delilah Vinzon |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

#4853-2344-6791