1   HENNIGAN, BENNETT & DORMAN LLP
    BRUCE BENNETT (Cal. Bar No. 105430)
2   JOSHUA M. MESTER (Cal. Bar No. 194783)
    MICHAEL C. SCHNEIDEREIT (Cal. Bar No. 234956)
3   865 South Figueroa Street, Suite 2900
    Los Angeles, California 90017
4   Telephone: (213) 694-1200
    Fax: (213) 694-1234
5
6   *Reorganization Counsel for Debtors
    and Debtors in Possession*

7

8                   **UNITED STATES BANKRUPTCY COURT**
                    **CENTRAL DISTRICT OF CALIFORNIA**
9                        **SANTA ANA DIVISION**

10

    *In re*                                )   Case No. 8:09-21712-TA
11  ☐  CALIFORNIA COASTAL                   )
           COMMUNITIES, INC.                )   Jointly Administered with Case Nos.
12  ☐  SIGNAL LANDMARK HOLDINGS, INC.       )   8:09-21713-TA; 8:09-21714-TA;
    ☐  SIGNAL LANDMARK                      )   8:09-21715-TA; 8:09-21717-TA;
13  ☐  HEARTHSIDE HOLDINGS, INC.            )   8:09-21718-TA; 8:09-21719-TA;
    ☐  HEARTSIDE HOMES, INC.                )   8:09-21720-TA; 8:09-21721-TA;
14  ☐  HHI CHANDLER, L.L.C.                 )   8:09-21722-TA; 8:09-21723-TA
    ☐  HHI CHINO II, L.L.C.                 )
15  ☐  HHI CROSBY, L.L.C.                   )   Chapter 11
    ☐  HHI HELLMAN, L.L.C.                  )
16  ☐  HHI LANCASTER I, L.L.C.              )   **MOTION FOR ENTRY OF (I) INTERIM**
    ☐  HHI SENECA, L.L.C.                   )   **ORDER PURSUANT TO 11 U.S.C. §§ 105,**
17                                          )   **361, 362, 363, AND 364 OF THE**
    ☒  All Debtors                          )   **BANKRUPTCY CODE (I)**
18                                          )   **AUTHORIZING THE DEBTORS TO**
              Debtors.                      )   **OBTAIN POSTPETITION FINANCING**
19                                          )   **AND USE CASH COLLATERAL, (II)**
                                            )   **GRANTING LIENS, SECURITY**
20                                          )   **INTERESTS AND SUPERPRIORITY**
                                            )   **CLAIMS, (III) GRANTING ADEQUATE**
21                                          )   **PROTECTION AND FINAL ORDER**
                                            )   **APPROVING PLAN SUPPORT**
22                                          )   **AGREEMENT AMONG DEBTORS AND**
                                            )   **PREPETITION LENDERS AND (IV)**
23                                          )   **SHORTENING TIME FOR NOTICE OF**
                                            )   **AND HEARING ON DISCLOSURE**
24                                          )   **STATEMENT; MEMORANDUM OF**
                                            )   **POINTS AND AUTHORITIES;**
25                                          )   **DECLARATIONS OF RAYMOND J.**
                                            )   **PACINI AND ROBERT H. WARSHAUER**
26                                          )   **IN SUPPORT**
                                            )
27                                          )   <u>Hearing</u>
                                            )
28                                          )   **Date:  TBD**
                                            )   **Time:  TBD**

779302.2

)　　Place:  Courtroom "5B"
)　　　　　411 West Fourth Street
)　　　　　Santa Ana, CA 92701-4593
)

**TO THE HONORABLE THEODOR C. ALBERT AND ALL INTERESTED PARTIES:**

California Coastal Communities, Inc. ("CALC"), et al., the debtors and debtors in possession herein (collectively, the "Debtors") hereby move this Court for entry of an order, in substantially the form of the proposed order (the "Order") attached hereto as Exhibit A,

　　　　　1.　　　Authorizing the Debtors to obtain postpetition financing pursuant to sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") by entering into a senior secured superpriority debtor in possession credit and guaranty agreement (as the same may be amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), substantially in the form of the draft attached hereto as Exhibit B among CALC, as borrower, and the other Debtors as guarantors, funds or accounts managed by Anchorage Capital Group, L.L.C. ("Anchorage"), Bank of America/Merrill Lynch ("Bank of America"), and Luxor Capital Group, L.P. ("Luxor" and, together with Anchorage and Bank of America, the "DIP Lenders"), and Wilmington Trust Company FSB, as administrative agent and collateral agent (the "DIP Agent"), and to borrow up to the amounts set forth in the Budget (defined below, a copy of which is attached hereto as Exhibit C) through the entry of the Final Order, under the DIP Credit Agreement on an emergency basis pending a final hearing on this Motion (the "Final Hearing");

　　　　　2.　　　Authorizing the Debtors to grant liens and superpriority claims to and on behalf of and for the benefit of the DIP Agent and the DIP Lenders in all Collateral (as defined in the Order) in accordance with the Order (and, if and when entered, the Final Order) to secure any and all of the obligations under the DIP Facility;

　　　　　3.　　　Authorizing the Debtors to use Cash Collateral (as defined in the Order);

　　　　　4.　　　Providing adequate protection to the Debtors' Prepetition Secured Lenders consistent with in the manner described in the Motion and set forth in the Order;

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

5. In accordance with Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting that the Court schedule the Final Hearing and approve notice with respect thereto as further described below;

6. Authorizing the Debtors to enter into a Plan Support Agreement attached hereto as Exhibit D; and

7. In accordance with Local Bankruptcy Rule 3017-1, shortening time to consider approval of a disclosure statement.

As explained more fully below, the Debtors urgently require this requested relief in order to continue the operation of their businesses. The Debtors project that they will run out of cash in the near future and need an immediate infusion of working capital. Without immediate additional funds, the Debtors will not have sufficient funds available to meet their ongoing expenses, which would significantly jeopardize the preservation of value for all stakeholders. The use of Cash Collateral alone will be insufficient to meet the Debtors' immediate postpetition liquidity needs, and the Debtors are unable to obtain the required funds on terms more favorable than those offered by the DIP Lenders under the DIP Credit Agreement and absent the protections and provisions of the Order. Accordingly, for all the reasons set forth below, the relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtors' business, the management and preservation of its assets and properties, and is in the best interests of the Debtors, their estates and creditors.

In support of this Motion, the Debtors submit the accompanying Declaration Of Raymond J. Pacini" (the "Pacini Declaration") and Declaration of Robert H. Warshauer (the "Warshauer Declaration") and respectfully represent as follows:

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2

Local Bankruptcy Rule 4001-2 requires a debtor to highlight for the Court's scrutiny certain terms and provisions in a cash collateral order (the "Highlighted Provisions"). The proposed Order contains substantially similar provisions for the use of cash collateral that existed in the prior interim cash collateral orders. In addition to those provisions, the following Highlighted Provisions represent important components to the Interim Order or Final Order:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

| Description | Page |
|---|---|
| Priming Liens.<br><br>The proposed order grants priming liens in favor of the DIP Agent for the benefit of the DIP Lenders.  The priming liens will only prime liens in favor of the Prepetition Secured Lenders and will not prime liens in favor of any other party.  Over 81% of the Prepetition Revolving Lenders and over 87% of the Prepetition Term Loan Lenders have consented to the priming liens to be granted in the proposed order. | Pages 3-4 and ¶ 4(a)(ii) |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

# I.    INTRODUCTION

1.    Since the commencement of these cases, the Debtors have been able to operate their businesses with the use of proceeds generated from the sale of homes at their Brightwater project in Huntington Beach.  Despite concerted efforts, the Debtors have not been able to exit from chapter 11 as expeditiously as originally hoped.  The extended stay in chapter 11 coupled with the lack of recovery in the residential real estate market has taken a toll on the Debtors' sales pace and cash flow and ultimately, its business.  At this point, the Debtors are in critical need of two things: liquidity and exiting from chapter 11 as soon as possible.  The Debtors have obtained agreement with a substantial portion of their Prepetition Secured Lenders that the Debtors believe will satisfy both needs.

2.    First, the largest holders of the Debtors' existing prepetition secured lenders – funds or accounts managed by Anchorage, Bank of America, and Luxor – holding in excess of 81% of the Debtors' prepetition secured debt under the Prepetition Revolving Credit Agreement (as hereafter defined) and in excess of 87% of the Debtors' prepetition secured debt under the Prepetition Term Loan Agreement (as hereafter defined) –  have agreed to provide the Debtors with $15 million in postpetition financing (the "DIP Facility"), with $5 million drawn upon interim approval and the remaining $10 million drawn upon final approval.  The liquidity offered by the DIP Facility is critical to avoid the Debtors from suffering irreparable harm.  Absent the liquidity offered by the DIP Lenders, the Debtors face the very real risk of running out of cash and not being able to meet their expenses in the coming weeks.  In addition, the DIP Facility provides the Debtors with a much needed vote of confidence in their business and the Brightwater project and sends a positive message to employees, creditors, vendors and prospective homebuyers that the Brightwater project continues to be viable.

3.    While the DIP Facility by itself is critical to the Debtors' immediate continued operations, it also provides an important component to the Debtors' emergence from chapter 11.  In connection with the DIP Facility, the Debtors have reached an agreement in principal with the DIP Lenders in their capacity as Prepetition Secured Lenders (as hereafter defined and, together with the DIP Lenders, the "Consenting Lenders") on the terms of a consensual plan of reorganization that

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

will allow the Debtors to emerge from chapter 11 and start the spring selling season without the pending bankruptcy case negatively impacting prospective purchasers. Under the Plan, as outlined in the term sheet attached to the Plan Support Agreement, the Revolving Lenders will receive an equal amount of new second lien term loans in exchange for their Prepetition Revolving Loans. The Term Loan Lenders, who hold approximately $99.8 million in secured claims, will receive a combination of new third lien loans with an aggregate principal amount of $44 million and 100% of the equity in CALC in satisfaction of their prepetition secured claims. And the DIP Facility contains the option to be converted into a new first lien credit facility upon emergence rather than being repaid in cash. As a result, the Debtors will have a significantly de-leveraged balance sheet and increased liquidity that will provide them with more flexibility in responding to market conditions after emergence.

4.      The terms of the plan agreed upon with the Consenting Lenders provides significant recoveries for unsecured creditors, who might otherwise not realize any recovery if the Debtors are forced into a liquidation. Priority claimants will receive payment in full of their claims. A substantial number of the Debtors' general unsecured creditors, primarily employees and creditors holding small claims, will receive payment in full. The remaining unsecured creditors will receive pro rata interests in a trust that will be funded with deposits aggregating either $2 million or $3 million if creditors vote to accept the plan.

5.      Finally, the proposed plan of reorganization described in the term sheet attached to the Plan Support Agreement will also provide for the settlement of the dispute concerning any claims that could be asserted related to the June 18, 2010 commitment from Luxor to provide exit financing. The Debtors, Luxor, Anchorage, and Bank of America have agreed that upon emergence Luxor will receive a new $1 million loan under the second lien loan facility being provided to the Revolving Lenders and reimbursement of its expenses in full settlement, compromise, and release of all claims related to the exit financing commitment. Resolving a potential significant administrative claim without protracted litigation facilitates the Debtors' emergence from chapter 11, which is in the best interests of all creditors.

779302.2

6.     To further facilitate implementing the terms of the proposed plan, the Debtors and the Consenting Lenders have negotiated a plan support agreement.  The Plan Support Agreement does not commit a creditor to vote to accept the plan, but rather memorializes the agreement of the parties not to oppose the plan and to support confirmation of the plan.  The Plan Support Agreement does provide for the Consenting Lenders to vote in favor of the plan after having reviewed and considered a disclosure statement approved by this Court.  The Plan Support Agreement represents an important tool resulting from plan negotiations that will allow the Debtors to proceed expeditiously toward confirmation and emergence.

7.     The agreements contained in the DIP Facility and the Plan Support Agreement will provide a benefit to all creditors and facilitate the Debtors' overdue emergence from chapter 11. Accordingly, the Court should grant the Motion.

## II.    BACKGROUND

8.     Debtor CALC, a publicly traded company on the over the counter market (ticker: CALCQ), and its subsidiaries are in the business of residential land development and homebuilding with properties owned or controlled in various counties in Southern California.  The Debtors' principal activities are: (1) obtaining zoning and other entitlements for land that they own or under consulting contracts for other landowners; (2) improving the land for residential development; and (3) designing, constructing, and selling single-family homes on that land.  Debtor Hearthside Homes, Inc. is the homebuilder for the Debtors' projects, and performs construction and marketing functions for the Debtors' projects.  Since 1994, the Debtors have delivered over 2,300 homes to families in Southern California.

### A.    Brightwater And The Debtors' Other Assets.

9.     Currently, the Debtors' largest project is "Brightwater," a 356 unit master planned community located on 105 acres of the Bolsa Chica mesa in the City of Huntington Beach in Orange County, California.  Brightwater offers a broad mix of four different neighborhoods (the Trails, the Sands, the Cliffs, and the Breakers) with home choices ranging from 1,710 to 4,339 square feet. Located near the Pacific Coast Highway and overlooking the Pacific Ocean, Huntington Harbor and the recently restored 1,300-acre Bolsa Chica Wetlands, 63 of the 356 homes at Brightwater will

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

1    have unobstructed ocean and/or wetlands views.  This project is located on one of the last large

2    undeveloped coastal properties in Southern California.  Brightwater is bordered on the north and

3    east by residential development in the City of Huntington Beach and Huntington Harbor, to the

4    south by open space and the 1,300-acre Bolsa Chica wetlands, and to the west by 120 acres of

5    publicly-owned conservation land and open space on the lower bench of the Bolsa Chica mesa,

6    Pacific Coast Highway, Bolsa Chica State Beach, and the Pacific Ocean. Brightwater also has 37

7    acres of open space and conservation area.

8        10.    As of November 30, 2010, the Debtors had delivered 83 homes in Brightwater to

9    individual home buyers and 17 model homes to an investor.

10        11.    The Debtors also have one other project – Debtor Signal Landmark owns The Ridge,

11    located near Brightwater, which is in the planning stage of development, with no construction

12    having been commenced.  Debtor HHI Lancaster I, LLC ("HHI Lancaster") also owns 73

13    unimproved lots in Lancaster, California.

14        **B.    The Prepetition Secured Lenders and the Interim Cash Collateral Orders.**

15        12.    On September 15, 2006, the Debtors entered into that certain Senior Secured

16    Revolving Credit Agreement (the "Prepetition Revolving Credit Agreement") with KeyBank

17    National Association, as agent (the "Revolver Agent") and lender and the lenders a party thereto (the

18    "Revolving Lenders") in the maximum amount of $100,000,000.  The obligations under the

19    Prepetition Revolving Credit Agreement are secured by, among other security, (i) the Deed of Trust

20    with Assignment of Rents, Security Agreement and Fixture Filing, by Signal Landmark, a California

21    corporation ("Signal Landmark") for the benefit of Revolver Agent, recorded in the Official Records

22    of Orange County, California as Instrument No. 2006000617267 (as modified, amended, restated,

23    supplemented, renewed or replaced from time to time, the "First Deed of Trust"), granting the Agent

24    a first priority security interest in the Brightwater project as described therein (the "Property"),

25    (ii) the Collateral Assignment of Contracts, Development Rights, Licenses, Permits, Warranties and

26    Guaranties and Subordination Agreement, dated as of September 15, 2006, by and among CALC,

27    Signal Landmark and Agent (as modified, amended, restated, supplemented, renewed or replaced

28    from time to time, the "Collateral Assignment"), and (iii) certain other collateral assignments or

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-8-

1  security agreements for the benefit of the Agent.  As of the Petition Date, approximately

2  $81,679,317.58 in principal, plus accrued and unpaid interest, fees and expenses, remained

3  outstanding under the Prepetition Revolving Credit Agreement.

4          13.      On September 15, 2006, the Debtors entered into that certain Senior Secured Term

5  Credit Agreement (the "Prepetition Term Loan Agreement" and together with the Prepetition

6  Revolving Credit Agreement, the "Prepetition Credit Agreements") with KeyBank National

7  Association, as agent (the "Term Loan Agent" and together with the Revolver Agent, the "Agent")

8  and lender and the lenders a party thereto (the "Term Loan Lenders" and together with the

9  Revolving Lenders, the "Prepetition Secured Lenders") in the maximum amount of $125,000,000.

10  The obligations under the Prepetition Term Loan Agreement are secured by, among other security,

11  (i) the Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, by Signal

12  Landmark for the benefit of the Term Loan Agent, recorded in the Official Records of Orange

13  County, California as Instrument No. 2006000617268 (as modified, amended, restated,

14  supplemented, renewed or replaced from time to time, the "Second Deed of Trust"), granting the

15  Agent a perfected second priority security interest in the Property, (ii) Pledge and Security

16  Agreement, dated as of September 15, 2006, by CALC, in favor of Term Loan Agent (as modified,

17  amended, restated, supplemented, renewed or replaced from time to time), pursuant to which CALC

18  pledged to the Term Loan Agent the ownership interests in Hearthside Holdings, Inc. and Signal

19  Landmark Holdings, Inc., (iii) Pledge and Security Agreement, dated as of September 15, 2006, by

20  Hearthside Holdings, Inc., in favor of Agent (as modified, amended, restated, supplemented,

21  renewed or replaced from time to time), pursuant to which such pledgor pledged to Agent as

22  additional security for the Loan its ownership interests in Hearthside Homes, Inc.), (iv) Pledge and

23  Security Agreement, dated as of September 15, 2006, by Signal Landmark Holdings, Inc., in favor

24  of the Term Loan Agent, pursuant to which such pledgor pledged to the Term Loan Agent its

25  ownership interests in Signal Landmark (as modified, amended, restated, supplemented, renewed or

26  replaced from time to time), (v) Pledge and Security Agreement, dated as of September 15, 2006, by

27  Hearthside Homes, Inc., in favor of Agent (as modified, amended, restated, supplemented, renewed

28  or replaced from time to time), pursuant to which such pledgor pledged to term Loan Agent its

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

1  ownership interests in it subsidiaries identified therein, and (vi) certain other collateral assignments

2  or security agreements for the benefit of the Term Loan Agent.  As of the Petition Date, $99,800,000

3  in principal, plus accrued and unpaid interest, fees and expenses, remained outstanding under the

4  Prepetition Term Loan Agreement.

5       14.    On November 6, 2009, the Debtors filed the Cash Collateral Motion pursuant to

6  which the Debtors requested authority to use cash collateral in which the Prepetition Secured

7  Lenders had an interest.  On November 12, 2009, the Court entered the "Interim Order pursuant to

8  Section 105, 362, 363, 503 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001 (I)

9  Authorizing Use of Cash Collateral; (II) Providing Adequate Protection to Prepetition Lenders;

10  (III) Modifying the Automatic Stay and (IV) Scheduling Final Hearing" (the "First Interim Cash

11  Collateral Order").  Thereafter the Agent and the Lenders have consented to, and the Court has

12  entered several additional interim orders authorizing the use of cash collateral (collectively, the

13  "Interim Cash Collateral Orders").

14       15.    On April 6, 2010, Wilmington Trust Company FSB became the successor Prepetition

15  Agent.

16       **C.    The Need For Post Petition Financing and The Budget.**

17       16.    The Debtors' have a critical need for the liquidity offered by the DIP Facility and the

18  continued use cash collateral.  As described in the Pacini Declaration and the Warshauer

19  Declaration, the Debtors currently hold approximately $2.7 million in cash collateral in which the

20  Prepetition Secured Lenders have an interest.  The Debtors have prepared a budget (the "Budget")

21  for the DIP Facility attached hereto as Exhibit C.  The Budget reflects expected proceeds from the

22  sale of homes at Brightwater, the costs of constructing homes at Brightwater, the Debtors' general

23  administrative and overhead costs, restructuring costs, and the adequate protection payments

24  proposed in the Order.  As shown in the Budget, absent the liquidity from the DIP Facility, the

25  Debtors' cash position would fall below $1 million.  Moreover, the Budget reflects the closing of

26  home sales.  While the Debtors expect that such closings will occur, there is no guaranty that they

27  will.  If the closings do not occur, the Debtors would not have sufficient liquidity to continue to

28  operate their businesses.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

17.    Since August 2010, the Debtors and Imperial Capital, LLC ("Imperial Capital"), the Debtors' financial advisor, have explored alternatives for obtaining liquidity and emerging from chapter 11.  Mr. Warshauer and others at Imperial Capital have spoken with a variety of strategic and institutional investors about either financing or entering into a transaction with the Debtors. Separately, Mr. Pacini has inquired with other potential financing sources.  Unfortunately, neither Imperial Capital nor the Debtors have found any sources of liquidity, other than the DIP Lenders, that would provide stakeholders with a better alternative.

18.    The DIP Facility, however, provides the Debtors with the comfort that they will be able to meet their expenses even if the near term home sale closings do not occur.  In addition, while the Debtors have been experiencing a liquidity crisis, they limited their construction of new homes that were not under contract.  In addition, the Debtors have sold through some of their standing inventory of completed homes in order to generate cash.  The DIP Facility provides the Debtors with resources to start rebuilding their inventory of homes at Brightwater so that they are in the best position to meet the market upon emergence.

19.    In addition, the liquidity from the DIP Facility and the ability to use cash collateral has certain intangible benefits that are critical to the Debtors' restructuring efforts.  The Debtors' reorganization hinges on the ongoing cooperation of suppliers, vendors, and employees to ensure a restructuring in an orderly and reasonable manner which seeks to preserve and enhance value of the Debtors' business for the benefit of all parties in interest.  These parties need to be assured that not only will the Debtors' business continue, but that the Debtors will have access to the necessary funds in the coming months.  Similarly, prospective and current home buyers require the confidence that the Debtors will have the resources to continue to construct and close on the sale of homes already under contract and that may be sold by new contracts.

**D.    Terms of the Proposed Postpetition Financing**

20.    The Debtors have obtained a commitment for $15 million in postpetition financing that will facilitate their emergence before the start of the spring selling season, a critical milestone

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

for the Debtors' businesses, on the terms and conditions set forth in the DIP Credit Agreement.  A

summary of some of the material terms of the DIP Facility are set forth below:[1]

| | |
|---|---|
| Borrower | California Coastal Communities, Inc. |
| Guarantors | Hearthside Holdings, Inc., Hearthside Homes, Inc., Signal Landmark Holdings, Inc., Signal Landmark, HHI Chandler LLC, Chino II, LLC, Crosby LLC, Hellman LLC, Lancaster LLC, HHI Seneca LLC. |
| Lenders | Funds or accounts managed or controlled by Anchorage, Bank of America, and Luxor Capital Group. |
| DIP Agent | Wilmington Trust Company FSB |
| Amount | Total facility of $15 million, with $5 million drawn upon interim approval and $10 million drawn upon final approval. |
| Maturity | March 7, 2011 |
| Interest Rate | Variable rate of LIBOR + 7.5%, with a floor of 2.5%, or Prime + 6.5% with a floor of 3.5%.  The initial rate will be 10.0%. |
| Fees | Closing Put Premium – 2.5% of the Principal Amount payable as the loans are drawn |
| | Backstop Premium – 2.5% of the Principal Amount payable as the loans are drawn[2] |
| | Conversion Fee – 2.0% of the Principal Amount due upon conversion |
| | Payment of Prepetition Agent and DIP Agent's outstanding fees and expenses upon interim approval and subsequent fees upon submission. |
| Collateral | All of the Debtors' real and personal property |
| Priority of Liens | Priming liens on all collateral on which the Prepetition Secured Lenders have liens pursuant to section 364(d). |
| | First Priority liens on unencumbered property pursuant to section 364(c)(2). |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

---

[1] To the extent that the summary of the DIP Facility differs from the terms of the DIP Credit Agreement or the Order, the terms of the DIP Credit Agreement and Order shall govern.

[2] All of the Debtors' Prepetition Secured Lenders were offered the opportunity to participate in the DIP Facility as a DIP Lender.  The DIP Lenders agreed that to the extent that other Prepetition Secured Lenders did not elect to participate in their pro rata share of the DIP Facility, the DIP Lenders would "back stop" their commitment and fund the entire $15 million.  No other Prepetition Secured Lender elected to participate in the DIP Facility and accordingly, the DIP Lenders have agreed to fund more than their pro rata share in exchange for the Back Stop Premium.

779302.2

| | | |
|---|---|---|
| | | Junior Liens on encumbered property pursuant to section 365(c)(3). |
| Notable Covenants | | The Debtors shall operate in accordance with the Budget, provided that the Debtors will be permitted to spend up to 10% in excess of a given line item so long as aggregate disbursements do not exceed 5% of the Budget.  Moreover, unused amounts in a given budget period for a given line item shall rollover to the next budget period for that line item. |
| Events of Default | | In addition to typical events of default, the DIP Credit Agreement provides the following notable events of default: <br> • Entry of an order approving a settlement that is not included in the Budget. <br> • Supporting a plan of reorganization that is not approved by the Requisite DIP Lenders <br> • Entry of an order approving a disclosure statement that is not satisfactory to the Requisite DIP Lenders. <br> • Termination, modification, amendment, or breach of the Plan Support Agreement. |
| Conversion to Exit Facility | | The DIP Credit Agreement provides that the DIP Facility may be converted into a first lien credit facility on the effective date of the Debtors' plan.  The right to convert the DIP Facility into the first lien exit facility is dependant upon, among other things, definitive documentation, the payment of the conversion fee, and confirmation of the plan. |

**E.      The Plan Support Agreement and Proposed Plan of Reorganization**

21.      The Debtors and the Consenting Lenders have reached agreement on the terms of a consensual plan of reorganization as set forth in the term sheet attached to the Plan Support Agreement.  The Consenting Lenders represent more than 81% of the principal amount of the Revolving Loans and more than 87% of the principal amount of the Term Loans.  The largest of these individual holders is Anchorage, who took a lead role in the discussions concerning the DIP Facility and the Plan Support Agreement.  Anchorage has played a similar influential role in several recent restructurings involving real estate development companies such as Newhall Land, Crescent Resources, and Orleans Homes where Anchorage has provided financing, oversight, and operational support for emerging companies.

779302.2

22.    As a result of arm's length negotiations with Anchorage, Bank of America and Luxor, the Debtors will be able to offer the following recoveries for creditors under a plan should it be confirmed by the Court:[3]

- The DIP Facility shall be converted into a first lien term loan facility that shall bear interest at the variable rate of LIBOR plus 7.5% with a LIBOR floor of 2.5% and mature on the second anniversary of the effective date.

- The Revolving Lenders will receive an equal amount of new second lien loans that shall bear interest at the variable rate of LIBOR plus 7.5% with a LIBOR floor of 2.5% and mature on the fifth anniversary of the effective date.

- The Term Loan Lenders shall receive a combination of (a) a pro rata share of a new third lien loan facility in the principal amount of $44 million, which shall bear interest at the fixed rate of 15% payable in kind and mature on the first business day prior to the sixth anniversary of the effective date and (b) 100% of the equity of reorganized CALC.

- The Prepetition Agent shall be paid its unpaid fees and expenses, including fees and expenses that were the subject of the settlement between the Debtors and the Agent dated July 13, 2010.

- Anchorage and Bank of America shall be paid their fees and expenses.

- Priority claims shall be paid in full on the effective date.

- Employee claims for paid time off shall be reinstated to the extent that the employee is employed by the reorganized debtors.

- Convenience claims which are general unsecured claims under $10,000 or general unsecured claims over $10,000 where the holders have elected to reduce their claims to $10,000, shall be paid in full.

- General unsecured claims shall receive pro rata interests in a trust. The trust will be funded quarterly with deposits that over two years will aggregate either (a) $2 million, or (b) if the classes of general unsecured creditors vote to accept the Plan, $3 million. The trust shall be further funded with a deposit of $250,000 to pay the costs of administering the trust, including costs of objecting to claims.

- Existing shareholders of CALC will have their equity interests canceled and not receive any distribution under the Plan.

23.    The Plan will also contain, and seek approval of, a settlement of all claims arising under, based upon, or relating to the June 18, 2010 commitment letter for exit financing and the order approving same, including Luxor's claim to a break-up fee. In full settlement, exchange, and compromise of these claims, Luxor will receive (a) payment in cash equal to an amount of

---

[3] To the extent that the summary of the proposed plan differs from the term sheet attached to the Plan Support Agreement, the plan term sheet shall control.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

$480,044.64 which represents the unpaid fees and expenses of Luxor and Luxor's counsel incurred

through November 17, 2010; (b) payment in cash of any and all unpaid reasonable and documented

fees and expenses of Luxor and Luxor's counsel incurred from November 18, 2010 up to and

through the Effective Date; and (c) $1 million of the new second lien loan to be issued on the

effective date.  The $1 million new second lien loan is in addition to the principal amount of second

lien loans being issued to the Prepetition Revolving Lenders and shall have the same rights and

obligations as those loans.

24.     In order to implement the Plan, the Debtors and the Consenting Lenders have

negotiated a plan support agreement, a copy of which is attached hereto as Exhibit D.  If approved,

the Plan Support Agreement will permit the Debtors and the Consenting Lenders to work

consensually to obtain an expeditious confirmation of the Plan.  The Plan Support Agreement

contains certain milestones for emerging from chapter 11 that is designed to recapitalize the Debtors

and enhance their liquidity in time to meet the spring selling season.

- On or prior to December 20, 2010, the Debtors shall file the Plan and the Disclosure Statement with the Bankruptcy Court;

- On or prior to January 12, 2011, the Bankruptcy Court shall have entered a final DIP Order approving the DIP Facility;

- On or prior to January 14, 2011, the Debtors shall have obtained Bankruptcy Court approval of an order approving the Disclosure Statement and setting forth the procedures upon which acceptances of the Chapter 11 Plan may be solicited;

- On or prior to February 18, 2011, the Bankruptcy Court shall have entered an order confirming the Chapter 11 Plan; and

- On or prior to March 7, 2011, the effective date of the Plan shall have occurred.

## III.    ARGUMENT

25.     By this Motion, the Debtors seek entry of the Order granting the following relief,

including without limitation:

a.     authorizing the Debtors to enter into the DIP Credit Agreement and grant liens and claims pursuant to section 364(c) and (d);

b.     authorizing the Debtors to use Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code;

c.     approving the form of adequate protection provided

779302.2

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

to the Prepetition Secured Lenders pursuant to sections 361, 362, and 363 of the Bankruptcy Code;

        d.      scheduling a Final Hearing on the Motion to consider entry of the Final Cash Collateral Order;

        e.      authorizing the Debtors to enter into the Plan Support Agreement;

        f.      shortening the time for the hearing and deadline to object to a proposed disclosure statement pursuant to Local Bankruptcy Rule 3017-1; and

        g.      granting related relief.

**A.**    **The Court Should Authorize The Debtors To Borrow Under The DIP Credit Agreement As Set Forth In The Proposed Order.**

26.    As a general matter, if a debtor is unable to obtain unsecured credit, section 364(c) authorizes the "obtaining of credit or the incurring of debt - . . . (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c)(1)-(3). These subsections permit the Court to approve the incurrence of postpetition indebtedness from the DIP Lenders on the terms of the DIP Credit Agreement, securing such postpetition indebtedness with (a) priority over all administrative expenses set forth in sections 503(b) and 507(b) of the Bankruptcy Code, (b) a senior lien on all unencumbered property of the estate (and property encumbered by liens in favor of the Prepetition Secured Lenders, who have consensually agreed to the priming of such liens), and/or (c) a junior lien on all property encumbered by existing liens.

27.    Typically, "courts apply a three part test to assess requests under section 364(c), requiring a showing that (1) the debtor cannot obtain credit unencumbered or without superpriority status; (2) the credit transactions are necessary to preserve assets of the estate, and (3) the terms of the credit agreements are fair, reasonable and adequate." 3 COLLIER ON BANKRUPTCY ¶ 364.04[01] (15th ed. rev. 2007) (*citing In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 553 (E.D. Pa. 1987)). In making that assessment, courts give broad deference to the business decisions and assessments of the debtor in possession, including the debtor in possession's business judgment regarding the need for and the proposed use of funds. As noted in *In re Ames Department*

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-16-

1   *Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990), a "court's discretion under section 364 is to be

2   utilized on grounds that permit reasonable business judgment to be exercised so long as the Credit

3   Agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is

4   not so much to benefit the estate as it is to benefit a party-in-interest." *See also In re Simasko Prod.*

5   *Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[O]nly in circumstances where there are allegations

6   of, and a real potential for, abuse by corporate insiders should the Court scrutinize the actions of the

7   corporation.").

8        28.     Here, Mr. Pacini's and Mr. Warshauer's efforts and investigation demonstrate that

9   the Debtors cannot obtain unsecured credit in the ordinary course of business pursuant to section

10  364(a) of the Bankruptcy Code, nor can they obtain secured credit pursuant to section 364(c) on

11  better terms and conditions than those offered by the Postpetition Lenders.  The efforts of Mr.

12  Warshauer and the Debtors easily satisfy the required showing "by a good faith effort that credit was

13  not available" without the protections afforded to potential lenders by section 364(c) and (d) of the

14  Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *Ames*, 115 B.R. at

15  40 (approving section 364(c) financing facility and holding that the debtor made reasonable efforts

16  to obtain less onerous terms where it approached four lending institutions, was rejected by two, and

17  selected the least onerous financing option from the remaining two lenders).

18       29.     Second, if the Debtors are unable to obtain the requested financing, their operations

19  will cease immediately, which would diminish if not destroy most of the value of the enterprise.

20  The preservation and maintenance of the going-concern value of the Debtors is critical to the

21  maximization of value for the benefit of all stakeholders.

22       30.     Third, the terms and conditions of the DIP Credit Agreement are reasonable and

23  appropriate under the circumstances.  Among other things, Mr. Warshauer believes that the terms

24  and conditions of the proposed financing are consistent with terms and conditions generally

25  available in the market for comparable credit facilities.  Moreover, the availability of funds offered

26  by the DIP Credit Agreement, taken together with the consensual plan of reorganization

27  contemplated by the Plan Support Agreement, sends a positive message to employees, creditors,

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

1  vendors and home buyers that the Debtors and the Brightwater project continue to be viable and will

2  thrive.

3      31.    Based on the foregoing, the Debtors submit that the proposed credit facility, as

4  embodied in the DIP Credit Agreement, is in the best interests of the Debtors and their bankruptcy

5  estates and should be approved on an interim basis as set forth in the Order.

6

7      **B.    The Court Should Authorize The Debtors To Grant Adequate Protection To
        The Prepetition Secured Lenders As Set Forth In The Proposed Order.**

8      32.    The Court also should authorize the Debtors to use Cash Collateral pending the Final

9  Hearing, subject to the adequate protection provisions set forth in the proposed Order.

10     33.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession "may

11 not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash

12 collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in

13 accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

14     34.    Section 363(e) of the Bankruptcy Code in turn provides:

15         Notwithstanding any other provision of this section, at any time, on
           request of an entity that has an interest in property used, sold, or leased, or
16         proposed to be used, sold, or leased, by the trustee, the court, with or
           without a hearing, shall prohibit or condition such use, sale or lease as is
17         necessary to **provide adequate protection** of such interest.

18 11 U.S.C. § 363(e) (emphasis added).

19     35.    Adequate protection is provided to safeguard a creditor against diminution in the

20 value of its collateral from the automatic stay and the use, sale, or lease of its collateral. *See First*

21 *Fed. Bank of Cal. v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (9th Cir. BAP 1998); *Paccom*

22 *Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.)*, 139 B.R. 945, 947 (9th Cir. BAP

23 1992); *Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007).

24 Generally, if the value of the collateral decreases – or even if there is a threat to the value of the

25 collateral – the creditor is entitled to adequate protection. *See, e.g., Delaney-Morin v. Day (In re*

26 *Delaney-Morin)*, 304 B.R. 365, 370 n.3 (9th Cir. BAP 2003) ("A secured creditor lacks adequate

27 protection if there is a threat of a decline in the value of the property.")**.**

28

-18-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

36.     The Bankruptcy Code does not set forth a specific definition of "adequate

protection."  Rather, section 361 provides three non-exclusive examples of treatment that suffices to

adequately protect the interests of a secured creditor:

> When adequate protection is required . . . of an interest of
> an entity in property, such adequate protection may be provided by
> –
>
>          (1)     requiring the trustee to make a cash payment or
> periodic cash payments to such entity, to the extent that the . . . use
> . . . under section 363 of this title . . . results in a decrease in the
> value of such entity's interest in such property;
>          (2)     providing to such entity an additional or
> replacement lien to the extent that such . . . use . . . results in a
> decrease in the value of such entity's interest in such property; or
>          (3)     granting such other relief, . . . as will result in the
> realization by such entity of the indubitable equivalent of such
> entity's interest in such property.

11 U.S.C. § 361.  The Debtors need only prove adequate protection by a preponderance of the

evidence.  *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 268 (Bankr. C.D. Cal. 1988).

37.     The proposed Order offers to provide the Prepetition Secured Lenders with adequate

protection that is nearly identical to the adequate protection included in the Interim Cash Collateral

Orders.  The Debtors intend that, if entered, the proposed Order will govern the Debtors' use of

Cash Collateral going forward and supersede the existing Interim Cash Collateral Orders.

**1.      Replacement Liens In Fresh Collateral.**

38.     As indicated by section 361, additional or replacement liens are common forms of

adequate protection.  11 U.S.C. § 361(2); *see MBank Dallas, N.A., v. O'Connor (In re O'Connor)*,

808 F.2d 1393, 1396-97 (10th Cir. 1987).  When a debtor is authorized to use its cash collateral, the

secured creditor "has the corresponding right to seek, from the court, both a lien on property and

priority to the extent necessary to insure adequate protection."  *Arkison v. Frontier Asset Mgmt. (In*

*re Skagit Pac. Corp.)*, 316 B.R. 330, 336 n.5 (9th Cir. BAP 2004); *see also United States v. Nat'l*

*Westminster Bank USA (In re Q-C Circuits Corp.)*, 231 B.R. 506, 511 (E.D.N.Y. 1999) (finding that

the Bankruptcy Court was "well within its powers" when it provided replacement liens as adequate

protection for the debtor's use of the cash collateral).

779302.2

39.    In the Interim Cash Collateral Orders, the Debtors granted the Prepetition Agent for the benefit of the Prepetition Secured Lenders, liens (the "<u>Adequate Protection Liens</u>"), to the extent of diminution in value of the Prepetition Agent's collateral, against assets in which the Prepetition Agent and the Prepetition Secured Lenders did not previously have an interest (the "<u>Fresh Collateral</u>").  The Fresh Collateral includes the following assets:

- The Ridge – a five acre parcel of real estate in Huntington Beach near Brightwater on which the Debtors intend to develop the first "green" neighborhood in Orange County consisting of a 22-lot master planned community;

- 73 unimproved lots in Lancaster, California;

- Equity interest in non-debtor subsidiaries, including New Henley Holdings Inc.; and

- Other personal real and personal property as identified as "Fresh Collateral".

40.    These assets serve as additional collateral to protect the Prepetition Secured Lenders against diminution in value of their prepetition collateral.

**2.    Periodic Cash Payments of Interest and Reasonable Fees And Expenses of The Prepetition Agent.**

41.    Another form of adequate protection under section 361 is periodic cash payments.  11 U.S.C. § 361(1).  Under the prior Interim Cash Collateral Orders, the Debtors have timely made periodic cash payments of interest at the contract non-default rate provided under the Prepetition Credit Agreements.  The Debtors propose to continue to continue to pay interest at the contract non-default rate as and when due and payable under the Prepetition Credit Agreements.  *See, In re Sunnymead Shopping Center Co.*, 178 B.R. 284, 296 (9th Cir. B.A.P. 1998).  In addition, under the Interim Cash Collateral Orders the Debtors have paid the reasonable fees and expenses of professionals retained by the Prepetition Agent and will continue to do so under the proposed Order.

**3.    Compliance with a Budget and Other Protections.**

42.    The Interim Cash Collateral Orders required the Debtors to use cash collateral in accordance with a budget.  As discussed above, the Debtors have agreed to continue to use cash collateral within a budget as set forth in the DIP Credit Agreement.  *See In Federal Nat'l Mortgage Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 209 (N.D. Ill. 1993) (recognizing that compliance with a budget may be an element of adequate protection).

779302.2

43.     Finally, the Interim Cash Collateral Orders previously included a waiver of the surcharge under section 506(c) of the Bankruptcy Code for so long as the Prepetition Agent and the Prepetition Secured Lenders had consented to the use of cash collateral.  The proposed Order also includes a 506(c) waiver.

**C.     The Debtors Should Be Authorized to Enter Into the Plan Support Agreement.**

44.     In connection with the DIP Facility, the Debtors have also reached an agreement on a term sheet for a plan of reorganization that will facilitate the Debtors' emergence from chapter 11 by the beginning of March 2011.  To implement the term sheet, the Debtors and the Consenting Lenders have negotiated the Plan Support Agreement.

45.     Courts have recognized that the scope of impermissible postpetition "solicitation" under section 1125(b) should be interpreted narrowly, and that section 1125(b) should not be used to inhibit negotiations among the parties in interest.  *See Century Glove, Inc.* v. *First American Bank of New York,* 860 F.2d 94, 101 (3d Cir. 1988); *see also Trans World Airlines, Inc.* v. *Texaco, Inc. (In re Texaco, Inc.),* 81 B.R. 813,814-16 (Bankr. S.D.N.Y. 1988).  Following this principle, several courts have approved postpetition plan support agreements reached among debtors and their creditors. *See, e.g., In re Almatis B.V.,* Case No. 10-12308 (MG) (Bankr. S.D.N.Y. August 3, 2010) (ECF No. 349) (approving postpetition plan support agreement); *In re Visteon Corp.,* Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010) (ECF No. 3427); *In re Tronox Inc.,* Case No. 09- 10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) (ECF No. 1030); (same); *In re Owens Corning,* Case No. 00-03837 (JKF) (Bankr. D. Del. June 29, 2006) (ECF No. 18208) (same).

46.     The Plan Support Agreement is the product of extensive negotiations among the parties.  The Plan Support Agreement does not dispense, or purport to dispense, with the solicitation and voting requirements of the Bankruptcy Code.  In particular, the Plan Support Agreement does not absolutely commit any of the parties thereto to support or vote for a particular plan of reorganization with no consideration of the disclosures set forth in an approved disclosure statement. The Plan Support Agreement thus contemplates that the Debtors would file and receive court approval for a disclosure statement with respect to the Plan, and that only thereafter, and after

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

1  review of the approved Disclosure Statement and its attachments, would the parties to the Plan

2  Support Agreement be obligated to exercise their chapter 11 voting rights.

3      47.    Given that the Plan Support Agreement is the product of the very plan negotiations

4  that are so critical to the Chapter 11 process and that should, as a policy matter, be strongly

5  encouraged, and the flexibility afforded to the parties to the Plan Support Agreement, the Debtors

6  submit that their entry into the Plan Support Agreement does not constitute a "solicitation" of the

7  votes of the Consenting Lenders that violates either the letter or the spirit of section 1125(b) of the

8  Bankruptcy Code.

9

10     **D.    Cause Exists to Shorten The Notice Period For Approval of a Disclosure
        Statement.**

11     48.    The Debtors also request that the Court shorten the time for consideration of the

12  disclosure statement that will be filed in accordance with the Plan Support Agreement.  Local

13  Bankruptcy Rule 3017-1 provides as follows:

14
          **(a) Notice of Hearing on Motion for Approval of
15        Disclosure Statement.** A hearing on a motion for approval of a
          disclosure statement must not be set on less than 36 days notice,
16        *unless the court, for good cause shown, prescribes a shorter
          period.*

17
          **(b) Objections to Disclosure Statement.** Objections to a
18        disclosure statement must be filed and served on the proponent not
          less than 14 days before the hearing, unless otherwise ordered by
19        the court.

20  LBR 3017-1 (emphasis added in italics).

21     49.    The Debtors anticipate filing their proposed disclosure statement and plan

22  implementing the plan term sheet by December 20, 2010.  In order to exit chapter 11 prior to the

23  commencement of the spring selling season and prior to the maturity of the DIP Facility, it is

24  important that the Debtors obtain approval of a disclosure statement by January 14, 2011 so that a

25  confirmation hearing can be held before February 17, 2011.  The Debtors request that the Court

26  shorten the time for notice of the hearing to consider the disclosure statement and set January 12,

27  2011 at 10:00 a.m. as the hearing to consider the disclosure statement and January 5, 2011 at 5:00

28  p.m. as the deadline to object to the disclosure statement.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2

1    50.    The schedule requested by the Debtors will offer creditors at least 16 days to object

2  to the disclosure statement and 23 days notice of the disclosure statement hearing.  These modest

3  reductions in the notice period are reasonable due in part to the fact that the Court has already

4  approved a prior disclosure statement by the Debtors.

5    51.    Accordingly, good cause exists to shorten the time for notice of the disclosure

6  statement hearing.

7  **IV.    CONCLUSION**

8    WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially

9  in the form of the proposed Order attached hereto as Exhibit A, granting the following relief:

10  (a) authorizing the Debtors to obtain postpetition financing on an interim basis on the terms and

11  conditions set forth in the DIP Credit Agreement pursuant to section 364 of the Bankruptcy Code,

12  (b) granting the liens and claims to the DIP Agent for the benefit of the DIP Lenders on an interim

13  basis, (c) authorizing the Debtors to use Cash Collateral pursuant to sections 361 and 363 of the

14  Bankruptcy Code on an interim basis; (d) approving the form of adequate protection provided to the

15  Prepetition Secured Lenders pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code;

16  (e) scheduling a final hearing to consider approval of postpetition financing and use of cash

17  collateral; (f) authorizing the Debtors to enter into the Plan Support Agreement; (g) shortening time

18  to consider approval of a disclosure statement pursuant to Local Bankruptcy Rule 3017-1; and (h)

19  granting related relief.

20

21  DATED:  December 7, 2010                    HENNIGAN, BENNETT & DORMAN LLP
22                                              865 South Figueroa Street, Suite 2900
                                                Los Angeles, CA 90017
23

24

25                                              By:  _/s/ Joshua M. Mester_____
                                                    Bruce Bennett
26                                                  Joshua M. Mester
                                                    Michael C. Schneidereit
27
                                                    *Reorganization Counsel for Debtors*
28                                                  *and Debtors in Possession*

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

779302.2