1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (Cal. Bar No. 105430)
2  JOSHUA M. MESTER (Cal. Bar No. 194783)
   MICHAEL C. SCHNEIDEREIT (Cal. Bar No. 234956)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone: (213) 694-1200
   Fax: (213) 694-1234
5
   *Reorganization Counsel for Debtors*
6  *and Debtors in Possession*

7

8           **UNITED STATES BANKRUPTCY COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
9                   **SANTA ANA DIVISION**

10

11  *In re*                                      )  Case No. 8:09-21712-TA
    ☐ CALIFORNIA COASTAL                         )
    COMMUNITIES, INC.                            )  Jointly Administered with Case Nos.
12  ☐ SIGNAL LANDMARK HOLDINGS, INC.             )  8:09-21713-TA; 8:09-21714-TA;
    ☐ SIGNAL LANDMARK                            )  8:09-21715-TA; 8:09-21717-TA;
13  ☐ HEARTHSIDE HOLDINGS, INC.                  )  8:09-21718-TA; 8:09-21719-TA;
    ☐ HEARTSIDE HOMES, INC.                      )  8:09-21720-TA; 8:09-21721-TA;
14  ☐ HHI CHANDLER, L.L.C.                       )  8:09-21722-TA; 8:09-21723-TA
    ☐ HHI CHINO II, L.L.C.                       )
15  ☐ HHI CROSBY, L.L.C.                         )         Chapter 11
    ☐ HHI HELLMAN, L.L.C.                        )
16  ☐ HHI LANCASTER I, L.L.C.                    )  **DISCLOSURE STATEMENT FOR SIXTH**
    ☐ HHI SENECA, L.L.C.                         )  **AMENDED PLAN OF**
17                                               )  **REORGANIZATION DATED DECEMBER**
    ☒ All Debtors                                )  **20, 2010**
18                                               )
             Debtors.                            )
19  _____)

20

21  **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**

22  **ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE**

23  **STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS**

24  **DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT**

25  **BEEN APPROVED BY THE BANKRUPTCY COURT**

26

27

28

1612527.3

# TABLE OF CONTENTS

**Page**

## TABLE OF CONTENTS CONT'D

EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A – Plan

Exhibit B – Plan Support Agreement

Exhibit C – Selected Historical Financial Information

Exhibit D – Projections

Exhibit E – Liquidation Analysis

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

# I.    INTRODUCTION

CALC; Signal Landmark Holdings Inc.; Signal Landmark; Hearthside Holdings, Inc.; Hearthside Homes, Inc.; HHI Lancaster I, L.L.C.; HHI Chandler, L.L.C.; HHI Chino II, L.L.C.; HHI Crosby, L.L.C.; HHI Hellman, L.L.C.; and HHI Seneca, L.L.C. (collectively, the "Debtors" or the "Plan Proponents") have filed a Sixth Amended Plan of Reorganization dated December 20, 2010 (the "Plan") to provide for the Debtors to emerge from bankruptcy. A copy of the Plan is attached as Exhibit A. This Disclosure Statement is being distributed to you by the Plan Proponents to help enable you to make an informed judgment about the Plan, and to solicit your acceptance of the Plan. The Plan Proponents believe that the acceptance, confirmation and implementation of the Plan are in the best interests of the Debtors, their creditors and their shareholders.

The United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") has scheduled a hearing on _____ __, 2011 to consider whether to confirm the Plan..

On _____ __, 2011, after notice and a hearing held on January 12, 2011, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors and equity interest holders to make an informed judgment whether to accept or reject the Plan. **APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THE SECURITIES AND EXCHANGE COMMISSION HAS NOT APPROVED OR DISAPPROVED THE DISCLOSURE STATEMENT, OR DETERMINED IF IT IS TRUTHFUL OR CORRECT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The Disclosure Statement Order sets forth deadlines for voting to accept or reject the Plan and concerning procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes.  A Ballot[1] for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a holder of Claims or interests who are entitled to vote to accept or reject the Plan.  In addition, voting instructions accompany each Ballot.

Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting to accept or reject the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- Plan Support Agreement dated December __, 2010 (Exhibit B);

- Selected historical financial information for CALC for 2009 and 2010 (Exhibit C);

- The Debtors' Financial Projections (the "Projections") (Exhibit D); and

- Analysis of the potential results of a liquidation of the Debtors' assets conducted in cases under chapter 7 of the Bankruptcy Code (Exhibit E)

**A.    Holders of Claims and Interests Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests in classes of Claims or Interests that are impaired under a chapter 11 plan are entitled to vote to accept or reject the Plan.  Classes of Claims or Interests in which the holders of Claims or Interests will not receive or retain any property under a chapter 11 plan are conclusively deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  Classes of Claims or

---

[1] Capitalized terms not defined herein have the meaning attributed to them in the Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    Interests in which the holders of Claims or Interests are unimpaired under a chapter 11 plan are

2    conclusively deemed to have accepted the plan and are not entitled to vote to accept or reject the

3    plan.

4          Classes 1D through 11D, 1E through 6E, 1F through 6F, 4I through 6I, and 2K through 6K

5    are unimpaired under the Plan and the holders of Claims or Interests in those Classes are

6    conclusively presumed to have accepted the Plan.  Classes 1K, 7E through 11 E, 7H through 11H, 1J

7    through 11J, and 7K through 11K receive no consideration under the Plan and the holders of Claims

8    or Interests in those Classes are conclusively presumed to have rejected the Plan.  Classes 1A

9    through 11A, Classes 1B through 11B, Class 6C, Classes 1G through 6G, and Classes 1H through

10    6H of the Plan are classified as impaired under the Plan and holders of Allowed Claims in those

11    Classes are entitled to vote to accept or reject the Plan.  Therefore, acceptances of the Plan are being

12    solicited only from holders of Claims or Interests in Classes 1A through 11A, Classes 1B through

13    11B, Class 6C, Classes 1G through 6G, and Classes 1H through 6H.

14          The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by

15    creditors in that class that hold at least two-thirds in dollar amount and more than one-half in

16    number of the claims that cast ballots for acceptance or rejection of the plan.  Acceptance of a plan

17    by a class of interests requires acceptance by at least two-thirds of the amount of shares in such class

18    for which ballots are cast for acceptance or rejection of the plan.  For a complete description of the

19    requirements for confirmation of the Plan, see Section VIII, "Voting Procedures and Confirmation

20    of Plan."

21          Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding

22    the non-acceptance of such plan by one or more impaired classes of claims or interests.  Under that

23    section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is

24    "fair and equitable" with respect to each non-accepting class.  For a more detailed description of the

25    requirements for confirmation of a nonconsensual plan, see Section VIII.E, "Best Interests Test,

26    Liquidation Analysis."

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    With respect to any Class of Claims that vote to reject the Plan, the Plan Proponents intend

2    to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code,

3    notwithstanding the rejection of the Plan by such Class or Classes.

4    **B.    Voting Procedures**

5    If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of

6    voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in

7    more than one Class, you will receive separate Ballots that must be used for each separate Class of

8    Claims.  Please vote and return your Ballot(s) to:

9
Hennigan, Bennett & Dorman LLP
Attention:  Mr. Kevin Floyd
10    865 S. Figueroa St., Suite 2900
Los Angeles, CA  90017
11    Facsimile:  213-694-1234
E-mail:  CALCbkcase@hbdlawyers.com

12

13    **DO NOT RETURN ANY SECURITIES OR OTHER EVIDENCE OF YOUR CLAIM**

14    **AGAINST THE DEBTORS WITH YOUR BALLOT.**

15    **TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR**

16    **REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED (INCLUDING BY**

17    **EMAIL) NO LATER THAN 5:00 P.M. P.D.T., ON _____ __, 2011.  ANY BALLOT THAT**

18    **DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN**

19    **WILL NOT BE COUNTED IN DETERMINING WHETHER A CLASS HAS ACCEPTED**

20    **OR REJECTED THE PLAN.**

21    **ANY CLAIM IN AN IMPAIRED CLASS AS TO WHICH AN OBJECTION OR**

22    **REQUEST FOR ESTIMATION IS PENDING BEFORE THE BANKRUPTCY COURT OR**

23    **WHICH IS SCHEDULED BY THE DEBTORS AS UNLIQUIDATED, DISPUTED OR**

24    **CONTINGENT, INCLUDING ANY TORT CLAIM, IS NOT ENTITLED TO VOTE ON**

25    **THE PLAN UNLESS THE HOLDER OF SUCH CLAIM HAS OBTAINED AN ORDER OF**

26    **THE BANKRUPTCY COURT TEMPORARILY ALLOWING SUCH CLAIM FOR THE**

27    **PURPOSE OF VOTING ON THE PLAN.**

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has set _____ __, 2011 as the record date for voting on the Plan.  Accordingly, only holders of Allowed Claims as of such date that are otherwise entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Hennigan, Bennett & Dorman LLP:

Hennigan, Bennett & Dorman LLP
Attention:  Mr. Kevin Floyd
865 S. Figueroa St., Suite 2900
Los Angeles, CA  90017
Telephone: 213-694-1200
Email:  CALCbkcase@hbdlawyers.com

**C.    Confirmation Hearing**

The hearing to consider confirmation of the Plan will be held on _____, 2011, at __:__ _.m. P.S.T., before the Honorable Theodor C. Albert, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom "5B," 411 West Fourth Street, Santa Ana, California 92701.

The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed so that they are received on or before _____ __, 2011 at 5:00 p.m., P.S.T.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the confirmation hearing or at any subsequent adjourned confirmation hearing.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not create an implication that there has not been any change in the information stated since the date hereof.

For the convenience of Holders of Claims and Interests, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  Also, summaries of certain provisions of agreements referred to in this disclosure statement do not purport

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-5-

1    to be complete and are subject to, and are qualified in their entirety by, reference to the full text of

2    the applicable agreement, including the definitions of terms contained in such agreement.

3        The Disclosure Statement may not be relied on for any purpose other than for the purpose of

4    determining whether to vote to accept or reject the Plan, and nothing stated herein shall constitute an

5    admission of any fact or liability by any party, or be admissible in any proceeding involving the

6    Debtors, or be deemed conclusive evidence of the tax, securities law, or other legal effects of the

7    Plan on the Debtors or holders of Claims or Interests.

8        Certain of the statements contained in this Disclosure Statement, by nature, are forward-

9    looking and contain estimates and assumptions based upon current facts and circumstances. There

10   can be no assurance that such statements will be reflective of actual outcomes, which may be

11   materially different from any future results expressed or implied in such forward-looking statements.

12   All holders of Claims should carefully read and consider fully Section VII of this Disclosure

13   Statement, "Certain Factors To Consider In Voting To Accept Or Reject The Plan," before voting to

14   accept or reject the Plan.

15       Although no assurance can be given, the Debtors believe that the Plan will enable the

16   Debtors to successfully reorganize and accomplish the objectives of chapter 11 and that acceptance

17   of the Plan is in the best interests of the Debtors, their creditors, and their shareholders.

18   **THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

## II.    OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.  The "recoveries" set forth below are projected recoveries only and may change based on factors related to the Debtors' business operations and general economic conditions.  For a description of certain risks associated with the recoveries provided under the Plan, see Section VII, "Certain Factors To Consider in Voting to Accept or Reject the Plan."

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 1A<br><br>Revolver Loan Claims against CALC<br><br>Impaired | $81.7 million | Holders of Revolver Loan Claims shall receive an equal amount of New Second Lien Loans. | 100% |
| Class 1B<br><br>Term Loan Claims against CALC<br><br>Impaired | $99.8 million | Holders of Term Loan Claims shall receive a pro rata share of New Third Lien Loans, which shall have a principal amount of $44,000,000, and 100% of the New CALC Common Stock. | TBD |
| Class 1D<br><br>Other Secured Claims against CALC<br><br>Unimpaired | $0 | Proceeds from the sale of its collateral, distribution of the collateral, or reinstatement of its Claim. | 100% |
| Class 1E<br><br>Other Priority Claims against CALC<br><br>Unimpaired | $22,000 | Payment in full in Cash. | 100% |
| Class 1F<br><br>Employee PTO Claims against CALC<br><br>Unimpaired | $_____ | Reinstated. | 100% |

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 1G<br><br>Convenience Claims against CALC<br><br>Impaired | $____ | Unsecured claims in an amount up to $10,000 shall receive payment in full in Cash on the Effective Date. | 100% |
| Class 1H<br><br>General Unsecured Claims against CALC<br><br>Impaired | $138,000 - $1,000,000 | Interests in the GUC Trust, which shall be funded with an aggregate amount of contributions from the Reorganized Debtors equal to $2,000,000 or $3,000,000 in the event that Classes 1H through 6H vote to accept the Plan. | ___ - ___% |
| Class 1J<br><br>Intercompany Claims against CALC<br><br>Impaired | $47.8 million | There shall be no distributions on account of Intercompany Claims against CALC. | 0% |
| Class 1K<br><br>Interests in CALC<br><br>Impaired | N/A | On the Effective Date, all existing Interests in CALC shall be canceled. | 0% |
| Classes 2B through 6B<br><br>Revolver Loan Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $81.7 million | Revolver Loan Claims in these Classes shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A. | 100% |
| Classes 2B through 6B<br><br>Term Loan Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $99.8 million | Deemed satisfied as a result of the payment of Cash on the Effective Date provided to the holders of Allowed Prepetition Term Loan Claims in Class A-2. | TBD |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 6C<br><br>IndyMac Secured Claim<br><br>Impaired | $0 | Cash as may be required to be paid pursuant to section 506(b) of the Bankruptcy Code. | 100% |
| Classes 2D through 6D<br><br>Other Secured Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Proceeds from the sale of its collateral, distribution of the collateral, or reinstatement of its Claim. | 100% |
| Classes 2E through 6E<br><br>Other Priority Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Payment in full in Cash. | 100% |
| Classes 2F through 6F<br><br>Employee PTO Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $_____ | Reinstated. | 100% |
| Classes 2G through 6G<br><br>Convenience Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $____ | Unsecured claims in an amount up to $10,000 shall receive payment in full in Cash on the Effective Date. | 100% |

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Classes 2H through 6H<br><br>General Unsecured Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $0 | Interests in the GUC Trust, which shall be funded with an aggregate amount of contributions from the Reorganized Debtors equal to $2,000,000 or $3,000,000 in the event that Classes 1H through 6H vote to accept the Plan. | __-__% |
| Classes 4I through 6I<br><br>Homeowner Warranty Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Reinstated. | 100% |
| Class 2J through 6J<br><br>Intercompany Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $____ | There shall be no distributions on account of Intercompany Claims against Reorganizing Subsidiary Debtors. | 0% |
| Classes 2K through 6K<br><br>Interests in Reorganizing Subsidiary Debtors<br><br>Unimpaired | N/A | Holders of Interests in Reorganizing Subsidiary Debtors shall retain such Interests. | 100% |
| Classes 7A through 11A<br><br>Revolver Loan Claims against Inactive Debtors<br><br>Impaired | $81.7 million | Revolver Loan Claims in these Classes shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Classes 7B through 11B<br><br>Prepetition Term Loan Claims against Inactive Debtors<br><br>Impaired | $99.8 million | Term Loan Claims in these Classes shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1B. | TBD |
| Classes 7D through 11D<br><br>Other Secured Claims against Inactive Debtors<br><br>Unimpaired | $0 | Proceeds from the sale of its collateral, distribution of the collateral, or reinstatement of its Claim. | 100% |
| Classes 7E through 11E<br><br>Other Priority Claims against Inactive Debtors<br><br>Impaired | $12,000 | Holders of Other Priority Claims against the Inactive Debtors shall receive no distribution under the Plan | 0% |
| Classes 7H through 11H<br><br>General Unsecured Claims against Inactive Debtors<br><br>Impaired | $36,200 | Holders of General Unsecured Claims against the Inactive Debtors shall receive no distribution under the Plan | 0% |
| Classes 7J through 11J<br><br>Intercompany Claims against Inactive Debtors<br><br>Impaired | $43.6 million | Holders of Intercompany Claims against the Inactive Debtors shall receive no distribution under the Plan | 0% |

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Classes 7K through 11K<br><br>Interests in Inactive Debtors<br><br>Impaired | N/A | Holders of Interests in the Inactive Debtors shall receive no distribution under the Plan | 0% |

The Plan will also contain, and seek approval of, a settlement of all claims arising under, based upon, or relating to the June 18, 2010 commitment letter for exit financing and the order approving same, including Luxor's claim to a break-up fee based upon, arising under, or related to the Commitment Letter and the order approving same. On June 18, 2010, the Bankruptcy Court entered an order authorizing the Debtors to enter into a commitment letter with Luxor for exit financing in the amount of $184,000,000. The Commitment Letter Order also approved the payment of a break-up fee to Luxor in the amount of 3.5% of the commitment in the event certain conditions occurred. The financing contemplated by the Commitment Letter was never consummated. Luxor contended that it was entitled to payment of the break-up fee pursuant to the Commitment Letter Order and the Commitment Letter. The Debtors and the Prepetition Agent contended that Luxor was not entitled to the break-up fee.

The Debtors and the Consenting Lenders have agreed to resolve all claims arising from, based upon, or related to the Commitment Letter Order and the Commitment Letter under the Plan as set forth in section 5.12 of the Plan (the "Luxor Settlement"). Under the Luxor Settlement, in full settlement, exchange, and compromise of the Commitment Letter Released Claims, Luxor will receive (a) payment in cash equal to an amount of $480,044.64 which represents the unpaid fees and expenses of Luxor and Luxor's counsel incurred through November 17, 2010; (b) payment in cash of any and all unpaid reasonable and documented fees and expenses of Luxor and Luxor's counsel incurred from November 18, 2010 up to and through the Effective Date; and (c) $1 million of the New Second Lien Loan to be issued on the effective date. The $1 million New Second Lien Loan is

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

in addition to the principal amount of second lien loans being issued to the Prepetition Revolving

Lenders and shall have the same rights and obligations as those loans.

The Debtors believe that the Luxor Settlement is fair and reasonable and falls within the

range of reasonable outcomes.  If Luxor were to prevail in its assertion of the break-up fee, the

Debtors and their estates could be required to pay Luxor, as an administrative claim, a fee of

approximately $6.4 million.  The obligation to pay such a fee would render the Plan unconfirmable.

Moreover, absent affirmative Lender financial support or the support of an alternative source of

capital that the Debtors have not yet found, the obligation to pay such a fee would render the Debtor

incapable of confirming virtually any plan of reorganization.  While the Debtors believe that they

have defenses to the Commitment Letter Released Claims, the prosecution of those defenses would

cause the estate to incur significant legal expenses and risk delay in exiting from chapter 11.  Under

the proposed settlement, Luxor will receive a new loan, which will be part of the New Second Lien

Loans issued on the Effective Date, in the amount of $1,000,000 and the payment of its attorneys'

fees in cash.  In return, the estate avoids the uncertainty, expense, and delay associated with

litigating the merits of the Commitment Letter Released Claims.

1612527.3

### III.    SUMMARY OF THE PLAN

The Plan Proponents believe that (i) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees and (ii) through the Plan, creditors and equity interest holders will obtain a greater recovery from the Debtors' estates than would be available if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions of the Plan.

### A.    Unclassified Claims

#### 1.    DIP Facility Claims

On the Effective Date, the DIP Facility shall be converted into the New First Lien Loan in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, provided that all of the conditions to conversion of the DIP Facility set forth in section 3.3 of the DIP Credit Agreement have been satisfied or waived in accordance with the terms of the DIP Credit Agreement, including without limitation the payment of the Conversion Consideration.

#### 2.    Administrative Expense Claims

Except as provided in Section 2.3 in the Plan or to the extent that the holder of an Allowed Administrative Expense Claim and the Debtors, with the written consent of the Requisite Consenting Lenders, agree to a different treatment, the Reorganized Debtors shall pay to each holder of an Allowed Administrative Expense Claim, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made on either (a) the latest to occur of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Administrative Expense Claim, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order; provided, however, that all Ordinary Course Administrative Expenses shall be paid in full by the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    of agreements relating thereto.  The Confirmation Order shall contain a bar date for purposes of

2    assertion and allowance of Administrative Expense Claims, other than Ordinary Course

3    Administrative Expenses.

4          **3.**      **Compensation and Reimbursement Claims**

5          Except as provided in Section 2.4 of the Plan, all Entities that are awarded compensation or

6    reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330 or 331 of

7    the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or

8    503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the

9    Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the

10   Effective Date and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes

11   a Final Order, or (b) upon such other terms as may be mutually agreed upon between such holder of

12   an Allowed Administrative Expense Claim and the Reorganized Debtors.

13         Professionals or other Entities asserting a Professional Fee Claim for services rendered to the

14   Estate before the Effective Date must File and serve on the pertinent Reorganized Debtors and such

15   other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Professional

16   Fee Order, or other order of the Bankruptcy Court, an application for final allowance of such

17   Professional Fee Claim, as it relates to services provided to the Estate, no later than 60 days after the

18   Effective Date.  Objections to any Professional Fee Claim must be Filed and served on the

19   Reorganized Debtors and the requesting party by the later of (1) 90 days after the Effective Date or

20   (2) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.  To

21   the extent necessary, the Confirmation Order will amend and supersede any previously entered order

22   of the Bankruptcy Court, including the Professional Fee Order, regarding the payment of

23   Professional Fee Claims.

24         **4.**      **Priority Tax Claims**

25         Unless otherwise agreed to by the Debtors (with the written consent of the Requisite

26   Consenting Lenders) and the holder of an Allowed Priority Tax Claim (in which event such other

27   agreement will govern), each holder of an Allowed Priority Tax Claim against any of the Debtors

28   that is due and payable on or before the Effective Date shall receive, at the option of the Debtors

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-15-

1612527.3

(with the written consent of the Requisite Consenting Lenders) and on account of and in full and complete settlement, release and discharge of such Claim, either (a) cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (b) equal annual cash payments aggregating the amount of such Allowed Priority Tax Claim, together with interest at the applicable non-bankruptcy rate over a period not exceeding five (5) years after the Petition Date.  All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

Notwithstanding the provisions of Section 2.5 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment as a General Unsecured Claim if not subordinated to General Unsecured Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the pertinent Debtor, Reorganized Debtor or their respective property.

**B.      Classification and Treatment of Claims and Interests**

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code.  As described more fully below, the Plan provides separately for each Class that holders of certain Claims and Interests will receive various amounts and types of consideration (e.g., Cash, notes, and/or New CALC Common Stock), thereby giving effect to the different rights of the holders of Claims and Interests in each Class.

**1.      Classification Of Claims Against And Interests In CALC (Class A)**

**a)      Class 1A – Revolver Loan Claims Against CALC**

The Revolver Loan Claims shall be deemed Allowed in an aggregate amount equal to $81,679,317.58, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges, and neither such Revolver Loan Claims nor the distributions thereon shall be subject to

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1  reduction, disallowance, subordination, set off or counterclaim.  On the Effective Date, each holder

2  of a Revolver Loan Claim against CALC shall receive a *pro rata* share of $81,679,317.58 in

3  principal amount of New Second Lien Loans.

4  Class 1A is impaired.  Because Class 1A is impaired and Holders of Class 1A Claims receive

5  consideration under the Plan, the Holders of Claims in Class 1A are permitted to vote to accept or

6  reject the Plan.

7  **b)  Class 1B – Term Loan Claims Against CALC**

8  The Term Loan Claims shall be deemed Allowed in an aggregate amount equal to

9  $99,800,000, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges,

10  and neither such Term Loan Claims nor the distributions thereon shall be subject to reduction,

11  disallowance, subordination, set off or counterclaim.  On the Effective Date, each holder of a Term

12  Loan Claim against CALC shall receive a *pro rata share* of New Third Lien Loans and 100% of the

13  New CALC Common Stock.

14  Class 1B is impaired.  Because Class 1B is impaired and Holders of Class 1B Claims receive

15  consideration under the Plan, the Holders of Claims in Class 1B are permitted to vote to accept or

16  reject the Plan.

17  **c)  Class 1D – Other Secured Claims Against CALC**

18  Class 1D consists of all Other Secured Claims against CALC.  On the Effective Date, each

19  Holder of an Allowed Other Secured Claim shall (a) receive in full satisfaction of its Allowed Other

20  Secured Claim, at the option of Reorganized CALC: (i) the net proceeds of the sale of the property

21  securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other

22  Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii) payments in

23  accordance with the provisions of any agreement relating to the property, on substantially the same

24  terms as such agreement, or (b) have its Allowed Other Secured Claim Reinstated against

25  Reorganized CALC.  Class 1D is unimpaired.  The Holders of Claims in Class 1D will not vote to

26  accept or reject the Plan and are deemed to accept the Plan.

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

### d)    Class 1E – Other Priority Claims Against CALC

Class 1E consists of all Other Priority Claims against CALC.  On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed upon by Reorganized CALC and the holder of such Claim, or (b) such other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim against CALC shall receive on account of and in full and complete settlement, release and discharge of such Claim, at Reorganized CALC's election , (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Other Priority Claims against CALC that are not due and payable on or before the Effective Date shall be paid by Reorganized CALC when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.  Class 1E is unimpaired.  The Holders of Claims in Class 1E will not vote to accept or reject the Plan and are deemed to accept the Plan.

### e)    Class 1F – Employee PTO Claims against CALC.

Class 1F consists of all Employee PTO Claims against CALC.  There shall be no monetary distributions on account of Employee PTO Claims against CALC.  Pursuant to section 1124 of the Bankruptcy Code, each holder of an Employee PTO Claim against CALC shall have its Employee PTO Claim reinstated.  Class 1F is unimpaired.  The Holders of Claims in Class 1F will not vote to accept or reject the Plan and are deemed to accept the Plan.

### f)    Class 1G – Convenience Claims Against CALC

Class 1G consists of all Convenience Claims against CALC.  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against CALC, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against CALC shall receive payment in full in Cash on account of such Claim; provided, however, that post-petition interest shall not be paid to any Holder of any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.  Class 1G is

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    impaired.  Because Class 1G is impaired and Holders of Class 1G Claims receive consideration

2    under the Plan, the Holders of Claims in Class 1G are permitted to vote to accept or reject the Plan.

### g)    Class 1H – General Unsecured Claims Against CALC

4        Class 1H consists of all General Unsecured Claims against CALC.  In full satisfaction of and

5    in exchange for each Allowed General Unsecured Claim against CALC, the Holder will receive a

6    pro rata share, calculated together with the Allowed amount of General Unsecured Claims against

7    Reorganizing Subsidiary Debtors, of GUC Trust Interests.  Class 1H is impaired.  Because Class 1H

8    is impaired and Holders of Class 1H Claims receive consideration under the Plan, the Holders of

9    Claims in Class 1H are permitted to vote to accept or reject the Plan.

### h)    Class 1J – Intercompany Claims Against CALC

11        Class 1J consists of Intercompany Claims against CALC.  Holders of an Intercompany

12    Claim against CALC shall not receive any distribution under the Plan.  Class 1J is impaired.

13    Because Class 1J is impaired and Holders of Claims in Class 1J do not receive consideration under

14    the Plan, the Holders of Claims in Class 1J are deemed to reject the Plan.

### i)    Class 1K – Interests In CALC

16        Class 1K consists of all Interests in CALC.  On the Effective Date, existing Interests in

17    CALC shall be canceled and Holders of Interests in CALC shall not receive any distribution under

18    the Plan.  Class 1K is impaired.  Because Class 1K is impaired and Holders of Class 1K Claims do

19    not receive consideration under the Plan, the Holders of Claims in Class 1K are deemed to reject the

20    Plan.

### 2.    Classification Of Claims Against And Interests In Reorganizing Subsidiary Debtors (Debtors 2 through 6).

23        The following chart assigns a letter to each Class against the Reorganizing Subsidiary

24    Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Revolver Loan Guaranty Claims |
| B | Term Loan Guaranty Claims |
| C | IndyMac Secured Claim |
| D | Other Secured Claims |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| | |
|---|---|
| E | Other Priority Claims |
| F | Employee PTO Claims |
| G | Convenience Claims |
| H | General Unsecured Claims |
| I | Homeowner Warranty Claims |
| J | Intercompany Claims |
| K | Interests |

### a) Classes 2A through 6A – Revolver Loan Guaranty Claims

Classes 2A through 6A consist of Revolver Loan Guaranty Claims against Reorganizing Subsidiary Debtors. The Revolver Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to $81,679,317.58, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges, and neither such Revolver Loan Guaranty Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim. The Allowed Revolver Loan Guaranty Claims in Classes 2A through 6A shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A above. Classes 2A through 6A are impaired. Because Classes 2A through 6A are impaired and Holders of Claims in Classes 2A through 6A receive consideration under the Plan, the Holders of Claims in Classes 2A through 6A are permitted to vote to accept or reject the Plan.

### b) Classes 2B through 6B – Term Loan Guaranty Claims

Classes 2B through 6B consist of Term Loan Guaranty Claims against Reorganizing Subsidiary Debtors. The Term Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to $99,800,00, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges, and neither such Term Loan Guaranty Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim. The Allowed Term Loan Guaranty Claims in Classes 2B through 6B shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Term Loan Claims in Class 1B above. Classes 2B through 6B are impaired. Because Classes 2B through 6B are impaired and

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1  Holders of Claims in Classes 2B through 6B receive consideration under the Plan, the Holders of

2  Claims in Classes 2B through 6B are permitted to vote to accept or reject the Plan.

3         **c)**    **Class 6C – Indymac Secured Claim**

4        Class 6C consists of the IndyMac Secured Claim.  On the Effective Date, IndyMac shall, on

5  account of the IndyMac Secured Claim, receive Cash as may be required to be paid under section

6  506(b) of the Bankruptcy Code.  Class 6C is impaired.  Because Class 6C is impaired and Holders

7  of Claims in Class 6C receive consideration under the Plan, the Holders of Claims in Class 6C are

8  permitted to vote to accept or reject the Plan.

9         **d)**    **Classes 2D through 6D – Other Secured Claims**

10        Classes 2D through 6D consist of all Other Secured Claims against the Reorganizing

11  Subsidiary Debtors.  On the Effective Date, each Holder of an Allowed Other Secured Claim against

12  a Reorganizing Subsidiary Debtor shall (a) receive in full satisfaction of its Allowed Other Secured

13  Claim, at the option of the applicable Reorganizing Subsidiary Debtor: (i) the net proceeds of the

14  sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such

15  Allowed Other Secured Claim; (ii) the property securing such Allowed Other Secured Claim; or (iii)

16  payments in accordance with the provisions of any agreement relating to the property, on

17  substantially the same terms as such agreement, or (b) have its Allowed Other Secured Claim

18  Reinstated against the applicable Reorganizing Subsidiary Debtor.  Classes 2D through 6D are

19  unimpaired.  The Holders of Claims in Classes 2D through 6D will not vote to accept or reject the

20  Plan and are deemed to accept the Plan.

21         **e)**    **Classes 2E through 6E – Other Priority Claims**

22        Classes 2D through 6E consist of all Other Priority Claims against Reorganizing Subsidiary

23  Debtors.  On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date

24  such claim becomes an Allowed Other Priority Claim, and (iii) such other date as may be agreed

25  upon by the applicable Reorganizing Subsidiary Debtor and the holder of such Claim, or (b) such

26  other date as the Bankruptcy Court may order, each holder of an Allowed Other Priority Claim

27  against a Reorganizing Subsidiary Debtor shall receive on account of and in full and complete

28  settlement, release and discharge of such Claim, at the applicable Reorganizing Subsidiary Debtor's

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

election, (i) cash in the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Other Priority Claims against the Reorganizing Subsidiary Debtors that are not due and payable on or before the Effective Date shall be paid by the applicable Reorganizing Subsidiary Debtor when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. Classes 2E through 6E are unimpaired. The Holders of Claims in Classes 2E through 6E will not vote to accept or reject the Plan and are deemed to accept the Plan.

### f)    Classes 2F through 6F – Employee PTO Claims

Classes 2F through 6F consist of all Employee PTO Claims against Reorganizing Subsidiary Debtors. There shall be no monetary distributions on account of Employee PTO Claims against a Reorganizing Subsidiary Debtor. Pursuant to section 1124 of the Bankruptcy Code, each holder of an Employee PTO Claim against a Reorganizing Subsidiary Debtor shall have its Employee PTO Claim reinstated. Classes 2F through 6F are unimpaired. The Holders of Claims in Classes 2F through 6F will not vote to accept or reject the Plan and are deemed to accept the Plan.

### g)    Classes 2G through 6G – Convenience Claims

Classes 2G through 6G consists of all Convenience Claims against Reorganizing Subsidiary Debtors. In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against Reorganizing Subsidiary Debtors, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Reorganizing Subsidiary Debtors shall receive payment in full in Cash on account of such Claim; provided, however, that post-petition interest shall not be paid to any Holder of any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes. Classes 2G through 6G are impaired. Because Classes 2G through 6G are impaired and Holders of Claims in Classes 2G through 6G receive consideration under the Plan, the Holders of Claims in Classes 2G through 6G are permitted to vote to accept or reject the Plan.

1612527.3

### h)       Classes 2H through 6H – General Unsecured Claims

Classes 2H through 6H consists of all General Unsecured Claims against Reorganizing Subsidiary Debtors.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim against a Reorganizing Subsidiary Debtor, the Holder will receive a pro rata share, calculated together with the Allowed amount of General Unsecured Claims against CALC, of GUC Trust Interests.  Classes 2H through 6H are impaired.  Because Classes 2H through 6H are impaired and Holders of Claims in Classes 2H through 6H receive consideration under the Plan, the Holders of Claims in Classes 2H through 6H are permitted to vote to accept or reject the Plan.

### i)       Classes 4I through 6I – Homeowner Warranty Claims

Classes 4I through 6I consist of all Homeowner Warranty Claims against Signal Landmark, Hearthside Homes, and HHI Lancaster. There shall be no monetary distributions on account of Homeowner Warranty Claims against Signal Landmark, Hearthside Homes, and HHI Lancaster. Pursuant to section 1124 of the Bankruptcy Code, each holder of a Homeowner Warranty Claim against Signal Landmark, Hearthside Homes, and HHI Lancaster shall have its Homeowner Warranty Claim reinstated as to that particular Reorganized Debtor. Classes 4I through 6I are unimpaired.  The Holders of Claims in Classes 4I through 6I will not vote to accept or reject the Plan and are deemed to accept the Plan.

### j)       Classes 2J through 6J – Intercompany Claims

Classes 2J through 6J consist of Intercompany Claims against Reorganizing Subsidiary Debtors.  Holders of Intercompany Claims against the Reorganizing Debtors shall receive no distribution under the Plan.  Classes 2J through 6J are impaired.  Because Classes 4J through 6J are impaired and Holders of Claims in Classes 2J through 6J do not receive consideration under the Plan, the Holders of Claims in Classes 2J through 6J are deemed to reject the Plan.

### k)       Classes 2K through 6K – Interests

Classes 2K through 6K consists of all in Interests in Reorganizing Subsidiary Debtors. Holders of Interests in Reorganizing Subsidiary Debtors shall retain such Interests.  Classes 2K through 6K are unimpaired.  The Holders of Interests in Classes 2K through 6K will not vote to accept or reject the Plan and are deemed to accept the Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-23-

3.    **Classification Of Claims Against And Interests In Inactive Debtors (Debtors 7 through 11)**

The following chart assigns a letter to each Class against Inactive Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Revolver Loan Guaranty Claims |
| B | Term Loan Guaranty Claims |
| D | Other Secured Claims |
| E | Other Priority Claims |
| H | General Unsecured Claims |
| J | Intercompany Claims |
| K | Interests |

a)    **Classes 7A through 11A – Revolver Loan Guaranty Claims**

Classes 7A through 11A consists of Revolver Loan Guaranty Claims against the Inactive Debtors.  The Revolver Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to $81,679,317.58, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges, and neither such Revolver Loan Guaranty Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.  The Allowed Revolver Loan Guaranty Claims in Classes 7A through 11A shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A above.  Classes 7A through 11A are impaired.  Because Classes 7A through 11A are impaired and Holders of Claims in Classes 7A through 11A receive consideration under the Plan, the Holders of Claims in Classes 7A through 11A are permitted to vote to accept or reject the Plan.

b)    **Classes 7B through 11B – Term Loan Guaranty Claims**

Classes 7B through 11B consist of the Term Loan Guaranty Claims against the Inactive Debtors.  The Term Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to $99,800,00, plus accrued and unpaid interest (at the non-default rate), fees, expenses and charges, and neither such Term Loan Guaranty Claims nor the distributions thereon shall be subject to

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-24-

1612527.3

reduction, disallowance, subordination, set off or counterclaim.  The Allowed Term Loan Guaranty Claims in Classes 7B through 11B shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Term Loan Claims in Class 1B above.  Classes 7B through 11B are impaired.  Because Classes 7B through 11B are impaired and Holders of Claims in Classes 7B through 11B receive consideration under the Plan, the Holders of Claims in Classes 7B through 11B are permitted to vote to accept or reject the Plan.

<b>c)</b>    <b>Classes 7D through 11D – Other Secured Claims:</b>

Classes 7D through 11D consist of all Other Secured Claims against the Inactive Debtors.  On the Effective Date, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction of its Allowed Other Secured Claim, at the option of the Inactive Debtors: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; or (ii) the property securing such Allowed Other Secured Claim.  Classes 7D through 11D are unimpaired.  The Holders of Claims in Classes 7D through 11D will not vote to accept or reject the Plan and are deemed to accept the Plan.

<b>d)</b>    <b>Classes 7E through 11E – Other Priority Claims</b>

Classes 7E through 11E consist of all Other Priority Claims against the Inactive Debtors.  Holders of Other Priority Claims against the Inactive Debtors shall receive no distribution under the Plan.  Classes 7E through 11E consist are impaired.  Because Classes 7E through 11E are impaired and Holders of Claims in Classes 7E through 11E do not receive consideration under the Plan, the Holders of Claims in Classes 7E through 11E are deemed to reject the Plan.

<b>e)</b>    <b>Classes 7H through 11H – General Unsecured Claims:</b>

Classes 7H through 11H consist of all General Unsecured Claims against the Inactive Debtors.  Holders of General Unsecured Claims against the Inactive Debtors shall receive no distribution under the Plan.  Classes 7H through 11H are impaired.  Because Classes 7H through 11H are impaired and Holders of Claims in Classes 7H through 11H do not receive consideration under the Plan, the Holders of Claims in Classes 7H through 11H are deemed to reject the Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS

1612527.3

#### f)        Classes 7J through 11J – Intercompany Claims

Classes 7J through 11J consist of Intercompany Claims against the Inactive Debtors.

Holders of Intercompany Claims against the Inactive Debtors shall receive no distribution under the

Plan. Classes 7J through 11J are impaired. Because Classes 7J through 11J are impaired and

Holders of Claims in Classes 7J through 11J do not receive consideration under the Plan, the

Holders of Claims in Classes 7J through 11J are deemed to reject the Plan.

#### g)        Classes 7K through 11K – Interests

Classes 7K through 11K consist of all Interests in the Inactive Debtors. On the Effective

Date, all Interests in the Inactive Debtors shall be canceled and holders of Interests in the Inactive

Debtors shall receive no distribution under the Plan. Classes 7K through 11K are impaired.

Because Classes 7K through 11K are impaired and Holders of Claims in Classes 7K through 11K do

not receive consideration under the Plan, the Holders of Claims in Classes 7K through 11K are

deemed to reject the Plan.

### C.     Means for Implementation of the Plan.

#### 1.     Revesting of Assets

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the

Estates of the Debtors (other than the Inactive Debtors), including all Rights of Action, and any

property acquired by the Debtors (other than the Inactive Debtors) under or in connection with the

Plan shall be assigned to and will vest in the respective Reorganized Debtor free and clear of all

Claims, Liens, charges, other encumbrances and interests, except as otherwise provided under the

Plan. On and after the Effective Date, the Reorganized Debtors may operate their business and may

use, acquire and dispose of property and compromise or settle any Claims or Interests without

supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the

Confirmation Order. Sources of Cash for future operations will include, inter alia, Cash of the

Debtors and anticipated revenue from further business operations. In accordance with section

1109(b) of the Bankruptcy Code, nothing in this paragraph shall preclude any party in interest from

appearing and being heard on any issue in the Reorganization Cases.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

2.    **Amended and Restated Articles of Incorporation & Amended and Restated By-Laws**

On the Effective Date, the Amended and Restated Articles of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their Amended and Restated Articles of Incorporation, Amended and Restated By-Laws and other constituent documents as permitted by applicable non-bankruptcy law. In addition, on the Effective Date, Reorganized CALC and the holders of the New CALC Common Stock as of the Effective Date shall enter into a shareholder agreement substantially in the form set forth in Exhibit 5.2 to the Plan, which shall be filed with the Plan Supplement.

3.    **Board of Directors/Management**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of the Reorganized Debtors shall be Raymond J. Pacini, as President and Chief Executive Officer, Sandra G. Sciutto, Senior Vice President and Chief Financial Officer, and Jon Johnston as Vice President and such other individuals as identified on Exhibit 5.3 to the Plan, which shall be filed no later than five days before the commencement of the Confirmation Hearing. On the Effective Date, the board of directors of Reorganized CALC shall have three (3) members. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 5.3 to the Plan, to be filed no later than five days before the commencement of the Confirmation Hearing, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized CALC and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person. Each such director and officer of Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law. Each member of the current board of directors of CALC will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3 to the Plan as continuing on the board of directors of Reorganized CALC. The compensation for the Officers and Directors of the Reorganized Debtors shall be disclosed on Exhibit 5.3 to the Plan.

1612527.3

### 4.        Dissolution of Inactive Debtors

The Plan provides that on the Effective Date, the Inactive Debtors shall be dissolved.

### 5.        New First Lien Loans

On the Effective Date, CALC shall exercise its conversion right under section 3.3 of the DIP Credit Agreement and take such steps as are necessary to close the New First Lien Loans.

### 6.        Issuance of New Securities

The Plan provides that on the Effective Date, the Reorganized CALC shall be authorized to issue the New CALC Common Stock for distribution in accordance with the Plan.  Reorganized CALC shall be authorized to take such actions as are necessary to become a privately held company no longer subject to public reporting requirements.

### 7.        Corporate Actions

The Plan provides that on the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the following:  (a) the adoption and the filing with the Secretary of State of the State of Delaware of the Amended and Restated Articles of Incorporation; (b) the adoption of the By-Laws; (c) the execution of and entry into the New Credit Agreements and all ancillary and related documents; (d) the execution of and entry into the Shareholder Agreement; (e) the dissolution of the Inactive Debtors; and (f) the execution and the delivery of, and the performance under, all documents and agreements contemplated by or relating to any of the foregoing.  All matters provided for under the Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of further action by the shareholders or the directors of the Reorganized Debtors.  On the Effective Date, the appropriate officers of each of the Reorganized Debtors are authorized and directed to execute and to deliver all agreements, documents and instruments contemplated by the Plan in the name and on behalf of the pertinent Reorganized Debtors.

1612527.3

1

### 8.    Sources of Cash for Plan Distributions

The sources of Cash for distribution under the Plan shall be the Debtors' Cash, the proceeds of the New First Lien Loans, and future revenues of the Reorganized Debtors that may be retained by the Reorganized Debtors or transferred to the Disbursing Agent as necessary for distribution pursuant to the terms and conditions of the Plan.

### 9.    Cancellation of Liens

Except as otherwise provided in the Plan, on the Effective Date any Lien securing any Secured Claim shall, without further order from the Bankruptcy Court, be deemed released, and the Entity holding such Secured Claim shall, without further order from the Bankruptcy Court,  be authorized and directed to release any collateral or other property of the debtors or the Estates (including without limitation any cash collateral) held by such entity and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including without limitation the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors (at the expense of the Reorganized Debtors).

### 10.    Cancellation of Existing Debt Instruments

On the Effective Date, all promissory notes, indentures, share certificates, options, warrants, and other instruments evidencing any Interest in CALC, Revolver Loan Obligations, Term Loan Obligations or IndyMac Secured Obligation shall be deemed cancelled and null and void without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors and Reorganized Debtors governing the Revolving Loan Obligations, Term Loan Obligations and IndyMac Secured Obligation shall be discharged.

### 11.    Equity Incentive Plan

At the discretion of the Board of Directors of Reorganized CALC, after the Effective Date the Reorganized Debtors may adopt an Equity Incentive Plan for the purpose of granting awards over time to officers and employees of Reorganized CALC and the other Reorganized Debtors.

### 12.    Luxor Settlement

The Debtors and their Estates, the Reorganized Debtors, the DIP Agent, the Revolver Agent, the Term Loan Agent, the Consenting Lenders (other than Luxor), and Luxor have agreed to settle

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-29-

any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon, arising out of, related to, or in connection with that certain Commitment Letter dated June 18, 2010 between the Debtors and Luxor (the "**Commitment Letter Released Claims**") on the terms and conditions set forth in Section 5.12 of the Plan (the "**Luxor Settlement**").

On the Effective Date in exchange for the releases set forth in Section 5.12, Luxor shall receive (a) $1,000,000 of New Second Lien Loans (the "**Luxor Settlement Portion of New Second Lien Loans"**) in accordance with Section 7.10 of the Plan, provided that Luxor shall be given the identical rights and obligations in respect of the Luxor Settlement Portion of the New Second Lien Loan as all other holders of the New Second Lien Loan under the Plan, (b) payment in cash equal to an amount of $480,044.64 from the Disbursing Agent, which amount represents the unpaid fees and expenses of Luxor and Luxor's counsel incurred through November 17, 2010; and (c) payment in cash from the Disbursing Agent of any and all unpaid reasonable and documented fees and expenses of Luxor and Luxor's counsel incurred from November 18, 2010 up to and through the Effective Date.

On the Effective Date, Luxor shall be deemed to have unconditionally released the Debtors and their Estates, the Reorganized Debtors, the DIP Agent, the Revolver Agent, the Term Loan Agent, and the Consenting Lenders (other than Luxor) from any and all Commitment Letter Released Claims, including without limitation any Administrative Expense Claim for a break-up fee arising under, based upon, or relating to the Commitment Letter.

On the Effective Date, the Debtors and their Estates, the Reorganized Debtors, the DIP Agent, the Revolver Agent, the Term Loan Agent, and the Consenting Lenders (other than Luxor) shall be deemed to have unconditionally released Luxor from any and all Commitment Letter Released Claims.

The Luxor Settlement shall not affect Luxor's rights to distribution under the Plan in respect of its Revolving Loan Claims and/or its Term Loan Claims.

1612527.3

After the Effective Date and for so long as Luxor remains a lender in a particular loan (e.g., New First Lien Loan, New Second Lien Loan and/or New Third Lien Loan), Luxor shall be entitled to receive reporting co-extensive with the rights to receive reporting held by other lenders in connection with such loan.  After the Effective Date and for so long as Luxor holds New CALC Common Stock, Luxor shall be entitled to receive reporting co-extensive with the rights to receive reporting held by other minority holders of New CALC Common Stock in their capacities as such. Notwithstanding the foregoing, nothing herein shall prejudice Luxor, from entry into any agreement with Reorganized CALC for the delivery of additional reporting to Luxor.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Plan implements the Luxor Settlement, and the Plan constitutes a request to authorize and approve the compromise and settlement of all Commitment Letter Released Claims pursuant to the Luxor Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Luxor Settlement and the Bankruptcy Court's finding that the Luxor Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

### 13.    Surety Bonds

The Debtors require and the Reorganized Debtors will require for their operations to maintain certain surety bonds issued on their behalf by ICW.  In consideration of the terms of the Plan and in consideration of the Debtors affirming their obligations to ICW under the terms of the agreements of indemnity between ICW and the Debtors, which obligations will become obligations of the Reorganized Debtors under the Plan, ICW will keep its bonds in effect after the Effective Date on behalf of the Reorganized Debtors subject to the terms of the indemnity agreement and underwriting practices.

### D.    The GUC Trust

On the Effective Date, the GUC Trust shall be established pursuant to the GUC Trust Agreement for the purposes of administering the GUC Trust Assets and making all distributions on account of GUC Trust Interests as provided for under the Plan.  The GUC Trust is intended to

1612527.3

1    qualify as a liquidating trust pursuant to Regulations section 301.7701-4(d).  Except as expressly

2    provided in Section 5.14 of the Plan and the GUC Trust Agreement with respect to the GUC Trust

3    Contributions, none of the Debtors or the Reorganized Debtors shall have any liability for any cost

4    or expense of the GUC Trust.  The GUC Trust Agreement shall be substantially in the form of

5    Exhibit 7.11.1 attached to the Plan and will be filed prior to the Confirmation Hearing.

6            On the Effective Date, the Reorganized Debtors shall fund the GUC Trust with a grant of

7    $250,000 plus the first Quarterly Contribution.  The GUC Trust Agreement shall provide that the

8    Reorganized Debtors shall fund the GUC Trust with eight Quarterly Contributions.  The Quarterly

9    Contribution shall be an amount of Cash equal to the Aggregate GUC Trust Contribution divided by

10   eight (8).  The Aggregate Trust Contribution shall be an amount equal to at least $_____,

11   provided however, that if Classes 1H through 6H vote to accept the Plan, the Aggregate Trust

12   contribution shall be increased to $_____.  To the extent that a Disputed General Unsecured

13   Claim is settled or litigated by the Debtors, Reorganized Debtors, or the GUC Trustee such that such

14   Disputed General Unsecured Claim is Allowed as something other than an Allowed General

15   Unsecured Claim (for instance, as an Allowed Other Priority Claim) then the GUC Trust Assets that

16   would otherwise have been distributed on account of such Disputed General Unsecured Claim, as if

17   it had been Allowed in full, shall be distributed to Reorganized CALC (the amount of such

18   distribution right, the "RC Distribution Amount"); provided, however, that the Reorganized Debtors

19   will be entitled to setoff an amount that is no greater than the RC Distribution Amount against their

20   obligations to make the Aggregate GUC Trust Contribution..

21           The GUC Trust shall be managed and operated by the GUC Trustee.  No other GUC Trust

22   Beneficiary shall have any consultation or approval rights whatsoever in respect of management and

23   operation of the GUC Trust.

24           The responsibilities of the GUC Trustee shall include, but shall not be limited to:

25   (a) objecting to the allowance of General Unsecured Claims through judgment and/or settlement,

26   including the assertion of any defense, counterclaim or cross claim; (b) at least annually, calculating

27   and making distributions required under the Plan to be made from the GUC Trust Assets; (c) filing

28   all required tax returns, and paying obligations on behalf of the GUC Trust from the GUC Trust

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

Assets; (d) otherwise administering the GUC Trust; (e) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Reorganized Debtors); and (f) such other responsibilities as may be vested in the GUC Trustee pursuant to the GUC Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the GUC Trust.  The GUC Trustee shall maintain good and sufficient books and records of account relating to the GUC Trust Assets, the management thereof, all transactions undertaken by the GUC Trustee, all expenses incurred by or on behalf of the GUC Trustee, and all distributions to GUC Trust Beneficiaries contemplated or effectuated under the Plan.

The GUC Trust will be dissolved no later than three (3) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the GUC Trust for a finite period if (i) such extension is necessary to the purpose of the GUC Trust, (ii) the GUC Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the GUC Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the GUC Trust's third (3rd) anniversary or the end of the immediately preceding extension period, as applicable.  Upon dissolution of the GUC Trust, any remaining Cash on hand and other assets will be distributed to the GUC Trust Beneficiaries in accordance with the GUC Trust Agreement.

Additional terms governing the GUC Trust are contained in Section 7.11 of the Plan and in the GUC Trust Agreement.

**E.    Treatment Of Executory Contracts And Unexpired Leases.**

**1.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all executory contracts or unexpired leases of the Debtors that have not been expressly rejected by the Debtors on or before the Effective Date shall be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included under a separate assumption/rejection motion

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    or is required under the Plan to be included in such motion, (iv) is an executory contract or

2    unexpired lease between any Debtor and any insider of a Debtor (or any affiliate of such insider)

3    ("Insider Executory Contract") that is to be rejected under the Plan, (v) has otherwise been identified

4    for rejection on Plan Schedule 6.1, which shall be the schedule of executory contracts or unexpired

5    leases rejected pursuant to the Plan, or (vi) are otherwise rejected pursuant to the terms of the Plan.

6    Any Insider Executory Contract that has not been rejected or assumed by the Debtors on or before

7    the Effective Date shall be deemed *rejected* in accordance with, and subject to, the provisions and

8    requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Insider Executory

9    Contract (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated

10    pursuant to its own terms, (iii) is an Insider Executory Contract that is included under a separate

11    assumption/rejection motion or is required under the Plan to be included in such motion, or (iv) has

12    otherwise been identified for assumption on Plan Schedule 6.1-A, which shall be the schedule of

13    Insider Executory Contract assumed pursuant to the Plan, or (v) are otherwise expressly assumed

14    pursuant to the terms of the Plan.  Each of Plan Schedules 6.1 and 6.1-A shall be Filed no later than

15    five Business Days prior to the Confirmation Date.  The Plan Proponents reserve the right to amend

16    each of Plan Schedules 6.1 and 6.1-A at any time prior to the Confirmation Date.  Entry of the

17    Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption or

18    rejection, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each

19    executory contract and unexpired lease assumed by the Debtors pursuant to the Plan or any

20    assumption/rejection motion shall be assigned by operation of law, revest in and be fully enforceable

21    by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of

22    the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or

23    applicable federal law.  Neither the exclusion nor the inclusion by the Plan Proponents of a contract

24    or lease on Plan Schedules 6.1 or 6.1-A, nor anything contained in the Plan, shall constitute an

25    admission by the Plan Proponents that such lease or contract is an unexpired lease or executory

26    contract that any Debtor or Non-Debtor Affiliate has any liability thereunder.  The Plan Proponents

27    reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Plan

28    Schedules 6.1 and 6.1-A on or before the Effective Date.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-34-

1612527.3

**2.      Cure of Defaults in Connection with Assumption**

Any monetary amounts by which each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan is in default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the pertinent Reorganized Debtor: (a) by payment of the default amount in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such executory contract or unexpired lease.  If there is a dispute regarding: (a) the amount of any cure payments; (b) the ability of the pertinent Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made promptly following the entry of a Final Order resolving the dispute and approving the assumption.

**3.      Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Reorganized Debtors, their successors or properties unless a proof of Claim is filed and served on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date.  Notice of the Bar Date for rejection damages shall be sent to all parties to such Contracts or Leases that were rejected.  All Claims for which proofs of Claim are required to be filed, if Allowed, will be, and will be treated as, General Unsecured Claims subject to the provisions of the Plan.

**4.      Bar Date for Bankruptcy Code § 365(n) Election**

If the rejection of an executory contract pursuant to the Plan gives rise to the right by the other party or parties to such contract to make an election under § 365(n) of the Bankruptcy Code to either treat such contract as terminated or to retain its rights under such contract, such other party to such contract will be deemed to elect to treat such contract as terminated unless such other party files and serves a notice of its alternative election on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date.

1612527.3

**F.      Distributions And Procedures For Resolving Disputed Claims.**

**1.      Reorganized Debtors to Serve As Disbursing Agent**

The Reorganized Debtors shall serve as the Disbursing Agents to hold and distribute Cash and such other property as may be distributed pursuant to the Plan, provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Plan.  Even if the Disbursing Agent is a Person other than the Reorganized Debtors, the Disbursing Agent shall be an agent of the Reorganized Debtors and not a separate taxable entity with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors.  The Reorganized Debtors shall not be required to post or otherwise provide a bond in connection with the making of any distributions pursuant to the Plan.

**2.      Dates of Distributions**

The Sections of the Plan on treatment of Administrative Expense Claims, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that, anything to the contrary contained herein notwithstanding, any payments to be made hereunder to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Holders of Revolver Loan Claims and/or Term Loan Claims (including, without limitation, Luxor on account of the Luxor Settlement) shall be made on the Effective Date.  If, under the terms of the Plan, the resolution of a particular Disputed Claim, (e.g., it is Disallowed), entitles other Holders of Claims or Interests to a further distribution, either (a) the Reorganized Debtors or the Disbursing Agent may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors or the Disbursing Agent who is to make such distribution, to be less than $500 for any Creditor, then, in order to afford the Reorganized Debtors an opportunity to minimize costs and aggregate such distributions, the

-36-

1612527.3

1 Reorganized Debtors or the Disbursing Agent may make such further distribution any time prior to

2 sixty (60) days after the Final Resolution Date.

3      **3.**      **Cash Distributions**

4      Distributions of Cash may be made either by check drawn on a domestic bank or wire

5 transfer from a domestic bank, at the option of the Reorganized Debtors, as applicable, except that

6 Cash payments made to foreign Creditors may be made in such funds and by such means as are

7 necessary or customary in a particular foreign jurisdiction; provided that, anything to the contrary

8 contained herein notwithstanding, cash payments to any of the DIP Agent, the DIP Lenders, Luxor

9 pursuant to the Luxor Settlement, the Prepetition Agent and any Holder of Revolver Loan Claims

10 and/or Term Loan Claims pursuant hereto shall be made by the Disbursing Agent by wire transfer

11 on the Effective Date (but only to the extent that such parties have delivered accurate wire transfer

12 instructions to the Disbursing Agent prior to the Effective Date).

13      **4.**      **De Minimis Distributions**

14      The Reorganized Debtors or Disbursing Agent shall not distribute Cash to the holder of an

15 Allowed Claim in an impaired Class if the total aggregate amount of Cash to be distributed on

16 account of such Claim is less than $25, unless the Reorganized Debtors or the Disbursing Agent

17 determines within its sole discretion to make such distribution.  Any holder of an Allowed Claim on

18 account of which the total aggregate amount of Cash to be distributed is less than $25 will have its

19 claim for such distribution discharged and will be forever barred from asserting any such claim

20 against the Debtors, the Reorganized Debtors or Disbursing Agent, or their respective property.

21      **5.**      **Disputed Claims**

22      Distributions of consideration due in respect of a Disputed Claim shall be held and not made

23 pending resolution of the Disputed Claim.  After an objection to a Disputed Claim is withdrawn,

24 resolved by agreement, or determined by Final Order, the distributions due on account of any

25 resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense Claim shall be made

26 by the Reorganized Debtors or the Disbursing Agent.  Such distribution shall be made at the time

27 provided in the Plan for the next scheduled distribution to the class or type of Claim, Interest or

28 Administrative Expense of such Holder and, if there is no such further scheduled time, within forty-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

five (45) days of the date that the Disputed Claim becomes an Allowed Claim, Allowed Interest or Allowed Administrative Expense.  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

If the Claim or Interest of a Holder of a Claim or Interest is Disallowed (by example only, under 11 U.S.C. § 502(d)), the Claim or Interest of such Holder shall be cancelled, retired and of no further force and effect and such Holder shall be obligated to surrender any document, certificate or other matter evidencing such Claim or Interest.  The Holders of any such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities or other documentation, or the cancellation thereof, except the rights provided pursuant to the Plan.

**6.    Distributions to Holders of Prepetition Revolver Claims and Prepetition Term Loan Claims**

All distributions under the Plan to Holders of Prepetition Revolver Claims and Prepetition Term Loan Claims **(including, without limitation, to Luxor on account of the Luxor Settlement)** shall be made to the Agent for the benefit of Holders of Prepetition Revolver Claims and Prepetition Term Loan Claims to be distributed in accordance with the Prepetition Revolver Agreement and the Prepetition Term Loan Agreement as the case may be.

**7.    Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to any Reorganized Debtor or its agents as undeliverable or the check or other similar instrument or distribution by a Reorganized Debtor remains uncashed or unclaimed for one hundred eighty (180) days, such distribution shall be deemed to be unclaimed property ("Unclaimed Property").  Upon a distribution becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtors.  Pending becoming Unclaimed Property, such distribution will remain in the possession of the Disbursing Agent and, if the Disbursing Agent is notified in writing of a new address for the Holder, it shall cause distribution of the Unclaimed Property, as appropriate, within 45 days thereafter.  Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may

1612527.3

otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the

Reorganized Debtors are notified in writing of such Holder's then-current address and status as a

Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any,

which first become due after such notification.

**8.    No Postpetition Interest on Prepetition Claims**

Except as otherwise set forth in the Plan, and except with respect to the Prepetition Revolver

Claims and the Prepetition Term Loan Claims, no interest shall be deemed to have accrued after the

Petition Date on Claims arising prior to the Petition Date, and no such interest shall be allowed or

paid.

**9.    Compliance with Tax Requirements**

The Reorganized Debtors and the Disbursing Agent shall comply with all withholding and

reporting requirements imposed by federal, state or local taxing authorities in connection with

making distributions pursuant to the Plan.  In connection with each distribution with respect to

which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042)

or withholding is required, the Reorganized Debtors and the Disbursing Agent shall file such

information return with the Internal Revenue Service and provide any required statements in

connection therewith to the recipients of such distribution, or effect any such withholding and

deposit all moneys so withheld to the extent required by law.  With respect to any Person from

whom a tax identification number, certified tax identification number or other tax information

required by law to avoid withholding has not been received by the Reorganized Debtors or the

Disbursing Agent, the Reorganized Debtors or the Disbursing Agent may, at their sole option,

withhold the amount required and distribute the balance to such Person or decline to make such

distribution until the information is received; provided, however, that the Reorganized Debtors or

the Disbursing Agent shall not be obligated to liquidate any securities to perform such withholding.

**10.    Objections to Claims**

All objections to Claims must be Filed and served on the Holders of such Claims by the

Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served

on the parties on the then-applicable service list in the Reorganization Cases.  If an objection is

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   required to be Filed and has not been Filed to a proof of Claim or a scheduled Claim by the Claims

2   Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be

3   treated as an Allowed Claim if such Claim has not been allowed earlier.  An objection is deemed to

4   have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of

5   the Claims Objection Bar Date.  Each such Tort Claim will remain a Disputed Claim until it

6   becomes an Allowed Claim.

7   **11.    Authority to Prosecute Objections**

8   After the entry of the Confirmation Order, only the Reorganized Debtors and the GUC

9   Trustee will have the authority to File, settle, compromise, withdraw or litigate to judgment

10   objections to Claims (and with respect to the GUC Trustee, only to General Unsecured Claims),

11   including pursuant to any alternative dispute resolution or similar procedures approved by the

12   Bankruptcy Court.

13   **12.    Estimation of Tax Claims**

14   In addition to any other available remedies or procedures with respect to Tax Claims or Tax

15   issues or liabilities, the Reorganized Debtors or any of them, at any time, may utilize (and receive

16   the benefits of) section 505 of the Bankruptcy Code with respect to: any Tax issue or liability

17   relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to

18   the Effective Date.  If a Reorganized Debtor utilizes section 505(b) of the Bankruptcy Code: (1) the

19   Court shall determine the amount of the subject Tax liability or Claim in the event that the

20   appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated

21   on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability or

22   Claim in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors and any

23   successors to the Debtors shall be entitled to such discharge which shall apply to any and all Taxes

24   relating to the period covered by such return.

25   **13.    Temporary or Permanent Resolution of Disputed Claims**

26   The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any

27   Disputed Claim, including without limitation any Tax Claim, pursuant to section 502(c) of the

28   Bankruptcy Code, irrespective of whether the Reorganized Debtors have previously objected to such

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-40-

1612527.3

1  Disputed Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy

2  Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time

3  during litigation concerning any objection to the Disputed Claim, including during the pendency of

4  any appeal relating to any such objection.  If the Bankruptcy Court estimates any Disputed Claim,

5  that estimated amount would constitute either the Allowed amount of such Disputed Claim or a

6  maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the

7  estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized

8  Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on

9  account of such Disputed Claim.  In addition, the Reorganized Debtors may resolve or adjudicate

10  any Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative

11  Expense Claim and the rights of the Holder of such Claim, Interest or Administrative Expense

12  Claim would have been resolved or adjudicated if the Reorganization Cases had not been

13  commenced.  All of the aforementioned objection, estimation and resolution procedures are

14  cumulative and not necessarily exclusive of one another.

15       **14.**    **Setoff**

16       The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable

17  non-bankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense Claim

18  and the distributions to be made pursuant to the Plan on account of such Claim, Interest or

19  Administrative Expense Claim (before any distribution is made on account of such Claim, Interest

20  or Administrative Expense Claim), the Rights of Action of any nature that the Debtors may hold

21  against the Holder of such Allowed Claim, Interest or Administrative Expense Claim.  Neither the

22  failure to set off nor the allowance of any Claim, Interest or Administrative Expense Claim

23  hereunder will constitute a waiver or release by the Reorganized Debtors of any such Rights of

24  Action that they may have against such Holder.

25       **15.**    **Rights of Action**

26       In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the

27  extent set forth below, and their successors, any assigns hereunder and future assigns will retain and

28  may exclusively enforce any Rights of Action subject only to any express waiver or release thereof

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Rights of Action. Absent such express waiver or release, the Reorganized Debtors, or its successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns). The Rights of Actions may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action upon or after Confirmation or Consummation. By example only and without limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any proceeding with respect thereto against a Person, by any Reorganized Debtor or any successor to or assign of it, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim or Administrative Expense Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim or Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time, determine that one or more of them has a defense under 11 U.S.C. § 502(d), e.g., a Reorganized Debtor holds a Right of Action for Recovery Action against the Holder of such Claim or Administrative Expense Claim and such Holder after demand refuses to pay the amount due in

1612527.3

respect thereto.  Such reservation shall remain subject to any limitation on application of 11 U.S.C.

§ 502(d) to Administrative Expense Claim under applicable law.

**16.    Payment of Certain Fee and Expense Claims**

**a)    Payment of Prepetition Agent's Fee/Expense Claims.**

Promptly upon the Effective Date, Reorganized CALC shall provide reimbursement for the

Prepetition Agent Fee/Expense Claims, without need for the filing of any application with the

Bankruptcy Court and/or the Bankruptcy Court's review and approval of the same.  The Prepetition

Agent shall provide the Debtors with a good faith estimate of the Prepetition Agent Fee/Expense

Claims seven (7) calendar days prior to the anticipated Effective Date, provided, however, that such

estimates shall be used solely for administrative purposes, shall not be binding on the Prepetition

Agent and shall not in any way limit, cap, or reduce the amount of the Prepetition Agent

Fee/Expense Claims.

**b)    Payment of Requisite Consenting Lender Fee/Expense Claims.**

Promptly upon the Effective Date, Reorganized CALC shall provide reimbursement for the

Requisite Consenting Lender Fee/Expense Claims, without need for the filing of any application

with the Bankruptcy Court and/or the Bankruptcy Court's review and approval of the same.  The

Holders of Requisite Consenting Lender Fee/Expense Claims shall provide the Debtors with good

faith estimates of their Requisite Consenting Lender Fee/Expense Claims seven (7) calendar days

prior to the anticipated Effective Date, <u>provided</u>, <u>however</u>, that such estimates shall be used solely

for administrative purposes, shall not be binding on the Holders of Requisite Consenting Lender

Fee/Expense Claims and shall not in any way limit, cap, or reduce the amount of the Requisite

Consenting Lender Fee/Expense Claims.

**G.    Confirmation And Effectiveness Of The Plan.**

**1.    Conditions to Confirmation**

Subject to <u>Section 15.2</u> of the Plan in all respects, the Bankruptcy Court will not enter the

Confirmation Order unless and until the following conditions have been satisfied or duly waived

pursuant to Section 10.3 of the Plan:

- The Disclosure Statement Order has been entered by the Bankruptcy Court in a form reasonably acceptable to the Plan Proponents.

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

- The Plan is reasonably acceptable in form and substance to the Plan Proponents and the Requisite Consenting Lenders.

- The Confirmation Order is reasonably acceptable in form and substance to the Plan Proponents and the Requisite Consenting Lenders.

- All Plan Documents are in form and substance reasonably satisfactory to the Plan Proponents and the Requisite Consenting Lender.

- Luxor has not exercised Luxor's Termination Right pursuant to Section 15.2 of the Plan and the Confirmation Order authorizes and approves the Luxor Settlement.

- The Bankruptcy Court shall have determined that termination of the Pension Plan is necessary for the Debtors to successfully emerge from chapter 11 in accordance with section 4041(c) of ERISA.

**2.    Conditions to the Effective Date**

Subject to <u>Section 15.2</u> of the Plan in all respects, the Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3 of the Plan:

- The Confirmation Order has been entered in a form reasonably acceptable to the Plan Proponents and the Requisite Consenting Lenders, has not been reversed, stayed, modified or amended.

- The Confirmation Order shall authorize the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including consummation of the transactions contemplated by the Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreement or documents generated in connection with the Plan.

- The Plan shall not have been amended, altered or modified from the Plan as confirmed, in any material respect, unless such amendment, alteration or modification has been consented to in accordance with Section 15.1 of the Plan, and all definitive documentation relating to the Plan and the transactions contemplated thereby, and all other documents material to the consummation of the transactions contemplated under the Plan shall be in a form reasonably acceptable to the Plan Proponents and the Requisite Consenting Lenders.

- All conditions to the New Credit Agreements, other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived pursuant to the terms thereof;

- All conditions to Confirmation shall have been satisfied or waived in accordance with Section 11.3 of the Plan; provided that, anything to the contrary contained herein notwithstanding, the condition to Confirmation contained in Section 11.1.5 of the Plan cannot be waived without the unanimous written consent of the Debtors and the Consenting Lenders.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**3.      Waiver of Conditions to the Confirmation or Effective Date**

Subject to Section 15.2 of the Plan in all respects, the conditions to Confirmation set forth in Section 11.1 of the Plan and the conditions to the Effective Date set forth in Section 11.2 of the Plan may be waived, in writing, in whole or in part by the Plan Proponents, with the written consent of the Requisite Consenting Lenders, at any time without an order of the Bankruptcy Court, provided that, anything to the contrary contained herein notwithstanding, the condition to Confirmation contained in Section 11.1.5 of the Plan cannot be waived without the unanimous written consent of the Debtors and the Consenting Lenders.

**4.      Effect of Nonoccurrence of Conditions to the Effective Date**

Subject to Section 15.2 of the Plan in all respects, if each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 11.3 of the Plan, then upon motion by the Plan Proponents or the Requisite Consenting Lenders made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section 11.4 of the Plan, subject to the Debtors' right to modify the Plan in accordance with Article XV of the Plan (1) the Plan will be null and void in all respects, including, without limitation:  (a) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code; (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Article VI of the Plan; and (c) the releases described in Section 14.6 of the Plan; (2) nothing contained in the Plan will:  (a) constitute a waiver or release of any claims by or against, or any Interest in, the Debtors; or (b) prejudice in any manner the rights of the Debtors, or any other party in interest.

**5.      Releases and Injunctions Under the Plan**

The Plan contains certain releases of claims of the Estates against the Released Parties and provides for releases by third parties as described below.  The Released Parties consist of each of (a)

1612527.3

the Debtors and the Reorganized Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Revolver Agent; (e) the Term Loan Agent; (f) the Consenting Lenders; and (g) Related Persons of the foregoing.

a)      **Releases by Debtors and Estates.**

Except as otherwise expressly provided in the Plan, on the Effective Date and effective simultaneously with the effectiveness of the Plan, the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person or Entity seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors and the GUC Trustee on behalf of the GUC Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), release unconditionally and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions, (the "Debtor Released Claims"), provided, however, that nothing in this Section shall be construed to (i) release any party from liability for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order or (ii) waive or release of any right of the Debtors, the Estates, the Reorganized Debtors or GUC Trust to assert, in response to any Claim asserted by any Person or Entity against one or more of them, any defense, right of setoff or counterclaim to such Claim.  Furthermore, notwithstanding the grant of the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any express contractual commercial obligations arising in the ordinary course of any Person or Entity to the Debtors, (ii) any Holder of an Interest in CALC on account of its status or its actions taken as such, (iii) any rights expressly provided under the Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**b)** **Releases by Holders of Claims and Interests.**

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person or Entity (a) that has voted to accept the Plan and has not opted out from granting the releases in Section 14.7 of the Plan, (b) that has voted to reject the Plan but has opted to grant the releases in Section 14.7 of the Plan, or (c) who otherwise agrees to provide the releases set forth in Section 14.7 of the Plan, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims"). Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any contractual obligation of any non-Debtor party due to any other non-Debtor party or (ii) any rights expressly provided by the Plan.

**c)** **Injunction Related to Releases.**

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or other debt, right, cause of action or liability or Interest that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon the Released Claims:  (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v)

1612527.3

1    commencing or continuing any judicial or administrative proceeding, in any forum, that does not

2    comply with or is inconsistent with the provisions of the Plan.  By accepting any distributions

3    pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving distributions pursuant to

4    the Plan will be deemed to have specifically consented to the injunctions set forth in Plan Section

5    14.9.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS

1612527.3

# IV.    DESCRIPTION OF THE DEBTORS' BUSINESS

The Debtors are residential land development and homebuilding companies with properties owned or controlled primarily in Orange County, California and Los Angeles County, California. Debtor California Coastal Communities, Inc. ("CALC") is a public company, whose common stock was previously traded over the Nasdaq exchange under the symbol CALC and is now traded on the over-the-counter market (OTCQB) under the CALCQ ticker symbol. The Debtors' primary asset is a 356-home luxury coastal community known as Brightwater. The Debtors' principal activities include:

- obtaining zoning and other entitlements for land that the Debtors own or for third parties under consulting agreements;

- improving the land for residential development; and

- designing, constructing and selling single-family homes in Southern California.

Once the Debtors' residential land is entitled, the Debtors either build homes, sell unimproved land to other developers or homebuilders, sell improved land to homebuilders, or participate in joint ventures with other developers, investors or homebuilders to finance and construct infrastructure and homes. Most of the Debtors' homes are designed to appeal to move-up homebuyers and are generally offered for sale in advance of their construction.

The Debtors' total revenues for the years ended December 31, 2009, 2008, and 2007 were $47.2 million, $46.0 million, and $47.0 million, respectively. For the years ended December 31, 2009, 2008, and 2007 the Debtors delivered 49, 55, and 77 homes, respectively, across all projects, including completed projects. For the years ended December 31, 2009, 2008, and 2007 the Debtors delivered 31, 23, and 9 homes, respectively, at the Brightwater project. For the year ending December 31, 2010, the Debtors delivered 21 homes, all at the Brightwater project.

The Debtors' total assets as of December 31, 2009 and 2008 were $249.9 million and $312.5 million, respectively. Hearthside Homes, Inc. has delivered over 2,300 homes to families throughout Southern California since its formation in 1994.

1612527.3

## A.    The Debtors' Current and Future Homesites.

The Debtors currently have on-going Southern California homebuilding projects in Orange County in the Huntington Beach area.  Brightwater is the coastal Orange County residential community, located on 105 acres of the Bolsa Chica mesa in the City of Huntington Beach, approximately 35 miles south of downtown Los Angeles. Brightwater was annexed into the City of Huntington Beach in 2008.  Brightwater offers a broad mix of home choices averaging 2,860 square feet and ranging in size from 1,710 square feet to 4,339 square feet. Located near Pacific Coast Highway and overlooking the Pacific Ocean, Huntington Harbor and the recently restored 1,300-acre Bolsa Chica Wetlands, 63 of the 356 homes at Brightwater will have unobstructed ocean and/or wetlands views.

Brightwater is the largest property in the Debtors' portfolio.  This project is located on one of the last large undeveloped coastal properties in Southern California. Brightwater is bordered on the north and east by residential development in the City of Huntington Beach and Huntington Harbor, to the south by open space and the 1,300-acre Bolsa Chica wetlands, and to the west by 120 acres of publicly-owned conservation land and open space on the lower bench of the Bolsa Chica mesa, Pacific Coast Highway, Bolsa Chica State Beach, and the Pacific Ocean. Brightwater also has 37 acres of open space and conservation area.

Key facts and assumptions regarding the Brightwater development project include the following:

- Brightwater is expected to consist of 356 homes, including 106 homes at The Breakers, 109 homes at The Cliffs, 79 homes at The Sands and 62 homes at The Trails.

- There are 63 homes at Brightwater that will have unobstructed views of the Pacific Ocean and/or the Bolsa Chica wetlands, including 36 homes at The Breakers (five delivered to date), 25 homes at The Cliffs (two delivered to date) and two homes at The Sands.

- Build-out of production homes, which is subject to market conditions, is currently expected to take approximately five years and be completed in 2015.

- Costs to improve the lots from their raw condition to finished lots, including County permits, City annexation fees and school fees, approximate $200,000 per lot.  As of September 30, 2010, approximately 77% of these lot improvement costs have already been incurred.

1612527.3

- The direct costs (excluding indirect costs such as supervision, overhead, sales and marketing, warranty, insurance, etc.) of building homes at Brightwater are currently expected to range from approximately $98 to $118 per square foot.

- Indirect costs are expected to approximate 3% of sales revenues.

The Debtors completed construction of eight model homes at The Trails and The Sands neighborhoods in July 2007 and held a grand opening in August 2007 and delivered the first nine homes in December 2007.  For the years ended December 31, 2009, 2008 and 2007, the Debtors delivered 24, 12 and nine homes at The Trails and The Sands, respectively, and generated $21.1 million, $12.3 million and $11.0 million in revenue, respectively.  The Debtors generated gross operating margins of 10.7%, 28.6% and 33.6% for The Trails and The Sands during 2009, 2008 and 2007, respectively.  Homes at The Trails and The Sands are presently being offered at prices ranging from $798,000 to $1.0 million.  As of December 20, 2010, there were two homes in escrow at The Trails and The Sands and four completed homes were being offered for sale.

During January 2008, the Debtors completed construction of nine additional model homes for The Cliffs and The Breakers and in February 2008 began selling homes to buyers who previously registered on their priority list.  The Debtors held a grand opening for these neighborhoods on March 15, 2008.  These homes are larger than The Trails and The Sands, ranging from 2,724 to 4,339 square feet.  The Debtors began delivering homes at The Cliffs and The Breakers during the third quarter of 2008 and delivered 11 of these homes during the year ended December 31, 2008 and seven homes during the year ended December 31, 2009.  The Debtors generated $15.9 million in revenue and generated gross operating margins of 30% for The Cliffs and The Breakers in 2009 and $21.0 million in revenue and generated gross operating margins of 35.1% for The Cliffs and The Breakers in 2008.  Homes at The Cliffs and The Breakers are presently being offered at prices ranging from $1.3 million to $3.0 million for 2,724 to 4,339 square foot homes.  As of December 20, 2010, no homes were in escrow at The Cliffs and The Breakers, one home was under construction and being offered for sale, and three completed homes were being offered for sale.

1612527.3

**B.    Homebuilding.**

The Debtors' current homebuilding operations include the four projects described above in the City of Huntington Beach in Southern California.  The Debtors delivered 21 Brightwater homes during 2010 compared to 49 homes (31 at Brightwater) during 2009, 55 homes (23 at Brightwater) during 2008, and 77 deliveries (9 at Brightwater) in 2007.  The Debtors acquired no single-family residential lots during 2010, 2009, 2008, 2007 or 2006 and have no contracts to acquire land or lots.

During 2009 and 2008, the Debtors saw continued price depreciation and an excess supply of homes available for sale in the Inland Empire and Lancaster markets.  As a result of declining markets and overleveraged projects, the Debtors decided to exit these markets during 2009 and successfully implemented this strategy as described below.

On March 31, 2009, a subsidiary of Hearthside Homes completed a deed-in-lieu transaction for the Hearthside Lane project in the City of Corona with the investor that had acquired the project loan secured by the property from IndyMac Federal Bank.  The subsidiary conveyed the remaining 134 finished lots to the investor in exchange for a $28.7 million reduction in the note balance and retained seven homes which secured the then remaining note balance of $2.5 million. These seven homes were delivered during the second and third quarters of 2009 and the remaining note balance was fully repaid.

On September 30, 2009, a subsidiary of Hearthside Homes completed a sale of the 62 remaining finished lots at the Woodhaven project for $1.8 million and sold the four remaining model homes for approximately $500,000, thereby disposing of all remaining assets of the project. The lender for the loan secured by the Woodhaven project accepted the proceeds of the sale in full settlement of the loan without further recourse or obligation and the Company recognized a $4.1 million gain on debt cancellation.

**C.    Management/Board of Directors.**

As of the Petition Date, the following individuals served as members of the board of directors for CALC:

Phillip R. Burnaman, II

Raymond J. Pacini

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    Geoffrey W. Arens

2    Marti P. Murray

3    As of the Petition Date, the following individuals served as members of the board of

4    directors for Debtors other than CALC:

5    Raymond J. Pacini

6    Sandra G. Sciutto

7    As of the Petition Date, the following individuals served as officers of each of the Debtors,

8    other than Hearthside Homes:

9    Raymond J. Pacini, President and Chief Executive Officer

10    Sandra G. Sciutto, Senior Vice President and Chief Financial Officer

11    Jon Johnston, Vice President

12    As of the Petition Date, the following individuals served as officers of Hearthside Homes:

13    Raymond J. Pacini, Chief Executive Officer

14    Michael J. Rafferty, President and Chief Operating Officer

15    Sandra G. Sciutto, Senior Vice President and Chief Financial Officer

16    Jon Johnston, Vice President

17    John W. Marshall, Senior Vice President

18    Ed Mountford, Senior Vice President

19    Doug Woodyard, Vice President

20    **D.    Summary of Prepetition Indebtedness and Prepetition Financing.**

21    **1.    Prepetition Revolving Loan.**

22    On September 15, 2006, the Debtors entered into that certain Senior Secured Revolving

23    Credit Agreement (the "Prepetition Revolving Credit Agreement") with KeyBank National

24    Association, as agent ("KeyBank" and the "Revolver Agent") and lender and the lenders a party

25    thereto (the "Revolving Lenders") in the maximum amount of $100,000,000.  The obligations under

26    the Prepetition Revolving Credit Agreement are secured by, among other security, (i) the Deed of

27    Trust with Assignment of Rents, Security Agreement and Fixture Filing, by Signal Landmark, a

28    California corporation ("Signal Landmark") for the benefit of Revolver Agent, recorded in the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Official Records of Orange County, California as Instrument No. 2006000617267 (as modified,

2    amended, restated, supplemented, renewed or replaced from time to time, the "First Deed of Trust"),

3    granting the Agent a first priority security interest in the Brightwater project as described therein

4    (the "Property"), (ii) the Collateral Assignment of Contracts, Development Rights, Licenses,

5    Permits, Warranties and Guaranties and Subordination Agreement, dated as of September 15, 2006,

6    by and among CALC, Signal Landmark and Agent (as modified, amended, restated, supplemented,

7    renewed or replaced from time to time, the "Collateral Assignment"), and (iii) certain other

8    collateral assignments or security agreements for the benefit of the Agent.  As of the Petition Date,

9    approximately $81,679,317.58 in principal, plus accrued and unpaid interest, fees and expenses,

10    remained outstanding under the Prepetition Revolving Credit Agreement.

11            **2.        Prepetition Term Loan.**

12            On September 15, 2006, the Debtors entered into that certain Senior Secured Term Credit

13    Agreement (the "Prepetition Term Loan Agreement" and together with the Prepetition Revolving

14    Credit Agreement, the "Prepetition Credit Agreements") with KeyBank National Association, as

15    agent (the "Term Loan Agent" and together with the Revolver Agent, the "Agent") and lender and

16    the lenders a party thereto (the "Term Loan Lenders" and together with the Revolving Lenders, the

17    "Prepetition Secured Lenders") in the maximum amount of $125,000,000.  The obligations under

18    the Prepetition Term Loan Agreement are secured by, among other security, (i) the Deed of Trust

19    with Assignment of Rents, Security Agreement and Fixture Filing, by Signal Landmark for the

20    benefit of the Term Loan Agent, recorded in the Official Records of Orange County, California as

21    Instrument No. 2006000617268 (as modified, amended, restated, supplemented, renewed or

22    replaced from time to time, the "Second Deed of Trust"), granting the Agent a perfected second

23    priority security interest in the Property, (ii) Pledge and Security Agreement, dated as of September

24    15, 2006, by CALC, in favor of Term Loan Agent (as modified, amended, restated, supplemented,

25    renewed or replaced from time to time), pursuant to which CALC pledged to the Term Loan Agent

26    the ownership interests in Hearthside Holdings, Inc. and Signal Landmark Holdings, Inc., (iii)

27    Pledge and Security Agreement, dated as of September 15, 2006, by Hearthside Holdings, Inc., in

28    favor of Agent (as modified, amended, restated, supplemented, renewed or replaced from time to

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   time), pursuant to which such pledgor pledged to Agent as additional security for the Loan its

2   ownership interests in Hearthside Homes, Inc.), (iv) Pledge and Security Agreement, dated as of

3   September 15, 2006, by Signal Landmark Holdings, Inc., in favor of the Term Loan Agent, pursuant

4   to which such pledgor pledged to the Term Loan Agent its ownership interests in Signal Landmark

5   (as modified, amended, restated, supplemented, renewed or replaced from time to time), (v) Pledge

6   and Security Agreement, dated as of September 15, 2006, by Hearthside Homes, Inc., in favor of

7   Agent (as modified, amended, restated, supplemented, renewed or replaced from time to time),

8   pursuant to which such pledgor pledged to term Loan Agent its ownership interests in it subsidiaries

9   identified therein, and (vi) certain other collateral assignments or security agreements for the benefit

10  of the Term Loan Agent.  As of the Petition Date, approximately $99,800,000 in principal, plus

11  accrued and unpaid interest, fees and expenses, remained outstanding under the Prepetition Term

12  Loan Agreement.

13      **3.    Model Home Financing.**

14      On December 31, 2008, the Debtors entered into a sale-leaseback transaction for 17 model

15  homes at its Brightwater project with an unrelated third party investor for $25.0 million, consisting

16  of $22.5 million cash, $2.0 million deferred and payable in two years provided there has not been a

17  significant decrease in the value of the model homes, and $500,000 payable for conversion of the

18  model homes for sale to homebuyers upon termination of the lease agreement.  The Debtors have an

19  option to repurchase the model homes after at least 90% of the homes of the respective model type

20  have sold, but no earlier than January 1, 2011.  If the Debtors do not repurchase the models, after the

21  lessor receives a 16% internal rate of return, the Debtors are entitled to receive 75% of any profit

22  resulting from the sale of the models at the end of the lease.

23      **4.    Other Project Debt.**

24      In conjunction with the acquisition of single-family residential lots, Hearthside Homes and

25  its subsidiaries, entered into construction loan agreements with commercial banks.  These loan

26  facilities finance a portion of land acquisitions and the majority of the construction of infrastructure

27  and homes.  Each loan facility requires a guaranty of project completion and an environmental

28  indemnity by Hearthside Homes.  As of the Petition Date the last remaining project loan was held by

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    IndyMac Ventures LLC with respect to the Quartz Hill project owned by HHI Lancaster.  IndyMac

2    Ventures asserted that HHI Lancaster owed in excess of $2.9 million under the loan agreement.

1612527.3

## V.    EVENTS PRECEDING THE COMMENCEMENT OF THE CASES

After commencing construction in 2006, the Debtors opened The Trails and The Sands neighborhoods (the smaller homes in the Brightwater project ranging from 1,710 to 2,160 square feet) in Brightwater in August 2007, which was also the start of the worldwide financial crisis. During that year, the Debtors sold nine homes in The Trails and The Sands neighborhoods.  In March 2008 (the same weekend as the collapse of Bear Stearns), the Debtors opened The Cliffs and The Breakers neighborhoods (the larger homes in Brightwater ranging from 2,724 to 4,339 square feet, 61 of which have unobstructed ocean views).  Unfortunately, shortly after the commencement of construction and release of homes for sale, the financial and housing markets took a precipitous decline, new home sales slowed dramatically, and credit markets for residential home buying tightened to historical levels.  During 2008 and 2009, Debtors sold 23 homes and 31 homes, respectively, across all four neighborhoods at Brightwater.

As a result of the decline in the financial and housing markets, in the summer of 2008 the Debtors were forced to negotiate amendments to the Prepetition Credit Agreements in an effort to extend the repayment of that indebtedness in hopes of weathering the economic storm.  However, such negotiations preceded the September 2008 collapse of Lehman Brothers that in turn sparked one of the worst financial crises in history.  In fact, while these amendments were executed on September 30, 2008, the terms of the amendments were based on operational forecasts developed much earlier in 2008 and therefore could not have anticipated the devastating economic collapse that occurred in the fourth quarter of 2008.

Thereafter, the Debtors commenced an intense effort to raise additional capital through the sale and leaseback of 17 model homes at Brightwater, negotiated the sale or transfer of their two largest inland projects in Corona and Beaumont, California to their lender and a third party, respectively, and reduced general administrative, overhead and operational costs in order to minimize the effect of the financial crisis on its ability to repay its debt obligations.  These cost saving efforts have enabled the Debtors to continue to perform their obligations to their trade creditors, keeping substantially current on these obligations.

1612527.3

1    While the Debtors' cost-cutting measures have improved operations and reduced overhead

2  costs, the credit market for home buyers remains tight and, except for the period from March 1, 2009

3  through September 30, 2009 when the Debtors generated net sales orders for 30 homes (or 4.29 net

4  orders per month) at Brightwater, home sales have remained sluggish.  As a result, the Debtors

5  commenced discussions with the Agent in July 2009 to restructure the obligations under the

6  Prepetition Credit Agreements over a longer period of time to allow market conditions to recover.

7  During those discussions, on September 30 2009, CALC missed a $1.7 million mandatory principal

8  payment under the Prepetition Revolving Credit Agreement and failed to satisfy a loan to value

9  covenant.  These defaults also triggered defaults under the Prepetition Term Loan Agreement.  The

10  Debtors were able to enter into forbearance agreements with the Agent and the Prepetition Secured

11  Lenders to enable the parties to have further discussions regarding a consensual restructuring of the

12  Prepetition Credit Agreements.  Under the forbearance agreements, the Agent and the Prepetition

13  Secured Lenders agreed to forbear from exercising any remedies until November 1, 2009.

14    The Debtors and the Agent used the forbearance period to continue their dialogue on a

15  consensual restructuring of the Prepetition Credit Agreements.  On October 14, 2009, CALC failed

16  to make required interest payments under the Prepetition Credit Agreements, which in turn

17  terminated the forbearance agreements.  Despite the occurrence of additional defaults, the Debtors

18  and the Prepetition Secured Lenders continued to discuss the proposed restructuring.

19    In light of the defaults under the Prepetition Credit Agreements and previously scheduled

20  reductions in commitments under the Prepetition Revolving Credit Agreement, the Debtors have lost

21  the ability to borrow additional amounts under the Revolving Credit Agreement.  While the Debtors

22  have continued to pay their suppliers, their liquidity has dropped significantly.  In order to preserve

23  liquidity to continue to construct homes and maximize the value of the Brightwater project and the

24  Debtors' business, the Debtors commenced these cases.  This enabled them to capture the expected

25  proceeds from the backlog of 17 Brightwater homes that were expected to close over the coming

26  months, eight of which closed in November and December 2009, six of which cancelled primarily

27  due to concerns over the bankruptcy process and another three that closed in 2010.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

# VI.    EVENTS OCCURRING
# DURING THE REORGANIZATION CASES

## A.    First Day Motions.

The Debtors filed numerous motions on the Petition Date seeking the relief provided by certain first-day orders.  First-day orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code, or as to which the Bankruptcy Code requires prior approval by the bankruptcy court.  The Bankruptcy Court entered first-day orders that, among other things:

- Authorized the joint administration of the Debtors' cases.

- Extended the deadline to file schedules of assets and liabilities and statements of financial affairs for each of the Debtors to December 12, 2009.

- Authorized use of existing cash management systems.  A final order was entered on March 3, 2010.

- Authorized the payment of certain prepetition lien claims related to the construction of homes at Brightwater.

- Authorized the Debtors to continue to sell homes and close on the sale of homes at Brightwater free and clear of liens claims and interests on an interim basis.  This authority has been extended through April 9, 2010.

- Authorized the Debtors to continue to perform their obligations under homeowner warranty programs.

- Authorized the Debtors to honor certain prepetition obligations to employees, such as expense reimbursements and employee benefit programs.

## B.    Interim Orders Authorizing Use Of Cash Collateral.

On November 6, 2009, the Debtors filed their Emergency Motion For Entry Of Interim Order (I) Authorizing Use Of Cash Collateral; (II) Providing Adequate Protection To Prepetition Lenders; (III) Modifying The Automatic Stay; And (IV) Scheduling A Final Hearing (the "First Cash Collateral Motion").  On November 10, 2009 the Court held an interim hearing and entered the First Interim Order authorizing the Debtors to use cash collateral through December 10, 2009.  The Court has issued five more interim cash collateral orders authorizing the Debtors to use cash collateral through May 12, 2010 (collectively, the "Interim Cash Collateral Orders").  Under the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1  Interim Cash Collateral Orders, the Agent and the Prepetition Secured Lenders consented to the use

2  of their cash collateral in accordance with budgets that were approved by the Agent.  In addition, the

3  Interim Cash Collateral Orders also provided, among other things, for the Debtors to pay the

4  Prepetition Secured Lenders current interest at the contract non-default rate, and the reasonable fees

5  and expenses of professionals for the Agent.  The Interim Cash Collateral Orders also granted the

6  Agent liens in assets that were not subject to the Agent's prepetition liens only to the extent of the

7  diminution in value of the Agent's prepetition collateral and superpriority claims.

8      On March 26, 2010, the Debtors filed their Second Emergency Motion For Entry Of Interim

9  Order (I) Authorizing Use Of Cash Collateral; (II) Providing Adequate Protection To Prepetition

10  Lenders; (III) Modifying The Automatic Stay; And (IV) Scheduling A Final Hearing (the "Second

11  Cash Collateral Motion") pursuant to which they requested authority to use cash collateral on a non-

12  consensual basis in anticipation of the expiration of the use of cash collateral on a consensual basis.

13  In support of the Second Cash Collateral Motion, the Debtors submitted the declaration of Mr. Carl

14  DiStefano and an appraisal of the Brightwater project that placed an "as is" value on Brightwater of

15  $219.7 million as of February 1, 2010.  The Debtors and Wilmington Trust reached an agreement on

16  continued use of cash collateral on a consensual basis and on April 13, 2010 the Court entered the

17  Interim Order Granting Second Emergency Motion For Order (I) Authorizing Use Of Cash

18  Collateral (II) Providing Adequate Protection To Prepetition Lenders, (III) Modifying The

19  Automatic Stay And (IV) Scheduling Final Hearing, which authorized the Debtors to use cash

20  collateral through June 30, 2010.  On July 1, 2010, the Court entered the Second Interim Order

21  Granting Second Emergency Motion For Order (I) Authorizing Use Of Cash Collateral (II)

22  Providing Adequate Protection To Prepetition Lenders, (III) Modifying The Automatic Stay And

23  (IV) Scheduling Final Hearing, which authorized the use of cash collateral through September 8,

24  2010.  Thereafter, the Bankruptcy Court entered two more interim cash collateral orders.  The

25  Debtors' authority to use cash collateral is now governed by the order approving postpetition

26  financing on an interim basis as described below.

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**C.      Authorization To Continue To Sell Homes Free And Clear.**

Another of the Debtors' first day motions was a request for authorization to continue to sell homes in the ordinary course free and clear of liens, claims, and encumbrances.  At the first day hearing, the Court entered an interim order authorizing the Debtors to continue to sell homes free and clear through December 9, 2009.  The Court has issued a total of fourteen orders extending the Debtors' authority to sell homes free and clear, with the most recent order set to expire on January 28, 2011.

**D.      Filing of Schedules of Assets and Statement of Financial Affairs and Claims Bar Date.**

On December 12, 2009, each of the Debtors filed their statements of financial affairs and schedules of assets and liabilities.  On June 17, 2010, the Bankruptcy Court entered an order setting a bar date for the assertion of claims and interests, which is August 6, 2010.

**E.      Approval of Payment of Sales Commissions.**

The Debtors employ "new home counselors" who serve as the interface between the Debtors and prospective homebuyers.  The counselors are involved at every stage of the sale process, soliciting customers, guiding them through the financing process, managing customer requests for options and changes to the homes, assisting them with closing escrow, and assisting them with any other issues that may arise.  On December 16, 2009, the Debtors filed a motion for authority to pay the counselors the commissions arising as a result of the closing of the sale of homes that were the subject of prepetition sales contracts.  On December 23, 2009, the Court authorized the payment of commissions arising from closings occurring in November 2009.  On January 28, 2010, the Court entered a final order authorizing the payment of any remaining commissions arising from the closing of prepetition sales contracts.

**F.      Retention of Professionals.**

The Debtors have retained several professionals in these cases, including Hennigan, Bennett & Dorman LLP as reorganization counsel, Corporate Law Solutions P.C. as special corporate counsel, Deloitte & Touche LLP as auditors, Imperial Capital as financial advisor, and DiStefano & Company as appraiser.  On February 16, 2010, the Bankruptcy Court entered an order authorizing the retention of certain professionals in the ordinary course of the Debtors' business.  On March 24,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    2010, the Bankruptcy Court entered an order approving interim compensation procedures for

2    professionals.

3    **G.    Sale of Quartz Hill Project.**

4            On November 25, 2009, Hearthside Homes and HHI Lancaster filed a motion for authority to

5    sell their interest in the Quartz Hill project that consisted of 54 unfinished lots in Lancaster,

6    California to Richmond American Homes, Inc. for $3.1 million.  On December 17, 2009, the Court

7    approved the sale of the Quartz Hill project to Richmond American, provided that approximately

8    $2.5 million of the proceeds from the sale were distributed to IndyMac Ventures, LLC through

9    escrow in partial satisfaction of IndyMac Ventures' secured claim against the property.  On

10   December 29, 2009, the Debtors closed the sale and are currently holding approximately

11   $548,022.18 in remaining sale proceeds in a segregated account.

12   **H.    Pension Plans.**

13           CALC has a noncontributory defined benefit retirement plan which covered substantially all

14   employees of CALC prior to September 30, 1993 who had completed one year of continuous

15   employment (the "ERISA Pension Plan").  The Pension Plan is covered by Title IV of the Employee

16   Retirement Income Security Act of 1974, as amended ("ERISA") (29 U.S.C. § 1304 et seq.).  The

17   benefits under the ERISA Pension Plan were frozen in 1993.  The Debtors estimate that as of the

18   Petition Date, the ERISA Pension Plan was underfunded by $3.4 million.  The Debtors estimate that

19   benefit payments will average approximately $520,000 for each of the next five years and an

20   aggregate of $2.3 million for the five fiscal years thereafter.  The Debtors were required to

21   contribute approximately $700,000 to the ERISA Pension Plan in 2010, however, none of these

22   contributions were made because the Debtors have taken the position that such amounts are

23   prepetition claims.

24           The Pension Benefit Guaranty Corporation (the "PBGC"), a United States Government

25   corporation that guarantees the payment of certain pension benefits upon termination of a pension

26   plan, asserts that the Debtors are obligated to contribute to the ERISA Pension Plan at least the

27   amounts necessary to satisfy ERISA's minimum funding standards, found in ERISA section 302 and

28   Internal Revenue Code section 412.  The PBGC also takes the position that in the event of a

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   termination of the ERISA Pension Plan, the Debtors and all members of their controlled group may

2   be jointly and severally liable for the unfunded benefit liabilities of the ERISA Pension Plan, See

3   ERISA section 4062, 29 U.S.C. § 1362, and that the ERISA Pension Plan may be terminated only if

4   the statutory requirements of either ERISA section 4041 or 4042 are met.

5        The Plan contemplates that the Debtors will terminate ERISA Pension Plan through a

6   voluntary distressed termination.  The PBGC has filed four claims against each of the Debtors for

7   different claims arising under ERISA and may amend those claims in the event that the ERISA

8   Pension Plan is terminated.

9        CALC also has a non-qualified pension plan entitled the "Retirement Plan for the Non-

10  Employee Directors of The Henley Group, Inc. (and Henley Properties, Inc.)" (the "Retiree Director

11  Pension Plan").  There are seven participants in the Retiree Director Pension Plan.  The Debtors'

12  estimate that approximately $171,000 has accrued and remains unpaid under the Retiree Director

13  Pension Plan through June 30, 2010 and approximately $2.1 million could be payable in the future

14  based upon certain actuarial assumptions.  Claims under the Retiree Director Pension Plan are

15  treated as General Unsecured Claims.

16  **I.    Change in Composition of the Prepetition Secured Lenders And Prepetition Agent.**

17       On or before April 6, 2010, certain Prepetition Secured Lenders, including KeyBank, sold

18  their holdings of Prepetition Secured Claims to other lenders.  As a result of KeyBank's sale of its

19  holdings of Prepetition Secured Claims, KeyBank also resigned as the Prepetition Agent.  On April

20  6, 2010, Wilmington Trust FSB ("Wilmington Trust") succeeded to KeyBank and became the

21  Prepetition Agent.

22  **J.    NASDAQ Delisting.**

23       The day after the Petition Date, CALC received a delisting notice from the Nasdaq Staff.   In

24  December 2009, CALC successfully appealed to the panel and was granted continued Nasdaq listing

25  until April 26, 2010, upon which date CALC was required by the Panel's decision to have emerged

26  from the Chapter 11.  CALC requested that the panel extend its deadline so that the common stock

27  would remain listed while the Debtors completed the Chapter 11 process.  When the panel refused to

28  grant any further extension, CALC submitted the matter to the Nasdaq Review Council which, by

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   having declined to accept the matter for review, resulted in CALC's common stock being delisting

2   effective April 27, 2010.  CALC's common stock is now traded on the over-the-counter market

3   (OTCQB) under the CALCQ ticker symbol.

4   **K.    Negotiation And Approval Of The Exit Facility Commitment Letter.**

5         In June 2010, the Debtors commenced negotiations with Luxor on the terms of a new loan to

6   finance the Debtors' obligations under the Plan.  On June 15, 2010, the Debtors obtained a

7   commitment letter from Luxor for a $182 million exit facility.  That same day they filed their

8   "Emergency Motion For Entry Of An Order (A) Authorizing The Debtors To Enter Into Exit

9   Financing Commitment Letter And Pay Related Fees; (B) Approving A Break Up Fee; (C)

10  Authorizing The Debtors To Amend Plan Of Reorganization; And (D) Rescheduling And

11  Consolidating Hearings On Valuation And Plan Confirmation" (the "<u>Exit Facility Motion</u>").  On

12  June 18, 2010, the Debtors and Luxor entered into the Commitment Letter, which superseded and

13  replaced the June 15, 2010 commitment letter in all respects and increased the principal amount of

14  the exit facility from $182 million to $184 million.  Wilmington Trust objected to approval of the

15  Exit Facility Motion.  After a hearing held on June 18, 2010, the Bankruptcy Court entered an order

16  granting the Exit Facility Motion and approving the June 18, 2010 Commitment Letter.  The

17  Bankruptcy Court also approved the payment of a break-up fee if certain conditions were met and

18  the financing did not close.

19        The Commitment Letter provided an outside date of August 31, 2010 for the closing of the

20  proposed exit financing.  The proposed exit financing did not close prior to that date.  As discussed

21  earlier, Luxor contended that it was entitled to a break-up fee of approximately $6.4 million as a

22  result of the failure to close the proposed exit financing.  The Debtors and Wilmington Trust

23  disputed this claims.  The Debtors, Luxor, Wilmington Trust, Anchorage Capital Group, L.L.C. and

24  Bank of America N.A. agreed to a proposed settlement of the Commitment Letter Released Claims

25  as set forth in section 5.12 of the Plan.

26  **L.    Settlement with Wilmington Trust and the Prepetition Secured Lenders.**

27        On July 15, 2010, after extensive negotiations, the Debtors, the Prepetition Agent, and nearly

28  all of the Lenders (the "<u>Lender Parties</u>"), entered into that certain Settlement Agreement dated as of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES CALIFORNIA

-64-

1    July 13, 2010.  The Settlement Agreement was intended to provide a full resolution, in the context

2    of a revised plan of reorganization that would timely implement the Exit Financing, of the issues

3    between the Debtors, on the one hand, and the Lender Parties and the Agent, on the other hand and

4    was intended to eliminate further litigation over the Debtors' new plan, thereby facilitating the

5    Debtors' emergence from chapter 11 at the earliest possible time.

6         Under the Settlement Agreement, the Agent and the Lenders, among other things, agreed (i)

7    to stand down on their objections to the Debtors' fourth amended disclosure statement and plan, (ii)

8    to waive claims for default interest exceeding $6 million, (iii) that the Prepetition Secured Lenders

9    would absorb a portion of the Agent's and Lender Parties' professional fees for the period December

10    2009 through August 2010, thus requiring the Debtors to reimburse the Agent only a discounted

11    amount for professional fees and for the months of December 2009 through June 2010, resulting in

12    an additional $600,000 in savings to the estates, and with a cap on fees for the months of July and

13    August, and (iv) to provide the Debtors with a broad release relating to claims against the Debtors

14    arising during that period.  In turn, the Debtors agreed to the allowance and payment in full, in cash,

15    on the plan effective date (which was required to have occurred by no later than August 31, 2010),

16    of full principal and non-default interest portions of the Agent's and Lender Parties' claims under

17    the governing loan agreements, plus a broad release relating to claims that the Debtors may possess

18    against the Agent and the Lender Parties.

19         On July 16, 2010, the Debtors and Wilmington Trust filed the Joint Motion For Order

20    Approving Settlement Among The Debtors, The Agent, And The Prepetition Secured Lenders

21    Pursuant To Fed. R. Bankr. P. 9019 [Docket No. 376] (the "Settlement Motion").  Attached to the

22    Settlement Motion as Exhibit B is a copy of the Settlement Agreement.  At a hearing on July 28,

23    2010 the Bankruptcy Court approved the Settlement Agreement.

24    **M.    The Debtors' Previous Plans.**

25         The Debtors have previously filed five other plans of reorganization.  The most recent plan

26    filed by the Debtors on or about July 28, 2010 was premised upon the closing of the exit financing

27    to be provided by Luxor.  The termination of the Luxor Commitment Letter precluded the

28    satisfaction of a condition to confirmation of that plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-65-

1612527.3

The Debtors have explored alternative sources of financing to fund their emergence from chapter 11 and have not been able to obtain any financing at a level that would pay the Prepetition Secured Lenders' claims in full.  Absent prospects for take-out financing, the Debtors commenced negotiations with their Prepetition Secured Lenders on the terms of a consensual plan.  A key part of those negotiations was the Consenting Lenders' willingness to provide essential credit support to the Debtors' continued operations.  The Debtors believe that the postpetition financing from the Consenting Lenders and the agreement set forth in the Plan Support Agreement provide the Debtors a path to a timely exit from the Reorganization Cases.

## N.  DIP Financing and the Plan Support Agreement

On December 7, 2010, the Debtors filed their Motion For Entry Of (I) Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, And 364 Of The Bankruptcy Code (I) Authorizing The Debtors To Obtain Postpetition Financing And Use Cash Collateral, (II) Granting Liens, Security Interests And Superpriority Claims, (III) Granting Adequate Protection And Final Order Approving Plan Support Agreement Among Debtors And Prepetition Lenders And (Iv) Shortening Time For Notice Of And Hearing On Disclosure Statement (the "DIP Financing Motion").  Pursuant to the DIP Financing Motion, the Debtors sought authority to borrow $15,000,000 ($5,000,000 of which would be drawn upon interim approval) under a postpetition financing facility provided by Anchorage, Bank of America, and Luxor (the "Consenting Lenders").  The DIP Financing Motion also sought authority for the Debtors to enter into a Plan Support Agreement with the Consenting Lenders whereby the Debtors and the Consenting Lenders would support confirmation of a plan that was consistent with the terms attached to the Plan Support Agreement.

On December 16, 2010, the Bankruptcy Court held a hearing on the DIP Financing Motion and granted the relief requested therein.  On December __, 2010, the Debtors and the Consenting Lenders executed the Plan Support Agreement, a copy of which is attached hereto as Exhibit B.  The Bankruptcy Court has scheduled a final hearing on the DIP Financing Motion for January 12, 2010.

As a result of the failure of the Debtors' previous efforts to obtain confirmation of a plan and the Consenting Lenders' agreement to support this Plan, the Plan includes provisions for the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1  reimbursement of fees and expenses of the Consenting Lenders and the Prepetition Agent, including

2  expenses that were the subject of the Settlement Agreement and the Luxor Settlement.

3  **O.    Significant Claims Against The Estates And Pending Litigation.**

4      Listed below are descriptions of several significant claims asserted against the Debtors'

5  estates and certain pending litigation:

6      **1.    Insurance Company of the West.**

7      Insurance Company of the West ("ICW") has issued numerous construction performance

8  bonds in support of several of the Debtors' residential development projects, including public

9  improvements to the Brightwater project, the Quartz Hill project, and a former project developed by

10  HHI Hellman, LLC.  The Debtors estimate that the face amount of the construction bonds issued by

11  ICW is approximately $18.6 million.  The Debtors' liability under the construction bonds is

12  contingent upon failure to complete the respective construction projects supported by the ICW

13  bonds.  CALC and Signal Landmark have agreed to indemnify ICW for any claims against ICW

14  under the construction bonds.  ICW has asserted current claims under the indemnity agreement of

15  approximately $100,000.

16      **2.    Brightwater Models, LLC.**

17      As discussed above, in December 2008, Signal Landmark entered into a sale-leaseback

18  transaction with Brightwater Models, LLC pursuant to which Signal Landmark sold the 17 model

19  homes at the Brightwater project.  In connection with that transaction, Brightwater Models, LLC

20  leased the model homes back to Signal Landmark.  The lease contains provisions for sharing profits

21  from the ultimate sale of the models.  On or about September 30, 2010, the Bankruptcy Court

22  entered an order authorizing the Debtors to assume the model home lease with Brightwater Models,

23  LLC.

24      **3.    State Lands Commission/AERA Energy LLC.**

25      In 1997, the predecessor to Signal Landmark sold 880 acres of wetlands located near the

26  Brightwater project to the State of California.  Pursuant to agreements related to that sale, CALC

27  and Signal Landmark agreed to indemnify the State Lands Commission for certain environmental

28  liabilities related to the property.  Environmental remediation is ongoing. The Debtors estimate that

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    their share of remediation expenses may range from $100,000 to over $1,000,000.  State Lands filed

2    an unsecured claim against CALC and Signal Landmark in the estimated amount of $2.5 million.

3    AERA Energy, LLC, which has been performing the environmental remediation work for State

4    Lands, has also filed a claim in the amount of approximately $2.2 million.

5            **4.    IndyMac Ventures, LLC.**

6            IndyMac Ventures, LLC asserted a secured claim against HHI Lancaster I, LLC in the

7    amount of $2,926,391.63 based upon a loan agreement between HHI Lancaster I, LLC and IndyMac

8    Bank FSB dated as of November 23, 2005.  IndyMac Ventures, LLC, as successor to IndyMac Bank

9    FSB with respect to the Lancaster Loan, asserted a security interest in real property owned by HHI

10   Lancaster I, LLC located in Lancaster, California commonly referred to as Quartz Hill.  As

11   discussed above, on December 17, 2009, the Court approved the sale of the Quartz Hill property,

12   and other assets, to Richmond American Homes, Inc. for $3.1 million.  Pursuant to the sale order,

13   $2,552,163.10 was paid to IndyMac Ventures, LLC at the closing of the sale to Richmond American

14   Homes.  IndyMac Ventures asserts a lien against the remaining proceeds of the sale.  The Debtors

15   dispute that IndyMac Ventures had a perfected security interest in all of the property that was sold to

16   Richmond American Homes and estimate IndyMac Ventures' remaining secured claim to be

17   between $100,000 and $400,000.

18           **5.    Pending Litigation.**

19           In *Continental Insurance Co., et al. v. Honeywell International, Inc. et al.*, Superior Court of

20   Morris County New Jersey, Case No. MRS-133-04, CALC is named as a cross-defendant for claims

21   relating to insurance coverage for various alleged asbestos liabilities and claims against various

22   former subsidiaries of Honeywell (f/k/a Allied-Signal, Inc.), a predecessor of CALC.  Resco

23   Holdings LLC and others have filed a cross-complaint in the 23rd Judicial District Court of Wharton

24   County, Texas against CALC for numerous indemnity claims related to M.W. Kellogg Company, a

25   former affiliate of CALC and Pullman Passenger Car Company ("PPCC"), a non-Debtor subsidiary

26   of CALC.  In connection with the December 1988 spin-off of CALC from its former parent, CALC

27   indemnified its former parent for certain liabilities of M.W. Kellogg.  In the PPCC matters, CALC

28   and PPCC are indemnified by MAFCO Consolidated Group Inc. ("MAFCO"), which has been

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-68-

1    defending all of these cases in accordance with a March 1997 Settlement Agreement between CALC

2    and MAFCO.  Travelers seeks declaratory relief and equitable subrogation against CALC, PPCC,

3    and MAFCO.

4           The litigation pending against CALC has been stayed and relief from stay has not been

5    granted.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

# VII.    CERTAIN FACTORS TO CONSIDER
## IN VOTING TO ACCEPT OR REJECT THE PLAN

**A.    The Homebuilding Industry Has Undergone A Significant And Sustained Downturn.**

The homebuilding and mortgage lending industries have experienced a significant and sustained downturn.  Unprecedented levels of national concern over instability in the credit markets, along with concerns over the recession and elevated levels of unemployment, have exacerbated the decline in demand for new homes.  These conditions include, among other things: reduced consumer confidence; significant concerns over the impact of higher-risk mortgage loan products on the banking system and financial markets; reduced availability and higher costs of mortgage loan financing; fluctuating energy costs; the absence of home price stability; and continued declines in the value of new homes.  All of these factors, in an economy that has been in recession since December 2007 and appears to be gradually recovering, have contributed to the significant decline in the demand for new homes.  The government's legislative and administrative measures aimed at restoring liquidity to the credit markets have recently begun to show positive results.

If the downturn in the homebuilding and mortgage lending industries continues or the recovery occurs slower than expected, or if the national economy experiences a "double dip" recession, the Debtors could experience further declines in the market value and demand for their homes, which could have a significant negative impact on their gross margins from home sales and financial and operational results.  Also, the prices of land and new homes, and the stock prices of companies like the Debtors' that build new homes, may decline further if the demand for new homes continues to weaken.  A decline in the prices for new homes has had and would continue to have an adverse effect on the Debtors' homebuilding business, in particular on their revenues and margins. The Debtors can provide no assurances that the homebuilding market will improve in the near future.

**B.    The Debtors' Strategies In Responding To The Adverse Conditions In The Homebuilding Industry May Not Be Successful.**

While the Debtors continue to monitor and modify their strategies in responding to the current economic environment, the effectiveness of these strategies in future reporting periods is

1612527.3

unknown.  To the extent they are not successful; the Reorganized Debtors' financial and operating results may be adversely impacted.  The Debtors believe that the cancellation rates largely reflected a decrease in homebuyer confidence based on sustained home price declines, increased offerings of sales incentives in the marketplace for both new and existing homes, generally poor economic conditions, and the filing of the Debtors' chapter 11 cases, all of which prompted homebuyers to forgo or delay home purchases.  While there appears to be improvement in the mortgage lending environment, the inability of some buyers to sell their existing homes has also led to lower demand for new homes and higher cancellations.  Many of these factors affecting new orders and cancellation rates are beyond the Debtors' control.  It is uncertain how long these factors, and the reduced sales levels and volatility in cancellations the Debtors have experienced will continue.

**C.      The Reorganized Debtors will have Substantial Indebtedness.**

Following the Effective Date, the Reorganized Debtors will have a substantial amount of indebtedness and other fixed obligations, including, without limitation, the New First Lien Loans, New Second Lien Loans, and the New Third Lien Loans.  The degree to which the Reorganized Debtors are leveraged could have important consequences, including, but not limited to: (i) making it more difficult to pay interest and satisfy debt obligations, (ii) increasing the Reorganized Debtors' vulnerability to general adverse economic and industry conditions, (iii) requiring the dedication of a substantial portion of the Reorganized Debtors' cash flow from operations to the payment of indebtedness and interest thereon, thereby reducing the availability of the cash flow to fund working capital or other general corporate requirements of the Reorganized Debtors, and (iv) limiting the ability of the Reorganized Debtors to obtain additional financing.

**D.      There are Risks Related to the New Credit Agreements**

The New Credit Agreements will require the Reorganized Debtors to comply with certain financial and operational covenants following the Effective Date.  These include limitations on the incurrence of indebtedness and in certain circumstances, minimum home sales.  However, there can be no assurance that a default or potential default will not arise under the covenants or other terms of the New Credit Agreements.  Such a default or potential default may have the effect of limiting or prohibiting payments required to be made under the Plan.

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**E.    Changes In Laws Or Other Events That Adversely Affect Liquidity In The Secondary Mortgage Market Could Hurt The Debtors' Business.**

The government-sponsored enterprises, principally FNMA and FHLMC, play a significant role in buying home mortgages and creating investment securities that they either sell to investors or hold in their portfolios.  These organizations provide liquidity to the secondary mortgage market. FNMA and FHLMC have experienced financial difficulties.  Any new federal laws or regulations that restrict or curtail their activities, or any other events or conditions that prevent or restrict these enterprises from continuing their historic businesses, could affect the ability of the Debtors' customers to obtain the mortgage loans or could increase mortgage interest rates or credit standards, which could reduce demand for the Debtors' homes and/or the loans that they originate and adversely affect their results of operations.

In addition, the Housing and Economic Recovery Act of 2008 prohibits, as of October 15, 2008, seller funded down payment assistance programs.  As a result of these trends, the ability and willingness of prospective buyers to finance home purchases or to sell their existing homes has been adversely affected, which has adversely affected the Debtors' operating results.  These conditions may continue.

**F.    The Homebuilding Industry Is Highly Competitive And, With More Limited Resources Than Many Of The Debtors' Competitors, The Debtors May Not Be Able To Compete Effectively.**

The homebuilding industry is highly competitive.  The Debtors compete with numerous other residential construction firms, including large national and regional firms, for customers, land, financing, raw materials, skilled labor and employees.  The Debtors compete for customers primarily on the basis of the location, design, quality and price of their homes and the availability of mortgage financing.  Some of the competitors have substantially larger operations and greater financial resources than the Debtors do and as a result may have lower costs of capital, labor and materials, and may be able to compete more effectively.  However, there is a very limited supply of land entitled for residential development along the coast of Southern California, and the Brightwater project offers a unique location that is expected to thrive as the housing market recovers.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**G.    The Debtors' Business Is Cyclical And Downward Changes In Economic Conditions Generally Or In The Market Regions Where The Debtors Operate Could Further Decrease Demand And Pricing For New Homes In These Areas.**

The residential homebuilding industry is sensitive to changes in economic conditions such as those which are listed below. Adverse changes in any of these conditions generally, or in the market regions where the Debtors operate, could decrease demand and pricing for new homes in these areas or result in customer cancellations of pending contracts, which could adversely affect the number of home deliveries the Debtors make or reduce the prices the Debtors can charge for homes, either of which could result in a decrease in the Debtors' revenues and earnings.

The Debtors' business is substantially affected by changes in national and general economic factors outside of the Debtors' control, such as:

- short and long term interest rates;

- the availability of financing for homebuyers;

- consumer confidence (which can be substantially affected by external conditions, including international hostilities involving the United States);

- consumer income;

- federal mortgage financing programs; and

- federal and state income tax provisions, including provisions for the deduction of mortgage interest payments.

The cyclicality of the Debtors' business is also highly sensitive to changes in economic conditions that can occur on a local or regional basis, such as changes in:

- housing demand;

- population growth;

- employment levels and job growth; and

- property taxes.

The factors described above can cause demand and prices for the Debtors' homes to diminish or cause the Debtors to take longer and incur more costs to build their homes.  The Debtors may not be able to recover these increased costs by raising prices because prices have been declining over the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   last four years and the price of each home is usually set several months before the home is delivered,

2   as the Debtors' customers typically sign their home purchase contracts before construction has even

3   begun on their homes.  In addition, some of the factors described above could cause some

4   homebuyers to renegotiate for lower prices or cancel their home purchase contracts altogether.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

# VIII.    VOTING PROCEDURES AND CONFIRMATION OF THE PLAN

**A.    General.**

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Plan Proponents have complied and will comply with the applicable provisions of the Bankruptcy Code;

- the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code (see Section VIII.D. "Acceptance or Cramdown"));

- the Plan is feasible, including that confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class who does not accept the Plan by providing to such creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the Plan provides for the continuation after the Effective Date of all retiree benefits provided by the Debtors, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Reorganized Debtors have been made.

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS

**B.      Voting Procedures and Requirements.**

Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in the Debtors that are "impaired" under the terms of the Plan are entitled to vote to accept or reject the Plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, classes of Claims or Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance.  The classification of Claims and Interests is summarized, together with an indication of whether each class of Claims or Interests is impaired or unimpaired, in Section III.B. "Summary of Classification and Treatment of Claims and Interests under the Plan."

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes.  By order of the Bankruptcy Court, certain vote tabulation rules have been approved that temporarily allow or disallow certain Claims for voting purposes only.  These tabulation rules are described in the solicitation materials provided with your Ballot.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS IMPORTANT.  YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

**PLEASE CAREFULLY FOLLOW ALL OF THE INSTRUCTIONS CONTAINED ON THE BALLOT PROVIDED TO YOU.  ALL BALLOTS MUST BE COMPLETED AND RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED.**

**TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY 5:00 P.M., P.S.T., ON [_____,] 2011 (OR SUCH OTHER TIME AND DATE IDENTIFIED ON YOUR BALLOT) AT THE ADDRESS SET FORTH ON THE PREADDRESSED ENVELOPE PROVIDED TO YOU.  IT IS OF THE UTMOST IMPORTANCE TO THE PLAN PROPONENTS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    Votes cannot be transmitted orally.  Accordingly, you are urged to return your signed and

2    completed Ballot promptly.

3    **IF ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO**

4    **REJECT THE PLAN, (I) THE PLAN PROPONENTS MAY SEEK TO SATISFY THE**

5    **REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN**

6    **PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND, IF REQUIRED,**

7    **MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION;**

8    **OR (II) THE PLAN MAY BE MODIFIED OR WITHDRAWN.**

9    IF YOU ARE ENTITLED TO VOTE AND YOU DID NOT RECEIVE A BALLOT,

10    RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, PLEASE CALL THE PLAN

11    PROPONENTS' VOTING AGENT.

12    **C.    Confirmation Hearing.**

13    The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on

14    whether the Plan Proponents have fulfilled the Confirmation requirements of section 1129 of the

15    Bankruptcy Code.  The Confirmation Hearing has been scheduled for [_____,] 2011 at [__:00

16    a.m.] before The Honorable Theodor C. Albert, United States Bankruptcy Court for the Central

17    District of California, Santa Ana Division, Courtroom 5B, 411 West Fourth Street, Santa Ana,

18    California  92701.  The Confirmation Hearing may be adjourned from time to time by the

19    Bankruptcy Court without further notice, except for an announcement of the adjourned date made at

20    the Confirmation Hearing.  Any objection to Confirmation must be made in writing and must

21    specify in detail the name and address of the objector, all grounds for the objection and the amount

22    of the Claim or Interest held by the objector.  Any such objections must be filed and served upon the

23    persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline

24    described therein.

25    **D.    Acceptance or Cramdown.**

26    As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired

27    Claims and Interests vote to accept the Plan, except under certain circumstances.

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1      Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired

2    creditors.  Classes 1D through 11D, 1E through 6E, 1F through 6F, and 4I through 6I are unimpaired

3    and deemed to accept the Plan.  Classes 1A through 11A, 1B through 11B, 6C, 1G through 6G, and

4    1H through 6H are permitted to vote to accept or reject the Plan.

5      Section 1129(a)(10) requires that if a plan impairs a class of creditors, one impaired class

6    must vote to accept the plan without counting the votes of an insider.  The Plan Proponents submit

7    that if any of Classes 1A through 11A, 1B through 11B, 6C, 1G through 6G, and 1H through 6H

8    votes to accept the Plan, the requirements of Section 1129(a)(10) will be meet.

9    **E.      Best Interests Test; Liquidation Analysis.**

10      Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the

11    Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or

12    Interest in any such impaired Class who has not voted to accept the Plan.  Accordingly, if an

13    impaired Class does not unanimously accept the Plan, the "best interests" test requires that the

14    Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on

15    account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to

16    the value of the distribution that each such member would receive if the Debtors were liquidated

17    under chapter 7 of the Bankruptcy Code on such date.

18      To estimate what members of each impaired Class of Claims or Interests would receive if the

19    Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first

20    determine the aggregate dollar amount that would be available if the Reorganization Cases were

21    converted to chapter 7 cases under the Bankruptcy Code and the Debtors' assets were liquidated by

22    a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtors would consist

23    of the net proceeds from the disposition of the assets of the Debtors, augmented by any cash held by

24    the Debtors.

25      The Liquidation Value available to holders of Unsecured Claims and Interests in Classes 1G

26    through 11G and 1H through 11H would be reduced by, among other things, (i) the Claims of

27    secured creditors to the extent of the value of their collateral; (ii) the costs, fees and expenses of the

28    liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (iii) unpaid

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-78-

1    Administrative Expense Claims of the Reorganization Cases; and (iv) Priority Claims and Priority

2    Tax Claims.  The costs of liquidation in chapter 7 cases would include the compensation of a trustee,

3    as well as of counsel and of other professionals retained by such trustee, asset disposition expenses,

4    applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the

5    pendency of the chapter 7 cases and all unpaid Administrative Expense Claims incurred by the

6    Debtors during the Reorganization Cases that are allowed in the chapter 7 case.  The liquidation

7    itself may trigger certain Priority Claims, such as Claims for severance pay, and would likely

8    accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be

9    payable in the ordinary course of business.  These Priority Claims and Priority Tax Claims would be

10   paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance

11   would be made available to pay Unsecured Claims or to make any distribution in respect of

12   Interests.  The Plan Proponents believe that the liquidation also would generate a significant increase

13   in Unsecured Claims, such as rejection damage Claims.

14           The information contained in Exhibit E hereto provides a summary of the Liquidation Value

15   of the Debtors' interests in property, assuming a chapter 7 liquidation in which a trustee appointed

16   by the Bankruptcy Court would liquidate the Debtors' properties and interests in property.  As more

17   fully described in Exhibit E, the liquidation analysis is based on a number of other estimates and

18   assumptions that are subject to significant uncertainties, including estimates and assumptions

19   relating to the proceeds of sales of assets, the timing of such sales, the impact of pending

20   liquidations on continuing operations and values and certain tax matters.  **YOU SHOULD**

21   **CAREFULLY REVIEW IN DETAIL ALL OF THE ESTIMATES AND ASSUMPTIONS**

22   **SET FORTH IN EXHIBIT E.  WHILE THE PLAN PROPONENTS BELIEVE THAT**

23   **THESE ESTIMATES AND ASSUMPTIONS ARE REASONABLE FOR THE PURPOSE OF**

24   **PREPARING HYPOTHETICAL CHAPTER 7 LIQUIDATION ANALYSES, NO**

25   **ASSURANCE EXISTS THAT SUCH ESTIMATES AND ASSUMPTIONS WOULD BE**

26   **VALID IF THE DEBTORS WERE, IN FACT, TO BE LIQUIDATED.  THE FUTURE**

27   **VALUE AVAILABLE FOR DISTRIBUTION TO HOLDERS OF CLAIMS AND**

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**INTERESTS UNDER A CHAPTER 7 LIQUIDATION COULD BE MATERIALLY GREATER OR LESSER THAN AS SET FORTH IN EXHIBIT E.**

As noted above, the Plan Proponents believe that chapter 7 liquidation could result in substantial litigation that could delay the liquidation beyond the periods assumed in Exhibit E.  This delay could materially reduce the amount determined on a present value basis available for distribution to creditors, including holders of Unsecured Claims in Classes 1H through 6H.  Moreover, the Plan Proponents believe that such litigation and attendant delay could adversely affect the values realizable in the sale of the Debtors' assets to an extent that cannot be reliably estimated at this time.

Based on the liquidation analysis set forth in Exhibit E, although no assurance can be given, the Plan Proponents believe that holders of Claims and Interests will receive value, as of the Effective Date, at equal to or greater value under the Plan than such holders would receive under a chapter 7 liquidation.

In actual liquidations of the Debtors, distributions to holders of Claims would be made substantially later than the Effective Date assumed in connection with the Plan.  This delay would materially reduce the amount determined on a present value basis available for distribution to creditors.  The hypothetical chapter 7 liquidation of the Debtors is assumed to commence on January __, 2011 and to be completed within 180 days thereafter.  The Liquidation Analysis assumes the distributions are made by the chapter 7 trustee beginning immediately following commencement of the liquidation and completed within 180 days of commencement.  As a result, the Plan Proponents believe the value of the liquidation distributions on a present value basis determined as of the projected Effective Date would be less than the value distributable under the Plan.

The Plan Proponents further believe that chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by holders of Claims and Interests, as compared to the proposed distributions under the Plan, because of, among other factors:

a.    the failure to realize the maximum going concern value of the Debtors' assets;

1612527.3

b.    additional expenses and Claims, some of which would be entitled to

priority in payment, which would arise by reason of the liquidation and from the

rejection of Executory Contracts and Unexpired Leases in connection with a

cessation of the Debtor's operations; and

c.    the substantial time that would elapse before entities would receive

any distribution in respect of their Claims.

Consequently, the Plan Proponents believe, although no assurance can be given, that the Plan

will provide a greater return to holders of Claims against the Debtors than would a chapter 7

liquidation.

**F.    Feasibility**

To confirm the Plan, the Bankruptcy Court must find that confirmation is not likely to be

followed by the liquidation or the need for further financial reorganization of the Debtors.  This

requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the

"feasibility" requirement.  Although no assurances can be given, the Plan Proponents believe that

the Reorganized Debtors will be able to timely perform all obligations described in the Plan, and,

therefore, that the Plan is feasible.

In an effort to demonstrate the feasibility of the Plan, the Debtors have prepared financial

projections for years 2011 – 2015, as set forth in Exhibit D attached to this Disclosure Statement

(the "Projections").  The Projections indicate that the Reorganized Debtors should have sufficient

cash flow to pay and service their debt obligations and to fund their operations.  Accordingly, the

Plan Proponents believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of

the Bankruptcy Code.

As noted in the Projections, however, the Debtors caution that no representations can be

made as to the accuracy of the Projections or as to the Reorganized Debtor's ability to achieve the

projected results.  Many of the assumptions upon which the Projections are based are subject to

uncertainties outside the control of the Plan Proponents.  Some assumptions inevitably will not

materialize, and events and circumstances occurring after the date on which the Projections were

prepared may be different from those assumed or may be unanticipated, and may adversely affect

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    the Reorganized Debtors' financial results.  Therefore, the actual results may vary from the

2    projected results and the variations may be material and adverse.  *See* Section VII "Certain Factors

3    to Consider in Voting to Accept or Reject the Plan" for a discussion of certain risk factors that may

4    affect feasibility of the Plan.

5    **THE PROJECTIONS WERE NOT PREPARED BY THE PLAN PROPONENTS**

6    **WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY**

7    **THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE**

8    **PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY**

9    **ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF**

10    **THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE PROJECTIONS HAVE**

11    **NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT ACCOUNTANTS.**

12    **ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS**

13    **ARE BASED UPON A VARIETY OF ASSUMPTIONS, WHICH ARE FURTHER**

14    **DESCRIBED IN EXHIBIT D.  THERE IS NO ASSURANCE THAT ANY OR ALL OF THE**

15    **ASSUMPTIONS WILL BE ACCURATE OR THAT THE PROJECTIONS WILL PROVE**

16    **TO BE ACCURATE.  SOME OF THESE ASSUMPTIONS HAVE NOT BEEN ACHIEVED**

17    **IN THE PAST, MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO**

18    **SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND**

19    **CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE PLAN**

20    **PROPONENTS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE**

21    **REGARDED AS A REPRESENTATION OR WARRANTY BY THE PLAN PROPONENTS,**

22    **OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL**

23    **RESULTS MAY BE MATERIALLY BETTER OR WORSE THAN THOSE PRESENTED**

24    **IN THE PROJECTIONS.**

25    **GENERAL DISCLAIMER REGARDING**
      **FORWARD-LOOKING STATEMENTS**

26

27    **CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE**

28    **STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1  **ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY**

2  **DIFFERENT FROM ACTUAL, FUTURE RESULTS.  EXCEPT WITH RESPECT TO THE**

3  **PROJECTIONS SET FORTH IN EXHIBIT "D" ATTACHED HERETO, AND EXCEPT AS**

4  **OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS**

5  **DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR**

6  **SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL**

7  **IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

8  **NEITHER THE PLAN PROPONENTS NOR THE REORGANIZED DEBTORS INTEND**

9  **TO UPDATE THE PROJECTIONS OR ANY FORWARD-LOOKING STATEMENTS.**

10 **THUS, THE PROJECTIONS (AND ANY FORWARD-LOOKING STATEMENT SET**

11 **FORTH HEREIN) WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT**

12 **EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING**

13 **THE PROJECTIONS OR SUCH FORWARD-LOOKING STATEMENTS.  FURTHER, THE**

14 **PLAN PROPONENTS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR**

15 **SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO**

16 **REFLECT SUCH OCCURRENCES.  ACCORDINGLY, THE DELIVERY OF THIS**

17 **DISCLOSURE STATEMENT DOES NOT UNDER ANY CIRCUMSTANCES IMPLY**

18 **THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME**

19 **SUBSEQUENT TO THE DATE HEREOF.**

20 **G.     Compliance with Applicable Provisions of the Bankruptcy Code**

21        Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable

22 provisions of the Bankruptcy Code.  The Plan Proponents have considered each of these issues in

23 the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy

24 Code.

25 **H.     Retention of Jurisdiction**

26        Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date,

27 the Bankruptcy Court shall retain jurisdiction over the Reorganization Cases and any of the

28 proceedings related to the Reorganization Cases pursuant to section 1142 of the Bankruptcy Code

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable

2    law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and

3    intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy

4    Court shall retain jurisdiction for the following purposes:

- to establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense Claim or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with Bankruptcy Code §505), resolve any objections to the allowance or priority of Claims, Administrative Expense Claim or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense Claim or Interest pursuant to the Plan;

- to grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which such Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

- to ensure that distributions to Holders of Allowed Claims or Administrative Expense Claims are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

- to decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

- to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

- to resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the Confirmation Order or any Person's rights arising under or obligations incurred in connection with the Plan or the Confirmation Order;

- subject to the restrictions on modifications in the Plan, to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

- to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or the Confirmation Order,

- to consider and act on the compromise and settlement of any Claim against, or Right of Action of the Debtors or the Estates;

- to decide or resolve any Rights of Action under the Bankruptcy Code, including without limitation, avoidance actions and claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

- to enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors or the Reorganized Debtors wherever located;

- to hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Reorganization Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Reorganized Debtors, and (iv) estimation or allowance of any tax claims asserted against the Debtors or Reorganized Debtors;

- to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

- to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Reorganization Cases or the Plan;

- to remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

- to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except for matters arising in connection with or relating to the New Credit Agreements or as otherwise provided in the Plan;

- to determine any other matter not inconsistent with the Bankruptcy Code; and

1612527.3

1    •     to enter an order concluding the Reorganization Cases.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1612527.3

## IX.    CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims who are U.S. persons within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code").  The following summary does not address the U.S. federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in Cash, or are otherwise unimpaired under the Plan (e.g., holders of Administrative Expense Claims, holders of Priority Tax Claims, Other Priority Claims, and certain Secured Claims), or (ii) holders whose Claims or Interests are or may be extinguished without a distribution in exchange therefor.

The following summary is based on the Code, Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No ruling has been requested from the IRS and no opinion of counsel has been received with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan or amounts received by Luxor pursuant to the Luxor Settlement, nor does it purport to address the U.S. federal income tax consequences of the Plan to Claims held solely by the United States or any state or local government, or to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).  This discussion assumes that all Claims are held as capital assets and that the New Second Lien Loans and New Third Lien Loans are treated as debt for U.S. federal income tax purposes.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS**

1612527.3

1  **NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON**

2  **THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.**

3  **ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN**

4  **TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX**

5  **CONSEQUENCES APPLICABLE UNDER THE PLAN.**

6        **In order to ensure compliance with requirements imposed by the Internal Revenue**

7  **Service ("IRS") under Circular 230 Standards of Practice, holders of Claims and Equity**

8  **Interests are notified that (A) any discussion of U.S. federal tax issues contained herein is not**

9  **intended or written to be used, and cannot be used by such holders, for the purpose of**

10  **avoiding any penalties asserted under the Code; (B) any discussion contained herein was**

11  **written to support the promotion or marketing of the transactions described in this Disclosure**

12  **Statement and the Plan; and (C) such holders should seek advice from, and rely solely upon,**

13  **their own independent tax advisor with respect to the U.S. federal, state, local and any foreign**

14  **tax consequences of the transactions described in the Disclosure Statement and Plan in light of**

15  **their particular circumstances.**

16  **A.    Consequences to the Debtors.**

17        As of December 31, 2009 the Debtors had U.S. federal net operating losses ("NOLs") of

18  approximately $163 million.  The amount of U.S. federal NOLs that expire if not utilized is $49

19  million in 2010, $42 million in 2011, zero in 2012, 2013 and 2014, and $72 million thereafter.  The

20  Debtors anticipate that a portion of such NOL carryforwards (and possibly certain other tax

21  attributes) may be eliminated or subject to limitations in future years upon the implementation of the

22  Plan as a result of the change in ownership of CALC.

23        **1.    Cancellation of Debt**

24        In general, the Code provides that a debtor in a bankruptcy case must reduce certain of its tax

25  attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets –

26  by the amount of any cancellations of debt ("COD") income.  COD income is the amount by which

27  the indebtedness discharged exceeds any consideration given in exchange therefor.  As a result of

28  the discharge of the Allowed Claims pursuant to the Plan, the Debtors would suffer COD income

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1   and tax attribute reduction, except to the extent that holders of Allowed Claims are paid in full or

2   one or more statutory or judicial exceptions to COD income and tax attribute reduction apply (such

3   as where the payment of the cancelled debt would have given rise to a tax reduction).  The extent of

4   such COD income and resulting tax attribute reduction will depend on the amount of cash and the

5   fair market value of other consideration transferred in discharge of such Allowed Claims.

6   Confirmation of the Plan will result in the reduction of the Debtors' NOL carryforwards after taking

7   into account current year operating income prior to consummation of the Plan to the extent the Plan

8   gives rise to COD income.

9   **2.    Limitation on Losses Following an Ownership Change**

10          Under Section 382 of the Code, any corporation that undergoes an "ownership change"

11  within the meaning of Section 382 becomes subject to an annual limitation on its ability to utilize its

12  NOLs and "built-in losses" in its assets.  A corporation has a built-in loss in its assets to the extent

13  that the corporation's tax basis in its assets is greater than the value of such assets.

14          The Plan will cause an ownership change for purposes of Section 382 of the Code.  If and to

15  the extent that the Debtors have NOLs remaining after implementation of the Plan, the Reorganized

16  Debtors' ability to use those NOLs would be subject to an annual limitation.  The amount of such

17  annual limitation would be approximately equal to the amount determined by multiplying the long-

18  term tax exempt bond rate (3.67% for an ownership change occurring in December) by the equity

19  value of the Reorganized Debtors immediately after emergence from bankruptcy.

20          **3.    Alternative Minimum Tax**

21          In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative

22  minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular

23  U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax

24  deductions and other beneficial allowances are modified or eliminated.  In particular, even though a

25  corporation otherwise might be able to offset all of its taxable income for regular tax purposes by

26  available NOL carryforwards, generally only 90% of a corporation's taxable income for AMT

27  purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    In addition, if a corporation undergoes an "ownership change" within the meaning of Section

2    382 of the Code and is in a net unrealized built-in loss position (as determined for AMT purposes)

3    on the date of the ownership change, the corporation's aggregate tax basis in its assets would be

4    reduced for certain AMT purposes to reflect the fair market value of such assets as of the change

5    date.

6    Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against

7    its regular U.S. federal income tax liability in future taxable years when the corporation is no longer

8    subject to the AMT.

9    **B.    Consequences to Holders of Certain Claims.**

10    **1.    Holders of Allowed Revolver Loan Claims and Allowed Term Loan Claims**

11    The tax treatment of holders of Allowed Revolver Loan Claims and Allowed Term Loan

12    Claims will depend on whether or not the satisfaction of their claims qualifies as a "recapitalization"

13    under the Code.  In general, for an exchange of Allowed Revolver Loan Claims or Allowed Term

14    Loan Claims for Plan consideration to qualify as a recapitalization, such claim surrendered must be

15    treated as a "security" for U.S. federal income tax purposes and the New Second Lien Loan or New

16    Third Lien Loan received also must be treated as a security.  In this regard, the term "security" is not

17    clearly defined under current U.S. federal income tax law.  Whether a debt instrument is a security is

18    determined based on all the facts, including the term of the debt instrument, the presence or absence

19    of certain shareholder type rights and certain other factors.  Generally, corporate debt instruments

20    with maturities when issued of less than five years are not considered securities while corporate debt

21    instruments with maturities when issued of ten years or more are considered securities.  The

22    Allowed Revolver Loan Claims had an original term of less than four years and the Allowed Term

23    Loan Claims had an initial term of five years.  As a result, it is unclear whether either the Allowed

24    Revolver Loan Claims or Allowed Term Loan Claims would be treated as securities for U.S. federal

25    income tax purposes.  The New Second Lien Loan has a term of five years and the New Third Lien

26    Loan has a term of almost six years.  It therefore also is unclear whether either the New Second Lien

27    Loans or New Third Lien Loans  would be treated as securities for U.S. federal income tax

28    purposes.

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

*Allowed Revolver Loan Claims.*  If the Allowed Revolver Loan Claims and New Second Lien Loans are treated as securities, the receipt of New Second Lien Loans (other than any New Second Lien Loans treated as paid in respect of accrued interest) should qualify as a recapitalization under the Code.  If the New Second Lien Loans are treated as received in a recapitalization, a holder of Allowed Revolver Loan Claims will not recognize gain or loss on the exchange contemplated by the Plan, except to the extent any portion of the New Second Lien Loans are treated as payment of accrued interest on the Allowed Revolver Loan Claims as discussed more fully below.

If the receipt of New Second Lien Loans for Allowed Revolver Loan Claims is treated as a recapitalization, a holder's total tax basis in New Second Lien Loans received (other than any such New Second Lien Loans received in respect of accrued interest) will be equal to such holder's tax basis in their Allowed Revolver Loan Claims. A holder's total basis in the New Second Lien Loans received in the exchange will equal their basis in the Allowed Revolver Loan Claims. A holder's holding period for New Second Lien Loans (other than any New Second Lien Loans received in exchange for accrued interest) will include such holder's holding period for the Allowed Revolver Loan Claims surrendered in exchange therefor.

If the receipt of New Second Lien Loans in exchange for Allowed Revolver Loan Claims is not treated as a recapitalization because either the Allowed Revolver Loan Claims or New Second Lien Loans are not securities, a holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the "issue price" of the New Second Lien Loans (other than any such loans treated as paid in respect of accrued interest) less (y) the holder's tax basis in the Allowed Revolver Loan Claims.  See below for a discussion of the determination of the issue price of the New Second Lien Loans.  Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if a holder held their Allowed Revolver Loan Claims for more than one year.  If the exchange is not treated as a recapitalization, a holder's tax basis in New Second Lien Loans received pursuant to the exchange (other than any New Second Lien Loans received in exchange for accrued interest) will be equal to the issue price of the Allowed Revolver Loan Claims and the holding period for the

1612527.3

1  New Second Lien Loans received (other than any new loans received in exchange for accrued

2  interest) will begin the day after the exchange.

3          A holder that acquired Allowed Revolver Loan Claims subsequent to their original issuance

4  with more than a *de minimis* amount of market discount will be subject to the market discount rules

5  under the Code.  Under those rules, assuming that a holder has made no election to include market

6  discount in income on a current basis, any gain recognized on the exchange will be characterized as

7  ordinary income to the extent of the accrued market discount as of the date of the exchange.  If the

8  exchange of Allowed Revolver Loan Claims for New Second Lien Loans is treated as a

9  recapitalization, any accrued market discount remaining thereon which has not been recognized as

10  ordinary income should be carried over to the New Second Lien Loans.  See below for a discussion

11  regarding the treatment of market discount.

12          *Allowed Term Loan Claims*.  If the Allowed Term Loan Claims are treated as securities, the

13  receipt of New Third Lien Loans and New CALC Common Sock (other than any such new loans or

14  new stock treated as paid in respect of accrued interest) should qualify as a recapitalization under the

15  Code.  In that case, a holder of Allowed Term Loan Claims will not recognize loss on the exchange

16  contemplated by the Plan and will only recognize gain if the New Third Lien Loans are not treated

17  as securities.  If the exchange is treated as a recapitalization and the New Third Lien Loans are not

18  treated as securities for U.S. federal income tax purposes, a holder of Allowed Term Loan Claims

19  will recognize gain, if any, to the extent (x) the sum of the issue price of the New Third Lien Loans

20  and the fair market value of the New CALC Common Stock exceeds (y) the holder's tax basis in

21  their Allowed Term Loan Claims, but in no event shall the recognized gain exceed the issue price of

22  the New Third Lien Loans.  If the exchange is a recapitalization and the New Third Lien Loans are

23  not treated as securities, a holder's tax basis in New CALC Common Stock (other than any such

24  stock received in respect of accrued interest) will be equal to that holder's tax basis in their Allowed

25  Term Loan Claim, increased by the amount of any gain recognized on the exchange and decreased

26  by the issue price of the New Third Lien Loans received, and the holder's tax basis in their New

27  Third Lien Loans will equal the issue price of those loans.  A holder's holding period for New

28  CALC Common stock received pursuant to the Plan (other than any such stock received in exchange

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-92-

1612527.3

for accrued interest) will include that person's holding period for the Allowed Term Loan Claims and their holding period for New Third Lien Loans will begin the day after the exchange.

If the receipt of New Third Lien Loans and New CALC Common Stock for Allowed Term Loan Claims is treated as a recapitalization and the New Third Lien Loans are treated as securities, a holder's total tax basis in New Third Lien Loans and New CALC Common Stock will equal the holder's basis in their Allowed Term Loan Claims, with such basis allocated between the New Third Lien Loans and New CALC Common Stock based on the relative fair market values of such instruments. A holder's holding period for New Third Lien Loans and New CALC Common Stock received in the exchange (other than any such instruments received in exchange for accrued interest) will include such holder's holding period for the Allowed Term Loan Claims surrendered in exchange therefor.

If the receipt of New Third Lien Loans and New CALC Common Stock in satisfaction of Allowed Term Loan Claims is not treated as a recapitalization because the existing claims are not securities, a holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the issue price of the New Third Lien Loans and the fair market value of New CALC Common Stock (other than any such loans or stock treated as paid in respect of accrued interest) less (y) the holder's tax basis in their existing claims. See below for a discussion of the determination of the issue price of the New Third Lien Loans. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the holder held their Allowed Term Loan Claims for more than one year. If the exchange is not treated as a recapitalization, a holder's tax basis in the New Third Lien Loans and New CALC Common Stock received pursuant to the exchange (other than any such loans or stock received in exchange for accrued interest) will be equal to the issue price of the New Third Lien Loans and fair market value of New CALC Common Stock received and the holding period for the New Third Lien Loans and New CALC Common Stock received (other than any new loans or stock received in exchange for accrued interest) will begin the day after the exchange.

1612527.3

1    A holder that acquired their Allowed Term Loan Claims subsequent to their original issuance

2    with more than a *de minimis* amount of market discount will be subject to the market discount rules

3    under the Code.  Under those rules, assuming that a holder has made no election to include market

4    discount in income on a current basis, any gain recognized on the exchange will be characterized as

5    ordinary income to the extent of the accrued market discount as of the date of the exchange.  If the

6    exchange of Allowed Term Loan Claims for New Third Lien Loans and New CALC Common

7    Stock is treated as a recapitalization, any accrued market discount remaining thereon which has not

8    been recognized as ordinary income should be carried over to the new instruments.  See below for a

9    discussion regarding the treatment of market discount.

10    **2.    Holders of Allowed General Unsecured Claims**

11    Each holder of an Allowed General Unsecured Claim will receive its share of the GUC Trust

12    Interests.  The GUC Trust is intended to qualify as a liquidating trust treated as a grantor trust for

13    U.S. federal income tax purposes.  As a result, a holder of an Allowed General Unsecured Claim

14    should be treated as receiving its share of assets of the GUC Trust, which will be cash received on

15    the Effective Date and additional cash payments from the Reorganized Debtors in the future, and

16    then as having transferred those assets to the GUC Trust in exchange for the GUC Trust Interests.

17    In general, each holder of an Allowed General Unsecured Claim will recognize gain or loss in an

18    amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its

19    Allowed General Unsecured Claim (other than any Allowed General Unsecured Claim for accrued

20    but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed General Unsecured Claim

21    (other than any Allowed General Unsecured Claim for accrued but unpaid interest).  For a

22    discussion of the tax consequences of claims for accrued interest, see [Section IX.B.4]

23    "Distributions in Discharge of Accrued Interest," below.

24    The "amount realized" by a holder generally will equal the holder's share of the amount of

25    any cash received by the GUC Trust.  Because certain payments to the GUC Trust are expected to

26    be received in a taxable year (or years) after the Effective Date, a holder of an Allowed General

27    Unsecured Claim may be able to report gain, if any, on their claim under the "installment method,"

28    which generally would allow deferral of gain attributable to payments to be received by the GUC

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

Trust from the Reorganized Debtors in a year after the year in which the Effective Date occurs, until the time those payments are received by the GUC Trust.  Similarly, due to the possibility of receiving additional payments in subsequent years, a holder of an Allowed General Unsecured Claim may be required to defer any loss with respect to their claim until all potential payments are received.

The characterization of gain or loss recognized by a holder of an Allowed General Unsecured Claim as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed General Unsecured Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Allowed General Unsecured Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.  A holder which purchased its Allowed General Unsecured Claim from a prior holder at a market discount may be subject to the market discount rules of the Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed General Unsecured Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed General Unsecured Claim as of the date of the exchange.

### 3. Holders of Allowed Convenience Claims

In general, each holder of an Allowed Convenience Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the tax consequences of Claims for accrued interest, see Section IX.B.4 "Distributions in Discharge of Accrued Interest," below.

The "amount realized" by a holder generally will equal the amount of any cash received.  The character of gain or loss recognized by a holder, as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-95-

the holder, whether the Allowed Convenience Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Allowed Convenience Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.  A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Convenience Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Convenience Claim as of the date of the exchange.

### 4.    Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  In general, to the extent that any amount received (whether new notes, stock, cash or other property) by a holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

**C.    Consequences of Holding New Second Lien Loans and New Third Lien Loans and New CALC Common Stock.**

### 1.    New Second Lien Loans.

If the "issue price" of the New Second Lien Loans is less than the "stated redemption price at maturity" by more than a *de minimis* amount (1/4 of 1 percent of a debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life, to the instrument's stated maturity), the New Second Lien Loans will be treated as having original issue discount ("OID").

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-96-

The issue price of debt instruments issued in a debt-for-debt exchange depends on whether a substantial amount of the debt instruments received or surrendered are treated as "traded on an established market" within the meaning of the applicable Treasury Regulations. Debt instruments are treated as "traded on an established market" if, among other things, the debt is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 or if price quotations are readily available from dealers, brokers or traders.  If neither the debt surrendered nor debt received in an exchange is treated as traded on an established market, the issue price of the debt received generally will equal the principal amount of the debt if the debt provides for adequate stated interest.

As noted above, if the New Second Lien Loans are treated as "traded on an established securities market," the issue price of the New Second Lien Loans would be  their fair market value on the date of the exchange. If the New Second Lien Loans are not so traded but the Allowed Prepetition Revolving Loan Claims surrendered in exchange therefor are, the issue price of the New Second Lien Loans would be equal to the fair market value of the Allowed Prepetition Revolving Loan Claims surrendered in exchange for the New Second Lien Loans.  If neither the New Second Lien Loans nor the Allowed Prepetition Revolving Loan Claims are treated as regularly traded, the issue price of the New Second Lien Loans will be their stated principal amount.  It is not believed that the Allowed Prepetition Revolving Loan Claims are regularly traded, nor is it expected that the New Second Lien Loans will be regularly traded.  As a result, , the issue price of the New Second Lien Loans received should equal its principal amount as long as the New Second Lien Loans provide for adequate stated interest.

The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of qualified stated interest.  "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest (or certain qualified floating rates) and the outstanding principal amount of the instrument, that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually.  All of the interest on the New Second Lien Loans should be treated as qualified stated interest.  As a result, the New Second Lien Loans would be treated as issued with OID only if their

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

1    issue price, determined in accordance with the preceding paragraph, is less that the face amount of

2    the New Second Lien Loans.

3        A holder of a note issued with OID must include such OID as ordinary interest income for

4    U.S. federal income tax purposes as it accrues under a constant yield method in advance of receipt

5    of the cash payments attributable to such income, regardless of such holder's regular method of tax

6    accounting and the timing or amount of any actual payments.  In general, the amount of OID

7    included in income by a holder of a note issued with OID is the sum of the daily portions of OID

8    with respect to the note for each day during the taxable year (or portion of the taxable year) on

9    which the holder held the note. The daily portion of OID on any note issued with OID is determined

10   by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual

11   period.  Accrual periods may be of any length and may vary in length over the term of the note,

12   provided that each accrual period is no longer than one year and each scheduled payment of

13   principal or interest occurs either on the final day or first day of an accrual period.  The amount of

14   OID allocable to each accrual period generally is equal to the difference between (i) the product of

15   the note's "adjusted issue price" at the beginning of the accrual period and the note's yield to

16   maturity (determined on the basis of compounding at the close of each accrual period and

17   appropriately adjusted to take into account the length of the particular accrual period) and (ii) the

18   amount of any qualified stated interest payments allocable to such accrual period.  The "adjusted

19   issue price" of a note issued with OID at the beginning of any accrual period is the sum of the issue

20   price of the note plus the amount of OID allocable to all prior accrual periods minus the amount of

21   any prior payments on the note that were not qualified stated interest payments.  Under these rules,

22   holders generally will have to include in taxable income increasingly greater amounts of OID in

23   successive accrual periods.

24       **2.**    **New Third Lien Loans**

25       The issue price of the New Third Lien Loans will be determined as described above in the

26   discussion of holding New Second Lien Loans and it is not believed that the Allowed Term Loan

27   Claims are regularly traded, nor is it expected that the New Third Lien Loans will be regularly

28   traded.  However, unlike the New Second Lien Loans, because interest on the New Third Lien

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   Loans is payable in kind, such interest will not be treated as qualified stated interest and, therefore,

2   such interest will be taken into account in determining the stated redemption price at maturity of the

3   New Third Lien Loans.  The New Third Lien Loans will, therefore, be treated as issued with OID.

4   See the above discussion of the tax consequences of holding a note issued with OID.

5

6   **3.     Acquisition Premium, Market Discount and Bond Premium With Respect to
        New Second Lien Loans and New Third Lien Loans**

7           If a holder has a tax basis in a New Second Lien Loan or New Third Lien Loan that is more

8   than the issue price of such loan but less than or equal to the stated redemption price at maturity of

9   such loan, such holder has acquisition premium with respect to such loan to the extent of that excess,

10  and the holder will not include OID to the extent of the acquisition premium.

11          A holder that has a tax basis in a New Second Lien Loan or New Third Lien Loan that is less

12  than the issue price of such loan will be subject to the market discount rules (unless the amount of

13  the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case

14  market discount is considered to be zero). If a holder elects to include market discount income

15  currently, once made, the election applies to all market discount obligations acquired in or after the

16  first taxable year to which the election applies and may not be revoked without the consent of the

17  IRS.  Absent such an election, a holder will be required to treat any principal payment on, or any

18  gain recognized on the sale, exchange, redemption, retirement or other disposition of a New Second

19  Lien Loan or New Third Lien Loan as ordinary income to the extent of any accrued market discount

20  that has not previously been included in income at the time of such payment or disposition.  In

21  addition, a holder may be required to defer, until the maturity date of the New Second Lien Loan or

22  New Third Lien Loan (as applicable) or the earlier disposition thereof, the deduction of all or a

23  portion of the interest expense on any indebtedness incurred to carry the New Second Lien Loan or

24  New Third Lien Loan.

25          As discussed above, if the exchange of an Allowed Revolver Loan Claim or Allowed Term

26  Loan Claim for Plan consideration is treated as a recapitalization, a holder who acquired its existing

27  Allowed Revolver Loan Claim or Allowed Term Loan Claim at a market discount may be required

28  to carry over to their New Second Lien Loans or New Third Lien Loans, as the case may be, any

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-99-

accrued market discount with respect to their existing claims to the extent that the accrued market discount was not previously included in income.  In that case, a holder holding such loans may have all or part of any market discount effectively converted into OID if the issue price of a New Second Lien Loan or New Third Lien Loan received is less than the stated redemption price at maturity of such loan.

If a holder has a tax basis in a New Second Lien Loan or New Third Lien Loan that exceeds such loan's stated redemption price at maturity, the New Second Lien Loan or New Third Lien Loan (as applicable) will have bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on the New Second Lien Loan or New Third Lien Loan (as applicable) in income.  A holder generally may elect to amortize the premium using the constant yield to maturity method as a reduction of the holder's non-OID interest income from the New Second Lien Loan or New Third Lien Loan.  Once made, the election to amortize premium on a constant yield to maturity method applies to all debt obligations held or subsequently acquired by the electing holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS.  Premium on a New Second Lien Loan or New Third Lien Loan held by a holder that does not make such election will decrease the gain or increase the loss otherwise recognized on the sale, exchange, redemption, retirement or other taxable disposition of a note.

A holder generally will recognize taxable gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a New Second Lien Loan or New Third Lien Loan in an amount equal to the difference between the amount realized upon such sale, exchange, redemption, retirement or other taxable disposition (reduced by any amounts attributable to accrued but unpaid qualified stated interest, which will be taxable as ordinary interest income) and such holder's adjusted tax basis in such loan. A holder's adjusted tax basis in a New Second Lien Loan or New Third Lien Loan generally will equal such holder's initial investment in such loan, (i) increased by the amount of any OID included in the holder's gross income with respect to the New Second Lien Loan or New Third Lien Loan (including any amounts of OID included in the holder's income as a result of the election to treat all interest as OID, as discussed above) and (ii) reduced by the amount

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-100-

1    of any payments received with respect to the New Second Lien Loan or New Third Lien Loan that

2    are not payments of qualified stated interest. Such gain or loss generally will be long-term capital

3    gain or loss if such loan is held for more than one year. Certain non-corporate holders (including

4    individuals) may be eligible for preferential tax rates in respect of long-term capital gain, which

5    rates currently are scheduled to increase on January 1, 2013. The deductibility of capital losses by

6    holders is subject to limitations.

7          **4.**     **New CALC Common Stock**

8         In addition to New Third Lien Loans, each holder that exchanges an Allowed Term Loan

9    Claim will receive New CALC Common Stock.  The gross amount of any distribution of cash or

10   other property made to a holder with respect to New CALC Common Stock generally will be

11   includible in the holder's gross income a dividend to the extent the distribution is paid out of the

12   Reorganized CALC's current or accumulated earnings and profits as determined under U.S. federal

13   income tax principles.  Cash distributions in excess of Reorganized CALC's earnings and profits

14   will be treated as a tax-free return of capital to the extent of the holder's adjusted tax basis in the

15   New CALC Common Stock, and thereafter as gain from the sale or exchange of a capital asset.  A

16   holder of New CALC Common Stock generally will recognize capital gain or loss upon the sale,

17   exchange, or other taxable disposition of the New CALC Common Stock in an amount equal to the

18   difference between (i) the amount realized by such holder and (ii) such holder's adjusted tax basis in

19   the New CALC Common Stock.  Any such gain or loss will be capital gain or loss and will be long-

20   term capital gain if the holder held the New CALC Common Stock for more than one year.

21   **D.**    **Information Reporting and Withholding**

22        All distributions to holders of Allowed Claims under the Plan are subject to any applicable

23   withholding (including employment tax withholding).  Under U.S. federal income tax law, interest,

24   dividends, and other reportable payments may, under certain circumstances, be subject to "backup

25   withholding," currently at a rate of 28%.  Backup withholding generally applies if the holder (a) fails

26   to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes

27   an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances,

28   fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**E.**    **U.S. Federal Income Tax Reporting of GUC Trust Assets Allocable to Disputed Claims**

Subject to definitive guidance from the IRS, or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if so requested, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee may (A) elect to treat any liquidating trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Reserves") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes.  Accordingly, the Trust Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their General Unsecured Claims as if distributed by the Debtors.  All parties (including, without limitation, the Debtors, the GUC Trustee, the GUC Trust Beneficiaries) will be required to report for U.S. federal income tax purposes consistent with the foregoing.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

1612527.3

## X.  RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Plan Proponents urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

DATED:  December _20. 2010

By: _____
            Raymond J. Pacini
            Chief Executive Officer
            California Coastal Communities, Inc.

1612527.3