# EXHIBIT A

**Proposed Changes to Disclosure Statement for Sixth Amended
Joint Plan of Reorganization Dated December 20, 2010**

# TABLE OF CONTENTS

**Page**

## TABLE OF CONTENTS CONT'D

I.      INTRODUCTION .................................................................... 1

    A.    Holders of Claims and Interests Entitled to Vote ...................... 2

    B.    Voting Procedures .................................................... 4

    C.    Confirmation Hearing ................................................. 5

II.    OVERVIEW OF THE PLAN ................................................... 7

III.    SUMMARY OF THE PLAN ................................................... 14

    A.    Unclassified Claims .................................................. 14

          1.    DIP Facility Claims .......................................... 14

          2.    Administrative Expense Claims ................................ 14

          3.    Compensation and Reimbursement Claims ....................... 15

          4.    Priority Tax Claims .......................................... 15

    B.    Classification and Treatment of Claims and Interests ................... 16

          1.    Classification Of Claims Against And Interests In CALC
(Class A) ................................................... 16

          2.    Classification Of Claims Against And Interests In
Reorganizing Subsidiary Debtors (Debtors 2 through 6). ......... 19

The following chart assigns a letter to each Class against the Reorganizing
    Subsidiary Debtors for purposes of identifying each separate Class: .......... 19

          3.    Classification Of Claims Against And Interests In Inactive
Debtors (Debtors 7 through 11) ................................ 24

    C.    Means for Implementation of the Plan. .............................. 26

          1.    Revesting of Assets .......................................... 26

          2.    Amended and Restated Articles of Incorporation & Amended
and Restated By-Laws ........................................ 27

          3.    Board of Directors/Management ................................ 27

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| | | | |
|---|---|---|---|
| | 4. | Dissolution of Inactive Debtors | 28 |
| | 5. | New First Lien Loans | 28 |
| | 6. | Issuance of New Securities | 28 |
| | 7. | Corporate Actions | 28 |
| | 8. | Sources of Cash for Plan Distributions | 29 |
| | 9. | Cancellation of Liens | 29 |
| | 10. | Cancellation of Existing Debt Instruments | 29 |
| | 11. | Equity Incentive Plan | 29 |
| | 12. | Luxor Settlement | 29 |
| | 13. | Surety Bonds | 31 |
| D. | | The GUC Trust | 31 |
| E. | | Treatment Of Executory Contracts And Unexpired Leases. | 33 |
| | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 33 |
| | 2. | Cure of Defaults in Connection with Assumption | 35 |
| | 3. | Bar Date for Rejection Damages | 35 |
| | 4. | Bar Date for Bankruptcy Code § 365(n) Election | 35 |
| F. | | Distributions And Procedures For Resolving Disputed Claims. | 36 |
| | 1. | Reorganized Debtors to Serve As Disbursing Agent | 36 |
| | 2. | Dates of Distributions | 36 |
| | 3. | Cash Distributions | 37 |
| | 4. | De Minimis Distributions | 37 |
| | 5. | Disputed Claims | 37 |
| | 6. | Distributions to Holders of Prepetition Revolver Claims and Prepetition Term Loan Claims | 38 |
| | 7. | Undeliverable and Unclaimed Distributions | 38 |
| | 8. | No Postpetition Interest on Prepetition Claims | 39 |

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

9.    Compliance with Tax Requirements .............................................. 39

10.    Objections to Claims ................................................................. 39

11.    Authority to Prosecute Objections ............................................... 40

12.    Estimation of Tax Claims .......................................................... 40

13.    Temporary or Permanent Resolution of Disputed Claims .............. 40

14.    Setoff ..................................................................................... 41

15.    Rights of Action ...................................................................... 41

16.    Payment of Certain Fee and Expense Claims ............................... 43

G.    Confirmation And Effectiveness Of The Plan. ........................................ 43

1.    Conditions to Confirmation ....................................................... 43

2.    Conditions to the Effective Date ................................................ 44

3.    Waiver of Conditions to the Confirmation or Effective Date .......... 45

4.    Effect of Nonoccurrence of Conditions to the Effective Date ......... 45

5.    Releases and Injunctions Under the Plan .................................... 45

IV.    DESCRIPTION OF THE DEBTORS' BUSINESS ......................................... 49

A.    The Debtors' Current and Future Homesites. ........................................ 50

B.    Homebuilding. .................................................................................. 52

C.    Management/Board of Directors. ......................................................... 52

D.    Summary of Prepetition Indebtedness and Prepetition Financing. ........... 53

1.    Prepetition Revolving Loan. ...................................................... 53

2.    Prepetition Term Loan. ............................................................. 54

3.    Model Home Financing. ............................................................ 55

4.    Other Project Debt. .................................................................. 55

V.    EVENTS PRECEDING THE COMMENCEMENT OF THE CASES ................. 57

VI.    EVENTS OCCURRING DURING THE REORGANIZATION CASES .............. 59

A.    First Day Motions. ........................................................................... 59

1612527.3

B.    Interim Orders Authorizing Use Of Cash Collateral. ...................................... 59

C.    Authorization To Continue To Sell Homes Free And Clear. .............................. 61

D.    Filing of Schedules of Assets and Statement of Financial Affairs and
      Claims Bar Date. ................................................................................................ 61

E.    Approval of Payment of Sales Commissions. .................................................... 61

F.    Retention of Professionals. ................................................................................ 61

G.    Sale of Quartz Hill Project. ............................................................................... 62

H.    Pension Plans. .................................................................................................... 62

I.    Change in Composition of the Prepetition Secured Lenders And
      Prepetition Agent. .............................................................................................. 63

J.    NASDAQ Delisting. .......................................................................................... 63

K.    Negotiation And Approval Of The Exit Facility Commitment Letter. .............. 64

L.    Settlement with Wilmington Trust and the Prepetition Secured
      Lenders. .............................................................................................................. 64

M.    The Debtors' Previous Plans. ............................................................................ 65

N.    DIP Financing and the Plan Support Agreement ............................................... 66

O.    Significant Claims Against The Estates And Pending Litigation. ..................... 67

      1.    Insurance Company of the West. ............................................................ 67

      2.    Brightwater Models, LLC. ..................................................................... 67

      3.    State Lands Commission/AERA Energy LLC. ...................................... 67

      4.    IndyMac Ventures, LLC. ........................................................................ 68

      5.    Department of Toxic Substances. ........................................................... 68

      6.    Pending Litigation. ................................................................................. 68

VII.  CERTAIN FACTORS TO CONSIDER  IN VOTING TO ACCEPT OR
      REJECT THE PLAN ............................................................................................ 70

      A.    The Homebuilding Industry Has Undergone A Significant And
            Sustained Downturn. .................................................................................. 70

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

B.    The Debtors' Strategies In Responding To The Adverse Conditions
In The Homebuilding Industry May Not Be Successful. .................................... 70

C.    The Reorganized Debtors will have Substantial Indebtedness. ......................... 71

D.    There are Risks Related to the New Credit Agreements ................................... 71

E.    Changes In Laws Or Other Events That Adversely Affect Liquidity
In The Secondary Mortgage Market Could Hurt The Debtors'
Business. ............................................................................................................. 72

F.    The Homebuilding Industry Is Highly Competitive And, With More
Limited Resources Than Many Of The Debtors' Competitors, The
Debtors May Not Be Able To Compete Effectively. .......................................... 72

G.    The Debtors' Business Is Cyclical And Downward Changes In
Economic Conditions Generally Or In The Market Regions Where
The Debtors Operate Could Further Decrease Demand And Pricing
For New Homes In These Areas. ......................................................................... 73

VIII.    VOTING PROCEDURES AND  CONFIRMATION OF THE PLAN ......................... 75

A.    General. ............................................................................................................... 75

B.    Voting Procedures and Requirements. ............................................................... 76

C.    Confirmation Hearing. ....................................................................................... 77

D.    Acceptance or Cramdown. ................................................................................. 77

E.    Best Interests Test; Liquidation Analysis. ......................................................... 78

F.    Feasibility ........................................................................................................... 81

G.    Compliance with Applicable Provisions of the Bankruptcy Code ..................... 83

H.    Retention of Jurisdiction .................................................................................... 83

IX.    CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF
CONSUMMATION OF THE PLAN ......................................................................... 87

A.    Consequences to the Debtors. ............................................................................ 88

1.    Cancellation of Debt ............................................................................... 88

2.    Limitation on Losses Following an Ownership Change ........................... 89

3.    Alternative Minimum Tax ........................................................................ 89

B.    Consequences to Holders of Certain Claims. ..................................................... 90

1612527.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1.    Holders of Allowed Revolver Loan Claims and Allowed
      Term Loan Claims ................................................................................ 90

2.    Holders of Allowed General Unsecured Claims ............................... 94

3.    Holders of Allowed Convenience Claims ......................................... 95

4.    Distributions in Discharge of Accrued Interest .............................. 96

C.    Consequences of Holding New Second Lien Loans and New Third
      Lien Loans and New CALC Common Stock. ..................................... 96

1.    New Second Lien Loans. ..................................................................... 96

2.    New Third Lien Loans ........................................................................ 98

3.    Acquisition Premium, Market Discount and Bond Premium
      With Respect to New Second Lien Loans and New Third
      Lien Loans ............................................................................................ 99

4.    New CALC Common Stock ............................................................... 101

D.    Information Reporting and Withholding ......................................... 101

E.    U.S. Federal Income Tax Reporting of GUC Trust Assets Allocable
      to Disputed Claims ............................................................................. 102

X.    RECOMMENDATION AND CONCLUSION ................................................ 103

EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A – Plan

Exhibit B – Plan Support Agreement

Exhibit C – Selected Historical Financial Information

Exhibit D – Projections

Exhibit E – Liquidation Analysis

1612527.3

The Disclosure Statement Order sets forth deadlines for voting to accept or reject the Plan and concerning procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes.  A Ballot[1] for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a holder of Claims or interests who are entitled to vote to accept or reject the Plan.  In addition, voting instructions accompany each Ballot.

Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting to accept or reject the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- Plan Support Agreement dated ~~December~~January __, ~~2010~~2011 (Exhibit B);

- Selected historical financial information for CALC for 2009 and 2010 (Exhibit C);

- The Debtors' Financial Projections (the "Projections") (Exhibit D); and

- Analysis of the potential results of a liquidation of the Debtors' assets conducted in cases under chapter 7 of the Bankruptcy Code (Exhibit E)

**A.    Holders of Claims and Interests Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests in classes of Claims or Interests that are impaired under a chapter 11 plan are entitled to vote to accept or reject the Plan.  Classes of Claims or Interests in which the holders of Claims or Interests will not receive or retain any property under a chapter 11 plan are conclusively deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  Classes of Claims or

---

[1] Capitalized terms not defined herein have the meaning attributed to them in the Plan.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## II.    OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.  The "recoveries" set forth below are projected recoveries only and may change based on factors related to the Debtors' business operations and general economic conditions.  For a description of certain risks associated with the recoveries provided under the Plan, see Section VII, "Certain Factors To Consider in Voting to Accept or Reject the Plan."

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 1A<br><br>Revolver Loan Claims against CALC<br><br>Impaired | $81.7 million | Holders of Revolver Loan Claims shall receive an equal amount of New Second Lien Loans. | 100% |
| Class 1B<br><br>Term Loan Claims against CALC<br><br>Impaired | $99.8 million | Holders of Term Loan Claims shall receive a pro rata share of New Third Lien Loans, which shall have a principal amount of $44,000,000, and 100% of the New CALC Common Stock. | TBD |
| Class 1D<br><br>Other Secured Claims against CALC<br><br>Unimpaired | $0 | Proceeds from the sale of its collateral, distribution of the collateral, or reinstatement of its Claim. | 100% |
| Class 1E<br><br>Other Priority Claims against CALC<br><br>Unimpaired | $22,000 | Payment in full in Cash. | 100% |
| Class 1F<br><br>Employee PTO Claims against CALC<br><br>Unimpaired | $ 125 ,000 | Reinstated. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 1G<br><br>Convenience Claims against CALC<br><br>Impaired | $~~—~~50,000 | Unsecured claims in an amount up to $10,000 shall receive payment in full in Cash on the Effective Date. | 100% |
| Class 1H<br><br>General Unsecured Claims against CALC<br><br>Impaired | $~~138,000~~6 million - $~~1,000,000~~ 10 million | Interests in the GUC Trust, which shall be funded with an aggregate amount of contributions from the Reorganized Debtors equal to $1,000,000 or $2,000,000 ~~or $3,000,000~~ in the event that Classes 1H through 6H vote to accept the Plan. | ~~10%~~ - ~~30%~~ |
| Class 1J<br><br>Intercompany Claims against CALC<br><br>Impaired | $47.8 million | There shall be no distributions on account of Intercompany Claims against CALC. | 0% |
| Class 1K<br><br>Interests in CALC<br><br>Impaired | N/A | On the Effective Date, all existing Interests in CALC shall be canceled. | 0% |
| Classes 2B through 6B<br><br>Revolver Loan Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $81.7 million | Revolver Loan Claims in these Classes shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A. | 100% |
| Classes 2B through 6B<br><br>Term Loan Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $99.8 million | Deemed satisfied as a result of the payment of Cash on the Effective Date provided to the holders of Allowed Prepetition Term Loan Claims in Class A-2. | TBD |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Class 6C<br><br>IndyMac Secured Claim<br><br>Impaired | $0 | Cash as may be required to be paid pursuant to section 506(b) of the Bankruptcy Code. | 100% |
| Classes 2D through 6D<br><br>Other Secured Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Proceeds from the sale of its collateral, distribution of the collateral, or reinstatement of its Claim. | 100% |
| Classes 2E through 6E<br><br>Other Priority Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Payment in full in Cash. | 100% |
| Classes 2F through 6F<br><br>Employee PTO Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $281,000 | Reinstated. | 100% |
| Classes 2G through 6G<br><br>Convenience Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $200,000 | Unsecured claims in an amount up to $10,000 shall receive payment in full in Cash on the Effective Date. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

| Description of Claims and Interests | Est. Allowed Amt. | Treatment | Recovery |
|---|---|---|---|
| Classes 2H through 6H<br><br>General Unsecured Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $0~~6 million - $10 million~~ | Interests in the GUC Trust, which shall be funded with an aggregate amount of contributions from the Reorganized Debtors equal to $~~1,000,000 or $~~2,000,000 ~~or $3,000,000~~ in the event that Classes 1H through 6H vote to accept the Plan. | ~~10%~~ -~~30~~% |
| Classes 4I through 6I<br><br>Homeowner Warranty Claims against Reorganizing Subsidiary Debtors<br><br>Unimpaired | $0 | Reinstated. | 100% |
| Class 2J through 6J<br><br>Intercompany Claims against Reorganizing Subsidiary Debtors<br><br>Impaired | $~~—~~N/A | There shall be no distributions on account of Intercompany Claims against Reorganizing Subsidiary Debtors. | 0% |
| Classes 2K through 6K<br><br>Interests in Reorganizing Subsidiary Debtors<br><br>Unimpaired | N/A | Holders of Interests in Reorganizing Subsidiary Debtors shall retain such Interests. | 100% |
| Classes 7A through 11A<br><br>Revolver Loan Claims against Inactive Debtors<br><br>Impaired | $81.7 million | Revolver Loan Claims in these Classes shall be deemed satisfied as a result of the distributions on the Effective Date provided to the holders of Allowed Revolver Loan Claims in Class 1A. | 100% |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

qualify as a liquidating trust pursuant to Regulations section 301.7701-4(d).  Except as expressly provided in Section 5.14 of the Plan and the GUC Trust Agreement with respect to the GUC Trust Contributions, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the GUC Trust.  The GUC Trust Agreement shall be substantially in the form of Exhibit 7.11.1 attached to the Plan and will be filed prior to the Confirmation Hearing.

On the Effective Date, the Reorganized Debtors shall fund the GUC Trust with a grant of $250,000 plus the first Quarterly Contribution.  The GUC Trust Agreement shall provide that the Reorganized Debtors shall fund the GUC Trust with eight Quarterly Contributions.  The Quarterly Contribution shall be an amount of Cash equal to the Aggregate GUC Trust Contribution divided by eight (8).  The Aggregate Trust Contribution shall be an amount equal to at least $~~————,~~1,000,000, provided however, that if Classes 1H through 6H vote to accept the Plan, the Aggregate Trust contribution shall be increased to $~~————,~~2,000,000.  To the extent that a Disputed General Unsecured Claim is settled or litigated by the Debtors, Reorganized Debtors, or the GUC Trustee such that such Disputed General Unsecured Claim is Allowed as something other than an Allowed General Unsecured Claim (for instance, as an Allowed Other Priority Claim) then the GUC Trust Assets that would otherwise have been distributed on account of such Disputed General Unsecured Claim, as if it had been Allowed in full, shall be distributed to Reorganized CALC (the amount of such distribution right, the "RC Distribution Amount"); provided, however, that the Reorganized Debtors will be entitled to setoff an amount that is no greater than the RC Distribution Amount against their obligations to make the Aggregate GUC Trust Contribution..

The GUC Trust shall be managed and operated by the GUC Trustee.  No other GUC Trust Beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the GUC Trust.

The responsibilities of the GUC Trustee shall include, but shall not be limited to:  (a) objecting to the allowance of General Unsecured Claims through judgment and/or settlement, including the assertion of any defense, counterclaim or cross claim; (b) at least annually, calculating and making distributions required under the Plan to be made from the GUC Trust Assets; (c) filing all required tax returns, and paying obligations on behalf of the GUC Trust from the GUC Trust

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

- The Disclosure Statement Order has been entered by the Bankruptcy Court in a form reasonably acceptable to the Plan Proponents.

- The Plan is reasonably acceptable in form and substance to the Plan Proponents and the Requisite Consenting Lenders.

- The Confirmation Order is reasonably acceptable in form and substance to the Plan Proponents and the Requisite Consenting Lenders.

- All Plan Documents are in form and substance reasonably satisfactory to the Plan Proponents and the Requisite Consenting Lender.

- Luxor has not exercised Luxor's Termination Right pursuant to Section 15.2 of the Plan and the Confirmation Order authorizes and approves the Luxor Settlement.

- The Bankruptcy Court shall have determined that termination of the Pension Plan is necessary for the Debtors to successfully emerge from chapter 11 in accordance with section 4041(c) of ERISA.

2.    **Conditions to the Effective Date**

Subject to <u>Section 15.2</u> of the Plan in all respects, the Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section ~~10.3~~<u>11.3</u> of the Plan:

- The Confirmation Order has been entered in a form reasonably acceptable to the Plan Proponents and the Requisite Consenting Lenders, has not been reversed, stayed, modified or amended.

- The Confirmation Order shall authorize the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including consummation of the transactions contemplated by the Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreement or documents generated in connection with the Plan.

- The Plan shall not have been amended, altered or modified from the Plan as confirmed, in any material respect, unless such amendment, alteration or modification has been consented to in accordance with Section 15.1 of the Plan, and all definitive documentation relating to the Plan and the transactions contemplated thereby, and all other documents material to the consummation of the transactions contemplated under the Plan shall be in a form reasonably acceptable to the Plan Proponents and the Requisite Consenting Lenders.

- All conditions to the New Credit Agreements, other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived pursuant to the terms thereof;

- All conditions to Confirmation shall have been satisfied or waived in accordance with Section 11.3 of the Plan; provided that, anything to the contrary contained herein notwithstanding, the condition to Confirmation contained in Section 11.1.5 of the Plan cannot be waived without the unanimous written consent of the Debtors and the Consenting Lenders.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  their share of remediation expenses may range from $100,000 to over $1,000,000. State Lands filed

2  an unsecured claim against CALC and Signal Landmark in the estimated amount of $2.5 million.

3  AERA Energy, LLC, which has been performing the environmental remediation work for State

4  Lands, has also filed a claim in the amount of approximately $2.2 million.

5  **4.    IndyMac Ventures, LLC.**

6  IndyMac Ventures, LLC asserted a secured claim against HHI Lancaster I, LLC in the

7  amount of $2,926,391.63 based upon a loan agreement between HHI Lancaster I, LLC and IndyMac

8  Bank FSB dated as of November 23, 2005. IndyMac Ventures, LLC, as successor to IndyMac Bank

9  FSB with respect to the Lancaster Loan, asserted a security interest in real property owned by HHI

10  Lancaster I, LLC located in Lancaster, California commonly referred to as Quartz Hill. As

11  discussed above, on December 17, 2009, the Court approved the sale of the Quartz Hill property,

12  and other assets, to Richmond American Homes, Inc. for $3.1 million. Pursuant to the sale order,

13  $2,552,163.10 was paid to IndyMac Ventures, LLC at the closing of the sale to Richmond American

14  Homes. IndyMac Ventures asserts a lien against the remaining proceeds of the sale. The Debtors

15  dispute that IndyMac Ventures had a perfected security interest in all of the property that was sold to

16  Richmond American Homes and estimate IndyMac Ventures' remaining secured claim to be

17  between $100,000 and $400,000.

18  **5.    Department of Toxic Substances.**

19  On November 8, 2010, the Department of Toxic Substances ("DTSC") obtained a default

20  judgment in the amount of $1,152,895 against non-debtor Hearthside Residential Corp. Prior to

21  obtaining the judgment against Hearthside Residential Corp., DTSC filed proofs of unsecured

22  claims against Signal Landmark Holdings, Inc., Signal Landmark, and Hearthside Homes, Inc. in the

23  amount of $1,152,895, asserting that those Debtors were liable to DTSC based upon an alter ego

24  theory of liability with non-debtor Hearthside Residential Corp. The Debtors dispute the merits of

25  DTSC's claim against the estates.

26  **6.    ~~5.~~ Pending Litigation.**

27  In *Continental Insurance Co., et al. v. Honeywell International, Inc. et al.*, Superior Court of

28  Morris County New Jersey, Case No. MRS-133-04, CALC is named as a cross-defendant for claims

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

**INTERESTS UNDER A CHAPTER 7 LIQUIDATION COULD BE MATERIALLY GREATER OR LESSER THAN AS SET FORTH IN EXHIBIT E.**

As noted above, the Plan Proponents believe that chapter 7 liquidation could result in substantial litigation that could delay the liquidation beyond the periods assumed in Exhibit E.  This delay could materially reduce the amount determined on a present value basis available for distribution to creditors, including holders of Unsecured Claims in Classes 1H through 6H.  Moreover, the Plan Proponents believe that such litigation and attendant delay could adversely affect the values realizable in the sale of the Debtors' assets to an extent that cannot be reliably estimated at this time.

Based on the liquidation analysis set forth in Exhibit E, although no assurance can be given, the Plan Proponents believe that holders of Claims and Interests will receive value, as of the Effective Date, at equal to or greater value under the Plan than such holders would receive under a chapter 7 liquidation.

In actual liquidations of the Debtors, distributions to holders of Claims would be made substantially later than the Effective Date assumed in connection with the Plan.  This delay would materially reduce the amount determined on a present value basis available for distribution to creditors.  The hypothetical chapter 7 liquidation of the Debtors is assumed to commence on January ⸺3, 2011 and to be completed within 180 days thereafter.  The Liquidation Analysis assumes the distributions are made by the chapter 7 trustee beginning immediately following commencement of the liquidation and completed within 180 days of commencement.  As a result, the Plan Proponents believe the value of the liquidation distributions on a present value basis determined as of the projected Effective Date would be less than the value distributable under the Plan.

The Plan Proponents further believe that chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by holders of Claims and Interests, as compared to the proposed distributions under the Plan, because of, among other factors:

a.    the failure to realize the maximum going concern value of the Debtors' assets;

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1612527.3

# X.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Plan Proponents urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

DATED:  December –20. 2010

By:_____
Raymond J. Pacini
Chief Executive Officer
California Coastal Communities, Inc.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-103-

1612527.3

# EXHIBIT B

**Proposed Changes to Sixth Amended Joint Plan of
Reorganization Dated December 20, 2010**

The Debtors hereby propose the following Plan of Reorganization pursuant to chapter 11 of the Bankruptcy Code:

## INTRODUCTION

The Plan defines the Debtors' financial structure from and after the Effective Date, including the ownership Interests in the Reorganized Debtors.  Among other things, the Plan designates Classes of Claims and Classes of Interests, identifies each Class of Claim or Interest as Unimpaired or impaired, provides for the treatment of all Claims against and Interests in the Debtors, and provides adequate means for the implementation of the Plan.

A separate document, entitled the "Debtors' Sixth Amended Disclosure Statement in Support of Sixth Amended Plan of Reorganization Dated December [20,] 2010" (the **"Disclosure Statement"**), accompanies the Plan.  The Disclosure Statement is intended to provide you with information sufficient to enable you to determine whether to vote for or against the Plan.  The Disclosure Statement includes a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Plan.  Along with the Plan and the Disclosure Statement, Holders of Claims and Interests entitled to vote on the Plan will receive a Ballot for voting on the Plan.

The Debtors strongly recommend that you review thoroughly both the Plan and Disclosure Statement before deciding whether you will accept or reject the Plan.

## ARTICLE I

### DEFINITIONS AND CONSTRUCTION OF TERMS

1.1     Definitions.  As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.1.1     **"Administrative Expense Claim"** means any Claim alleged to have priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of a Debtor, any actual and necessary expenses of operating the business of the Debtors, all compensation and

1612323.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  authorize and approve the compromise and settlement of all Commitment Letter Released

2  Claims pursuant to the Luxor Settlement.  Entry of the Confirmation Order shall constitute the

3  Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Luxor Settlement and

4  the Bankruptcy Court's finding that the Luxor Settlement is in the best interests of the Debtors,

5  the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and

6  is fair, equitable and reasonable.

7       5.13    <u>Surety Bonds</u>.  The Debtors require and the Reorganized Debtors will require for

8  their operations to maintain certain surety bonds issued on their behalf by ICW.  In consideration of

9  the terms of the Plan and in consideration of the Debtors affirming their obligations to ICW under

10  the terms of the agreements of indemnity between ICW and the Debtors, which obligations will

11  become obligations of the Reorganized Debtors under the Plan, ICW will keep its bonds in effect

12  after the Effective Date and on behalf of the Reorganized Debtors subject to the terms of the

13  indemnity agreement and underwriting practices.

14       5.14    <u>Funding of GUC Trust</u>.  The GUC Trust Agreement shall provide that the

15  Reorganized Debtors shall fund the GUC Trust with eight Quarterly Contributions and a grant of

16  $250,000 to fund expenses of administering the GUC Trust.  On the Effective Date, the Reorganized

17  Debtors shall fund the GUC Trust with a grant of $250,000 plus the first Quarterly Contribution.

18  The second Quarterly Contribution shall be made on the 90th day following the first Quarterly

19  Contribution and each subsequent Quarterly Contribution shall be made every 90 days thereafter

20  until the eighth and final Quarterly Contribution has been made.  The "Quarterly Contribution" shall

21  be an amount of Cash equal to the Aggregate GUC Trust Contribution divided by eight (8).  The

22  "**Aggregate GUC Trust Contribution**" shall mean an amount equal to $~~————~~1,000,000,

23  provided <u>however</u>, that if Classes 1H through 6H vote to accept the Plan, the Aggregate Trust

24  contribution shall be increased to $~~————~~2,000,000.  To the extent that a Disputed General

25  Unsecured Claim is settled or litigated by the Debtors, Reorganized Debtors, or the GUC Trustee

26  such that such Disputed General Unsecured Claim is Allowed as something other than an Allowed

27  General Unsecured Claim (for instance, as an Allowed Other Priority Claim) then the GUC Trust

28  Assets that would otherwise have been distributed on account of such Disputed General Unsecured

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# EXHIBIT C

**Exhibit C to Disclosure Statement
Historical Financial Information**

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Balance Sheets

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| | ($ in millions) | | |
| **Assets** | | | |
| Cash and Cash Equivalents | $ 8.9 | $ 2.3 | $ 24.3 |
| Restricted Cash | 0.8 | 5.4 | 6.0 |
| Real Estate Inventories | 235.4 | 260.7 | 286.4 |
| Deferred Tax Assets | - | 37.1 | 44.4 |
| Other Assets, net | 4.8 | 7.0 | 6.5 |
| **Total Assets** | **$ 249.9** | **$ 312.5** | **$ 367.6** |
| | | | |
| **Liabilities and Stockholders' Equity** | | | |
| **Liabilities:** | | | |
| Accounts Payable and Accrued Liabilities | $ 3.8 | $ 5.0 | $ 12.5 |
| Model Home Financing | 22.5 | 22.5 | - |
| Revolving Loan | 81.7 | 74.4 | 76.0 |
| Term Loan | 99.8 | 107.4 | 121.8 |
| Other Project Debt | - | 38.9 | 48.8 |
| Other Liabilities | 8.7 | 8.8 | 7.0 |
| **Total Liabilities** | **$ 216.5** | **$ 257.0** | **$ 266.1** |
| | | | |
| **Commitments and Contingencies** | | | |
| **Stockholders' Equity:** | | | |
| Common Stock - $0.05 par value; 13,500,000 shares authorized; 10,995,902 shares issued and outstanding, respectively | $ 0.5 | $ 0.5 | $ 0.5 |
| Excess Stock - $0.05 par value; 13,500,000 shares authorized; no shares outstanding | - | - | - |
| Additional Paid-In Capital | 59.5 | 59.4 | 59.3 |
| Accumulated Deficit | (24.0) | (1.6) | 43.1 |
| Accumulated Other Comprehensive Loss | (2.6) | (2.8) | (1.4) |
| **Total Stockholders' Equity** | **$ 33.4** | **$ 55.5** | **$ 101.5** |
| | | | |
| **Total Liabilities and Stockholders' Equity** | **$ 249.9** | **$ 312.5** | **$ 367.6** |

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Statement of Operations
and Comprehensive Loss

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| | ($ in millions, except per share amounts) | | |
| **Revenues:** | | | |
| Homebuilding | $ 42.3 | $ 46.0 | $ 47.0 |
| Lot Sales | 4.9 | - | - |
| **Total Revenues** | **$ 47.2** | **$ 46.0** | **$ 47.0** |
| **Cost of Sales:** | | | |
| Homebuilding | 33.4 | 33.7 | 41.1 |
| Lot Sales | 4.3 | - | - |
| Loss on Impairment of Real Estate Inventories | 11.7 | 35.0 | 32.0 |
| **Total Cost of Sales** | **$ 49.4** | **$ 68.7** | **$ 73.1** |
| **Gross Operating Loss** | **$ (2.2)** | **$ (22.7)** | **$ (26.1)** |
| Selling, General and Administrative Expenses | 4.9 | 6.6 | 5.9 |
| Reorganization Costs | 1.3 | - | - |
| Interest Expense | 0.8 | 1.0 | 0.1 |
| Gains on Debt Restructuring and Extinguishment | (24.8) | - | - |
| Loss (income) from Unconsolidated Joint Ventures | - | 3.5 | (0.6) |
| Other Expense, net | 2.0 | 2.6 | 0.4 |
| **Income (loss) Before Income Taxes** | **$ 13.6** | **$ (36.4)** | **$ (31.9)** |
| Provision (benefit) for Income Taxes | 36.0 | 8.3 | (13.0) |
| **Net Loss** | **$ (22.4)** | **$ (44.7)** | **$ (18.9)** |
| Other Comprehensive Income (loss), net of Income Taxes: | | | |
| Minimum Pension Liability Adjustment | 0.2 | (1.4) | 0.1 |
| **Comprehensive Loss** | **$ (22.2)** | **$ (46.1)** | **$ (18.8)** |
| Net Loss per Common Share: | | | |
| Basic and Diluted | $ (2.04) | $ (4.10) | $ (1.73) |
| Common Equivalent Shares: | | | |
| Basic and Diluted | $ 11.00 | $ 10.90 | $ 10.90 |
| Special Dividend Paid per Common Share Outstanding | - | - | - |

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Statement of Cash Flows

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| | ($ in millions) | | |
| Cash Flows from Operating Activities: | | | |
| Net Loss | $ (22.4) | $ (44.7) | $ (18.9) |
| Adjustments to Reconcile Net Income to Cash Used in Operating Activities: | | | |
| Gains on Debt Restructuring and Extinguishment | (24.8) | - | - |
| Equity in Loss (earnings) of Unconsolidated Joint Ventures | - | 3.0 | (0.6) |
| Model Homes Depreciation | 0.3 | 0.7 | - |
| Deferred Taxes | 4.9 | (15.0) | (13.0) |
| Deferred Tax Asset Valuation Allowance | 31.1 | 23.2 | - |
| Gains on Sales of Real Estate Inventories | (9.5) | (12.3) | (5.9) |
| Loss on Impairment of Real Estate Inventories | 11.7 | 35.0 | 32.0 |
| Proceeds from Sale of Real Estate Inventories, net | 45.7 | 44.8 | 45.2 |
| Investments in Real Estate Inventories | (26.9) | (40.9) | (91.8) |
| Non-Cash Reorganization Items | 0.4 | - | - |
| Other | 0.1 | - | 0.5 |
| Changes in Operating Assets and Liabilities: | | | |
| Decrease (increase) in Other Assets | 1.4 | (1.4) | 0.9 |
| Increase (decrease) in Accounts Payable, Accrued and Other Liabilities | 0.3 | (7.8) | (1.5) |
| **Cash Provided by (used in) Operating Activities** | **$ 12.3** | **$ (15.4)** | **$ (53.1)** |
| Cash Flows from Investing Activities: | | | |
| Sales of Short-Term Investments | - | - | 0.5 |
| Investments in Unconsolidated Joint Ventures | - | (0.4) | (0.4) |
| Change in Restricted Cash | 2.9 | 0.6 | 8.6 |
| **Cash Provided by Investing Activities** | **$ 2.9** | **$ 0.2** | **$ 8.7** |
| Cash Flows from Financing Activities: | | | |
| Borrowings of Revolving Loan | 26.5 | 45.3 | 69.7 |
| Repayments of Revolving Loan | (19.2) | (46.9) | (12.0) |
| Repayments of Term Loan | (7.6) | (14.4) | (3.2) |
| Borrowings of Other Project Debt | - | 1.1 | 24.0 |
| Repayments of Other Project Debt | (8.1) | (11.0) | (20.1) |
| Proceeds from Model Home Financing | - | 22.5 | - |
| Deferred Financing Costs | (0.2) | (3.4) | (0.3) |
| **Cash Provided by (used in) Financing Activities** | **$ (8.6)** | **$ (6.8)** | **$ 58.1** |
| **Net Increase (decrease) in Cash and Cash Equivalents** | **$ 6.6** | **$ (22.0)** | **$ 13.7** |
| Cash and Cash Equivalents - Beginning of Year | 2.3 | 24.3 | 10.6 |
| **Cash and Cash Equivalents - End of Year** | **$ 8.9** | **$ 2.3** | **$ 24.3** |
| Supplemental Disclosures of Cash Flow Information: | | | |
| Cash Paid During the Period for Income Taxes, net of Refunds Received | $ 0.1 | - | $ 0.2 |
| Cash Paid During the Period for Reorganization Items | 0.9 | - | - |
| Supplemental Disclosures of Non-Cash Investing and Financing Activities: | | | |
| Minimum pension liability adjustment recorded as other comprehensive (loss) income, net of income tax (benefit) expense of $0.2 million, $(0.9) million, and $0.0 respectively | $ 0.2 | $ (1.4) | $ 0.1 |
| Amortization of Deferred Financing Costs Capitalized in Real Estate Inventories | 2.2 | 1.6 | 0.9 |
| Decrease in Project Debt and Accrued Liabilities due to Debt Restructuring | 32.8 | - | - |

# EXHIBIT D

## Exhibit D to Disclosure Statement
## Projections

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

**Summary of Projected Cash Flows for
the Reorganized Debtors**

| *($ in millions, except home deliveries)* | **2011** | **2012** | **2013** | **2014** | **2015** | **5 - Year Total** |
|---|---|---|---|---|---|---|
| <u>Brightwater</u> | | | | | | |
| *Homes Deliveries* | *33* | *50* | *75* | *70* | *27* | *255* |
| Revenue | $ 34.3 | $ 67.9 | $ 116.4 | $ 131.7 | $ 61.5 | $ 411.9 |
| Cash Costs | (16.3) | (26.5) | (40.8) | (43.1) | (14.7) | (141.3) |
|   Brightwater Project Cash Flow | $ 17.9 | $ 41.5 | $ 75.6 | $ 88.6 | $ 46.9 | $ 270.5 |
| <u>Model Home Sales</u> | | | | | | |
| *Homes Deliveries* | - | *4* | *4* | - | *9* | *17* |
|   Model Home net Cash Flow to Calc | - | - | - | - | $ 8.2 | $ 8.2 |
| <u>The Ridge</u> | | | | | | |
| *Homes Deliveries* | - | - | - | - | *22* | *22* |
| Revenue | - | - | - | - | $ 41.0 | $ 41.0 |
| Cash Costs | (0.2) | (0.1) | (0.1) | - | (20.6) | (21.0) |
|   Ridge Project Cash Flow | $ (0.2) | $ (0.1) | $ (0.1) | - | $ 20.4 | $ 20.0 |
| <u>Lancaster</u> | | | | | | |
| *Homes Deliveries* | - | - | *15* | *29* | *29* | *73* |
| Revenue | - | - | $ 4.0 | $ 8.2 | $ 8.6 | $ 20.8 |
| Cash Costs | (0.0) | (0.9) | (6.5) | (5.7) | (2.6) | (15.7) |
|   Lancaster Project Cash Flow | $ (0.0) | $ (0.9) | $ (2.4) | $ 2.5 | $ 6.0 | $ 5.1 |
| **Total Project-Level Cash Flow** | **$17.7** | **$40.5** | **$73.1** | **$91.1** | **$81.5** | **$303.9** |
| (-) Corporate Expenses | ($2.8) | ($2.9) | ($2.8) | ($2.8) | ($1.4) | ($12.7) |
| (-) Cash Restructuring Expenses | (7.6) | (1.0) | - | - | - | (8.6) |
| (-) Cash Interest Expense | (9.3) | (8.3) | (4.3) | - | - | (21.9) |
| (-) Cash Income Taxes | - | (1.5) | (3.7) | (4.0) | (8.3) | (17.5) |
| **Cash Available for Debt Repayment** | **($2.0)** | **$26.8** | **$62.4** | **$84.2** | **$71.8** | **$243.2** |
| (-) Debt Borrowings/(Repayments)[1] | 13.8 | (26.8) | (62.4) | (80.6) | - | (155.9) |
| Total Change in Cash | $11.8 | $0.0 | $0.0 | $3.6 | $71.8 | $87.3 |
| Beginning Cash Balance | $ 3.2 | $ 15.0 | $ 15.0 | $ 15.0 | $ 18.6 | $ 3.2 |
| Change in Cash | 11.8 | - | - | 3.6 | 71.8 | 87.3 |
|   **Ending Cash Balance** | **$ 15.0** | **$ 15.0** | **$ 15.0** | **$ 18.6** | **$ 90.4** | **$ 90.4** |
| **End of Year Debt Balances** | | | | | | |
| 1st Lien | $13.8 | - | - | - | - | - |
| 2nd Lien | 82.7 | 69.7 | 7.4 | - | - | - |
| 3rd Lien | 49.8 | 57.6 | 66.8 | - | - | - |
|   **Total Debt Balance** | **$ 146.2** | **$ 127.4** | **$ 74.2** | **-** | **-** | **-** |

(1) Includes repayment of accrued PIK interest

## Notes to Projected Financial Statements

**Projections and Methodology**

1. *Projection Period.*  The financial projections (the "Projections") were prepared by management for the fiscal years 2011 though 2015 (the "Projection Period").  The Debtors and their inactive non-debtor subsidiaries (the "Company") operate on a fiscal year ending December 31st.

2. *Methodology.* Management has developed Projections for the Debtors' continued business operations upon emergence from chapter 11 through the fiscal year ending December 31, 2015.  The Projections were prepared by management based upon a number of assumptions with regards to the future performance of the Debtors and the residential real estate market in which the Debtors operate.  Management prepared the Projections in good faith, and based upon management's extensive operating experience, believes the assumptions are reasonable; it is important to note that such Projections may not be realized as they are dependent upon a number of external market factors beyond management's control.  The Projections should be reviewed in conjunction with these assumptions in addition to the qualifications and footnotes set forth herein.

   As referenced in the Disclosure Statement, the Projections were not prepared by the Plan proponents with a view toward compliance with the guidelines established by The American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the SEC regarding projections.  Furthermore, the Projections have not been audited by the Debtors' independent accountants.  Rather, the Projections reflect the forecasted cash flows of the business as such receipts and disbursements are projected to be realized by the Company.

**Key Assumptions**

1. *Plan Consummation*.   The Projections assume the Plan will be confirmed and consummated and that the Debtors will emerge from chapter 11 on or about March 1, 2011.

2. *Macroeconomic and Housing Market Conditions*. The Projections assume a steadily improving macroeconomic environment, as well as a stabilizing and improving residential housing market.  The Projections include material increases in the pace of home deliveries and in home price inflation over the 5-year forecast at the Company's projects.

3. *Brightwater.* Currently Brightwater is the only Company project with homes available for delivery.   The Projections contemplate that post emergence the reorganized Debtors will continue to sell the remaining Brightwater project homes in inventory.  Additionally, the Debtors will resume construction operations on speculative homes in order to replenish and increase the inventory of homes available for sale.  The Projections assume 33 Brightwater home deliveries in 2011, reflecting a return to the levels experienced by the Debtors prior to their chapter 11 filings in 2009.  The Debtors assume that emergence from chapter 11 will result in renewed home buyer interest in the Brightwater project.   The Projections assume home deliveries will reach a peak of 75 homes in fiscal year 2013, gradually decreasing until a sell-out of the Brightwater project in 2015.

   The Company's lower-priced Trails and Sands homes have accounted for nearly 70% of all homes delivered to date at Brightwater, while approximately 72% of remaining unsold lots as of December 31, 2010 consisted of higher-priced Cliffs and Breakers homes.  The Company forecasts a change in the delivery mix of homes over the Projection Period as Trails and Sands homes sell out, leading to more sales of Cliffs and Breakers homes in 2012 - 2015.

4. *Brightwater Model Homes.*  The Brightwater project currently has 17 model homes used to showcase the various floor plans and features that are available at the project.  As discussed in article IV(D)(3) of the Disclosure Statement, the model homes were

sold to an outside investor through a sale-leaseback transaction in December 2008.  In accordance with the sale-leaseback agreement, the Projections reflect that the Debtors are entitled to receive 75% of any profit resulting from the sale of the model homes at the end of the lease, after the lessor receives a 16% internal rate of return on its investment.

5.  *The Ridge*.  The Ridge project is a development adjacent to the Brightwater project that is being planned for 22 single family homes, similar to the lot and home sizes of the Cliffs and Breakers products.  The Projections assume that entitlements are obtained from the California Coastal Commission by the end of 2013, construction begins on the homes in 2014 and all 22 homes are delivered in 2015.  The Projections assume entitlement costs will be incurred in 2011 through 2013 in connection with obtaining the necessary permits for the project.

6.  *Lancaster*.  The Lancaster project is a planned development of 73 lots located in the California desert near Edwards Air Force base.  The Projections assume construction begins at the end of 2012 with the first 15 homes being delivered in 2013, 29 homes delivered in 2014 and the remaining 29 homes to be delivered in 2015.  The Projections assume significantly lower home prices and construction costs for the Lancaster project than at Brightwater and the Ridge projects, given the location and different product positioning.  The Projections assume some costs incurred in 2012 in connection with obtaining the necessary permits for the project.

7.  *Corporate Expenses and Other Costs*.  The Projections include corporate expenses associated with running the Debtors' day-to-day operations; including salaries and benefits for employees, annual management fee paid to Anchorage Capital Group, LLC (pro-rated in 2011), overhead costs related to its headquarters (lease payments, office equipment, etc.), normal legal and auditor professional fees, insurance and corporate Delaware taxes, among other customary corporate related expenses.

8.  *Restructuring Expenses.*  Restructuring expenses include: professional fees of approximately $4.3 million in 2011; other priority and administrative plan payments of approximately $806,000 at or near emergence; the one-time GUC Trust

administrative expense in 2011 of $250,000; GUC Trust funding payments of $1.0 million in both 2011 and 2012 (through quarterly installments), assuming a $2.0 million GUC Trust; plan payments in 2011 for convenience class claims of approximately $200,000; and payment of the DIP closing/ backstop and conversion fees in 2011 aggregating approximately $1.1 million.

9. *Debt Borrowings/(Repayments).*    The Company's debt facilities will be repaid in order of priority.  The Projections assume that the reorganized Debtors will repay all outstanding debt by the end of fiscal year 2014, including the repayment of all accrued pay-in-kind (PIK) interest.  The Company's forecasted pay-down of debt is a function of material concessions made by pre-petition term loan lenders as part of the plan of reorganization.  Such concessions include a significant reduction in principal, PIK interest on the third lien facility and other features. The Debtors do not expect to incur any additional indebtedness beyond the debt outlined in the Plan of Reorganization.

10. *Income Taxes.*    The Debtors anticipate that their net operating loss (NOL) carryforwards will be subject to significant limitations in the Projection Period upon the implementation of the Plan as a result of the change in ownership of the Company.  Furthermore the Debtors do not forecast having positive taxable income until 2012.