# EXHIBIT A

Plan Term Sheet

## TERM SHEET FOR PROPOSED CHAPTER 11 PLAN[1]

## IN RE CALIFORNIA COASTAL COMMUNITIES, INC., ET AL.

The following is a summary of the principal terms and conditions of a proposed joint chapter 11 plan of California Coastal Communities, Inc. ("CALC"), a debtor and debtor in possession that filed a petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and its affiliated debtors and debtors in possession that also filed petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (collectively, the "Debtors"). The restructuring of the Debtors' balance sheet and outstanding senior secured debt obligations, as described herein, will be implemented through the confirmation and consummation of a chapter 11 plan of reorganization (the "Plan").

This term sheet ("Term Sheet") is subject to, among other things, definitive documentation and is for discussion purposes only. This Term Sheet does not contain all of the terms of any proposed plan and shall not be construed as (i) an offer capable of acceptance, (ii) a binding agreement of any kind, (iii) a commitment to enter into, or offer to enter into, any agreement or (iv) an agreement to file any plan or disclosure statement or consummate any transaction.

This Term Sheet is not an offer with respect to any securities or a solicitation of acceptances or rejections with respect to any restructuring or plan. Any such offer or solicitation will be conducted in accordance with the Bankruptcy Code and/or applicable securities laws. This Term Sheet and all related communications are for discussion and settlement purposes only and shall be deemed to be settlement negotiations and subject to Rule 408 of the Federal Rules of Evidence and any other applicable state or federal law or rule.

This Term Sheet shall be implemented through and will be subject to (i) the provisions of a Plan Support Agreement that shall be in a form reasonably acceptable to and executed by the Debtors and by Prepetition Lenders (defined below) that have committed to become DIP Lenders (defined below) (collectively, the "Consenting Lenders"), and (ii) an entered order of the Bankruptcy Court approving the Plan Support Agreement and that is in form and substance satisfactory to Consenting Lenders that hold at least 60% in amount of the debtor in possession loan ("Requisite Consenting Lenders"). Anything contained herein to the contrary notwithstanding, any modification to this Term Sheet, the Plan (and documents that implement the transactions contemplated in the Plan), the Plan Support Agreement, the DIP Facility (defined below)(collectively, the "Transaction Documents"), and/or any order of the Bankruptcy Court approving any of the foregoing documents that (i) modifies any term or condition of the Luxor Settlement (defined below) shall require the consent of Luxor (defined below), or (ii) results in treatment of a Consenting Lender that is less favorable than the treatment provided to any of the other Consenting Lenders in their respective capacities (whether in respect of the DIP Facility claims or any other claims held by the Consenting Lenders), then such modification shall require the consent of the Consenting Lenders.

Furthermore, anything contained herein or any other Transaction Document to the contrary notwithstanding, the Requisite Consenting Lenders shall use commercially reasonable efforts to obtain approval by the Bankruptcy Court of the material economic terms of all of the Transaction Documents; provided, however, if the Requisite Consenting Lenders consent to a modification to any of the Transaction Documents that results in a material adverse change to the economic terms of any of the Transaction Documents to which Luxor Capital Group, L.P. ("Luxor") does not consent, Luxor fully reserves, and by this Term Sheet and the Plan Support Agreement does not waive, the right, upon prior

---

[1]   Capitalized terms not defined herein shall have the meaning customarily ascribed to them in chapter 11 plans.

written notice to counsel to the Debtors and Wilmington Trust FSB, to terminate its consent to and participation in the Plan Support Agreement and object to confirmation of the Plan on any grounds ("Luxor's Termination Right"); provided, however, that upon the exercise of Luxor's Termination Right, the Luxor Settlement (as described below), including without limitation, all consideration and releases set forth therein, will automatically terminate and the Plan will be amended, modified and/or supplemented to reflect such termination and to reinstate and preserve any claims that are the subject of the Luxor Settlement.  The exercise of Luxor's Termination Right will not cause the Plan Support Agreement to be terminated with respect to any other party thereto; provided, however, that the Requisite Consenting Lenders may, upon delivery of written notice to the Debtors no more than five business days after the exercise of Luxor's Termination Right, elect to terminate the Plan Support Agreement.

## I.  TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN.

The Plan shall classify and provide treatment for claims and interests as described below, and shall otherwise be in form and substance acceptable to Requisite Consenting Lenders.  Except as specified below, claims and interests shall be satisfied in full by the delivery of the applicable consideration on or as soon as practicable after the effective date of the Plan (the "Effective Date").

CALC, Signal Landmark Holdings Inc. ("SLH"), Hearthside Holdings, Inc. ("HH") Signal Landmark ("SL"), Hearthside Homes, Inc. ("HHI") and HHI Lancaster I, LLC ("HHIL") shall collectively be the "Reorganized Debtors" and each individually as "Reorganized _____".

| DIP Loan Obligations | It is contemplated that, subject to further negotiation and entry into definitive documentation, CALC will obtain postpetition financing from funds or accounts managed or advised by Anchorage Capital Group, LLC (collectively, "ACG"), Bank of America/Merrill Lynch, and funds or accounts managed or advised by Luxor (collectively, the "DIP Lenders") (the "DIP Facility").  The DIP Facility shall be funded ratably among the DIP Lenders, based upon their respective aggregate holdings of Revolving Loan Claims and Term Loan Claims (and, in the case of Luxor, excluding any consideration it is to receive under the Luxor Settlement (discussed below)).  The DIP Facility is intended to act as a bridge for the Debtors to reach the Effective Date.  Furthermore, the DIP Facility will roll into exit financing in the form of the New First Lien Facility (as defined below). |
|---|---|
| **Administrative Expense Claims** <br><br> **(Unimpaired)** | Each holder of an allowed Administrative Expense Claim shall, in full and final satisfaction of such allowed Administrative Expense Claim, be paid either (i) in cash, in full, on the later of the (x) Effective Date and (y) date such Claim becomes due and payable in the ordinary course of business, or (ii) on such other terms and conditions as may be agreed between the holder of such Claim and the Debtors, with the consent of Requisite Consenting Lenders. |
| **Priority Non-Tax Claims** <br><br> **(Unimpaired)** | Each holder of an allowed Priority Non-Tax Claim shall, in full and final satisfaction of such allowed Priority Non-Tax Claim, be paid either (i) in cash, in full, on the later of the (x) Effective Date and (y) date such Claim becomes due and payable in the ordinary course of business, or (ii) on such other terms and conditions as may be agreed between the holder of such Claim and the Debtors, with the consent of Requisite Consenting Lenders. |

| **Priority Tax Claims** (Unimpaired) | Each holder of an allowed Priority Tax Claim shall, in full and final satisfaction of such allowed Priority Tax Claim, be paid either (i) in cash, in full, on the later of the (x) Effective Date and (y) date such Claim becomes due and payable in the ordinary course of business, (ii) in equal annual cash payments aggregating the amount of such allowed Priority Tax Claim together with interest at the applicable non-bankruptcy rate over a period not exceeding 5 years, or (iii) on such other terms and conditions as may be agreed between the holder of such Claim and the Debtors, with the consent of Requisite Consenting Lenders. |
|---|---|
| **Revolving Loan Claims**[2] (Impaired) | Claims arising under the First Lien Revolving Credit Facility (the "Revolving Loan Claims") shall be allowed under the Plan in an amount that is not less than $81,679,317.58 plus all accrued and unpaid interest (at the applicable non-default rate), fees, expenses, and charges.  The Revolving Loan Claims also shall include all unpaid fees and expenses of the legal and financial advisors of Wilmington Trust, FSB as Agent (the "Revolving Agent") under the First Lien Revolving Credit Facility ("Revolving Agent Fees"). Notwithstanding the Settlement Agreement and Release dated July 13, 2010, the Revolving Agent Fees shall include all unpaid fees and expenses incurred by the Revolving Agent otherwise payable under the First Lien Revolving Credit Facility. |

In full and final satisfaction of allowed Revolving Loan Claims, each holder of an allowed Revolving Loan Claim (the "Revolving Lenders") shall receive:

- on the Effective Date, its *pro rata* share of $81,679,317.58 of loans issued pursuant to a new second lien term loan facility (the "New Second Lien Loan") with the following terms:

  - Total Principal Balance of New Second Lien Loan: $82,679,317.58

  - Maturity Date: The fifth anniversary of the Effective Date

  - Interest Rate: LIBOR + 750bp; LIBOR floor of 250bp

  - Collateral: On account of the New Second Lien Loan, the lenders thereunder will receive as collateral a blanket lien against and security interest in all assets of the Reorganized Debtors, junior only to the liens and security interests granted on account of the New First Lien Facility (as defined below) and, certain permitted liens including liens that are not extinguished or discharged through the Plan.

---

[2]    That certain Senior Secured Revolving Credit Agreement among California Coastal Communities, Inc., Signal Landmark, Signal Landmark Holdings Inc., KeyBank N.A. as Agent, and the Guarantors and Lenders from time-to-time party thereto, dated as of September 15, 2006 (as amended or modified, the "First Lien Revolving Credit Facility").

<table>
<tr><td></td><td>

- Guarantors: Debtors and all affiliates, including without limitation reorganized SLH, HH, SL, HHI and HHI Lancaster (the "Guarantors")

- Covenants –

  o limitation on additional indebtedness

  o minimum home sale closings as follows:

      o First two quarters – 0

      o 12 months thereafter – 10

      o 12 months thereafter – 20

      o 12 months thereafter – 30

      o 12 months thereafter – 30

  The Reorganized Debtors' failure to satisfy the minimum home sale closings covenant will not constitute an event of default under the New Second Lien Facility

- Information and Reporting Rights

  o Information and Reporting rights typical for a transaction of this nature, including, without limitation, financials on a quarterly basis, and otherwise acceptable to Requisite Consenting Lenders

- Mandatory Prepayments –

  o After repayment of New First Lien Facility, cash in excess of $15,000,000 measured on a quarterly basis and payable on the 10th business day following the end of the applicable quarter (the "Minimum Liquidity Threshold"), shall be used to repay the New Second Lien Loan.

  o Payable at par; plus accrued and unpaid interest

  o Subordination to New First Lien Facility (see below)

- Payment in full, in cash, on the Effective Date, of all Revolving Agent Fees

</td></tr>
<tr><td>

**Term Loan Claims[3]**

**(Impaired)**

</td><td>

Claims arising under the Term Loan Credit Facility ("Term Loan Claims") shall be allowed under the Plan in an amount that is not less than $99,800,000.00 plus all accrued and unpaid interest (at the applicable non-default rate), fees, expenses, and charges.  The Term Loan Claims also shall include all unpaid fees and expenses of the legal and financial advisors of Wilmington Trust, FSB as Agent (the "Term Agent" and, collectively with the Revolving Agent, the "Prepetition Agents") under the Term Loan Credit Facility ("Term

</td></tr>
</table>

---

[3]    That certain Senior Secured Term Loan Agreement among California Coastal Communities, Inc., KeyBank N.A. as Agent, and the Guarantors and Lenders from time-to-time party thereto, dated as of September 15, 2006 (as amended or modified, the "Term Loan Credit Facility").

Agent Fees"). Notwithstanding the Settlement Agreement and Release dated July 13, 2010, the Term Agent Fees shall include all unpaid fees and expenses incurred by the Term Agent otherwise payable under the Term Loan Credit Facility.

In full and final satisfaction of the allowed Term Loan Claims, each holder of an allowed Term Loan Claim ("Term Lenders" and, together with Revolving Lenders, the "Prepetition Lenders") shall receive, on the Effective Date, payment in full, in cash, of all Term Agent Fees, and shall receive its *pro rata* share of the following:

(i) a new third lien term loan (the "New Third Lien Loan") with the following terms:

- Principal Balance of $44,000,000.00

- Maturity Date: One (1) business day prior to the sixth anniversary of the Effective Date

- Interest Rate: 15% fixed, payable in kind ("PIK")

- Collateral: On account of the New Third Lien Loan, the lenders thereunder will receive as collateral a blanket lien against and security interest in all/substantially all of the assets of the Reorganized Debtors, junior only to the liens and security interests granted on account of the New First Lien Facility and the New Second Lien Loan and to certain permitted liens.

- Guarantors: Debtors and all affiliates, including without limitation reorganized SLH, HH, SL, HHI and HHI Lancaster

- Covenants –
  o limitation on additional indebtedness
  o minimum home sale closings as follows:
    o First two quarters – 0
    o 12 months thereafter – 10
    o 12 months thereafter – 20
    o 12 months thereafter – 30
    o 12 months thereafter – 30

The Reorganized Debtors' failure to satisfy the minimum home sale closings covenant will not constitute an event of default under the New Third Lien Facility

- Information and Reporting Rights
  o Information and Reporting rights typical for a transaction of this nature, including, without limitation, financials on a quarterly basis, and otherwise acceptable to Requisite Consenting Lenders

|  | • Mandatory Prepayments – |
|---|---|
|  | o After repayment in full of New First Lien Facility and New Second Lien Loan, cash in excess of Minimum Liquidity Threshold, measured on a quarterly basis and payable on the 10th business day following the end of the applicable quarter, shall be used to payoff of New Third Lien Loan. |
|  | o payable at 103%, 102%, 101% of par in years one, two and three, respectively, and thereafter at par; plus accrued and unpaid interest |
|  | (ii) 100% of equity of Reorganized CALC (subject to dilution to be described in the Plan) ("New CALC Common Stock").  Reorganized CALC will be a privately held company and all holders of New CALC Common Stock shall enter into a shareholder agreement in a form to be negotiated and acceptable to Requisite Consenting Lenders, but which shall contain minority shareholder protections that include (a) protections against disproportionate or discriminatory treatment, (b) minority approval rights for any related party or interested party transactions between the controlling shareholders or its affiliates and Reorganized CALC, [including capital being invested in Reorganized CALC (debt or equity) by the controlling shareholder or pre-agreed Management Fee (addressed below) with the controlling shareholder,] (c) tag/drag along rights and (d) preemptive rights, *provided* that (i) the protections set forth in subsections (a) through (d) hereof shall be reasonable under the circumstances; (ii) any objection by a Consenting Lender to the reasonableness of any such minority shareholder protection shall be filed with the Bankruptcy Court and served upon the other parties to the Plan Support Agreement by no later than the date on which objections to the Plan are due such that the objection may be considered by the Bankruptcy Court at the confirmation hearing; and (iii) if an objection contemplated by subsection (ii) hereof is filed by a Consenting Lender, the reasonableness of the provision of the shareholder agreement in question shall be determined by the Bankruptcy Court, which determination shall be binding on all of the Consenting Lenders.  Nothing herein shall require that the shareholder agreement contain any provision that would give registration rights to any holder of New CALC Common Stock. |
|  | (iii) Subordination to New First Lien Facility and New Second Lien Loan (see below) |
| **Subordination** | Provided there is no default, the New First Lien Facility and the New Second Lien Loan will receive interest payable in cash.  The New Third Lien loan will receive PIK interest, a portion of which may be payable in cash after the repayment in full of the New First Lien Facility and the New Second Lien Loan. |

| | |
|---|---|
| | Until the New First Lien Facility is paid in full, all quarterly cash sweeps in excess of the Minimum Liquidity Threshold shall be paid to amortize the principal balance of the New First Lien Facility. Once the New First Lien Facility is paid in full, then all quarterly cash sweeps in excess of the Minimum Liquidity Threshold shall be paid to amortize the principal balance of the New Second Lien Loan. Once the New Second Lien Loan is paid in full, then all quarterly cash sweeps in excess of the Minimum Liquidity Threshold shall be paid to amortize the principal balance of the New Third Lien Loan. |
| | Upon the occurrence of an event of a default, no funds shall be paid with respect to either the New Second Lien Loan or the New Third Lien Loan until such time as the New First Lien Facility is paid in full. |
| | After the new First Lien Facility is paid in full, upon the occurrence of an event of a default under the New Second Lien Loan, no funds shall be paid with respect to the New Third Lien Loan until such time as the New Second Lien Loan is paid in full. |
| **IndyMac Secured Claim** <br><br> **(Impaired)** | On account of its Secured Claim, IndyMac shall receive Cash as may be required to be paid under section 506(b). |
| **Other Secured Claims** <br><br> **(Unimpaired)** | Each holder of an allowed Other Secured Debt Claim shall receive, in full and final satisfaction of such allowed Other Secured Debt Claim either (i) cash on the Effective Date equal to the allowed amount of such Other Secured Debt Claim, (ii) treatment that leaves unaltered the legal, equitable, and contractual rights to which such allowed Other Secured Debt Claim entitles the holder of such claim, (iii) reinstatement of the allowed portion of such Other Secured Debt Claim, or (iv) such other treatment as may be agreed upon with the holder of such allowed Other Secured Debt Claim and the Debtors, with the consent of Requisite Consenting Lenders.  On the full payment or other satisfaction of such obligations, the Liens securing such Other Secured Debt Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any person. |
| **Employee PTO Claims** <br><br> **(Unimpaired)** | Claims for accrued and unused paid time off and sick time for any employee of the Debtors employed by the Reorganized Debtors as of the Effective Date shall be Reinstated against the Reorganized Debtors and honored in the ordinary course. |
| **Convenience Claims** <br><br> **(Impaired)** | Unsecured claims against Reorganized Debtors equal to or less than $10,000 shall be paid in full as soon as practicable following the Effective Date.  Holders of unsecured claims against the Reorganized Debtors in excess of $10,000 shall have the option to reduce their claims to $10,000 and be included in the applicable Convenience Claim Class. |
| **Other General Unsecured** | All allowed general unsecured claims, other than Convenience Claims or PTO Claims, including without limitation all claims |

| | |
|---|---|
| **Claims**<br><br>**(Impaired)** | asserted by the Pension Benefit Guaranty Corporation and State Lands Commission, ("Other GUC") shall receive a pro rata share of beneficial interests in a trust (the "GUC Trust") to be established for the benefit of holders of Allowed Other GUC (the "GUC Trust Beneficiaries").<br><br>Subject to the terms hereof, the GUC Trust shall be funded by the Reorganized Debtors as follows: (i) on the Effective Date, cash in the amount of **$250,0000**, to cover costs of administering the GUC Trust (the "GUC Administrative Funds"), plus (ii) equal quarterly deposits of cash that over a period of two years will aggregate [TBD] ((i) and (ii), collectively, the "GUC Trust Funds" or, when referencing the contributions being funded into the GUC Trust, the "Aggregate Trust Contributions"). The GUC Trust Funds shall be deposited in a non-interest-bearing segregated trust account at an insured depository institution, with one of the Reorganized Subsidiaries, or its designee, as trustee (the "GUC Trustee").<br><br>To the extent that the costs of administering the GUC Trust are less than the amount of the GUC Administrative Funds, the balance of any GUC Administrative Funds may be distributed to the GUC Trust Beneficiaries in accordance with the provisions of the agreement governing the GUC Trust (the "GUC Trust Agreement"). To the extent that the expenses of administering the GUC Trust exceed the amount of the GUC Administrative Funds, the expenses of such administration shall be paid from the remaining GUC Trust Funds. The GUC Trustee will be authorized to hold any GUC Trust Funds in reserve to the extent that the GUC Trustee determines, in its sole discretion, that the GUC Administrative Funds will not be sufficient to pay all costs of administering the GUC Trust.<br><br>Subject to the provisions hereof, each holder of an Allowed Other GUC shall receive its *pro rata* share of the GUC Trust Funds. Neither the DIP Lenders nor the Prepetition Lenders will be beneficiaries of the GUC Trust and will not receive GUC Trust Funds on account of any claims they may hold.<br><br>To the extent that a Disputed General Unsecured Claim is settled or litigated by the Debtors, Reorganized Debtors or the GUC Trustee such that such Disputed General Unsecured Claim is Allowed as something other than an Allowed General Unsecured Claim (for instance, as an Allowed Other Priority Claim) then the assets of the GUC Trust that would otherwise have been distributed on account of such Disputed General Unsecured Claim, as if it had been Allowed in full, shall be distributed to Reorganized CALC (the amount of such distribution right, the "RC Distribution Amount"); provided, however, that the Reorganized Debtors will be entitled to setoff an amount that is no greater than the RC Distribution Amount against their obligations to make the Aggregate Trust Contributions. |
| **Existing Equity Interests of CALC**<br><br>**(Impaired)** | Existing Equity Interests of CALC will have no recovery and will be cancelled. |

| | |
|---|---|
| **Existing Equity Interests of Debtors, other than CALC and Inactive Debtors**<br><br>**(Unimpaired)** | Existing Equity Interests in each of the remaining Debtors, other than Inactive Debtors, including those held by CALC, will be retained, except to the extent any direct or indirect subsidiary of CALC is Inactive Debtor. |
| **Intercompany Claims** | Intercompany Claims shall receive the treatment agreed upon by the Debtors and the Requisite Consenting Lenders. |
| **Luxor Settlement** | The Plan shall include and constitute a settlement and release of any and all claims, rights, and causes of action of the Debtors, their estates, Luxor and any of the Prepetition Lenders that are signatories to the Plan Support Agreement against any party based upon, arising out of, related to, or in connection with that certain Commitment Letter dated June 18, 2010 between the Debtors and Luxor (the "Commitment Letter Released Claims").<br><br>The Plan shall provide that in exchange for and contemporaneously with the mutual waivers and releases of the Commitment Letter Released Claims, on the Effective Date, Luxor shall receive (a) payment in cash equal to an amount of $480,044.64 which represents the unpaid fees and expenses of Luxor and Luxor's counsel incurred through November 17, 2010; (b) payment in cash of any and all unpaid reasonable and documented fees and expenses of Luxor and Luxor's counsel incurred from November 18, 2010 up to and through the Effective Date; and (c) $1,000,000 of New Second Lien Loan (the "Luxor Settlement Portion of the New Second Lien Loan"), provided that Luxor shall be given the identical rights and obligations in respect of the Luxor Settlement Portion of the New Second Lien Loan as all other holders of the New Second Lien Loan under the Plan.  The Luxor Settlement shall not affect Luxor's rights to distribution under the Plan in respect of its Revolving Loan Claims and/or its Term Loan Claims.<br><br>Prior to the Effective Date of the Plan, Luxor shall be entitled to the reporting delivered by the Debtors to the DIP Lenders.  After the Effective Date and for so long as Luxor remains a lender in a particular loan (e.g., New First Lien Loan, New Second Lien Loan and/or New Third Lien Loan), Luxor shall be entitled to receive reporting co-extensive with the rights to receive reporting held by other lenders in connection with such loan.  After the Effective Date and for so long as Luxor remains a shareholder in Reorganized CALC, Luxor shall be entitled to receive reporting co-extensive with the rights to receive reporting held by other minority shareholders of Reorganized CALC in their capacities as such. Notwithstanding the foregoing, nothing herein shall prejudice Luxor, from entry into any agreement with Reorganized CALC for the delivery of additional reporting to Luxor. |
| **Executory Contracts** | All executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed assumed under the Plan unless specifically rejected under the Plan (and as may be set forth in a plan supplement to be filed by no later than 14 days before the plan confirmation hearing); provided, however, that any employment agreements or other executory contract or unexpired |

|  | lease with a non-debtor insider of any of the Debtors shall be deemed rejected unless specifically assumed under the Plan.<br><br>The treatment of the Debtors' agreements with ICW TBD. |
| --- | --- |
| **Inactive Debtors** | HHI Chandler, LLC, HHI Crosby, LLC, HHI Chino II, LLC, HHI Hellman LLC and HHI Seneca LLC (the "Inactive Debtors") will be dissolved as soon as practicable after the Effective Date. |

## II.  **FUNDING OF PLAN/REORGANIZED DEBTORS.**

| New First Lien Facility | Upon the Effective Date, the DIP Facility will convert into an exit facility under which the participating DIP Lenders will become new lenders ("New First Lien Lenders") to CALC under a  $15,000,000 term loan facility (the "New First Lien Facility").  To the extent that CALC has not fully drawn on the DIP Facility, the New First Lien Lenders will advance to CALC the positive difference between the amount advanced under the DIP Facility and $15,000,000, less any unpaid fees and charges payable to the DIP Lenders and/or the New First Lien Lenders under their respective facilities. |
|---|---|
| | The New First Lien Facility shall have among the following material terms: |
| | <ul><li>Agent: Wilmington Trust, FSB</li><li>Maturity Date: The second anniversary of the Effective Date</li><li>Interest Rate: LIBOR + 750bps; LIBOR floor of 250bps</li><li>Collateral: On account of the New First Lien Facility, the New First Lien Lenders will receive as collateral a blanket lien against and security interest in all assets of the Reorganized Debtors, that is senior to any other liens and security interests granted on such assets, subject only to certain permitted and existing liens.</li><li>Guarantors: Guaranteed by the Guarantors</li><li>Covenants – No senior indebtedness</li><li>Information and Reporting Rights<ul><li>Information and Reporting rights typical for a transaction of this nature, including, without limitation, financials on a quarterly basis, and otherwise acceptable to New First Lien Lenders holding 60% of the amount of the New First Lien Facility</li></ul></li><li>Mandatory Prepayments –<ul><li>Cash in excess of Minimum Liquidity Threshold, measured on a quarterly basis and payable on the 10th business day following the end of the applicable quarter, shall be used to repay the New First Lien Facility.</li><li>payable at par; plus accrued and unpaid interest</li></ul></li></ul> |
| **Use of Proceeds** | Proceeds from the New First Lien Facility will be used by the Reorganized Debtors to:<br><ul><li>Satisfy Allowed Claims and expenses of administration of the Debtors, as provided herein, including the amounts for the Luxor Settlement.</li></ul> |

|  | • To provide capital to the other Reorganized Debtors and to fund expenses of operation after the Effective Date.<br><br>• Pay all fees of the New First Lien Lenders as described in the New First Lien Facility, including all unreimbursed expenses incurred by the New First Lien Lenders during the Debtors' cases (including reasonable fees and expenses of counsel) in their capacity as Prepetition Lenders (regardless of whether such fees were limited or released by the Settlement Agreement and Release dated July 13, 2010). |
|---|---|

## III.  MISCELLANEOUS ISSUES.

| | |
|---|---|
| **Conditions to Plan Effectiveness** | The Plan shall contain conditions to the effectiveness of the Plan including the following: <br><br> • The Bankruptcy Court shall have approved the Luxor Settlement. <br><br> • The Bankruptcy Court shall have entered the Confirmation Order, in a form reasonably acceptable to the Debtors and the Requisite Consenting Lenders. <br><br> • Either (a) the Bankruptcy Court shall have determined that termination of the Pension Plan is necessary for the Debtors to successfully emerge from chapter 11 in accordance with section 4041(c) of ERISA or (b) the Pension Plan shall have otherwise been terminated. <br><br> • Other conditions customary for plans of this type. |
| **Directors and Management** | Board shall consist of three directors to be selected by Requisite Consenting Lenders.  Management compensation shall be as set forth in the Plan Supplement. |
| **Management Incentive Plan** | The board of Reorganized CALC shall have the authority to implement a management incentive plan. |
| **Modification of Plan** | Any modification of the Plan or this Term Sheet must be acceptable to Requisite Consenting Lenders |
| **Other Plan Terms and Conditions** | The Plan shall contain other terms customary for plans of this type. |
| **DIP Conversion Fee** | As a fee for converting the DIP Loan into the New First Lien Facility, the DIP Lenders shall receive their ratable share of a conversion fee in the form of 2% of the amount loaned pursuant to the DIP Loan, which shall be payable upon the effective date of the conversion of the DIP Loan into the New First Lien Facility. |
| **[Management Fee** | Any management services agreement shall provide for the payment by Reorganized CALC to ACG or an affiliate of ACG (so long as ACG holds no less than 40% of the equity in Reorganized CALC) of an amount not to exceed $750,000 per annum, subject to annual approval of 51% of disinterested equity.  Any modification to the foregoing prior to the Effective Date shall require the consent of all of the Consenting Lenders, and after the Effective Date, the consent of no less than 51% of the disinterested shareholders of Reorganized CALC.] TBD |

## IV.  RELEASE PROVISIONS.

| | |
|---|---|
| **Mutual Release by Releasees** | Releases acceptable to Requisite Consenting Lenders |
| **Releases by Holders of Claims and Interests** | Releases by holders of claims and interests acceptable to Requisite Consenting Lenders. |
| **Injunction** | Except as otherwise expressly provided in the Plan, all holders of Claims and Existing Equity Interests shall be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Existing Equity Interest against the Debtors, their estates, the DIP Agent, the DIP Lenders, the Prepetition Agents, or Consenting Lenders, unless a previous order modifying the stay provided under section 362 of the Bankruptcy Code was entered by the Court; (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors, their estates, the Prepetition Agents, or Consenting Lenders, and (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of Debtors, their estates, the Prepetition Agents, or Consenting Lenders, in each case in respect of any Claims arising prior to the Petition Date. |
| **Exculpation** | The Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Consenting Lenders, and their respective successors, predecessors, control persons, members, agents and present, former, and future officers, directors and employees (and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) shall neither have nor incur any liability to any Person or Entity (including any holder of a Claim or Existing Equity Interest) for any and all claims, assertions, causes of action or allegations which might otherwise be made in law or equity under any federal, state, administrative or regulatory agency statue, rule, code of conduct, or other pronouncement based upon, arising out of, or in connection with any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date of the Plan, the disclosure statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with, or in contemplation of, restructuring of the Debtors. |

# EXHIBIT B

Form Of Joinder Agreement

## JOINDER AGREEMENT TO THE
## PLAN SUPPORT AGREEMENT

       Upon execution of this joinder agreement, the undersigned shall, from the date set forth below, become a party to that certain Plan Support Agreement, dated as of December [_], 2010 (the "Agreement"), by and among the California Coastal Communities, Inc., for itself and for its wholly-owned subsidiaries Signal Landmark Holdings, Inc., Signal Landmark, Hearthside Holdings, Inc., Hearthside Homes, Inc., HHI Chandler, LLC, HHI Chino II, LLC, HHI Crosby, LLC, HHI Hellman, LLC, HHI Lancaster I, LLC, HHI Seneca, LLC (collectively, the "Company"), and each of the lenders to the Company that are party to the Agreement. The undersigned acknowledges that it has been furnished with and has carefully read a copy of the Agreement prior to its execution of this joinder agreement. The undersigned hereby agrees to be fully bound by all of the terms, conditions, obligations and restrictions set forth in the Agreement as a "Consenting Lender" (as defined in the Agreement) thereunder as though an original party to the Agreement. The undersigned authorizes this joinder agreement to be attached to and made part of the Agreement.

### CONSENTING LENDER:

_____
Print Name of Consenting Lender

By: _____
     Signature of Authorized Signatory

_____
Print Name of Authorized Signatory

_____
Print Title of Authorized Signatory

### Address for Notices :

_____
Address – Line 1

_____
Address – Line 2

_____
Address – Line 3

_____
Attention

_____
Facsimile

_____
Telephone

# EXHIBIT C

## Historical Financial Information

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Balance Sheets

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| | ($ in millions) | | |
| **Assets** | | | |
| Cash and Cash Equivalents | $ 8.9 | $ 2.3 | $ 24.3 |
| Restricted Cash | 0.8 | 5.4 | 6.0 |
| Real Estate Inventories | 235.4 | 260.7 | 286.4 |
| Deferred Tax Assets | - | 37.1 | 44.4 |
| Other Assets, net | 4.8 | 7.0 | 6.5 |
| **Total Assets** | **$ 249.9** | **$ 312.5** | **$ 367.6** |
| | | | |
| **Liabilities and Stockholders' Equity** | | | |
| **Liabilities:** | | | |
| Accounts Payable and Accrued Liabilities | $ 3.8 | $ 5.0 | $ 12.5 |
| Model Home Financing | 22.5 | 22.5 | - |
| Revolving Loan | 81.7 | 74.4 | 76.0 |
| Term Loan | 99.8 | 107.4 | 121.8 |
| Other Project Debt | - | 38.9 | 48.8 |
| Other Liabilities | 8.7 | 8.8 | 7.0 |
| **Total Liabilities** | **$ 216.5** | **$ 257.0** | **$ 266.1** |
| | | | |
| **Commitments and Contingencies** | | | |
| **Stockholders' Equity:** | | | |
| Common Stock - $0.05 par value; 13,500,000 shares authorized; 10,995,902 shares issued and outstanding, respectively | $ 0.5 | $ 0.5 | $ 0.5 |
| Excess Stock - $0.05 par value; 13,500,000 shares authorized; no shares outstanding | - | - | - |
| Additional Paid-In Capital | 59.5 | 59.4 | 59.3 |
| Accumulated Deficit | (24.0) | (1.6) | 43.1 |
| Accumulated Other Comprehensive Loss | (2.6) | (2.8) | (1.4) |
| **Total Stockholders' Equity** | **$ 33.4** | **$ 55.5** | **$ 101.5** |
| | | | |
| **Total Liabilities and Stockholders' Equity** | **$ 249.9** | **$ 312.5** | **$ 367.6** |

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Statement of Operations
and Comprehensive Loss

|  | December 31, | | |
|---|---|---|---|
|  | **2009** | **2008** | **2007** |
|  | ($ in millions, except per share amounts) | | |
| **Revenues:** | | | |
| Homebuilding | $ 42.3 | $ 46.0 | $ 47.0 |
| Lot Sales | 4.9 | - | - |
| **Total Revenues** | **$ 47.2** | **$ 46.0** | **$ 47.0** |
| | | | |
| **Cost of Sales:** | | | |
| Homebuilding | 33.4 | 33.7 | 41.1 |
| Lot Sales | 4.3 | - | - |
| Loss on Impairment of Real Estate Inventories | 11.7 | 35.0 | 32.0 |
| **Total Cost of Sales** | **$ 49.4** | **$ 68.7** | **$ 73.1** |
| **Gross Operating Loss** | **$ (2.2)** | **$ (22.7)** | **$ (26.1)** |
| Selling, General and Administrative Expenses | 4.9 | 6.6 | 5.9 |
| Reorganization Costs | 1.3 | - | - |
| Interest Expense | 0.8 | 1.0 | 0.1 |
| Gains on Debt Restructuring and Extinguishment | (24.8) | - | - |
| Loss (income) from Unconsolidated Joint Ventures | - | 3.5 | (0.6) |
| Other Expense, net | 2.0 | 2.6 | 0.4 |
| **Income (loss) Before Income Taxes** | **$ 13.6** | **$ (36.4)** | **$ (31.9)** |
| Provision (benefit) for Income Taxes | 36.0 | 8.3 | (13.0) |
| **Net Loss** | **$ (22.4)** | **$ (44.7)** | **$ (18.9)** |
| | | | |
| Other Comprehensive Income (loss), net of Income Taxes: | | | |
| Minimum Pension Liability Adjustment | 0.2 | (1.4) | 0.1 |
| **Comprehensive Loss** | **$ (22.2)** | **$ (46.1)** | **$ (18.8)** |
| | | | |
| Net Loss per Common Share: | | | |
| Basic and Diluted | $ (2.04) | $ (4.10) | $ (1.73) |
| Common Equivalent Shares: | | | |
| Basic and Diluted | $ 11.00 | $ 10.90 | $ 10.90 |
| Special Dividend Paid per Common Share Outstanding | - | - | - |

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

Consolidated Statement of Cash Flows

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| | | ($ in millions) | |
| Cash Flows from Operating Activities: | | | |
| Net Loss | $ (22.4) | $ (44.7) | $ (18.9) |
| Adjustments to Reconcile Net Income to Cash Used in Operating Activities: | | | |
| Gains on Debt Restructuring and Extinguishment | (24.8) | - | - |
| Equity in Loss (earnings) of Unconsolidated Joint Ventures | - | 3.0 | (0.6) |
| Model Homes Depreciation | 0.3 | 0.7 | - |
| Deferred Taxes | 4.9 | (15.0) | (13.0) |
| Deferred Tax Asset Valuation Allowance | 31.1 | 23.2 | - |
| Gains on Sales of Real Estate Inventories | (9.5) | (12.3) | (5.9) |
| Loss on Impairment of Real Estate Inventories | 11.7 | 35.0 | 32.0 |
| Proceeds from Sale of Real Estate Inventories, net | 45.7 | 44.8 | 45.2 |
| Investments in Real Estate Inventories | (26.9) | (40.9) | (91.8) |
| Non-Cash Reorganization Items | 0.4 | - | - |
| Other | 0.1 | - | 0.5 |
| Changes in Operating Assets and Liabilities: | | | |
| Decrease (increase) in Other Assets | 1.4 | (1.4) | 0.9 |
| Increase (decrease) in Accounts Payable, Accrued and Other Liabilities | 0.3 | (7.8) | (1.5) |
| **Cash Provided by (used in) Operating Activities** | **$ 12.3** | **$ (15.4)** | **$ (53.1)** |
| | | | |
| Cash Flows from Investing Activities: | | | |
| Sales of Short-Term Investments | - | - | 0.5 |
| Investments in Unconsolidated Joint Ventures | - | (0.4) | (0.4) |
| Change in Restricted Cash | 2.9 | 0.6 | 8.6 |
| **Cash Provided by Investing Activities** | **$ 2.9** | **$ 0.2** | **$ 8.7** |
| | | | |
| Cash Flows from Financing Activities: | | | |
| Borrowings of Revolving Loan | 26.5 | 45.3 | 69.7 |
| Repayments of Revolving Loan | (19.2) | (46.9) | (12.0) |
| Repayments of Term Loan | (7.6) | (14.4) | (3.2) |
| Borrowings of Other Project Debt | - | 1.1 | 24.0 |
| Repayments of Other Project Debt | (8.1) | (11.0) | (20.1) |
| Proceeds from Model Home Financing | - | 22.5 | - |
| Deferred Financing Costs | (0.2) | (3.4) | (0.3) |
| **Cash Provided by (used in) Financing Activities** | **$ (8.6)** | **$ (6.8)** | **$ 58.1** |
| | | | |
| **Net Increase (decrease) in Cash and Cash Equivalents** | **$ 6.6** | **$ (22.0)** | **$ 13.7** |
| Cash and Cash Equivalents - Beginning of Year | 2.3 | 24.3 | 10.6 |
| **Cash and Cash Equivalents - End of Year** | **$ 8.9** | **$ 2.3** | **$ 24.3** |
| | | | |
| Supplemental Disclosures of Cash Flow Information: | | | |
| Cash Paid During the Period for Income Taxes, net of Refunds Received | $ 0.1 | - | $ 0.2 |
| Cash Paid During the Period for Reorganization Items | 0.9 | - | - |
| | | | |
| Supplemental Disclosures of Non-Cash Investing and Financing Activities: | | | |
| Minimum pension liability adjustment recorded as other comprehensive (loss) income, net of income tax (benefit) expense of $0.2 million, $(0.9) million, and $0.0 respectively | $ 0.2 | $ (1.4) | $ 0.1 |
| Amortization of Deferred Financing Costs Capitalized in Real Estate Inventories | 2.2 | 1.6 | 0.9 |
| Decrease in Project Debt and Accrued Liabilities due to Debt Restructuring | 32.8 | - | - |

# EXHIBIT D

## Projections

**California Coastal Communities, Inc.**

(Debtor - In- Possession)

**Summary of Projected Cash Flows for
the Reorganized Debtors**

| ($ in millions, except home deliveries) | 2011 | 2012 | 2013 | 2014 | 2015 | 5 - Year Total |
|---|---|---|---|---|---|---|
| Brightwater | | | | | | |
| *Homes Deliveries* | *33* | *50* | *75* | *70* | *27* | *255* |
| Revenue | $ 34.3 | $ 67.9 | $ 116.4 | $ 131.7 | $ 61.5 | $ 411.9 |
| Cash Costs | (16.3) | (26.5) | (40.8) | (43.1) | (14.7) | (141.3) |
| Brightwater Project Cash Flow | $ 17.9 | $ 41.5 | $ 75.6 | $ 88.6 | $ 46.9 | $ 270.5 |
| Model Home Sales | | | | | | |
| *Homes Deliveries* | *-* | *4* | *4* | *-* | *9* | *17* |
| Model Home net Cash Flow to Calc | - | - | - | - | $ 8.2 | $ 8.2 |
| The Ridge | | | | | | |
| *Homes Deliveries* | *-* | *-* | *-* | *-* | *22* | *22* |
| Revenue | - | - | - | - | $ 41.0 | $ 41.0 |
| Cash Costs | (0.2) | (0.1) | (0.1) | - | (20.6) | (21.0) |
| Ridge Project Cash Flow | $ (0.2) | $ (0.1) | $ (0.1) | - | $ 20.4 | $ 20.0 |
| Lancaster | | | | | | |
| *Homes Deliveries* | *-* | *-* | *15* | *29* | *29* | *73* |
| Revenue | - | - | $ 4.0 | $ 8.2 | $ 8.6 | $ 20.8 |
| Cash Costs | (0.0) | (0.9) | (6.5) | (5.7) | (2.6) | (15.7) |
| Lancaster Project Cash Flow | $ (0.0) | $ (0.9) | $ (2.4) | $ 2.5 | $ 6.0 | $ 5.1 |
| **Total Project-Level Cash Flow** | **$17.7** | **$40.5** | **$73.1** | **$91.1** | **$81.5** | **$303.9** |
| (-) Corporate Expenses | ($2.8) | ($2.9) | ($2.8) | ($2.8) | ($1.4) | ($12.7) |
| (-) Cash Restructuring Expenses | (7.6) | (1.0) | - | - | - | (8.6) |
| (-) Cash Interest Expense | (9.3) | (8.3) | (4.3) | - | - | (21.9) |
| (-) Cash Income Taxes | - | (1.5) | (3.7) | (4.0) | (8.3) | (17.5) |
| **Cash Available for Debt Repayment** | **($2.0)** | **$26.8** | **$62.4** | **$84.2** | **$71.8** | **$243.2** |
| (-) Debt Borrowings/(Repayments)[1] | 13.8 | (26.8) | (62.4) | (80.6) | - | (155.9) |
| Total Change in Cash | $11.8 | $0.0 | $0.0 | $3.6 | $71.8 | $87.3 |
| Beginning Cash Balance | $ 3.2 | $ 15.0 | $ 15.0 | $ 15.0 | $ 18.6 | $ 3.2 |
| Change in Cash | 11.8 | - | - | 3.6 | 71.8 | 87.3 |
| **Ending Cash Balance** | **$ 15.0** | **$ 15.0** | **$ 15.0** | **$ 18.6** | **$ 90.4** | **$ 90.4** |
| End of Year Debt Balances | | | | | | |
| 1st Lien | $13.8 | - | - | - | - | - |
| 2nd Lien | 82.7 | 69.7 | 7.4 | - | - | - |
| 3rd Lien | 49.8 | 57.6 | 66.8 | - | - | - |
| **Total Debt Balance** | **$ 146.2** | **$ 127.4** | **$ 74.2** | **-** | **-** | **-** |

(1) Includes repayment of accrued PIK interest

## Notes to Projected Financial Statements

### Projections and Methodology

1. *Projection Period.*  The financial projections (the "Projections") were prepared by management for the fiscal years 2011 though 2015 (the "Projection Period").  The Debtors and their inactive non-debtor subsidiaries (the "Company") operate on a fiscal year ending December 31st.

2. *Methodology.* Management has developed Projections for the Debtors' continued business operations upon emergence from chapter 11 through the fiscal year ending December 31, 2015.  The Projections were prepared by management based upon a number of assumptions with regards to the future performance of the Debtors and the residential real estate market in which the Debtors operate.  Management prepared the Projections in good faith, and based upon management's extensive operating experience, believes the assumptions are reasonable; it is important to note that such Projections may not be realized as they are dependent upon a number of external market factors beyond management's control.  The Projections should be reviewed in conjunction with these assumptions in addition to the qualifications and footnotes set forth herein.

   As referenced in the Disclosure Statement, the Projections were not prepared by the Plan proponents with a view toward compliance with the guidelines established by The American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the SEC regarding projections.  Furthermore, the Projections have not been audited by the Debtors' independent accountants.  Rather, the Projections reflect the forecasted cash flows of the business as such receipts and disbursements are projected to be realized by the Company.

**Key Assumptions**

1. *Plan Consummation*.   The Projections assume the Plan will be confirmed and consummated and that the Debtors will emerge from chapter 11 on or about March 1, 2011.

2. *Macroeconomic and Housing Market Conditions*. The Projections assume a steadily improving macroeconomic environment, as well as a stabilizing and improving residential housing market.  The Projections include material increases in the pace of home deliveries and in home price inflation over the 5-year forecast at the Company's projects.

3. *Brightwater.* Currently Brightwater is the only Company project with homes available for delivery.   The Projections contemplate that post emergence the reorganized Debtors will continue to sell the remaining Brightwater project homes in inventory.  Additionally, the Debtors will resume construction operations on speculative homes in order to replenish and increase the inventory of homes available for sale.  The Projections assume 33 Brightwater home deliveries in 2011, reflecting a return to the levels experienced by the Debtors prior to their chapter 11 filings in 2009.  The Debtors assume that emergence from chapter 11 will result in renewed home buyer interest in the Brightwater project.   The Projections assume home deliveries will reach a peak of 75 homes in fiscal year 2013, gradually decreasing until a sell-out of the Brightwater project in 2015.

The Company's lower-priced Trails and Sands homes have accounted for nearly 70% of all homes delivered to date at Brightwater, while approximately 72% of remaining unsold lots as of December 31, 2010 consisted of higher-priced Cliffs and Breakers homes.  The Company forecasts a change in the delivery mix of homes over the Projection Period as Trails and Sands homes sell out, leading to more sales of Cliffs and Breakers homes in 2012 - 2015.

4. *Brightwater Model Homes.*  The Brightwater project currently has 17 model homes used to showcase the various floor plans and features that are available at the project.  As discussed in article IV(D)(3) of the Disclosure Statement, the model homes were

sold to an outside investor through a sale-leaseback transaction in December 2008.  In accordance with the sale-leaseback agreement, the Projections reflect that the Debtors are entitled to receive 75% of any profit resulting from the sale of the model homes at the end of the lease, after the lessor receives a 16% internal rate of return on its investment.

5.  *The Ridge*.  The Ridge project is a development adjacent to the Brightwater project that is being planned for 22 single family homes, similar to the lot and home sizes of the Cliffs and Breakers products.  The Projections assume that entitlements are obtained from the California Coastal Commission by the end of 2013, construction begins on the homes in 2014 and all 22 homes are delivered in 2015.  The Projections assume entitlement costs will be incurred in 2011 through 2013 in connection with obtaining the necessary permits for the project.

6.  *Lancaster*.  The Lancaster project is a planned development of 73 lots located in the California desert near Edwards Air Force base.  The Projections assume construction begins at the end of 2012 with the first 15 homes being delivered in 2013, 29 homes delivered in 2014 and the remaining 29 homes to be delivered in 2015.  The Projections assume significantly lower home prices and construction costs for the Lancaster project than at Brightwater and the Ridge projects, given the location and different product positioning.  The Projections assume some costs incurred in 2012 in connection with obtaining the necessary permits for the project.

7.  *Corporate Expenses and Other Costs*.  The Projections include corporate expenses associated with running the Debtors' day-to-day operations; including salaries and benefits for employees, annual management fee paid to Anchorage Capital Group, LLC (pro-rated in 2011), overhead costs related to its headquarters (lease payments, office equipment, etc.), normal legal and auditor professional fees, insurance and corporate Delaware taxes, among other customary corporate related expenses.

8.  *Restructuring Expenses.*  Restructuring expenses include: professional fees of approximately $4.3 million in 2011; other priority and administrative plan payments of approximately $806,000 at or near emergence; the one-time GUC Trust

administrative expense in 2011 of $250,000; GUC Trust funding payments of $1.0 million in both 2011 and 2012 (through quarterly installments), assuming a $2.0 million GUC Trust; plan payments in 2011 for convenience class claims of approximately $200,000; and payment of the DIP closing/ backstop and conversion fees in 2011 aggregating approximately $1.1 million.

9. *Debt Borrowings/(Repayments).* The Company's debt facilities will be repaid in order of priority. The Projections assume that the reorganized Debtors will repay all outstanding debt by the end of fiscal year 2014, including the repayment of all accrued pay-in-kind (PIK) interest. The Company's forecasted pay-down of debt is a function of material concessions made by pre-petition term loan lenders as part of the plan of reorganization. Such concessions include a significant reduction in principal, PIK interest on the third lien facility and other features. The Debtors do not expect to incur any additional indebtedness beyond the debt outlined in the Plan of Reorganization.

10. *Income Taxes.* The Debtors anticipate that their net operating loss (NOL) carryforwards will be subject to significant limitations in the Projection Period upon the implementation of the Plan as a result of the change in ownership of the Company. Furthermore the Debtors do not forecast having positive taxable income until 2012.

# EXHIBIT E

## Liquidation Analysis

# EXHIBIT E
# Liquidation Analysis

The Liquidation Analysis reflects the Debtors' estimate of a hypothetical chapter 7 liquidation of California Coastal Communities, Inc., Signal Landmark, HHI Lancaster I, LLC, and Hearthside Homes, Inc.

## I.      Secured Claims Against the Debtors' Assets

Pursuant to the various cash collateral orders that have been entered in the case, the Debtors have stipulated that the holders of Revolving Loan Claims and Term Loan Claims were fully secured as of the Petition Date in an amount in excess of $181,400,000.  In exchange for the right to use cash collateral and to protect the Prepetition Secured Lenders against diminution in value resulting from the imposition of the automatic stay and the use of their collateral, the various cash collateral orders granted the Prepetition Secured Lenders with liens against all of the Debtors' assets to the extent of any diminution in value of the original prepetition collateral.

In addition, the Debtors have incurred, or are expected to incur, $15 million in postpetition financing that is secured by all of the Debtors' assets and is senior to the liens in favor of the Prepetition Secured Lenders.

## II.     The Brightwater Project and Other Assets

The Liquidation Analysis assumes that Hearthside Homes, Inc. ceases operations and a chapter 7 trustee markets and sells the Brightwater project, the Ridge, and real property owned by HHI Lancaster I, LLC within three months.  The Liquidation Analysis further assumes that the sale price obtained by a chapter 7 trustee for Brightwater would take into account that a purchaser would incur increased property taxes with respect to Brightwater, that it would take between six to 12 months to restart the permitting process, construction and sales efforts at Brightwater, and that the purchaser would expect to incur additional costs.  Based upon these assumptions, the Debtors' estimate that a liquidation of the Debtors' assets would result in the following, prior to considering costs of sale.

| Asset | Gross Liquidation Proceeds |
|---|---|
| Cash | $  14,200,000 |
| Brightwater Project | $130,000,000 |
| The Ridge | $   2,500,000 |
| Lancaster Lots | $       200,000 |
| Other Personal Property | *de minimis* |

III.    Costs of Sale

Costs of sale for real estate projects, such as Brightwater, The Ridge, and the Lancaster lots are assumed to be 8% of the sales prices for such properties based upon a range of possible commissions charged by land brokers.

IV.    Claims

The DIP Lenders have a first priority security interest in the Debtors' cash collateral.  The Liquidation Analysis assumes that the Debtors' cash would be used to reduce the amounts outstanding under the DIP Facility.  Any remaining unpaid amounts under the DIP Facility would then be satisfied from the Debtors' remaining assets, including the Brightwater Project.  After satisfaction of the DIP Facility, the remaining Brightwater Project proceeds would be paid to the Prepetition Secured Lenders, which would result in a deficiency claim in excess of $50,000,000.  Under the cash collateral orders, the Prepetition Secured Lenders' deficiency claim would be treated as an adequate protection claim entitled to a lien against the Debtors' remaining assets.  As shown above, the liquidation value of the remaining assets is less than the Prepetition Secured Lenders' hypothetical adequate protection claim.  Accordingly, there would be no remaining assets available for distribution to administrative, priority, or unsecured creditors.

V.    Remaining Debtors

This Liquidation Analysis further assumes that the Inactive Debtors, Hearthside Holdings, Inc., and Signal Landmark Holdings, Inc. are found to be no-asset cases that would not be administered by a chapter 7 trustee.